IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Micah Uetricht, | ) | |
| Marianela D'Aprile, and | ) | |
| John Kaderbek, | ) | No. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Chicago Parking Meters, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiffs Micah Uetricht, Marianela D'Aprile, and John Kaderbek complain against

Defendant Chicago Parking Meters, LLC ("CPM"), as follows:

**INTRODUCTION**

1.      Plaintiffs are licensed drivers and Chicago residents who pay parking fees to

CPM, pursuant to a June 5, 2013 Parking Meter Concession Agreement, entered by and between

the City of Chicago and CPM, attached to this Complaint as Exhibit A. Plaintiffs refer to that

Agreement throughout this Complaint as the "June 2013 Agreement" or just the "Agreement."

2.      Under the June 2013 Agreement, the City of Chicago granted CPM, a private

party, monopoly control over the City's parking meter system for an astonishing 75-year-long

period, without regard for the changes in technology and innovations in transportation taking

place now and for the rest of the century, without regard for the rapidly changing consumer

needs and preferences for different types of transportation, and without regard for changes in

transportation resulting from climate change and the imperative need to reduce greenhouse gas

emissions.

3.      Specifically, under the Agreement, the City has granted CPM the exclusive right, for 75 years, to require a fixed number of parking spaces to be set aside for CPM's exclusive benefit, and also imposed special restrictions on competing forms of transportation such as bicycles, ride sharing, public transit, and the onset of driverless cars – thereby restricting or delaying the introduction of better, faster, and environmentally safer forms of transportation.

4.      Further, the June 2013 Agreement bars both active regulation by the City over the terms on which CPM serves the public, including the rates that CPM charges for the fixed number of parking spaces that it unilaterally sets, as well as rebidding or bidding for the same contract for 75 years by CPM competitors, several of which could provide the same services for a smaller number of meters and in a manner that is environmentally safe and consistent with consumer needs and preferences.

5.      Plaintiffs, who are consumers, have suffered and continue to suffer harm as a direct result of the unreasonable 75-year monopoly that the City has granted to CPM under the June 2013 Agreement.

6.      For example, Plaintiffs frequently use public transit and ride sharing, and expect to soon use driverless cars, all of which are more attractive and safer means of transportation that do not require on-street parking, and which would be more widely available to Plaintiffs but for the City granting CPM the 75-year monopoly and allowing it to set a fixed number of parking spaces on public streets for its exclusive benefit throughout that lengthy period.

7.      Plaintiffs have similarly been harmed because their preferences for street closures for pedestrian use, which other cities have introduced, are also less available or excluded or delayed because of the unreasonable 75-year monopoly the City has granted to CPM. And, as just one final example, because the unreasonable 75-year monopoly granted to CPM has both

limited the number of bike lanes in the City and made the existing bike lanes more dangerous as a result of increased on-street parking.

8.      Plaintiffs challenge the June 2013 Agreement pursuant to both federal and state law, as follows:

9.      Count I, asserts that CPM's monopoly control over the City's parking meters violates Section 2 of the Sherman Act, 15 U.S.C. 2.

10.     Count II asserts that the June 2013 Agreement, as a result of its unreasonable length in excluding other bidders to take over the control of the City's parking meters and failure to offer more flexibility in removal of such meters, is an unlawful exclusive dealing agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

11.     Count III asserts that the conduct of Defendant CPM's business under the June 2013 Agreement is an unfair trade practice in violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq*.

## THE PARTIES

12.  Plaintiffs Micah Uetricht, Marianela D'Aprile, and John Kaderbek are residents of Chicago, who each have a valid driver's licenses, and who have at times paid for parking at meters controlled by CPM, and expect to continue to pay such parking fees to CPM in the future.

13.  Defendant CPM is a Delaware limited liability company, doing business in Illinois, with its principal office located 205 N. Michigan Ave. #1910, Chicago, Illinois 60601.

14.  As noted above, Defendant CPM is a signatory and party to the June 2013 Agreement.

## JURISDICTION

15.   This Court has jurisdiction over Plaintiff's federal claims in Counts I and II under 28 U.S.C. §§ 1331 and 1337.

16.   This Court has supplemental jurisdiction over Plaintiffs state law claim in Count III under 28 U.S.C. § 1367.

**FACTS**

17.   On December 4, 2008, the Chicago City Council approved then-Mayor Richard J. Daley's proposal to lease the City's metered parking system to a private party, CPM, for 75 years under an agreement entitled "Chicago Metered Parking System Concession Agreement dated as of December 4 2009 by and between the City of Chicago and Chicago s LLC" ("the Original Agreement").

