**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICAH UETRICHT, MARIANELA | ) | |
| D'APRILE, and JOHN KADERBEK, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:21-cv-03364 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| CHICAGO PARKING METERS, LLC, | ) | |
| | ) | Mag. Judge Gabriel A. Fuentes |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF CHICAGO PARKING METERS, LLC'S**
**<u>RULE 12(B)(1) AND RULE 12(B)(6) MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

Page(s)

INTRODUCTION AND OVERVIEW ........................................................................1

BACKGROUND .....................................................................................................2

    I.      The Concession ................................................................................2

    II.     Plaintiffs' Alleged Injuries, Claims, and Requested Injunctive Relief ..................6

ARGUMENT ...........................................................................................................7

    I.      Plaintiffs Lack Article III Standing ...................................................7

    II.     Plaintiffs Have Not Alleged the Type of Injury Needed to Plead Their Claims ..........................................................................................10

          A.   Plaintiffs have not pled an antitrust injury needed to assert Sherman Act claims ..................................................................10

          B.   Plaintiffs cannot plead a pecuniary loss required to assert an ICFA claim ..................................................................................11

    III.    Plaintiffs' Sherman Act Claims Are Barred by the State Action Immunity Doctrine ......................................................................13

    IV.    Plaintiffs' Claims Suffer from Fundamental Pleading Deficiencies ....................15

          A.   Plaintiffs fail to plead required elements of their Sherman Act claims. ..................................................................................15

               1.   Plaintiffs do not sufficiently plead that CPM has monopoly power ..............................................................................15

               2.   Plaintiffs do not allege an unreasonable restraint of trade. ..........16

               3.   Plaintiffs do not allege a plausibly defined market ......................17

          B.   Plaintiffs failed to plead required elements of a ICFA claim .....................18

                1.   Plaintiffs do not plead an unfair practice. ....................................18

               2.   Plaintiffs do not plead CPM's intent to act unfairly. ...................21

    V.     Plaintiffs' Claims Are Untimely and Should Be Dismissed Based on *Laches* ......................................................................................22

i

A.    Plaintiffs' Sherman Act claims are untimely. ..............................................22

B.    Plaintiffs' ICFA claim is untimely. ..........................................................24

CONCLUSION..........................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*42nd Parallel North v. E Street Denim Co.*,
    286 F.3d 401 (7th Cir. 2002) ............................................... 18

*Active Disposal, Inc. v. City of Darien*,
    2010 WL 1416461 (N.D. Ill. Mar. 31, 2010) ....................... 14

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) ............................................... 15

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
    129 F. Supp. 3d 614 (N.D. Ill. 2015)............................. 11, 23

*Alarm Detection Sys. v. Orland Fire Prot. Dist.*,
    326 F. Supp. 3d 602 (N.D. Ill. 2018)................................... 14

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
    2020 WL 5642941 (N.D. Ill. Sep. 22, 2020) ...................... 18

*Ass'n of Am. Physicians & Surgeons v. Koskinen*,
    2014 WL 1056495 (E.D. Wis. Mar. 18, 2014) .................... 10

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ............................................................ 11

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
    909 F. Supp. 162 (S.D.N.Y. 1995)...................................... 18

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
    784 F.2d 1325 (7th Cir. 1986) ...................................... 10, 15

*Batson v. Live Nation Entertainment, Inc.*,
    746 F.3d 827 (7th Cir. 2014) ........................................ 20, 21

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) ............................................ 17

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962) ............................................................ 17

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
    429 U.S. 477 (1977) ............................................................ 10

*Brunswick Corp. v. Riegel Textile Corp.*,
   752 F.2d 261 (7th Cir. 1984) ................................................. 11, 16

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
   445 U.S. 97 (1980) .................................................................. 13

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
   761 F.3d 732 (7th Cir. 2014) ................................................. 13

*Campbell v. Chicago*,
   823 F.2d 1182 (7th Cir. 1987) ............................................... 14, 15

*Cannon v. Univ. of Health Scis./The Chi. Med. Sch.*,
   710 F.2d 351 (7th Cir. 1983) ................................................. 22, 23, 24

*Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*,
   545 F. Supp. 2d 768 (N.D. Ill. 2008) ................................... 19

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008) ................................................. 18

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
   810 F.2d 869 (9th Cir. 1987) ................................................. 13

*Chattanoga Mfg., Inc. v. Nike, Inc.*,
   301 F.3d 789 (7th Cir. 2002) ................................................. 24

*Checker Taxi Co., Inc. v. Nat'l Prod. Workers Union*,
   113 F.R.D. 561 (N.D. Ill. 1986) ............................................ 23

*Chicago Prof'l Sports Ltd. P'Ship v. Nat'l Basketball Ass'n*,
   961 F.2d 667 (7th Cir. 1992) ................................................. 11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .............................................................. 7, 9, 10

*Common Cause Ind. v. Lawson*,
   937 F.3d 944 (7th Cir. 2019) ................................................. 9

*Cooney v. Chi. Pub. Schs*,
   407 Ill. App. 3d 358, 943 N.E.2d 23 (1st Dist. 2010) .......... 12

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
   472 F.3d 23 (2d Cir. 2006) ................................................... 17

*Elliott v. United Ctr.*,
   126 F.3d 1003 (7th Cir. 1997) ............................................... 11, 17

iv

*Fair Elections Ohio v. Husted,*
  770 F.3d 456 (6th Cir. 2014) ...................................................................8

*Freedom from Religion Found., Inc. v. Obama,*
  641 F.3d 803 (7th Cir. 2011) ..................................................................8

*Garrett v. RentGrow, Inc.,*
  2005 WL 1563162 (N.D. Ill. July 1, 2005) .........................................21

*Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.,*
  204 Ill. Dec. 769, 642 N.E.2d 470 (1994) ...........................................19

*Gill v. Whitford,*
  138 S. Ct. 1916 (2018) ............................................................................9

*Gov't of Puerto Rico v. Carpenter Co.,*
  442 F. Supp. 3d 464 (D.P.R. 2020).......................................................23

*Green Sols. Recycling, LLC v. Reno Disposal Co., Inc.,*
  814 F. App'x 218 (9th Cir. 2020) .........................................................13

*Hot Wax, Inc. v. Turtle Wax, Inc.,*
  191 F.3d 813 (7th Cir. 1999) ................................................................23

*Humboldt Bay Mun. Water Dist. v. Louisiana-Pacific Corp.,*
  608 F. Supp. 562 (N.D. Cal. 1985) .......................................................16

*Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad,*
  2014 IL App (1st) 123629, 13 N.E.3d 251 (1st Div. 2014)...........................*passim*

*Ind. Grocery Inc. v. Super Valu Stores, Inc.,*
  864 F.2d 1409 (7th Cir. 1989) ..............................................................15

*JetAway Aviation, LLC v. Bd. of Cty. Com'rs of Cty. of Montrose, Colo.,*
  754 F.3d 824 (10th Cir. 2014) ..............................................................11

*Justice v. Town of Cicero,*
  577 F.3d 768 (7th Cir. 2008) ................................................................14

*Kim v. Carter's Inc.,*
  598 F.3d 362 (7th Cir. 2010) ..........................................................12, 13

*Krause v. GE Capital Mortg. Serv., Inc.,*
  314 Ill. App. 3d 376, 731 N.E.2d 302 (1st Div. 2000).........................22

*L & H Sanitation, Inc. v. Lake City Sanitation, Inc.,*
  769 F.2d 517 (8th Cir. 1985) ................................................................13

*LaSalle Nat'l Bank v. Cty. of DuPage*,
  777 F.2d 377 (7th Cir. 1985) ........................................... 14

*Lathrop v. Juneau & Assocs.*,
  220 F.R.D. 330 (S.D. Ill. 2004) ........................................ 14

*McCready v. Ill. Secretary of State, White*,
  382 Ill. App. 3d 789, 888 N.E.2d 702 (1st Dist. 2008) .......................... 24

*McGarry & McGarry, LLC v. Bankr. Mgmt. Solutions, Inc.*,
  937 F.3d 1056 (7th Cir. 2019) ........................................ 19

