IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Micah Uetricht and John Kaderbek, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | 21-cv-3364 |
| ) | |
| Chicago Parking Meters, LLC, ) | The Honorable Matthew F. Kennelly |
| ) | |
| Defendant. ) | JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

1. Since 2008 plaintiffs and other Chicago residents have paid sharply increased metered parking fees. The metered fees for on street-parking are now double what they were in 2008. Plaintiffs continue to pay such sharply increased fees pursuant to a 75-year exclusive agreement between the City of Chicago and Chicago Parking Meters LLC ("CPM"). That "Parking Meter Concession Agreement" (the "Agreement"), which was entered in 2008 and later modified in 2013, is attached and incorporated into this Amended Complaint as Exhibit A. It confers a private monopoly on CPM to operate all of the City's "Metered Parking Spaces," provide all the City's "Metered Parking Services," and operate the City's entire "Metered Parking System" (as those terms are defined in Agreement paragraph 1.1). CPM receives all the revenue from these higher rates which are effectively fixed for 75 years and may not be modified, re-bid, or terminated without separate and exorbitant compensation to CPM.

2. The Agreement also insulates CPM's exclusive private monopoly from active regulation by the City of Chicago. It is insulation from active regulation by the City which leads to CPM's *de facto* exclusive control over the Metered Parking System (hereafter, CPM's "exclusive

control") and renders the Agreement in violation of federal antitrust law and the Illinois consumer fraud statute.

3. Plaintiffs are car owners who live in various Chicago neighborhoods. Plaintiffs have no practical alternative to the regular or repeated use of the Metered Parking System operated by CPM, nor to paying the higher rates to CPM.

4. As set out in Count I, CPM's exclusive control over the Metered Parking System for 75 years and the higher rates CPM forces Plaintiffs to pay inflicts economic injury on plaintiffs, even in low density areas and in off peak hours. In addition to injury from the higher metered rates, the Agreement also deprives plaintiffs of the benefits from active regulation of the public streets and ways that previously existed or could exist if there was competition from other vendors, but which competition is blocked for 75 years under the Agreement. As such, the Agreement confers an illegal monopoly on CPM in violation of Section 2 of the Sherman Act, 15 U.S.C. §2 (hereafter, "Section 2" and "Section 2 violation").

5. As set out in Count II, CPM's exclusive control under the Agreement, which includes significant restrictions on re-bidding by other vendors after a reasonable period, also constitutes an illegal restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1 (hereafter, "Section 1" and "Section 1 violation").

6. As set out in Count III, CPM's monopoly is also an unfair trade practice under the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS, 505/1 et seq. (hereafter, the "Illinois Consumer Fraud Act"). The Agreement's ban on active regulation conflicts with public policy. The Agreement has an oppressive 75-year term and is one sided and unconscionable in the massive profit conferred on CPM out of all proportion to its investment. The Agreement inflicts substantial economic injury in the aggregate on plaintiffs and other residents by locking in these higher rates,

blocking the City from actively regulating CPM under the Agreement, and blocking the City from resumption of active regulation and/or re-bidding of the meter system that would provide better terms to Plaintiffs and other residents.

7. The loss of active regulation has caused damages to the Plaintiffs and other residents in additional ways, including but not limited to the City's inability to manage traffic, relieve congestion, or provide alternatives to car use that would lead to additional savings by plaintiffs in the use of their cars.

8. Pursuant to 15 U.S.C.§ 16, plaintiffs seek to bar the enforcement of the Agreement until it is terminated, modified, or otherwise reformed.

**PARTIES**

9. Plaintiffs Micah Uetricht and John Kaderbek are residents of Chicago who from time to time are required in ordinary use of their cars to pay for parking at the Metered Parking System operated by defendant CPM.[1]

10. Defendant Chicago Parking Meters LLC (CPM) is a limited liability company incorporated in Delaware and doing business in Illinois, with its principal office located at 205 N. Michigan Avenue in Chicago.

---

[1] The sole reason that Ms. Marianela D'Aprile is no longer a plaintiff is because she moved away from Chicago.

**JURISDICTION**

11.     This Court has subject matter jurisdiction over Counts I and II under 28 U.S.C. §§ 1331 and 1337.

12.     This Court has supplemental jurisdiction over count III under 28 U.S.C. § 1367 because Count III is so related to Counts I and II that they form part of the same case or controversy under Article III of the United States Constitution.