18.   On June 5, 2013, the City entered into an amended and restated agreement with CPM that covered the same rights and obligations as the Original Agreement.  As noted above on page 1, this Complaint refers to the current operative agreement as the "June 2013 Agreement" or just the "Agreement."

19.   Under Agreement Section 2.1, CPM controls the meter parking system, all system property, and all revenues produced from the system within the City of Chicago.

20.   On February 13, 2009, pursuant to Section 2.1, the City of Chicago transferred control of the City's approximately 36,000 on street parking meters to CPM for a 75-year period, in exchange for a $1,156,500,000 payment to the City.

21.   Thereafter, under the Agreement, rates for parking have more than doubled.

22.   In 2008, prior to the adoption of the Agreement, City of Chicago was collecting $23.8 million in annual parking meter rates.

23. In contrast, in 2019, according to a financial report by the auditing firm KPMG, CPM collected over $138.7 million in annual parking meter rates.

24. This amount includes $27 million in so called "true up" payments to CPM for compensation to CPM when the City uses its reserved powers or police powers for the public health and safety in a manner that affects the compensation to CPM.

25. By the end of 2019, CPM had already recovered $500 million *more* than its original $1.16 billion investment, including revenue from the City for "true up" payments, with 60 years still to go on the remainder of the lease.

26. The rates to be charged are fixed by the Original Agreement enacted in 2008 and cannot be changed or adjusted by the City of Chicago unilaterally.

27. The City of Chicago may not actively regulate rates or the number of spaces without a large penalty being imposed upon the City if the City deviates from the terms guaranteed to CPM.

28. As set out in the Original Agreement, CPM obtained provisions that assure the unnatural life of its monopoly for a 75-year period, without any new entrant or competitive bidding by a new entrant that could provide the same service with fewer restrictions on the number of parking spaces that can be removed or setting a lower cost in doing so.

29. The June 2013 Agreement continues this lengthy period for restrictions on removal of parking spaces and for preventing either rebidding of the terms of service or easing in the barriers to the new or alternative forms of transportation desired by Plaintiffs and other consumers.

30. Such restrictions on rebidding of a 75-year monopoly which the City is not otherwise free to actively regulate is already preventing or delaying the expanded use of bike

lanes, bus lanes, ride sharing, and ultimately driverless cars that would flow faster and be preferable to consumers like Plaintiffs and local businesses.

31.  Because the City could not intelligently foresee the consequences of a 75 year Agreement that it could not actively regulate, CPM has already made a windfall profit, and an even greater profit than any other utility in Illinois, or any utility which the government is free to regulate.

32.  Over the 75-year life of the Agreement, having already profited by $500 million, CPM has achieved and will have achieved an extraordinary rate of return on its original $1.16 billion investment, at the expense of consumers like Plaintiffs who prefer other uses of the transportation grid on which this windfall profit depends.

33.  Crucial to this windfall profit by CPM – and windfall profit to come – are the City's guarantees in Section 14.3 and other sections of the Agreement, providing that the City will no longer freely exercise its sovereign power or "Reserved Powers" as before to protect the public health, public convenience, and public safety when to do so would adversely affect compensation to CPM.

34.  Under Agreement Section 14.3, the City of Chicago may use its Reserved Powers only if the City reimburses CPM at a level that makes any large-scale removal of meters prohibitively expensive, and thereby frustrates consumer preferences for new or better forms of mobility in a time of climate change and major technological changes in transportation.

## CLASS ACTION ALLEGATIONS

35. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs seek to certify a class of all persons who are licensed drivers and paying for CPM parking meters, for the purpose of seeking injunctive relief.

36. Plaintiffs also reserve the right to convert this action to a class under Rule 23(b)(3) for monetary relief, if discovery determines that individual monetary relief is feasible and appropriate.

## COUNT I
### (Violation of Section 2 of the Sherman Act)

37. Plaintiffs incorporate the allegations of paragraphs 1 through 34 as if stated in this paragraph.

38. As set forth above, and in violation of Section 2 of the Sherman Act, Defendant CPM has obtained an unlawful monopoly for an unreasonable 75-year period over the lease of parking spaces in a fixed number and at fixed rates and without active regulation by the City, without regard to consumer preferences for alternative forms of transportation.