*McIntosh v. Walgreens Boots Alliance, Inc.*,
  434 Ill. Dec. 189, 135 N.E.3d 73 (2019) ................................ 13

*Medina v. Public Storage, Inc.*,
  2014 WL 1715517 (N.D. Ill. April 30, 2014) .............................. 20

*Messina v. Green Tree Servicing, LLC*,
  210 F. Supp. 3d 992 (N.D. Ill. 2016) ................................... 19

*In re Michaels Stores Pin Pad Litig.*,
  830 F. Supp. 2d 518 (N.D. Ill. 2011) ................................... 12

*Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*,
  392 F.3d 265 (8th Cir. 2004) ......................................... 23

*Morris v. Harvey Cycle & Camper, Inc.*,
  392 Ill. App. 3d 399, 911 N.E.2d 1049 (1st Dist. 2009) ...................... 12

*New York v. Facebook*,
  2021 WL 2643724 (D.D.C. June 28, 2021) .............................. 24

*Northern Ind. Gun & Outdoor Shows v. City of S. Bend*,
  163 F.3d 449 (7th Cir. 1998) .......................................... 4

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) .............................................. 16

*Oliver v. SD-3D LLC*,
  751 F.3d 1081 (9th Cir. 2014) ........................................ 23

*Price v. Philip Morris, Inc.*,
  219 Ill.2d 182, 848 N.E.2d 1 (2005) ................................... 12

*Queen City Pizza v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d. Cir. 1997) ......................................... 17

*Raines v. Byrd,*
   521 U.S. 811 (1997) ...................................................................................9

*Reapers Hockey Ass'n v. Amateur Hockey Ass'n of Ill., Inc.,*
   412 F. Supp. 3d 941 (N.D. Ill. 2019)...................................................17

*Republic Tobacco Co. v. North Atl. Trading Co., Inc.,*
   381 F.3d 717 (7th Cir. 2004) .................................................................17

*Reveal Chat Holdco, LLC v. Facebook, Inc.,*
   471 F. Supp. 3d 981 (N.D. Cal. 2020)..................................................23

*Robinson v. Toyota Motor Credit Corp.,*
   201 Ill.2d 403, 775 N.E.2d 951 (2002)............................................ 19, 20

*Roland Mach. Co. v. Dresser Indus., Inc.,*
   749 F.2d 380 (7th Cir. 1984) .................................................................17

*Saunders v. Mich. Ave. Nat'l Bank,*
   278 Ill. App. 3d 307, 662 N.E.2d 602 (1st Dist. 1996) ......................20

*Schilke v. Wachovia Mortg., FSB,*
   820 F. Supp. 2d 825 (N.D. Ill. 2011)....................................................23

*Shakman v. Dunne,*
   829 F.2d 1387 (7th Cir. 1987) ...............................................................10

*Sheffler v. Commonwealth Edison Co.,*
   353 Ill. Dec. 299, 955 N.E.2d 1110 (2011) .........................................22

*Siegel v. Shell Oil Co.,*
   612 F.3d 932 (7th Cir. 2010) .................................................................12

*Spokeo, Inc. v. Robins,*
   578 U. S. 330 (2016) ...............................................................................7

*Stamatakis Indus., Inc. v. King,*
   965 F.2d 469 (7th Cir. 1992) .................................................................10

*Stanton v. Ash,*
   384 F. Supp. 625 (S.D. Ind. 1974) ..........................................................9

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
   373 F.3d 57 (1st Cir. 2004)....................................................................16

*Sundance Homes v. County of Du Page,*
   195 Ill. 2d 257, 746 N.E.2d 254 (2001).......................................... 24, 25

*Teamsters & Emplrs Welfare Trust v. Gorman Bros. Ready Mix*,
  283 F.3d 877 (7th Cir. 2002) ................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ..........................................................................3

*The Cornucopia Inst. v. U.S. Dep't of Agric.*,
  260 F. Supp. 3d 1061 (W.D. Wis. 2017) ...........................................10

*Thompson v. Ill. Dept. of Prof'l Regulation*,
  300 F.3d 750 (7th Cir. 2002) ..............................................................4

*Tillman v. Pritzker*,
  2021 IL 126387 ................................................................................25

*Toulon v. Cont'l Cas. Co.*,
  877 F.3d 725 (7th Cir. 2017) ............................................................12

*Town of Hallie v. City of Eau Claire*,
  471 U.S. 34 (1985) ...........................................................................13

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ...................................................................7, 8

*Tully v. State*,
  143 Ill. 2d 425, 574 N.E.2d 659 (1991).............................................25

*U.S. Awami League, Inc. v. City of Chi.*,
  110 F. Supp. 3d 887 (N.D. Ill. 2015).................................................8

*United States v. Lewis*,
  411 F.3d 838 (7th Cir. 2005) ............................................................22

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
  2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ...................................16

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .........................................................................15

*Wigod v. Wells Fargo Bank, N.A.*,
  673 F.3d 547 (7th Cir. 2012) ............................................................18

*Wilmes v. U.S. Postal Serv.*,
  810 F.2d 130 (7th Cir. 1987) ............................................................24

*Yu v. Int'l Business Machs. Corp.*,
  314 Ill. App. 3d 892, 732 N.E.2d 1173 (1st Dist. 2000) ...................12

*Zelazny v. Lyng*,
    1987 WL 12664 (N.D. Ill. June 16, 1987)...........................................................................23

**Statutes**

65 ILCS 5/1-1-10 ................................................................................................ 15, 19

65 ILCS 5/11-71-1 .............................................................................................. 14, 19

740 ILCS 10/3.............................................................................................................19

815 ILCS 505/1, *et seq.*................................................................................................2

815 ILCS 505/10a .......................................................................................................11

815 ILCS 505/10a(e)...................................................................................................24

15 U.S.C. § 15b (2018) ...............................................................................................22

Mun. Code of Chicago, § 9-64-205 ........................................................................5, 23

Mun. Code of Chicago, § 9-64-190 ...............................................................................5

Mun. Code of Chicago, § 9-64-207 ...............................................................................5

**Other Authorities**

Chi. Dep't. of Transp., 2017 Bikeways – Year in Review (2018),
    https://secureservercdn.net/198.71.233.36/40f.4ba.myftpupload.com/wp-
    content/uploads/2013/06/YearEndReview_2017_2018_0416.pdf ............................6

Chi. City Council, *Journal of Council Proceedings, Dec. 4, 2008*, at 50505 (2008),
    https://chicityclerk.s3.amazonaws.com/s3fs-
    public/document_uploads/journals-proceedings/2008/120408SP.pdf....................3

Chi. City Council, *Journal of Council Proceedings, June 5, 2013*, at 54082 (2013),
    https://chicityclerk.s3.amazonaws.com/s3fs-
    public/document_uploads/journals-proceedings/2013/060513VI.pdf....................3

*About Parking Meters*, Chi. Dep't. of Fin. (last visited Aug. 8, 2021),
    https://www.chicago.gov/city/en/depts/fin/supp_info/revenue/parking_meters.
    html.............................................................................................................................22

## INTRODUCTION AND OVERVIEW

Almost thirteen years after the City of Chicago executed the Chicago Metered Parking System Concession Agreement with Chicago Parking Meters ("CPM"), Plaintiffs filed this suit against CPM challenging the Concession as a supposed violation of Federal antitrust and Illinois consumer protection laws. The gist of Plaintiffs' Complaint is that the Concession, by which CPM paid the City more than $1.15 billion in exchange for rights and obligations associated with operating the City's on-street metered parking system, slows the development of transportation methods that Plaintiffs prefer to on-street parking, such as biking, public transport, ride sharing, and driverless cars. Plaintiffs seek to enjoin CPM from collecting parking meter fees until the Concession has been "reformed" to foster "environmentally safer forms of transportation." Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), CPM moves the Court to dismiss the Complaint for the following reasons:

*First*, Plaintiffs lack standing. Plaintiffs do not allege a concrete and particularized injury, as needed to invoke this Court's jurisdiction under Article III. They claim an abstract harm comprised of a supposed loss of green transportation options. Based on that, they ask the Court to rework the Concession in a way they speculate would bring about less on-street parking and more bikes, foot traffic, and other alternatives. Insofar as Plaintiffs seek such injunctive relief, Article III requires that they plead injury that is not only concrete and particularized, but which also threatens them imminently. They have not done so. Their theoretic alleged harm and attenuated theory about the relationship between the Concession and the distribution of different transportation options in Chicago do not come close to satisfying Article III's requirements.