**FACTS**

13.     CPM purchased from the City of Chicago what amounts to an exclusive right to operate all or nearly all metered parking on the public streets and ways, especially in business and commercial areas and restricts price competition from City-controlled off-street parking.

14.     Under the Agreement, CPM: (a) bought roughly 36,000 metered parking spaces; (b) sets the rates charged for those spaces; (c) immediately and significantly increased those rates; (d) secured the right to operate those spaces without any meaningful competition by other potential vendors; and (e) secured the right to operate those curb spaces for CPM's benefit without active regulation by the City of Chicago.

15.     Specifically, as set forth in Agreement Section 2.1, CPM bought the right to operate all "Metered Parking Spaces," provide all "Metered Parking Services," and operate the entire "Metered Parking System." They also brought the right to retain the profits from the Metered Parking System, allegedly "for the benefit of the City," but, in reality, requiring the City to compensate CPM in such a way as to retain the profits from the Metered Parking System for itself.

16.     CPM has the right to operate all "spaces or places that the City designates from time to time as parking spaces or places where, during certain periods of time, the City requires the payment

of a Metered Parking Fee for parking a motor vehicle at that space or place for a limited period of time and such designation is effective for all purposes of this Agreement . . ..") Agreement § 1.1.

17. As set forth in more detail below, Plaintiffs have no alternative to regular or repeated use of the Metered Parking System turned over to CPM and to make payment to CPM of the Metered Parking Fees.

18. The Agreement has a term of 75 years and may not be rebid or modified during such term without full payment of the value of the Agreement to CPM.

19. Such payment for any significant change in the Agreement is potentially extraordinary and is far beyond the City's current ability to pay.

20. In addition, while CPM originally paid $1.1 billion for the Agreement in 2008, CPM has already recovered that full amount and at least $500 million or more in addition to its original investment, with an additional 60 years of revenue to come.

## The Agreement's Increase in Price and Limit on Supply

21. Starting in 2008, the Agreement doubled the rates that previously existed for use of such meters and requires the City to impose such rates during the entire 75- year term of the Agreement.

22. The Agreement limits the supply of meters from any source and from any competitor unless the City compensates CPM for the resulting loss of the value of its Agreement as a result of such competition.

23. Section 3.12 of the Agreement, for example, restricts price competition with CPM from off-street parking owned by the City or on land owned by the City and requires the cost to be three times higher than the highest metered fee in effect for Concession Meters in that same area.

24. The Agreement also effectively limits the supply of alternative forms of transportation, or alternatives to use of the Metered Parking System, such as bike lanes, express bus lanes, and pedestrian use, if providing such additional supply results in or requires the removal of meters and any loss of value of the Agreement to CPM.

**The Agreement Restricts the City's Active Regulation of the Parking Meters**

25. Under the Agreement, the City is restricted from active regulation of CPM and the Metered Parking System.

26. For example, the City may not reduce the number of meters in the Metered Parking System without full payment in so-called true-up payments and other compensation set out in Articles 7 and 14 of the Agreement.

27. The Agreement further prohibits the City from regulating curb space and other public spaces belonging to the City. This includes but is not limited to the ability to reduce rates, use peak pricing, remove meters to reduce congestion, put in "drop off" zones, and eliminate safety hazards in high crash areas, without a determination and possible arbitration of the compensation due to CPM.

28. The economic and transactional costs associated with any reduction in metered spaces or their removal to others are often so great that both the costs and uncertainty paralyze elected and appointed officials from proceeding with any project that does not guarantee CPM will have the same number of spaces.

29. The Agreement's financial restrictions on removal of meters and other common sense regulatory actions makes impossible or precludes the City's active regulation of curb space and the City's adoption of parking management practices being introduced in other U.S. cities.

30. The City is also restricted from re-bidding the Agreement for a 75-year period to new entrants that may provide the meters on more favorable terms, including lower or flexible rates in off peak hour parking or just lower rates, or to allow resumption of active regulation of CPM.

31. The City is also restricted to this extent from removing meters to favor options like bike lanes, bus lanes, pedestrian use and the closing of public streets for commercial and public purposes, which would allow plaintiffs to save on the cost of car use and potentially allow the savings from giving up car ownership altogether.

32. Agreement Section 14.3 provides the City with certain, so-called "Reserved Powers." The City, however, may only use these purported Reserved Powers or otherwise use its sovereign authority over the streets and public way if it reimburses CPM for any loss of the value of the Agreement to CPM from the use of such Reserved Powers or sovereign authority. Use of the City's Reserved Powers under the Agreement has proved prohibitively expensive for the City, thereby prohibiting, or at the very least, severely inhibiting, the City's use of its Reserved Powers.