39. The relevant product market is the rental of the parking spaces in the business and commercial areas served by the City's parking metered system, as described in the June 2013 Agreement.

40. The relevant geographic market is the City of Chicago and the location of the City's parking metered system, as identified in the June 2013 Agreement.

41. CPM's monopoly control of this distinctive market as described in the June 2013 Agreement is not subject to active regulation by the City, nor is it subject to rebidding at reasonable intervals by competitors to CPM that would offer the same service but with fewer or less onerous restrictions on alternative forms of transportation by reducing the cost of removing parking meters.

42.   There is no state law, regulatory body, or officer that has specifically authorized this sale of the meters to CPM, and no analogue at the state level for the grant of a monopoly of this nature.

43.   Accordingly, the City has no Home Rule Authority for such an action when there is no precedent for such action by the State of Illinois itself to justify similar action under the City's Home Rule Authority.

44.   Nor is there any City of Chicago legislative body, regulatory body, or officer exercising active oversight or supervision of what CPM may charge to Plaintiffs or conditions and terms on which parking meters may be removed.

45.   By such acts, and in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, CPM is exercising illegal monopoly power that depends on maintaining barriers to other better forms of transportation over an unreasonable 75 year period and frustrating the needs and preferences of Plaintiffs and other consumers for bicycle lanes, bus lanes, and easier traffic flow for ride sharing and driverless cars.

46.   By such acts, and in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, CPM is receiving windfall profits from Plaintiffs and other class members by maintaining an outmoded parking system adverse to their interest for a 75-year period without active regulation by the City or rebidding by competitors that would offer the same service with fewer restrictions on alternative transportation uses on city streets.

47.   Under 15 U.S.C. § 26, any person, including Plaintiffs and class members, "shall be entitled to sue for and have injunctive relief entered . . . against threatened loss or damage by a violation of the antitrust laws."

48. Under this provision, Plaintiffs are entitled to injunctive relief against Defendant CPM's continued enforcement of the June 2013 Agreement.

49. Over the next sixty years, Plaintiffs face threatened loss or damage by increased congestion of city streets from parked cars and the reduced availability of competing forms of transportation, including bicycling, public transit, ride sharing, and driverless cars.

50. Plaintiffs also face threatened loss or damage from paying for an increasingly outmoded parking system that does not serve their interests and delays or inhibits the increased use or availability of better carbon free means of transportation existing now, as well as new technological innovations that are certain to come over the next sixty years.

51. Accordingly, Plaintiffs and other class members seek an injunction restraining CPM from collecting any additional revenue under the CPM Agreement, or in the alternative, while this action is pending, to place such sum in escrow, unless and until such Agreement has been reformed by the parties to ensure active regulation by the City and the rebidding now and at reasonable intervals by CPM and others capable of providing the same service.

WHEREFORE, Plaintiffs pray this Court to:

A. Certify the proposed class under Fed. R. Civ. P. 23(b)(2), for purpose of injunctive relief only;

B. Declare pursuant to 28 U.S.C. §2201 that the CPM Agreement is in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

C. Grant the injunctive relief set forth in paragraph 51 above, until it has been reformed to comply with the judicially implied exemption under 15 U.S.C.§ 2 for an actively regulated public monopoly;

D.  Grant Plaintiffs their legal fees and costs, either by an award of fees directly or by

    permitted recovery from any common or monetary fund created by this action; and

E.  Grant Plaintiffs such other relief as this Court deems just and proper.

## COUNT II
### (Section 1 of The Sherman Act)

52.  Plaintiffs incorporate the allegations of paragraphs 1 through 50 as if stated in this paragraph.

53.  As a form of exclusive dealing in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, CPM has entered into and continues to enforce such an agreement for an unreasonable 75-year period from the date of the Original Agreement.

54.  For the better part of the 21st century, the Agreement restricts any new bidding by competitors to provide the same service on terms more favorable to consumers, including lower rates for what is an increasingly outmoded parking system and for fewer restrictions on removal of parking spaces to facilitate public transit, bicycling, ride-sharing, driverless cars and other alternative uses better for consumers and local businesses they patronize.