*Second*, Plaintiffs have not pled cognizable harm under the Federal antitrust and Illinois consumer protection laws. The Complaint does not allege the type of injury needed to assert claims under the Sherman Act, which requires loss stemming from acts that reduced supply or raised

prices in the alleged relevant market—i.e., on-street rental parking. Just the opposite, Plaintiffs' complaint is that there is *too much* on-street parking, not too little. And, CPM does not determine parking meter rates, which are set independently by the City Council. Nor have Plaintiffs alleged they have suffered actual pecuniary loss caused by the Concession, which is needed to sue for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

*Third*, Plaintiffs' Sherman Act claims are barred by the state action immunity doctrine. State of Illinois transportation laws authorized the City to regulate competition for on-street parking through contracts concerning the City's parking meters. The Concession, as an exercise of that authority by the City, is immune from challenge under the Sherman Act.

*Fourth*, Plaintiffs' claims suffer from fatal pleading defects. For example, Plaintiffs do not plausibly plead a relevant market to support their Sherman Act claims. They artificially focus strictly on the meter system to the exclusion of the many competing transportation alternatives they admit exist in Chicago. As to Plaintiffs' ICFA claim, the Complaint fails to plead how the Concession—approved by the City Council under State law expressly authorizing such an agreement—could plausibly constitute an unfair trade practice in violation of State policy.

*Fifth*, Plaintiffs' claims are untimely. Plaintiffs' claims accrued in December 2008, when the Concession was executed, or at least by June 2013, when it was amended. There is no valid reason why Plaintiffs waited until 2021 to sue, long beyond the four-year statute that guides the application of *laches* for Sherman Act claims and the three-year statute for ICFA claims.

The Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

### I. The Concession

Plaintiffs Micah Uetricht, Marianela D'Aprile, and John Kaderbek describe themselves as "licensed drivers and Chicago residents who pay parking fees to CPM, pursuant to a June 5, 2013

Parking Meter Concession Agreement, entered by and between the City of Chicago and CPM" (Compl. ¶1), commonly referred to as the Concession.[1] The Concession is an agreement between the City and CPM giving CPM the right to operate the "Metered Parking System" in Chicago and "to retain the revenues to be derived from the operation of the" system. Ex. A to Compl., Dkt. No. 8, at p. 1, § 2.1 [the "Concession"]; *see also* Compl. ¶ 19. On December 4, 2008, the Chicago City Council approved the Concession upon finding it to be "in the best interests of the residents of the City and desirable for the welfare of its government and affairs," following a public competitive bidding process in which CPM submitted the highest bid, $1,156,500,000. Concession at pp. 1-2;[2] *see also* Compl. ¶ 17. On June 5, 2013, the Concession was restated and amended (Compl. ¶ 18), and City Council again gave its approval.[3]

The Concession obligates CPM to maintain and upgrade the metered parking system. *E.g.*, Concession §§ 3.16, 4.1, 4.7. Among other improvements, CPM has "upgrad[ed] the parking meter system by installing 'Pay and Display' pay boxes that permit payment by credit or debit card, allow more cars to park on the street, and allow customers to purchase 'portable time' (i.e., the right to park in multiple meter locations without paying duplicative meter fees)." *Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad*, 2014 IL App (1st) 123629, ¶ 6, 13 N.E.3d 251, 253 (1st Div. 2014).

Plaintiffs allege the Concession gives CPM "monopoly control over the City's parking meter system." Compl. ¶ 2. They claim the Concession "fixes" or allows CPM to "unilaterally

---

[1] The facts herein are drawn from the well-pled factual allegations in the Complaint, which for purposes of this motion only are accepted as true; documents referred to or incorporated into the Complaint; and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). For citations herein, unless otherwise noted, emphasis has been added and internal citations omitted.

[2] *See also* Chi. City Council, *Journal of Council Proceedings, Dec. 4, 2008*, at 50508-09 (2008), https://chicityclerk.s3.amazonaws.com/s3fs-public/document_uploads/journals-proceedings/2008/120408SP.pdf.

[3] *See* Chi. City Council, *Journal of Council Proceedings, June 5, 2013*, at 54082-83 (2013), https://chicityclerk.s3.amazonaws.com/s3fs-public/document_uploads/journals-proceedings/2013/060513VI.pdf.

set[]" parking meter rates (*id.* ¶¶ 4, 26), grants CPM "the exclusive right … to require a fixed number of parking spaces to be set aside for CPM's exclusive benefit" (*id.* ¶¶ 3, 6), restricts the City's ability to act in the public interest and "bars" "active regulation" over the system (*id.* ¶¶ 4, 23-24, 33-34), and imposes "special restrictions on competing forms of transportation such as bicycles, ride sharing, public transit, and the onset of driverless cars." *Id.* ¶ 3.

Most of Plaintiffs' characterizations of the Concession are unsupported or contradicted by its terms, and the Court need not accept such allegations.[4]  To begin, the Concession does not say anything about, let alone impose "special restrictions on," bicycles, ride sharing, public transit, or driverless cars.  Compl. ¶ 3.  The Concession concerns the on-street metered parking system.  In fact, CPM's right to operate that system is made subject to the City's exercise of its "Reserved Powers" (Concession §§ 2.1, 3.1(a)), including the City's powers to designate the number and location of metered parking spaces, add or remove spaces, establish the periods for use of the meters, and set or revise the fees parkers pay to use the spaces.  *Id.* § 1.1 (definition, "Reserved Powers"); § 7.1 ("The City has . . . the Reserved Power to establish and revise from time to time the Metered Parking Fees that shall be imposed and charged in respect of motor vehicles using Metered Parking Spaces.").[5]  Those are matters subject to City control (*id.* §§ 2.1, 3.1(a), 3.2(e),

---

[4] Although the Complaint may be dismissed without considering the terms of the Concession (Exhibit A), it is a "well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, *the exhibit trumps the allegations*." *Thompson v. Ill. Dep't. of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) (emphasis in original).  "In fact, [a] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Northern Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 454-55 (7th Cir. 1998).

[5] The Concession confirmed the City's adoption of a rate schedule pursuant to ordinance.  While expressly reserving the City's power to revise that schedule, the City agreed that if it changed rates in a way that reduced the value of the Concession prior to December 31, 2013, it would compensate CPM for that reduced value. *Id.* § 7.1.  Subsequent to December 31, 2013, the only restraint on the City's exercise of its power to set rates is that the City cannot exercise that power in such a way as to favor the use by the public of other, nearby parking spaces (i.e., non-Concession spaces), relative to Concession spaces—i.e., it cannot *overprice* the Concession spaces so as to make them uncompetitive with City-retained parking—or otherwise needs to compensate CPM for doing so.  *Id.*

7.1, 7.7(a)), and governed by City ordinance, not the Concession.[6]

Thus, many of Plaintiffs' characterizations of the Concession are false, including their claims that CPM "unilaterally sets" meter rates (Compl. ¶ 4), that rates are "fixed" by the Concession (*id.* ¶¶ 4, 26), and that the City "may not actively regulate rates." *Id.* ¶ 27. Additionally, rather than "require a fixed number of spaces" for CPM's benefit (*id.* ¶¶ 3, 6), the City retains the power to add or remove spaces and to designate and bid out new metered parking spaces to third parties, subject to certain first-refusal rights of CPM. Concession §§ 2.1, 7.2.