33. For example, in 2019, the City was required to pay $27 million in true-up payments to compensate CPM for use of the City's Reserved Powers or other actions affecting meter use or availability, even if such actions were in the public interest. This is a serious deterrent even to this limited use at a time that the City is running a substantial deficit.

34. In addition, Agreement Article 15 provides detailed dispute resolution procedures that the City must follow in order to calculate and pay CPM for use of its Reserved Powers. Many of the City's attempts to assert its Reserved Powers end up in arbitration between the City and CPM. Under the complicated and expensive procedures required to calculate and/or arbitrate the amounts due to CPM for the City's use of the Reserved Powers, the City of Chicago has no certainty in advance as to

what use of its Reserved Powers may cost. This fact, in turn, further deters the City from attempting to use its Reserved Powers.

### Control of Product Market

35. Under the Agreement, CPM has an exclusive 75-year monopoly over the Metered Parking System and exclusive access to the public streets and curb space necessary to operate the Metered Parking System, which is a product for which car owners pay.

36. The applicable criteria for determining a monopoly in a product market are set forth in the 2010 Justice Department and Federal Trade Commission Guidelines for Horizontal Mergers (the "Guidelines"). Pursuant to the Guidelines, the Metered Parking System is the relevant product or product market in which CPM has established a monopoly.

37. Plaintiffs in the ordinary use of their cars have no meaningful alternative or ability to substitute for (a) regular or repeated use of parking provided by CPM or (b) use of the Metered Parking System for trips to and from the commercial and business areas where the meters in the Metered Parking System are located.

38. While plaintiffs can take public transportation and use bikes in certain limited circumstances, there is no interchangeability of these options in their current limited forms with use of the Metered Parking System. Furthermore, the Agreement actually restricts the City from removal of meters to expand the availability, reliability, and safety of such alternative options to use of motor vehicle.

39. While some retail outlets have limited off-street parking on their own property, the vast majority of such outlets are not accessible by car use except through the Metered Parking System.

40. Accordingly, the relevant product market is the Metered Parking System that offers metered parking at public curb space belonging to the City and that is operated by CPM under the terms of the Agreement.

**Further Economic Injury and Injury to Quality of Service**

41. With the special case of New York excepted, plaintiffs pay the highest average rates for short term on-street meter use for any U.S. city over 100,000. Plaintiffs and other drivers in Chicago are required to pay these higher rates without receiving the benefit of any active regulation that citizens in other cities do, including unrestricted regulatory actions to ease congestion or otherwise serve the public interest.

42. By restricting active regulation, the Agreement also limits innovations like off-peak pricing which would allow Plaintiffs to achieve substantial savings by traveling and parking during off-peak hours. Several American cities are currently introducing such off-peaking parking.

43. By restricting active regulation, the Agreement also limits the benefits to Plaintiffs from increased bike lanes and express bus lanes which Plaintiffs would prefer to use and which would allow Plaintiffs to have cheaper modes of transportation, achieve substantial cost savings, and limit environmental impacts of transportation.

44. Both for economic and environmental reasons, Plaintiffs would prefer to use their cars less or not at all and would benefit from allowing competition from other vendors that would permit the City to engage in active regulation and substitution of the current Metered Parking System controlled by CPM.

45. As a result, plaintiffs are locked into paying higher prices to CPM than they would pay in comparable cities and are denied the cost savings and quality improvements in transportation that the

City of Chicago could implement if it were not restricted from active regulation of CPM and if CPM were not insulated for 75 years from competition.

### The Agreement's Conflict with Public Policy

46. As the Agreement is an exclusive dealing relationship which restricts active regulation by the City for 75 years, the Agreement serves no clear public policy.

47. Both Mayor Emanuel and Mayor Lightfoot have criticized the Agreement and deplored it on public policy grounds for giving up active regulation of the City's parking meter system for 75 years.

48. There is now a clear consensus of elected officials in the City that the Agreement is inimical to the public interest.

49. Furthermore, the duration and one-sided terms of the Agreement are oppressive, especially given the fiscal condition of the City which was desperate for funding at the time of the Agreement and is now deprived both of revenue from the meters and of the ability to actively regulate the streets and public ways.

50. Under the one-sided terms of the Agreement, CPM will achieve an extraordinary return on its $1.1 billion investment and has already recouped the full sum and $500 million profit, while the City currently runs a substantial deficit.