55.  Because of actual or threatened injury to them over the next sixty years, Plaintiffs are entitled to injunctive relief as set forth in paragraph 51 above

WHEREFORE, Plaintiffs pray this Court to:

A.  Certify the proposed class under Fed. R. Civ. P. 23(b)(2), for purpose of injunctive relief only;

B.  Declare pursuant to 28 U.S.C. §2201 that the CPM Agreement as described above is in violation of Section 1 of the Sherman Act, 15 U.S.C.§ 1;

C.  Grant the injunctive relief set forth above in paragraph 51, until the CPM Agreement has been reformed for a reasonable period of time and otherwise to comply with Section 1 of the Sherman Act, 15 U.S.C.§1;

D.  Grant Plaintiffs their legal fees and costs, either by a direct award of fees from Defendant, or recovery from any common or monetary fund created by this action; and

E.  Grant such other relief as this Court deems just and proper.

## COUNT III
### (Consumer Fraud and Deceptive Practices Act)

56.  By the acts set forth above, and in violation of the Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq*., Defendant CPM has been and is engaging in an unlawful trade practice to the detriment and expense of Plaintiffs and the Proposed Class under Rule 23(b)(2) F.R.Civ.P. as set forth above.

57.  An unfair trade practice under the Illinois Consumer Fraud Act is any practice by a seller of goods or services that is either (1) against the public policy of the State; (2) immoral, oppressive, or unethical: (3) causing substantial injury, or (4) that has any combination of factors (1), (2), and (3).

58.  The unfair trade practice set out here is against the public policy of Illinois, including but not limited to Section 3(3) of the Illinois Antitrust Act, 740 ILCS 10/3(3), in that there is no active regulation of the monopoly granted to CPM, and because the City cannot intelligently foresee the consequences of entering such an Agreement for 75 years while giving up such active regulation.

59.  As to the second factor, it is immoral and oppressive to require Plaintiffs and other class members to confer a windfall on CPM for maintaining an outmoded parking system over the next 60 years, when that return is out of all proportion to the service provided by CPM,

and the system itself frustrates their own preferences for transportation alternatives that do not require massive use of parking cars on city streets.

60. As to the third factor, there is substantial injury on consumers like Plaintiffs to be denied alternatives that are of greater convenience and safety to them and do not inhibit faster, easier, and/or carbon free methods of transportation throughout the City.

61. By any factor independently, or by the combination of these three factors, CPM has engaged in and continues to engage in an unfair trade practice in violation of the Illinois Consumer Fraud Act.

62. Pursuant to Section 10(b) of the Illinois Consumer Fraud Act, there is no statutory exemption for such an unfair trade practice, as there is no state law, officer, or regulatory body that has approved the June 2013 Agreement.

63. Furthermore, by statute, the Illinois General Assembly may limit the authority of a home rule unit to authorize or provide an exemption for an unfair trade practice.

64. Under Section10a(c) of the Illinois Consumer Fraud Act, Plaintiffs are "persons" who may seek injunctive relief against any person, which includes corporations, that are conducting business in violation of the Act.

65. Accordingly, Plaintiffs and the Plaintiff Class seeks an injunction restraining CPM from collecting any additional revenue under the Agreement, or in the alternative, while this action is pending, to place such sum in escrow, unless and until such Agreement has been reformed by the parties in an appropriate manner and approved by state law or otherwise rescinded altogether.

WHEREFORE Plaintiffs pray this Court to:

A. Certify the proposed class under Rule 23(b)(2), for purpose of injunctive relief only;

B.  Grant the injunctive relief set forth above;

C.  Grant Plaintiffs their legal fees, either by direct award from the Defendant, or by recovery

from any common or monetary fund created by this action; and

D.  Grant such other relief as this Court may deem just and proper.


                                               __/s/ Thomas Geoghegan_____

                                             One of the Attorneys for Plaintiffs


Michael Persoon
Will Bloom
Thomas Geoghegan
**DESPRES, SCHWARTZ AND GEOGHEGAN, LTD.**
77 West Washington St., Suite 711
Chicago IL 60602
mpersoon@dsgchicago.com
wbloom @dsgchicago.com
tgeoghegan@dsgchicago.com
312 -372 2511


Stuart J. Chanen
Ariel Olstein
**CHANEN & OLSTEIN**
7373 N. Lincoln Ave., Suite 100
Lincolnwood, IL  60712
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com
847-469-4669

*Attorneys for Plaintiffs*