The Concession contains mechanisms by which the City compensates CPM for City actions that reduce the Concession's value.[7] Plaintiffs claim § 14.3, in particular, "provide[s] that the City will no longer freely exercise its sovereign power or 'Reserved Powers' as before to protect the public health, public convenience, and public safety when to do so would adversely affect compensation to CPM." Compl. ¶ 33. That is not what § 14.3 says. It says the opposite: that "the Parties acknowledge and agree that (i) it is anticipated that the City will exercise its Reserved Powers during the Term" (Concession § 14.3), and that "the impact of certain of such actions may have a material adverse effect on the fair market value of the Concessionaire Interest," in which case the Concession provides a mechanism for the City to reimburse CPM. *Id.*[8] Plaintiffs

---

[6] *See, e.g.*, MUN. CODE OF CHICAGO, § 9-64-190 ("Parking meter zones – Regulations"), § 9-64-205 ("Parking meter rates"), § 9-64-205 ("parking meters – Hours of operation"), § 9-64-207 ("Parking meter increments and maximum periods for parking").

[7] *See, e.g.*, *id.* § 7.5 and Article 7 generally (provisions setting forth mechanisms for payments relating to meter closures and certain other fluctuations in system usage), § 14.3 (provisions describing potential compensation mechanism relating to the City's exercise of Reserved Powers in a manner adversely affecting Concession market value), § 15.3 (provisions describing potential payment for "Compensation Events," generally meaning certain specified events or expenses/losses associated with CPM's compliance with directives from the City).

[8] As explained by the Illinois Court of Appeals in denying a prior challenge to the Concession:

> [T]hese compensation payment provisions are based on the premise that the approximately $1.15 billion CPM paid the City for the concession represents the estimated 75-year value of an assumed number of parking meters assets, whose value may change as a result of the City's exercise of its home rule powers over meter inventory or operations. Accordingly, the City agreed to compensate

admit that the City has exercised its Reserved Powers in ways impacting the meter system, contrary to their claim that the Concession prohibits it. Compl. ¶ 24.[9]

## II. Plaintiffs' Alleged Injuries, Claims, and Requested Injunctive Relief

Due to the Concession, as they characterize it, Plaintiffs claim they "have suffered and continue to suffer harm" (Compl. ¶ 5), as follows:

- But for the Concession, "more attractive and safer means of transportation that do not require on-street parking," such as public transport, ride sharing, and driverless cars, "would be more widely available to Plaintiffs" (*id.* ¶ 6);

- Plaintiffs' "preferences for street closures for pedestrian use . . . are also less available or excluded or delayed" (*id.* ¶ 7);

- The Concession has supposedly "limited the number of bike lanes in the City and made the existing bike lanes more dangerous as a result of increased on-street parking" (*id.*); and

- Plaintiffs face "threatened loss or damage from paying for an increasingly outmoded parking system that does not serve their interests and delays or inhibits the increased use or availability of better carbon free means of transportation existing now, as well as new technological innovations that are certain to come over the next sixty years" (*id.* ¶ 50).

Plaintiffs allege these purported injuries entitle them to relief under two statutes. First, they assert claims under §§ 1 and 2 of the Sherman Act for alleged exclusive dealing and illegal monopolization. Compl. ¶¶ 37-55. Plaintiffs define the relevant product market allegedly monopolized as "the rental of the parking spaces in the business and commercial areas served by the City's parking meter system," (*id.* ¶ 39), and the relevant geographic market as "the City of Chicago and the location of the City's parking metered system." *Id.* ¶ 40. Second, Plaintiffs claim

---

CPM as necessary … to maintain the benefit of the bargain.

*Ahmad*, 2014 IL App (1st) 123629, ¶ 10. The court rejected the same mischaracterizations of the Concession as those asserted by Plaintiffs. *See, e.g.*, *id.* ¶ 74 (rejecting the claim that the Concession fixes meter rates); *id.* ¶ 73 (rejecting claim that City has surrendered its police powers over the metered parking system); *id.* ¶ 81 (describing that "true up" payments "demonstrate that the City has, in fact, exercised its police powers to make changes to the metered-parking system, for the benefit of the public, notwithstanding the concession agreement's compensation provisions").

[9] Indeed, it is a well-publicized fact subject to judicial notice that the City has expanded bike lanes in recent years, while the Concession has been in effect. *E.g.*, CHI. DEP'T. OF TRANSP., 2017 BIKEWAYS – YEAR IN REVIEW (2018), https://secureservercdn.net/198.71.233.36/40f.4ba.myftpupload.com/wp-content/uploads/2013/06/YearEndReview_2017_2018_0416.pdf.

that CPM has violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*., by allegedly "engaging in an unlawful trade practice." *Id*. ¶¶ 56-65.

Plaintiffs do not seek damages. *See* Compl. ¶¶ 35-36, 51, 55, 65. They seek to certify a class in pursuit of a declaration that the Concession violates the Sherman Act (*id*. ¶¶ 35, 51, 55), and "an injunction restraining CPM from collecting any additional revenue under the [Concession], or in the alternative … to place such sum in escrow, unless and until [it] has been reformed by the parties to ensure active regulation by the City and rebidding now and at reasonable intervals …." *Id*. ¶¶ 51, 55, 65.

## ARGUMENT

### I.  Plaintiffs Lack Article III Standing

Plaintiffs bear the burden of establishing standing to sue in federal court by pleading that they have "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Id*. at 2210. Standing to pursue injunctive relief, as Plaintiffs request, requires showing a prospective concrete injury that is "imminent," meaning "*certainly impending*"; merely "*possible* future injury" is not enough. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). Plaintiffs seek injunctive relief based on alleged "harm" comprised of less public transportation, ride sharing, driverless cars, street closures, and bike lanes, as compared to on-street parking, in the City. Compl. ¶¶ 6-7, 51, 55, 65. That does not satisfy Article III.[10]

*Plaintiffs' alleged injuries are not concrete.* A "concrete" injury means one that is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340 (2016). "Concrete" injuries include

---

[10] Given that Plaintiffs plead no injury in fact, there is no need to address that Plaintiffs have also failed to plead the but-for causation and redressability aspects of the Article III standing requirement.

"tangible harms, such as physical harms and monetary harms," intangible harms such as "reputational harms, disclosure of private information, and intrusion upon seclusion," and harms "specified by the Constitution itself," e.g., abridgment of free speech. *TransUnion*, 141 S. Ct. at 2204. An alleged statutory violation, by itself, does not suffice. *Id.* at 2205-6.

Plaintiffs have not alleged economic harm, physical injury, a recognized intangible injury, or an infringement of their Constitutional rights. *Id.* at 2204. In passing, the Complaint alleges that meter fees have increased since adoption of the Concession. Compl. ¶ 21. But Plaintiffs do not—and cannot—claim that fee increases are attributable to CPM or the Concession, as the City, not CPM, controls meter fees and does so independently of the Concession. Rather, Plaintiffs' alleged harm boils down to there being relatively less of their preferred transit options, which they speculate would change if the Concession was more actively regulated or rebid. *Id.* ¶¶ 6-7, 30.[11] "[F]ederal courts do not adjudicate" such "hypothetical or abstract disputes." *TransUnion*, 141 S. Ct. at 2203; *see also Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) (group lacked standing to challenge National Day of Prayer proclamation because "the value interests of concerned bystanders do not support standing to sue"); *U.S. Awami League, Inc. v. City of Chi.*, 110 F. Supp. 3d 887, 891 (N.D. Ill. 2015) ("Offense at government activity … is not a sufficiently direct or concrete injury to create standing."); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("Harm to abstract social interests cannot confer Article III standing.").

*Plaintiffs' alleged injuries are not "particularized."* To be "particularized," an injury must be specific to the plaintiff, in a manner that gives the plaintiff a "personal stake" in the alleged dispute that is distinct from the general populace, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), and

---

[11] Plaintiffs lament paying for a parking system they claim will become "increasingly outmoded" over time (*id.* ¶ 50), but that is just a spin on the same theme—that transportation options in Chicago will not be arranged to their liking.

"distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). "That threshold requirement ensures that [Article III courts] act as judges, and do not engage in policymaking properly left to elected representatives." *Id.*

Plaintiffs have no "personal stake" in how Chicago's transportation options are arranged any more than do any of the City's other three million inhabitants. Insofar as Plaintiffs claim the Concession violates the Sherman Act or ICFA, "[i]ndignation at violation of the law … is not particularized because it does not affect [a plaintiff] in an individual way." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 956 (7th Cir. 2019); *see also Stanton v. Ash*, 384 F. Supp. 625, 629 (S.D. Ind. 1974) (plaintiff lacked standing to pursue "general grievance" that defendants withheld funds that could be used for transportation programs; "[Plaintiff] asserts … that they are denied the benefit of highway programs and projects; that they are injured due to the inflation of highway costs; and, that their right to travel has been infringed by the acts of the defendants. … It is quite clear that the only injury the plaintiff has asserted is one shared by all citizens and is injury in the abstract"). Plaintiffs assert a generalized grievance that Chicagoans are denied a greener transportation system, which does not constitute a particularized injury under Article III.

*Plaintiffs' alleged threatened injuries are not imminent.* Far from alleging harm that is "*certainly impending*," *Clapper*, 568 U.S. at 408-09, Plaintiffs waited 13 years to file this suit. They have done so based on an alleged fear that City transportation will not feature their preferred mix of options, which is simply guesswork. It is guesswork that is grounded, moreover, in the false premise that the Concession precludes the City from regulating the meter system. Compl. ¶¶ 4, 23-24, 33-34. Plaintiffs assume that City transportation will include more bike lanes and other options if the Concession is "reformed" to permit more regulation and rebidding. *Id.* ¶¶ 6-7, 30, 51. That assumption relies on speculation about the preferences, motives, and behaviors of City government officials, CPM, and unnamed third parties who might play a role in shaping the City's

transportation. The Supreme Court has cautioned against "endors[ing] standing theories that require" such "guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 414, and courts consistently dismiss such claims for lack of Article III standing. *See, e.g.*, *Shakman v. Dunne*, 829 F.2d 1387, 1397 (7th Cir. 1987); *The Cornucopia Inst. v. U.S. Dep't of Agric.*, 260 F. Supp. 3d 1061, 1069 (W.D. Wis. 2017); *Ass'n of Am. Physicians & Surgeons v. Koskinen*, 2014 WL 1056495, at *7-8 (E.D. Wis. Mar. 18, 2014).

Plaintiffs lack Article III standing, and the Complaint should be dismissed in its entirety on that basis.

## II. Plaintiffs Have Not Alleged the Type of Injury Needed to Plead Their Claims

### A. Plaintiffs have not pled an antitrust injury needed to assert Sherman Act claims.

Plaintiffs' Sherman Act claims require an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). "[T]he 'antitrust injury' rule applies to requests for damages and injunctions alike." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986). An antitrust injury exists where the challenged conduct causes (a) reduced output or (b) higher prices for consumers in the relevant market—here, according to Plaintiffs, on-street rental parking. *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

Plaintiffs do not claim reduced parking volumes. To the contrary, they claim the supply of meter parking is *higher* than they prefer. They contend the Concession reinforces the longevity of the meter system, which they dislike, and they want regulation that would supposedly reduce the supply of parking spaces and foster the expansion of *other* modes of transportation. Compl. ¶¶ 6-7, 32, 45, 49, 60. Yet, a "restraint that in the end expands output" in the relevant market "serves

the interests of consumers" in that market "and should be applauded rather than condemned." *Chicago Prof'l Sports Ltd. P'Ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992).

Plaintiffs also do not allege facts describing higher prices caused by the Concession. The Complaint alleges that meter fees have increased since adoption of the Concession. Compl. ¶ 21. But Plaintiffs do not and cannot attribute that to CPM. As described above, the City, not CPM, controls meter pricing and does so independently of the Concession. Thus, the alleged higher prices are not "attributable to an anticompetitive aspect of the practice under scrutiny." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see also Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997) (affirming dismissal where "price and output" of the relevant product in the relevant market "are totally unaffected by the [defendant's conduct]").

Additionally, even if the Concession gave CPM control over price (which it does not), the City's lawful transfer of the metered parking system through an open bidding process does not constitute anticompetitive conduct. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984).[12] Without that, Plaintiffs cannot plead an antitrust injury.

**B.  Plaintiffs cannot plead a pecuniary loss required to assert an ICFA claim.**

To assert a claim under the ICFA, a plaintiff must plead "actual damage." 815 ILCS 505/10a. This means the plaintiff "suffer[ed] actual pecuniary loss" caused by the defendant's violation of the statute. *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). "[T]he defendant's deception must have affected the plaintiff in a way that made him or her tangibly worse off.

---

[12] *See also Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 635-36 (N.D. Ill. 2015) ("Absent an allegation that [the challenged] agreements … somehow decreased competition, the mere transfer of a monopoly is not an antitrust injury…."); *JetAway Aviation, LLC v. Bd. of Cty. Com'rs of Cty. of Montrose, Colo.*, 754 F.3d 824, 839 & n.12 (10th Cir. 2014) (J. Holmes, concurring) ("And there can be no anticompetitive conduct—that is, harm to competition—in situations where the sole act in question is the replacement of one monopolist by another.").

Theoretical harm is insufficient." *Price v. Philip Morris, Inc.*, 219 Ill.2d 182, 275-276, 848 N.E.2d 1, 55 (2005) (Karmeir, J., concurring). The Complaint fails this requirement.

Plaintiffs claim their transportation preferences are or will be unsatisfied. That is not an "actual pecuniary loss." *See, e.g.*, *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 402, 911 N.E.2d 1049, 1053 (1st Dist. 2009) (alleged abstract harms like emotional distress, inconvenience, or aggravation insufficient). Plaintiffs allege they pay for parking at meters and face the prospect of doing so in the future as the system becomes "increasingly outdated." Compl. ¶¶ 1, 50. But allegations of future harm are insufficient to constitute actual damages. *Yu v. Int'l Business Machs. Corp.*, 314 Ill. App. 3d 892, 897, 732 N.E.2d 1173, 1177 (1st Dist. 2000). And the mere purchase of the service *relating* to an alleged IFCA violation does not suffice to constitute damages *caused* by that violation. *Cooney v. Chi. Pub. Schs*, 407 Ill. App. 3d 358, 365-66, 943 N.E.2d 23, 31 (1st Dist. 2010); *see also In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 527 (N.D. Ill. 2011) ("individuals cannot create standing [under the ICFA] by voluntarily incurring costs in response to a defendant's act").

Plaintiffs admit they have many other transportation options at their disposal, which they "frequently use" (Compl. ¶ 6), and they do not claim that they are somehow worse off economically due to the Concession. *See Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 741 (7th Cir. 2017) (affirming dismissal based on charge of allegedly unfair insurance premiums because plaintiff "could have avoided the harm by purchasing a different long-term care insurance policy"); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (affirming dismissal claim relating to manipulated gas prices because plaintiff failed to show defendants' conduct caused him to purchase defendants' gasoline, and plaintiff had other options for purchase).[13]

---

[13] Nor do Plaintiffs claim they have been denied the benefit of the bargain—i.e., parking in exchange for paying the meter. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014); *Kim*, 598 F.3d at 365.

Even if Plaintiffs alleged a pecuniary loss from paying meter fees (which they do not), the voluntary payment doctrine precludes them from pleading damages on that basis. "[M]oney voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered by the payor solely because the claim was illegal," unless "there was some necessity that amounted to compulsion and payment was made under the influence of that compulsion." *McIntosh v. Walgreens Boots Alliance, Inc.*, 434 Ill. Dec. 189, 201, 135 N.E.3d 73, 80, 85 (2019). Plaintiffs do not plead they lacked knowledge of the facts or were or will be compelled to pay parking meters. They simply voluntarily paid meters, in lieu of the other options they admit were and are available. Compl. ¶ 6. The voluntary payment doctrine therefore precludes them from pleading damages under the IFCA.