51. It is impossible to call the Agreement a form of reasonable compensation for the provision of metered parking spaces by CPM. The Agreement has no relationship whatever to the actual cost to CPM of the services it provides.

### CLASS ACTION ALLEGATIONS

52. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs seek to certify a class of all Chicago residents who are using the Metered Parking System as solely for the purpose of class wide injunctive relief as set out below.

53. A class action for injunctive relief is appropriate because the class of those injured is too numerous to join, and there are common questions of fact and law, and the claims of plaintiffs are typical of those of the class. Plaintiffs have obtained counsel who will adequately represent the interests of the class.

## CAUSES OF ACTION

### COUNT I
### ILLEGAL MONOPOLY IN VIOLATION OF SHERMAN ACT SECTION 2

54. Plaintiffs incorporate all allegations above into this Count I.

55. Defendant CPM has obtained an unlawful monopoly from the City in violation of Sherman Act Section 2. The ceding of control to CPM of the Metered Parking System effectively blocks the City from actively regulating CPM and its use of the City streets and public ways.

56. In violation of Sherman Act Section 2, which protects competition based on quality as well as price, defendant CPM has increased the metered street parking rates plaintiffs pay for use of the Metered Parking System, deprived the City of its ability to actively regulate the Metered Parking System, insulated itself from competition for 75 years, and caused continuing economic injury to plaintiffs and other members of the proposed class.

57. Furthermore, CPM has denied plaintiffs the benefits of the City's active and unrestrictive regulation of the streets and public ways for their safety and convenience in order to maintain a guaranteed value from CPM's monopoly.

58. The Agreement is not exempt from antitrust laws under the so-called Parker immunity doctrine.

59. Because of the injury suffered by Plaintiffs, Plaintiffs are entitled to the injunctive relief set out in paragraph C of the prayer for relief below.

## COUNT II
## ILLEGAL RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1

60. Plaintiffs incorporate all the allegations above into this Count II.

61. As set forth above, and in violation of Sherman Act Section 1, Defendant CPM has entered an unlawful exclusive dealing relationship with the City of Chicago for an unreasonable 75-year term.

62. In violation of Section 1, Defendant CPM and the Agreement have unreasonably insulated CPM from competition with other vendors and from active regulation by the City of Chicago, and has caused the economic and other injury to Plaintiffs identified above.

63. Because of such injury, Plaintiffs are entitled to the injunctive relief in paragraph C of the prayer for relief below.

## COUNT III
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT

64. In violation of the Illinois Consumer Fraud Act, Defendant CPM has engaged – and continues to engage in – an unlawful trade practice injurious to Plaintiffs and other members of the proposed class.

65. The Agreement's bar to the City's active regulation of metered parking in the City and bar to related regulation of the streets and public ways is in conflict with public policy. It is oppressive and one-sided in the compensation CPM receives providing this service. It causes in the aggregate substantial economic and non-economic injury to the Plaintiff and members of the proposed class.

66. Under Illinois Consumer Fraud Act Section 10, this Court may grant injunctive relief in lieu of damages.

WHEREFORE plaintiffs pray this Court to

13

    A.    Certify the proposed class pursuant to Federal Rule of Civil Procedure 23(b)(2);

    B.    Declare Defendant CPM and the Agreement in violation of Sherman Act Sections 1 and 2 and the Illinois Consumer Fraud Act;

    C.    Enjoin CPM from enforcing the Agreement unless and until CPM has modified the Agreement to permit active regulation by the City of the Metered Parking System and a reasonable termination date for such Agreement, as modified;

    D.    Grant Plaintiffs their legal fees and costs; and

    E.    Grant such other and further relief as this Court deems just and appropriate.

Date: September 7, 2021

        Respectfully submitted,

        Plaintiffs Micah Uetricht and John Kaderbek

        By:    /s/ *Thomas H. Geoghegan*

Thomas H. Geoghegan
Michael P. Persoon
Will Bloom
**DESPRES, SCHWARTZ & GEOGHEGAN, LTD.**
77 W. Washington St., Ste. 711
Chicago, Illinois 60602
(312) 372-7391
tgeoghegan@dsgchicago.com
mpersoon@dsgchicago.com
wbloom@dsgchicago.com

Stuart J. Chanen
Ariel Olstein
**CHANEN & OLSTEIN**
7373 N. Lincoln Ave., Suite 100
Lincolnwood, IL  60712
847-469-4669
Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com

*Attorneys for Plaintiffs*