### III. Plaintiffs' Sherman Act Claims Are Barred by the State Action Immunity Doctrine

Allegedly anticompetitive arrangements between municipalities and private parties are shielded from federal antitrust liability if the challenged conduct is "clearly articulated and affirmatively expressed as state policy." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). The state policy need not compel the municipality to take the action that is challenged as anticompetitive; it is sufficient that the anticompetitive effects of such action are a "foreseeable result" of the state's grant of authority. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42 (1985).[14] The Seventh Circuit has "broadly interpreted the concept of foreseeability," *Active Disposal, Inc. v. City of Darien*, 2010 WL 1416461, at *4 (N.D. Ill. Mar.

---

[14] Immunity under the doctrine is not limited to state or municipal entities as defendants, but rather applies equally to private parties in contract with a state or municipality in relation to the challenged action. *See, e.g.*, *Green Sols. Recycling, LLC v. Reno Disposal Co., Inc.*, 814 F. App'x 218, 222 (9th Cir. 2020); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 878 (9th Cir. 1987); *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 522 (8th Cir. 1985).

31, 2010), and thus courts in this circuit have repeatedly applied the state action immunity doctrine to reject Sherman Act challenges similar to this one.[15]

The City and CPM executed the Concession pursuant to state law authorizing the City to regulate and execute contracts in relation to on-street parking meters. The Illinois Municipal Code provides that "[a]ny municipality" is authorized to "[a]cquire by purchase or otherwise, own, construct, equip, manage, control, erect, improve, extend, maintain and operate … parking meters, and any other revenue producing facilities … necessary or incidental to the regulation, control and parking of motor vehicles." 65 ILCS 5/11-71-1(a). Municipalities are further entitled to "[e]nter into contracts dealing in any manner with the objects and purposes" of that authorization. 65 ILCS 5/11-71-1(c). That the City might execute exclusive contracts for on-street parking, like the Concession, is the foreseeable result of these provisions, given that "[i]n the context of municipal powers, it is generally understood that the authority to contract contemplates the power to create exclusive contracts." *Active Disposal, Inc.*, 635 F.3d at 889. Furthermore, the Illinois legislature "has explicitly provided that municipalities may act in anticompetitive ways that do not comply with federal anti-trust laws." *Lathrop v. Juneau & Assocs.*, 220 F.R.D. 330, 336 (S.D. Ill. 2004) (citing 65 ILCS 5/1-1-10) (Illinois State legislature "inten[ds] . . . that the 'State action exemption' to the application of federal antitrust statutes be fully available to all municipalities, and the agents

---

[15] *See, e.g.*, *Justice v. Town of Cicero*, 577 F.3d 768, 775 (7th Cir. 2008) (Illinois law that authorized local governments to "make all needful rules and regulations concerning the use of water supplied by the waterworks of the city or village" and to fix and collect water rates "as the corporate authorities may deem necessary or expedient" was sufficient to invoke state action immunity in relation to water department requirements for water meters and fees); *Campbell v. Chicago*, 823 F.2d 1182, 1184 (7th Cir. 1987) (city cap on number of available taxicab licenses was foreseeable result of statute authorizing city to "license, tax, and regulate hackmen, dragmen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and [to] prescribe their compensation"); *LaSalle Nat'l Bank v. Cty. of DuPage*, 777 F.2d 377, 382-83 (7th Cir. 1985) (municipalities' actions undertaken in the provision of sewer services immune based on state statute that authorized municipalities to "furnish sewerage service to municipal corporations and enter into and perform contracts with any municipality for the furnishing of sewerage service"); *Alarm Detection Sys. v. Orland Fire Prot. Dist.*, 326 F. Supp. 3d 602, 620 (N.D. Ill. 2018) (municipal agency's statutory authorization to contract in area of fire-alarm protection rendered immune its exclusive contract with private company defendant).

. . . of each," and it is "the policy of this State that home-rule municipalities" may exercise their functions "*notwithstanding effects on competition*").

Because the purportedly anticompetitive effects that Plaintiffs complain of, relating to the Concession, "logically result from the [City's] authority to regulate" and contract for the operation of its parking meters under state law, *Campbell v. Chicago*, 823 F.2d 1182, 1184 (7th Cir. 1987), the state action immunity doctrine precludes Plaintiffs' Sherman Act claims.

## IV.  Plaintiffs' Claims Suffer from Fundamental Pleading Deficiencies

### A.  Plaintiffs fail to plead required elements of their Sherman Act claims.

To plead a Sherman Act § 2 monopolization claim, Plaintiffs must allege, among other requirements, that CPM (1) possesses monopoly power (2) in a defined, relevant market and (3) acquired or maintained that monopoly power with anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  A Sherman Act § 1 claim similarly requires, among other elements, an unreasonable restraint of trade in a plausibly pled market.  *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012).  The Complaint fails to plead those requirements.

#### 1.  Plaintiffs do not sufficiently plead that CPM has monopoly power.

The Seventh Circuit has alternatively defined "monopoly power" as "the power to exclude competition or control price," *Ind. Grocery Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989), or "the ability to raise price significantly higher than the competitive level by restricting output," *Ball Mem'l Hosp.*, 784 F.2d at 1331.  However it is defined, Plaintiffs cannot plead CPM has monopoly power.

Despite Plaintiffs' claims to the contrary, the Concession makes clear that CPM cannot raise prices or reduce output in the meter parking system.  The Concession expressly reserves for

the City the power to set meter fees (Concession § 7.1) and the power to add or remove parking spaces. *Id*. § 7.2. The City's uncontestable ability to determine prices and output forecloses Plaintiffs from pleading CPM's monopoly power. *Humboldt Bay Mun. Water Dist. v. Louisiana-Pacific Corp.*, 608 F. Supp. 562, 568 (N.D. Cal. 1985) (no monopoly power where the defendants had no power to control prices because the water district set prices).

Even assuming CPM has monopoly power (which it does not), Plaintiffs have not pled that it acquired or maintained that power in an anticompetitive matter. CPM simply lodged the highest bid through an open process and then executed the Concession. The Concession, as Plaintiffs concede, did not create any purported monopoly—it only transferred operational control of the system to CPM. Compl. ¶ 20. Merely shifting purported monopoly power from one person to another has no competitive impact and thus "no antitrust significance." *Riegel*, 752 F.2d at 266 (affirming dismissal of § 2 claim based on the transfer of a monopoly-conferring patent). It is the "same monopoly" as before, with "no increase in the restriction of output." *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *13 (N.D. Ill. Sept. 28, 2015).

### 2. Plaintiffs do not allege an unreasonable restraint of trade.

Exclusive-dealing arrangements typically have procompetitive benefits, such as reduced costs and stable long-term supply. Courts therefore assess whether they are reasonable under § 1 using the rule of reason. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 65 (1st Cir. 2004). To establish an unreasonable restraint of trade under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). As with § 2 claims, merely shifting market power from one person to another, as Plaintiffs allege here, has no competitive impact and is not an unreasonable restraint of trade. *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006); *see also*

16

*supra* n.12. In addition, the Complaint does not allege substantial anticompetitive effect, as it does not allege what portion of the market was foreclosed, what competitors were foreclosed, or how foreclosure raised prices or reduced output. *Republic Tobacco Co. v. North Atl. Trading Co., Inc.*, 381 F.3d 717, 736-38 (7th Cir. 2004) (exclusive dealing arrangements violate § 1 "only when they foreclose competition in a substantial share" of the relevant market); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (exclusive dealing violates § 1 only if it "raise[s] prices above (and therefore reduce[s] output below) the competitive level").

### 3. Plaintiffs do not allege a plausibly defined market.

Plaintiffs must plausibly define both the product and geographic market allegedly monopolized. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999). A market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). The defined market must "correspond to the commercial realities of the industry." *Id.* at 336. Failure to allege a plausible market requires dismissal of both § 1 and § 2 claims. *United Ctr.*, 126 F.3d at 1003; *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d. Cir. 1997); *Reapers Hockey Ass'n v. Amateur Hockey Ass'n of Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019).

Plaintiffs allege the relevant product market is "the rental of the parking spaces in the business and commercial areas served by the City's parking metered system, as described in the June 2013 Agreement." Compl. ¶ 39. Nowhere does the Complaint allege facts describing why Plaintiffs' proposed market excludes alternate parking options such as garages or unmetered spaces, or why other forms of transportation are not reasonably interchangeable substitutes— despite admitting that such substitutes abound. Plaintiffs acknowledge that "competing forms of transportation" include "bicycles, ride sharing, [and] public transit." *Id.* ¶ 3. Their silence as to

why those competing options should not be included in the product market requires dismissal. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *7 (N.D. Ill. Sep. 22, 2020) (complaint did not allege facts plausibly suggesting that consumers distinguish between physicians allegedly inside and outside of the market); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (plaintiffs did not provide "an explanation for why they are defining the relevant product market in such narrow terms"); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (market did not include contracts outside of the alleged market in which plaintiff allegedly competed).

Additionally, the Complaint's only geographic market allegation is the conclusory statement that "[t]he relevant geographic market is the City of Chicago and the location of the City's parking metered system, as identified in the June 2013 Agreement." Compl. ¶ 40. The Complaint provides no explanation for why the market should not be broader—to include, for example, parking in adjacent non-commercial areas. *See, e.g.*, *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (plaintiff's geographic market failed to include nearby areas where consumers could purchase substitutes).

Thus, Plaintiffs' failure to allege a plausible product or geographic market requires dismissal of their Sherman Act claims.

### B. Plaintiffs failed to plead required elements of a ICFA claim.

An ICFA claim requires, *inter alia*, pleading of (1) a deceptive or unfair act by the defendant; and (2) the defendant's intent that the plaintiff rely on that deceptive or unfair act. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). The Complaint does not plead either.

#### 1. Plaintiffs do not plead an unfair practice.

Plaintiffs do not allege deception, only that the Concession is "unfair." Compl. ¶¶ 57-63.

18

To plead unfairness, Plaintiffs must allege the Concession: (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and/or (3) substantially injures consumers. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417, 775 N.E.2d 951, 960 (2002). They have not done so.

*First*, to establish a violation of public policy, Plaintiffs must identify "a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations" that was violated. *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1004 (N.D. Ill. 2016). Plaintiffs make a conclusory allegation that the Concession violates the anti-monopolization provisions of § 3(3) of the Illinois Antitrust Act. Compl. ¶ 58. But Illinois courts follow federal guidance on antitrust matters,[16] and thus CPM has not illegally monopolized the meter system under Illinois law, just as it has not under federal law. Also, the Illinois Municipal Code could not be clearer: "It is further the policy of this State that home-rule municipalities … may (1) exercise any power and perform any function pertaining to their government and affairs or (2) exercise those powers within traditional areas of municipal activity, except as limited by the Illinois Constitution or a proper limiting statute, *notwithstanding effects on competition*." 65 ILCS 5/1-1-10. As State law also authorized the City to enter into the Concession, 65 ILCS 5/11-71-1, the Concession is indisputably *consistent with*, rather than in violation of, State policy.

*Second*, a practice is immoral and oppressive only when "it imposes a lack of meaningful choice or an unreasonable burden on its target." *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008). Plaintiffs claim that it is immoral and oppressive for parking meter users to confer a "windfall" on CPM for use of an "outmoded parking system." Compl. ¶ 59. But whether the challenged conduct is lucrative to the defendant is generally

---

[16] *E.g.*, *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 204 Ill. Dec. 769, 771-72, 642 N.E.2d 470, 472-73 (1994); *McGarry & McGarry, LLC v. Bankr. Mgmt. Solutions, Inc.*, 937 F.3d 1056, 1062 (7th Cir. 2019).

irrelevant, absent facts pleading that the plaintiff lacked meaningful choice or was unreasonably burdened in the transaction. *Batson v. Live Nation Entertainment, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307, 313, 662 N.E.2d 602, 608 (1st Dist. 1996). It is beyond dispute that Chicagoans are not *forced* to use meter parking. Indeed, Plaintiffs cannot claim the Concession denies them meaningful choice in transportation while admitting they "frequently use public transit and ride sharing." Compl. ¶ 6. The Concession, which did not create the meter system but rather merely transferred its operation from the City to CPM, certainly does not place a "burden" on Plaintiffs, let alone one "so oppressive as to leave [them] with little alternative except to submit to it." *Robinson*, 201 Ill.2d at 418; *see also Medina v. Public Storage, Inc.*, 2014 WL 1715517, at *7 (N.D. Ill. April 30, 2014) (unfairness not pled because "plaintiffs do not suggest that they were coerced into purchasing insurance from Public Storage rather than an independent insurer or that they lacked reasonable alternatives").

*Third*, Plaintiffs have not plausibly alleged any cognizable injury to consumers, let alone a "substantial" one. They contend that consumers are substantially injured by a lack of alternative transportation methods. Compl. ¶ 60. As already established, that is not a cognizable harm under the IFCA. But even a cognizable injury is only "substantial" if it is "not outweighed by any countervailing benefits to consumers," and is "one that consumers themselves could not reasonably have avoided." *Batson*, 746 F.3d at 834. Here, CPM paid the City approximately $1.15 billion, which conferred measurable benefits outweighing Plaintiffs' purely speculated loss of a different mix of transportation options; a fact recognized by City Council when approving the Concession and the Illinois Court of Appeals in rejecting a prior challenge to it:

> [T]he City used that money [received from CPM] to set up: (1) a $400 million revenue replacement fund to generate $20 million a year … that could be used for the City's ongoing operations; (2) a $100 million human infrastructure fund to … provid[e] resources to … residents most in need; (3) a $325 million mid-term reserve fund to supplement revenues in the City's corporate fund through 2012; and

> (4) a $324 million budget stabilization fund to pay any amounts the City might owe CPM under the concession agreement and for any other purposes authorized by the city council.

*Ahmad*, 2014 IL App (1st) 123629, ¶ 7.  It cannot be disputed, moreover, that Plaintiffs can easily avoid the meter parking system by using alternatives like public transit, ride sharing, garages, and bikes.  *See, e.g.*, *Batson*, 746 F.3d at 834 (plaintiffs failed to state a claim because parking fees at issue "could reasonably have been avoided … [by] opting for alternative entertainment").

For these reasons, Plaintiffs have not pled that CPM has engaged in any unfair practice in violation of the IFCA.

### 2.  Plaintiffs do not plead CPM's intent to act unfairly.

"[E]ven if [Plaintiff's] allegations … met the criteria of an unfair practice," they "must still allege … intent."  *Garrett v. RentGrow, Inc.*, 2005 WL 1563162, at *4 (N.D. Ill. July 1, 2005).  Intent exists where a defendant intends for the plaintiff to rely on the alleged unfair practice or intends to be unfair to the plaintiff.  *Id.*  Plaintiffs do not plead any such facts, nor could they.

As described previously, the Concession was bid and executed in full public view, with CPM selected based on making the highest bid.  *See* Concession at 1-2; *Ahmad*, 2014 IL App (1st) 123629, ¶ 3.  Not a single allegation in the Complaint suggests that CPM intended or did anything underhanded, nor that any relevant information about the Concession or the metered parking system has been withheld from public view.[17]  Plaintiffs cannot plead intent in such circumstances.  *See, e.g.*, *Sheffler v. Commonwealth Edison Co.*, 353 Ill. Dec. 299, 317, 955 N.E.2d 1110, 1128 (2011) ("[P]laintiffs cannot allege that [defendant] intended that plaintiffs rely on its purportedly unfair conduct" where plaintiffs had notice of terms on which services were provided); *Krause v.*

---

[17] The City maintains a public website with information on the Concession, including financial analyses relating to certain mandatory reporting from CPM via the Concession (*see* Concession Art. 8), FAQs, and an option for seeking refunds for meter payments.  CITY OF CHICAGO, *About Parking Meters* (last visited Aug. 8, 2021), https://www.chicago.gov/city/en/depts/fin/supp_info/revenue/parking_meters.html.

*GE Capital Mortg. Serv., Inc.*, 314 Ill. App. 3d 376, 387, 731 N.E.2d 302, 311 (1st Div. 2000) ("The undisputed evidence in the record established that defendant disclosed to plaintiffs the fees at issue before plaintiffs chose the additional services provided and before charging plaintiffs for these services. … Plaintiffs cannot point to any evidence of defendant's intent to deceive plaintiffs or any evidence of defendant's intent for plaintiffs to rely on some undisclosed or hidden material fact. Defendant charged the quote and fax fees with full and accurate disclosure.").

### V.      Plaintiffs' Claims Are Untimely and Should Be Dismissed Based on *Laches*

A plaintiff pleads herself out of court "where, as here, the allegations of the complaint itself … plainly reveals that an action is untimely." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). Plaintiffs complain of events that transpired in December 2008, when the Concession was executed, or at the latest June 2013, when it was amended. Compl. ¶¶ 17-18. Their delay in filing until July 2021 means their claims are untimely.

### A.      Plaintiffs' Sherman Act claims are untimely.

Sherman Act claims for damages are subject to a four-year statute of limitations. 15 U.S.C. § 15b (2018). Plaintiffs seek equitable relief, not damages. Compl. ¶¶ 35-36, 51, 55, 65. Yet, "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy." *Cannon v. Univ. of Health Scis./The Chi. Med. Sch.*, 710 F.2d 351, 358 (7th Cir. 1983). Thus, *laches* bars untimely claims for equitable relief where the plaintiff's undue delay prejudices the party against whom relief is sought. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Here, Plaintiffs' delay is to be measured against the four-year statute for bringing damages claims, which serves "as a baseline for determining whether a presumption of laches applies." *Hot Wax, Inc.*, 191 F.3d at 821.[18] "*Laches* is a question of

---

[18] Multiple circuits have referred to the four-year period to determine whether a claim for injunctive relief is timely.

degree"; "[i]f the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required." *Cannon*, 710 F.2d at 824.

It is apparent from the Complaint that Plaintiffs needlessly delayed. They complain of a Concession publicly entered in December 2008, which was publicly amended—not in any way that Plaintiffs claim is relevant—in June 2013.[19] To be sure, the Concession has remained in operation since that time. But the performance of an allegedly anticompetitive contract does not restart or extend the limitations period. *Alarm Detection Sys.*, 129 F. Supp. 3d at 633-34. In *Alarm Detection Systems*, the Court dismissed antitrust claims in comparable circumstances where the plaintiff challenged certain municipal ordinances and agreements between nine and twelve years later. The court held that plaintiff's equitable claims were time-barred, notwithstanding continued performance of the challenged restraints. *Id.* Courts in the Seventh Circuit have similarly found an eight-year delay "unreasonable" as a matter of law,[20] and a six-year delay untimely under *laches*. *See, e.g., Checker Taxi Co., Inc. v. Nat'l Prod. Workers Union*, 113 F.R.D. 561, 569-70 (N.D. Ill. 1986); *see also New York v. Facebook*, 2021 WL 2643724, at *22 (D.D.C. June 28, 2021) (applying *laches* to dismiss antitrust claims due to delay of "six and eight years, compared to the four-year guideline statute of limitations," which was unreasonable "to challenge two highly publicized acquisitions").

Plaintiffs' "unreasonable, inexcusable delay raises a presumption that [CPM] suffers damage and prejudice." *Wilmes v. U.S. Postal Serv.*, 810 F.2d 130, 134 (7th Cir. 1987); *see also*

---

*See, e.g., Oliver v. SD-3D LLC*, 751 F.3d 1081, 1085-86 (9th Cir. 2014); *Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265, 277 (8th Cir. 2004); *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 474-75 (D.P.R. 2020); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991-92 (N.D. Cal. 2020).

[19] *See, e.g.,* Mun. Code of Chicago § 9-64-205 (2021), https://www.chicityclerk.com/legislation-records/municipal-code; *supra* notes 2-3 (published proceedings of Concession and amendment's passage). Since the ordinance and the Concession agreements are matters of public record, Plaintiffs can be charged with constructive notice dating back to at least 2013. *See Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 838 (N.D. Ill. 2011) (citing cases).

[20] *Zelazny v. Lyng*, 1987 WL 12664, at *2 (N.D. Ill. June 16, 1987), *aff'd* 853 F.2d 540 (7th Cir. 1988).

*Cannon*, 710 F.2d at 359 n.9 (delay gives rise to presumption of *laches*, placing burden on plaintiff to show that the delay was excusable or that defendant was not prejudiced). Plaintiffs do not allege any facts to justify their prolonged delay and rebut that presumption.

Even if a presumption of prejudice did not apply, a defendant's significant expenditure of time and money during the period that the plaintiff "sat idly by and chose not to challenge" the alleged conduct "constitute[s] sufficient prejudice as a matter of law." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002). CPM paid the City more than $1.15 billion for the Concession. Concession § 2.1. And for the last 13 years, CPM has been responsible for maintaining, improving, and upgrading the system. *See, e.g.*, *id.* §§ 3.16, 4.1, 4.7. That included "installing 'Pay and Display' pay boxes that permit payment by credit or debit card, allow more cars to park on the street, and allow customers to purchase 'portable time' (i.e., the right to park in multiple meter locations without paying duplicative meter fees)." *Ahmad*, 2014 IL App (1st) 123629, ¶ 10. Without question, Plaintiffs' extreme delay in filing this suit is prejudicial.

### B. Plaintiffs' ICFA claim is untimely.

By the same reasoning, Plaintiffs' ICFA claim is also untimely. The ICFA provides a three-year limitations period. *See* 815 ILCS 505/10a(e); *McCready v. Ill. Secretary of State, White*, 382 Ill. App. 3d 789, 798, 888 N.E.2d 702, 710 (1st Dist. 2008). The period runs from the day "when facts exist which authorize one party to maintain an action against another." *Sundance Homes v. County of Du Page*, 195 Ill. 2d 257, 265, 746 N.E.2d 254, 260 (2001). Though the IFCA limitations period applies as written to damages claims, Illinois courts "ordinarily follow statutes of limitation as convenient measures for determining the length of time that ought to operate as a bar to an equitable cause of action" through the application of *laches*. *Id.* at 270.[21] "The doctrine

---

[21] Because the referenced limitations period is a state law, rather than a federal law, state law principles on *laches*

is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party." *Tully v. State*, 143 Ill. 2d 425, 432, 574 N.E.2d 659, 662 (1991). "There are two fundamental elements of *laches*: (1) lack of due diligence by the party asserting the claim and (2) prejudice to the opposing party." *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25.

Plaintiffs' delay in filing this action until 12 years after the well-publicized Concession and eight years after its public amendment readily establishes lack of diligence. *See id*. ¶¶ 26-27 (plaintiff had constructive notice of challenged bond authorization statutes based on their publication yet waited years to file challenge). And, that CPM has expended more than $1.15 billion to win the Concession and additional resources to upgrade the system as the Concession required establishes prejudice for purposes of *laches* under Illinois law, the same as under federal law. *Id*. ¶ 28 (prejudice satisfied by fact that defendant had expended large sums of money).

Plaintiffs' unexplained delay in bringing their IFCA claim is therefore additional reason for its dismissal.

## CONCLUSION

For the foregoing reasons, CPM respectfully requests the Court to dismiss the Complaint with prejudice.

Dated: August 10, 2021                    Respectfully submitted,

                                          By: /s/ Joseph L. Motto

                                          Dan K. Webb
                                          Robert Y. Sperling

---

apply. *See Teamsters & Emplrs Welfare Trust v. Gorman Bros. Ready Mix*, 283 F.3d 877, 885-86 (7th Cir. 2002) (Easterbrook, J., concurring) ("If state law supplies the period of limitations, then it also supplies all related doctrines of tolling and laches."). In any event, application of federal principles leads to the same outcome.

Joseph L. Motto
Conor Reidy
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
DWebb@winston.com
RSperling@winston.com
JMotto@winston.com
CReidy@winston.com

*Attorneys for Chicago Parking Meters, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 10, 2021, I caused a true and correct copy of the foregoing to be filed via the CM/ECF system and served upon all counsel of record.

<u>/s/ Joseph L. Motto</u>