**AMENDED AND RESTATED CHICAGO METERED PARKING SYSTEM CONCESSION AGREEMENT (WITH FIRST AND SECOND AMENDMENT CHANGES)**

dated as of

June 5, 2013

by and between

**CITY OF CHICAGO**

and

**CHICAGO PARKING METERS, LLC**

## TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND INTERPRETATION ...................................................... 1

    Section 1.1. Definitions.................................................................................... 1

    Section 1.2. Number and Gender ................................................................... 26

    Section 1.3. Headings .................................................................................... 26

    Section 1.4. References to this Agreement .................................................... 26

    Section 1.5. References to Any Person .......................................................... 27

    Section 1.6. Meaning of Including................................................................. 27

    Section 1.7. Meaning of Discretion .............................................................. 27

    Section 1.8. Meaning of Notice .................................................................... 27

    Section 1.9. Consents and Approvals ........................................................... 27

    Section 1.10. Trade Meanings ........................................................................ 27

    Section 1.11. Laws ......................................................................................... 27

    Section 1.12. Currency.................................................................................... 27

    Section 1.13. Generally Accepted Accounting Principles ....................................... 27

    Section 1.14. Calculation of Time .................................................................. 27

    Section 1.15. Approvals, Consents and Performance by the City ......................... 28

    Section 1.16. Enactment, Administration, Application and Enforcement of Laws by the City ....................................................................... 29

    Section 1.17. Incorporation of Schedules and Exhibit............................................ 29

ARTICLE 2 THE TRANSACTION; CLOSING; CONDITIONS PRECEDENT; COVENANTS ............................................................................ 29

    Section 2.1. Grant of Concession.................................................................. 29

    Section 2.2. Closing ...................................................................................... 31

    Section 2.3. Deposit ...................................................................................... 31

    Section 2.4. Conditions Precedent; Termination ................................................. 32

    Section 2.5. Covenants.................................................................................. 34

    Section 2.6. Intended Treatment for Federal and State Income Tax Purposes ...... 38

    Section 2.7. Closing Deliveries ..................................................................... 38

ARTICLE 3 TERMS OF THE CONCESSION ................................................................. 38

    Section 3.1. Right to Use and Present Condition................................................. 38

    Section 3.2. Metered Parking System Operations ............................................... 39

## TABLE OF CONTENTS
(continued)

**Page**

Section 3.3.        Operator ................................................................................................ 41

Section 3.4.        Authorizations; Qualifications .......................................................... 42

Section 3.5.        No Encumbrances ............................................................................... 42

Section 3.6.        Single Purpose Covenants.................................................................. 43

Section 3.7.        Rights of the City to Access and Perform Work on the Metered
                    Parking System ................................................................................... 44

Section 3.8.        Intentionally deleted........................................................................... 45

Section 3.9.        Intentionally deleted........................................................................... 45

Section 3.10.       Payment of Taxes ............................................................................... 45

Section 3.11.       Utilities................................................................................................ 46

Section 3.12.       Competing Off-Street Parking ........................................................... 46

Section 3.13.       Notices of Defaults and Claims ......................................................... 47

Section 3.14.       Assignment of Operating Agreements and Plans .............................. 47

Section 3.15.       City Use of Information and Records ................................................. 48

Section 3.16.       Metering Devices................................................................................ 48

Section 3.17.       Payments by the City ......................................................................... 48

Section 3.18.       Naming Rights and Commercial Advertisements and Activities ...... 48

Section 3.19.       Administration of the Public Way ...................................................... 49

Section 3.20.       Reversion of Metered Parking System .............................................. 49

Section 3.21.       Parking Lot Fees ................................................................................ 49

ARTICLE  4        CAPITAL IMPROVEMENTS S ................................................................. 50

Section 4.1.        Concessionaire Responsibility for Capital Improvements................. 50

Section 4.2.        Authorizations Related to Capital Improvements.............................. 50

Section 4.3.        Intentionally deleted........................................................................... 50

Section 4.4.        Required Payment Options ................................................................. 50

Section 4.5.        Closure of Parking Lots ..................................................................... 50

Section 4.6.        Maintenance of Parking Lots ............................................................. 50

Section 4.7.        New Technology.................................................................................. 50

ARTICLE  5        MODIFICATIONS .................................................................................. 54

Section 5.1.        City Directives .................................................................................... 54

## TABLE OF CONTENTS
(continued)

**Page**

Section 5.2.   Concessionaire Requests .................................................................. 54

Section 5.3.   Performance of Modifications .......................................................... 54

ARTICLE 6   OPERATING STANDARDS .................................................. 54

Section 6.1.   Compliance with Operating Standards .............................................. 54

Section 6.2.   Proposed Operating Standards .......................................................... 55

Section 6.3.   Modified Operating Standards .......................................................... 55

ARTICLE 7   PARKING REVENUES AND CONCESSION VALUE ........... 56

Section 7.1.   Metered Parking Fees ....................................................................... 56

Section 7.2.   Designation and Removal of Metered Parking Spaces ..................... 57

Section 7.3.   Notice of Exercise of Reserved Powers ............................................ 59

Section 7.4.   Revenue Value .................................................................................. 60

Section 7.5.   Allocation of Actual Operating Revenue and Required Closure Payments to Concession Metered Parking Spaces .......................... 61

Section 7.6.   Settlements ....................................................................................... 62

Section 7.7.   Parking Fines and Enforcement ........................................................ 62

Section 7.8.   Additional Concession Metered Parking Spaces .............................. 64

Section 7.9.   Adjustments to Revenue Values ....................................................... 64

Section 7.10.   Incentive to Modernize Metering Devices ....................................... 67

Section 7.11.   Reduction in Concession Metered Parking Spaces ........................... 67

Section 7.12.   Excessive Use By Exempt Persons ................................................... 68

Section 7.13.   Right to Challenge ........................................................................... 68

Section 7.14.   RPA Determination Concerning Revenue Value Adjustment .......... 68

Section 7.15.   Special Rule for the Reporting Year Commencing March 1, 2014 .................................................................................................. 72

ARTICLE 8   REPORTING; AUDITS; INSPECTIONS .................................. 73

Section 8.1.   Reports ............................................................................................. 73

Section 8.2.   Information ....................................................................................... 73

Section 8.3.   Inspection, Audit and Review Rights of the City .............................. 75

Section 8.4.   Audits, Assistance, Inspections and Approvals ................................ 76

ARTICLE 9   REPRESENTATIONS AND WARRANTIES ............................. 76

Section 9.1.   Representations and Warranties of the City ...................................... 76

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| Section 9.2. | Representations and Warranties of the Concessionaire | 79 |
| Section 9.3. | Non-Waiver | 80 |
| Section 9.4. | Survival | 80 |
| ARTICLE 10 | FINANCE OBLIGATIONS | 81 |
| Section 10.1. | Concessionaire's Obligations | 81 |
| Section 10.2. | City's Obligations | 81 |
| Section 10.3. | Concessionaire's Obligation for Estoppel Certificates | 82 |
| Section 10.4. | Prohibited Tax Shelter Transactions | 82 |
| ARTICLE 11 | COMPLIANCE WITH LAWS | 82 |
| Section 11.1. | Compliance with Laws | 82 |
| Section 11.2. | Non-Discrimination | 82 |
| Section 11.3. | Non-Collusion, Bribery of a Public Officer or Employee | 84 |
| Section 11.4. | Cooperation with City Inspector General | 84 |
| Section 11.5. | Ethics and Conflict of Interest Requirements | 85 |
| Section 11.6. | Prevailing Wage | 85 |
| Section 11.7. | Living Wage | 85 |
| Section 11.8. | MBE/WBE, Affirmative Action and City Resident Requirements | 85 |
| Section 11.9. | MacBride Principles | 88 |
| Section 11.10. | Executive Order 2005-1 | 88 |
| Section 11.11. | Cooperation with City Office of Compliance | 88 |
| Section 11.12. | City License Requirements | 88 |
| ARTICLE 12 | INDEMNIFICATION | 89 |
| Section 12.1. | Indemnification by the Concessionaire | 89 |
| Section 12.2. | Indemnification by the City | 89 |
| Section 12.3. | Agency for Representatives | 89 |
| Section 12.4. | Third Party Claims | 90 |
| Section 12.5. | Direct Claims | 91 |
| Section 12.6. | Failure to Give Timely Notice | 91 |
| Section 12.7. | Reductions and Subrogation | 91 |

-iv-

# TABLE OF CONTENTS
(continued)

Page

Section 12.8. Payment and Interest ................................................................. 91

Section 12.9. Limitation on Certain Claims ...................................................... 91

Section 12.10. Other Matters ............................................................................. 92

Section 12.11. Offset Rights; Limitations on Certain Damages ........................ 92

Section 12.12. Survival ..................................................................................... 92

ARTICLE 13     INSURANCE ........................................................................... 92

Section 13.1. Insurance Coverage Required .................................................... 92

Section 13.2. Additional Requirements ............................................................ 94

Section 13.3. Damage and Destruction ............................................................ 96

ARTICLE 14     ADVERSE ACTIONS .............................................................. 99

Section 14.1. Adverse Action .......................................................................... 99

Section 14.2. Termination .............................................................................. 101

Section 14.3. Reserved Powers Adverse Actions ........................................... 102

Section 14.4. Right of City to Remedy ........................................................... 104

Section 14.5. Other Actions by Governmental Authorities .............................. 104

ARTICLE 15     DELAY EVENTS AND CONCESSION COMPENSATION ...... 105

Section 15.1. Delay Events ............................................................................ 105

Section 15.2. Relationship to Compensation Event ........................................ 106

Section 15.3. Payment of Concession Compensation ..................................... 106

ARTICLE 16     DEFAULTS; LETTERS OF CREDIT ...................................... 107

Section 16.1. Default by the Concessionaire .................................................. 107

Section 16.2. Defaults by the City .................................................................. 110

Section 16.3. Letters of Credit ....................................................................... 112

Section 16.4. Consequences of Termination or Reversion .............................. 114

Section 16.5. Termination Other Than Pursuant to Agreement ....................... 116

ARTICLE 17     RESTRICTIONS ON TRANSFERS ........................................ 117

Section 17.1. Transfers by the Concessionaire ............................................... 117

Section 17.2. Assignment by the City ............................................................. 118

ARTICLE 18     LENDER'S RIGHTS AND REMEDIES ................................... 118

Section 18.1. Collateral Assignments ............................................................. 118

## TABLE OF CONTENTS
(continued)

Page

Section 18.2.    Notices and Payments to Collateral Assignees ................................ 119

Section 18.3.    Collateral Assignee's Right to Cure ................................................ 120

Section 18.4.    Rights of the Collateral Assignee ................................................... 120

Section 18.5.    City's Termination of this Agreement; New Agreement ................ 121

Section 18.6.    Right to Arbitration ......................................................................... 122

Section 18.7.    Recognition by the City of Collateral Assignee ............................. 122

Section 18.8.    City's Right to Purchase Indebtedness Secured by Collateral
                 Assignment ...................................................................................... 122

ARTICLE 19      DISPUTE RESOLUTION .......................................................................... 123

Section 19.1.    Scope ................................................................................................ 123

Section 19.2.    Informal Dispute Resolution Procedures ......................................... 123

Section 19.3.    Mediation ......................................................................................... 124

Section 19.4.    Arbitration ........................................................................................ 124

Section 19.5.    Provisional Remedies ....................................................................... 124

Section 19.6.    Tolling .............................................................................................. 125

Section 19.7.    Technical Arbitration ....................................................................... 125

Section 19.8.    Undisputed Amounts ........................................................................ 126

ARTICLE 20      MISCELLANEOUS .................................................................................. 127

Section 20.1.    Notice ............................................................................................... 127

Section 20.2.    Entire Agreement ............................................................................. 127

Section 20.3.    Amendment ...................................................................................... 128

Section 20.4.    Waiver of Rights .............................................................................. 128

Section 20.5.    Severability ...................................................................................... 128

Section 20.6.    Governing Law ................................................................................. 128

Section 20.7.    Submission to Jurisdiction ............................................................... 128

Section 20.8.    Further Acts ...................................................................................... 129

Section 20.9.    Costs ................................................................................................. 129

Section 20.10.   Interest .............................................................................................. 129

Section 20.11.   Inurement and Binding Effect .......................................................... 129

Section 20.12.   No Partnership or Third Party Beneficiaries ................................... 129

-vi-

**TABLE OF CONTENTS**
(continued)

**Page**

Section 20.13.    Cumulative Remedies ....................................................................... 130

Section 20.14.    Non-Liability of Public Officials ..................................................... 130

Section 20.15.    Conflicts of Interest.......................................................................... 130

Section 20.16.    Counterparts; Facsimile Execution .................................................. 130

Section 20.17.    Collaboration..................................................................................... 130

**<u>SCHEDULES</u>**

Schedule 1     Metered Parking System Contracts

Schedule 2     Required Capital Improvements

Schedule 3     Operating Standards

Schedule 4     Metered Parking System Assets

Schedule 5     Metered Parking System

Schedule 6     Article 7 Methodology

Schedule 7     Concession Metered Parking Spaces

Schedule 8     INTENTIONALLY DELETED

Schedule 9     Initial Parking Fees

Schedule 10    Revenue Value

Schedule 11    Form of Legal Opinion of Counsel to the City

Schedule 12    Form of Legal Opinion of Counsel to the Concessionaire

Schedule 13    Financial Information

Schedule 14    Exempt Persons Statistical Sampling Methodology

Schedule 15    Parking Zones

**<u>EXHIBIT</u>**

Exhibit A     Metered Parking System Ordinance

THIS AMENDED AND RESTATED CHICAGO METERED PARKING SYSTEM CONCESSION AGREEMENT (this "Agreement") is made and entered into as of this 5th day of June, 2013 by and between the City of Chicago, a municipal corporation and home rule unit of local government organized and existing under Article VII, Sections 1 and 6(a), respectively, of the 1970 Constitution of the State of Illinois (the "City"), and Chicago Parking Meters, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Concessionaire").

RECITALS

WHEREAS, the City has established a Metered Parking System (as defined herein); and

WHEREAS, pursuant to, and under the terms and conditions contained in, that certain ordinance adopted by the City Council of the City and signed by the Mayor in substantially the same form as set forth on Exhibit A attached hereto (the "Metered Parking System Ordinance"), the City is authorized to enter into the Transaction (as defined herein); and

WHEREAS, the City and the Concessionaire have entered into the CHICAGO METERED PARKING SYSTEM CONCESSION AGREEMENT dated as of December 4, 2008, as amended by letters dated May 20, 2010 and November 10, 2010 (the "Original Agreement"), pursuant to which the Concessionaire obtained from the City the right to operate, maintain and improve the Metered Parking System, to retain the revenues to be derived from the operation of the Concession Metered Parking Spaces and to be compensated for the operation of Reserve Metered Parking Spaces for the Term of the Agreement, subject to the reserved police powers and regulatory powers of the City with respect to the Metered Parking System; and

WHEREAS, the Concessionaire and the City desire to amend the Original Agreement; and

WHEREAS, the Concessionaire agrees to operate, maintain and improve the Metered Parking System in accordance with the provisions of this Agreement including the "Operating Standards" (as herein defined); and

WHEREAS, the rights granted to the Concessionaire pursuant to this Agreement are subject to the reserved police powers and regulatory powers of the City with respect to the Metered Parking System, as further provided in this Agreement;

NOW THEREFORE, for and in consideration of the premises, the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties (as defined herein) covenant and agree as follows:

**ARTICLE 1**
**DEFINITIONS AND INTERPRETATION**

**Section 1.1.** **Definitions**. Unless otherwise specified or the context otherwise requires, for the purposes of this Agreement the following terms have the following meanings:

"<u>AAA</u>" means the American Arbitration Association.

"<u>AAA Rules</u>" means the Commercial Arbitration Rules of the AAA.

"<u>AA-Compensation</u>" has the meaning ascribed thereto in <u>Section 14.1(b)</u>.

"<u>AA-Dispute Notice</u>" has the meaning ascribed thereto in <u>Section 14.1(c)</u>.

"<u>AA-Notice</u>" has the meaning ascribed thereto in <u>Section 14.1(c)</u>.

"<u>AA-Preliminary Notice</u>" has the meaning ascribed thereto in <u>Section 14.1(c)</u>.

"<u>Acquisition Cost Limitation</u>" means, for any Reporting Year, an amount of money equal to $5,000,000, Adjusted for Inflation from the Closing Date to the last Day of the Reporting Year.

"<u>Actual Operating Revenue</u>" means, with respect to a Concession Metered Parking Space and for each Reporting Year or other period of time, the Metered Parking Revenue derived from such Concession Metered Parking Space for that Reporting Year or other period of time as determined by the Concessionaire.

"<u>Actual System Operating Revenue</u>" means, for each Reporting Year, the Metered Parking Revenue derived from the Concession Metered Parking Spaces for such Reporting Year as determined by the Concessionaire. For the avoidance of doubt, "Actual System Operating Revenue" shall not include Concession Compensation or Reserved Powers Adverse Action Compensation.

"<u>Additional Coverages</u>" has the meaning ascribed thereto in <u>Section 13.2(1)</u>.

"<u>Adjusted for Inflation</u>" means adjusted by the percentage increase, if any, or decrease, if any, in the Index during the applicable adjustment period.

"<u>Adverse Action</u>" has the meaning ascribed thereto in <u>Section 14.1(a)</u>.

"<u>Affected Concession Metered Parking Space</u>" means, as of the first Day of a Reporting Year, a Concession Metered Parking Space with respect to which the City exercised a Reserved Power and set an Expected Utilization Rate during the Reporting Year ending one year and one Day prior to such Reporting Year.

"<u>Affiliate</u>", when used to indicate a relationship with a specified Person, means a Person that, directly or indirectly, through one or more intermediaries has a 10% or more voting or economic interest in such specified Person or controls, is controlled by or is under common control with (which shall include, with respect to a managed fund or trust, the right to direct or cause the direction of the management and policies of such managed fund or trust as manager, advisor, supervisor, sponsor or trustee pursuant to relevant contractual arrangements) such specified Person, and a Person shall be deemed to be controlled by another Person, if controlled in any manner whatsoever that results in control in fact by that other Person (or that other Person and any Person or Persons with whom that other Person is acting jointly or in concert), whether

directly or indirectly and whether through share ownership, a trust, a contract or otherwise (for purposes of this definition, a managed fund or trust shall be deemed to be an Affiliate of the Person managing, supervising, sponsoring or advising such fund or trust and a limited partner in a managed fund or trust shall be deemed to be an Affiliate of such fund or trust and of the Person managing, supervising, sponsoring or advising such fund or trust).

"Aggregate Revenue Value" means, as of the first Day of any month, the sum of the Revenue Values of all Concession Metered Parking Spaces and the sum of the Revenue Value Adjustments of all Concession Metered Parking Spaces.

"Agreed Date" means the March 1 occurring not less than 12 months and not more than or equal to 24 months after the date a CLZ Change became effective.

"Agreement" has the meaning ascribed thereto in the preamble to this Agreement (including all Schedules referred to herein), as amended from time to time in accordance with the terms hereof.

"Amended Schedule 10" means Schedule 10 as amended by the First Amendment.

"Amended Schedule 10A" means that portion of Amended Schedule 10 as described in Section 3.21 and Section 7.2(a).

"Amended Schedule 10B" means that portion of Amended Schedule 10 as described in Section 7.2(a).

"Amended Schedule 10C" means that portion of Amended Schedule 10 as described in Section 7.2(a).

"Annual Percentage Adjustment" means (a) for the Reporting Year ending in 2014, zero percent (0%) and (b) for each Reporting Year ending in the year 2015 or any subsequent year, the annual percentage change in the Index for the annual period ending August 31 of the preceding Reporting Year.

"Approval", "Approved", "Approves", "Approved by the City" and similar expressions mean approved or consented to by the City in accordance with the provisions of Section 1.15.

"Assumed Liabilities" has the meaning ascribed thereto in Section 3.2(c).

"Audit" and similar expressions mean, with respect to any matter or thing relating to the Metered Parking System, the Metered Parking System Operations or this Agreement, the performance by or on behalf of the City of such reviews, investigations, inspections and audits relating to such matter or thing as the City may reasonably determine to be necessary in the circumstances, conducted in each case in accordance with applicable United States industry accepted practices, if any, or as required by Law, but in accordance with the provisions of this Agreement.

"Authorization" means any approval, certificate of approval, authorization, consent, waiver, variance, exemption, declaratory order, exception, license, filing, registration, permit,

notarization or other requirement of any Person that applies to the Metered Parking System or is reasonably required from time to time for the Metered Parking System Operations.

"Bank Rate" means the 3-Month London Interbank Offered Rate (LIBOR) (or any successor rate thereto) as reported in *The Wall Street Journal* (or any successor thereof).

"Bid Date" means December 1, 2008.

"Block" means one side of a street between intersecting streets on which one or more Metered Parking Spaces are located, whether or not such spaces are serviced by one or more Metering Devices.

"Breakage Costs" means any breakage costs, make-whole premium payments, termination payments or other prepayment amounts (including debt premiums) that are required to be paid by the Concessionaire with respect to Collateral Assignment Debt as a result of the early repayment of such Collateral Assignment Debt prior to its scheduled maturity date.

"Business Day" means any day that is neither a Saturday, a Sunday nor a day observed as a holiday by the City, the State of Illinois or the United States government.

"Cash Deposit" has the meaning ascribed thereto in Section 2.3(a).

"Casualty Cost" has the meaning ascribed thereto in Section 13.3(a).

"CE-Dispute Notice" has the meaning ascribed thereto in Section 15.3(c).

"CE-Notice" has the meaning ascribed thereto in Section 15.3(a).

"CE-Preliminary Notice" has the meaning ascribed thereto in Section 15.3(a).

"Central Business District" means the district consisting of those streets or parts of streets within the area of the City bounded by a line as follows: beginning at the easternmost point of Division Street extended to Lake Michigan; then west on Division Street to LaSalle Street; then south on LaSalle Street to Chicago Avenue; then west on Chicago Avenue to Halsted Street; then south on Halsted Street to Roosevelt Road; then east on Roosevelt Road to its easternmost point extended to Lake Michigan; including parking spaces on both sides of any of the above-mentioned streets.

"Change in Control" means, with respect to any Person, whether accomplished through a single transaction or a series of related or unrelated transactions and whether accomplished directly or indirectly, either (i) a change in ownership so that 50% or more of the direct or indirect voting or economic interests in such Person is transferred to a Person or group of Persons acting in concert, (ii) the power directly or indirectly to direct or cause the direction of management and policy of such Person, whether through ownership of voting securities, by contract, management agreement, or common directors, officers or trustees or otherwise, is transferred to a Person or group of Persons acting in concert or (iii) the merger, consolidation, amalgamation, business combination or sale of substantially all of the assets of such Person; *provided, however*, that notwithstanding anything to the contrary set forth in this definition (A)

- 4 -

clauses (i) and (ii) above shall apply to transactions in shares of a publicly traded company or other transactions involving a publicly traded company only if they cause such company to no longer be a publicly traded company, (B) Transfers of direct or indirect ownership interests in the Concessionaire or the Operator (as applicable) between or among Persons that are Affiliates (including funds or similar entities managed by such Persons) shall not constitute a "Change in Control" for the purposes of this Agreement, (C) Transfers of shares of the Concessionaire or its direct or indirect parent pursuant to an initial public offering on the New York Stock Exchange, NASDAQ, London Stock Exchange or comparable securities exchange shall not constitute a "Change in Control," (D) transfers of direct or indirect ownership interest in the Concessionaire by any Equity Participant or its beneficial owner(s) to any Person shall not constitute a "Change in Control" so long as the Equity Participants or their beneficial owner(s) having, in the aggregate, more than 50% direct or indirect ownership interest in the Concessionaire as of December 4, 2008 retain, in the aggregate, more than 50% of the rights to elect directors, officers and managers of the Concessionaire.

"City" has the meaning ascribed thereto in the preamble to this Agreement.

"City Default" has the meaning ascribed thereto in Section 16.2(a).

"City Directive" means a written order or directive prepared by or on behalf of the City directing the Concessionaire, to the extent permitted hereby, to add or perform work in respect of the Metered Parking System in addition to that provided for in this Agreement; *provided, however*, that no such order or directive may in any event order or direct the Concessionaire to do any act that could reasonably be expected to violate any applicable Law or cause the Concessionaire to fail to be in compliance with this Agreement.

"City's Option" has the meaning ascribed thereto in Section 18.8(a).

"Claim" means any demand, action, cause of action, suit, proceeding, arbitration, claim, judgment or settlement or compromise relating thereto which may give rise to a right to indemnification under Section 12.1 or 12.2.

"Closing" has the meaning ascribed thereto in Section 2.2(a).

"Closing Date" has the meaning ascribed thereto in Section 2.2(a).

"Closing LOC" has the meaning ascribed thereto in Section 2.3(a).

"CLZ Affected Concession Metered Parking Spaces" means, with respect to a Commercial Loading Zone for which a CLZ Change has occurred, the Concession Metered Parking Spaces located on the same Block (or on the Block across the street from such Block) as such Commercial Loading Zone.

"CLZ Change" shall mean any of the following: (i) a Metered Parking Fee for a Commercial Loading Zone is less than the Metered Parking Fee for any CLZ Affected Concession Metered Parking Spaces, (ii) the Period of Operation for a Commercial Loading Zone is shorter than the Period of Operation for any CLZ Affected Concession Metered Parking Spaces and has the effect of allowing free parking at such Commercial Loading Zone during the

Period of Operation of such CLZ Affected Concession Metered Parking Spaces, or (iii) the CLZ Rate to Fine Multiple is less than 10. For the avoidance of doubt, any change to the Period of Stay for a Commercial Loading Zone shall not give rise to a CLZ Change.

"CLZ Rate to Fine Multiple" means, with respect to any Reserve Metered Parking Space in a Commercial Loading Zone, the amount of the fine imposed for a parking violation divided by the hourly Metered Parking Fee with respect to such Reserve Metered Parking Space.

"Collateral Assignee" means the holder or beneficiary of a Collateral Assignment.

"Collateral Assignee Notice Requirements" means the delivery by a holder of a Collateral Assignment to the City, no later than 10 Business Days after the execution and delivery of such Collateral Assignment by the Concessionaire, of a true and complete copy of the executed original of such Collateral Assignment, together with a notice containing the name and post office address of the holder of such Collateral Assignment.

"Collateral Assignee's Notice" has the meaning ascribed thereto in Section 18.8(a).

"Collateral Assignment" means any collateral assignment or other security agreement or arrangement (including a securitization transaction with respect to Metered Parking Revenues but not Metered Parking Revenues collected by the Concessionaire on behalf of the City) encumbering any or all of the Concessionaire Interest or the shares or equity interests in the capital of the Concessionaire and any cash reserves or deposits held in the name of the Concessionaire, in each case that satisfies all of the conditions in Section 18.1.

"Collateral Assignment Debt" means any bona fide debt (including principal, accrued interest and customary lender or financial insurer, agent and trustee fees, costs, premiums, expenses and reimbursement obligations with respect thereto, and including all payment obligations under interest rate hedging agreements with respect thereto and reimbursement obligations with respect thereto to any financial insurer) or an assignment in connection with a securitization transaction relating to the Metered Parking System and granted to a Person pursuant to an agreement entered into prior to the occurrence of any Adverse Action or City Default or any event of termination, cancellation, rescinding or voiding referred to in Section 16.5 giving rise to the payment of amounts for or in respect of termination under this Agreement. For the purposes of determining Metered Parking System Concession Value, Collateral Assignment Debt shall not include (i) debt from an Affiliate of the Concessionaire or the Operator, unless such debt is on terms consistent with terms that would reasonably be expected from a non-Affiliate lender acting in good faith; (ii) any increase in debt to the extent such increase is the result of an agreement or other arrangement entered into after the Concessionaire was aware (or should have been aware, using reasonable due diligence) of the prospective occurrence of an event giving rise to the payment of the Metered Parking System Concession Value; or (iii) any debt with respect to which the Collateral Assignee did not provide the City with notice of its Collateral Assignment in accordance in all material respects with the Collateral Assignee Notice Requirements. Notwithstanding anything to the contrary set forth in this definition, except with respect to debt incurred or committed on or prior to the Closing Date, all of which incurred or committed debt shall be deemed to be Collateral Assignment Debt, Collateral Assignment Debt shall not include any new debt incurred or committed following the

Closing Date (it being understood and agreed by the Parties that any capitalization of interest or accretion of principal or other committed increases on any debt incurred or committed on or prior to the Closing Date shall not constitute new debt) unless (A) the Concessionaire has provided the City with a written appraisal (at the Concessionaire's expense and by an independent third party appraiser described under "Metered Parking System Concession Value") of the fair market value of the Concessionaire Interest at the time of the incurrence or commitment of such new debt, and (B) such appraisal confirms the aggregate amount of Collateral Assignment Debt after giving effect to the incurrence or commitment of any such new debt is not in excess of the fair market value of the Concessionaire Interest set forth in such appraisal at the time of incurrence of commitment of such new debt *provided* that any capitalization of interest or accretion of principal or other committed increases on any debt set forth in such appraisal shall constitute Collateral Assignment Debt to the extent such debt constitutes Collateral Assignment Debt on the date such appraisal is given; and *provided further* that the Parties agree that notwithstanding the requirements of the foregoing subclauses (A) and (B), the amount of Consideration paid at closing shall be deemed to constitute the fair market value of the Concessionaire Interest for a period of six months after the Closing Date and, as such, no appraisal shall be required within such six-month period. The appraisal requirement in the preceding sentence shall not apply to any protective advances made by any Collateral Assignee or advances made by any Collateral Assignee to cure Concessionaire defaults under the Collateral Assignment (regardless of whether entered into on or after the Closing Date) or other financing documents of such Collateral Assignee.

"Commercial Loading Zone Reserved Power" shall have the meaning given to such term in Section 7.9.

"Commercial Loading Zones" means those spaces or places that the City designates from time to time as spaces or places where, during certain periods of time, the City requires the payment of a Metered Parking Fee for a Commercial Vehicle to be parked, stopped or standing at such space or place for a limited period of time and such designation is effective for all purposes of this Agreement.

"Commercial Vehicle" means a vehicle that is not a Public Passenger Vehicle, and either (i) carries a permit issued under Section 9-64-160(d) of the Municipal Code, (ii) bears commercial vehicle license plates, or (iii) is emblazoned with the name, logo or other identifier of a business affixed either permanently (e.g., stenciled or painted) or temporarily (e.g., a magnetic sticker, or a sign attached to the antenna or placed in a clear sleeve) to the vehicle in a manner identifiable from at least twenty-five feet away. Temporary, unaffixed identification (e.g., a sheet of paper or cardboard on the dashboard or rear window deck) is not sufficient to qualify a vehicle as a Commercial Vehicle.

"Compensation Event" means the Concessionaire's compliance with or the implementation of any City Directive or any modified or changed Operating Standard subject to Section 6.3(b), the occurrence of an Adverse Action or the occurrence of any other event that under the terms of this Agreement explicitly requires the payment of Concession Compensation, including under Section 3.12(c), Section 3.21, Section 4.7(f), Section 6.3(b), Section 7.1, and Section 7.7.

"Competing Public Parking Facility" has the meaning ascribed thereto in Section 3.12(a).

"Concession Compensation" means compensation payable by the City to the Concessionaire in order to restore the Concessionaire to the same economic position the Concessionaire would have enjoyed if the applicable Compensation Event had not occurred, which compensation shall be equal to the sum of (i) all Losses (including increased operating, financing, capital and maintenance costs but excluding any costs and expenses that the Concessionaire would otherwise expend or incur in order to comply with this Agreement or in the ordinary course of the performance of the Metered Parking System Operations or the carrying on of business in the ordinary course) that are reasonably attributable to such Compensation Event plus (ii) the actual and estimated net losses (after giving effect, to the extent applicable, to any increase in revenues, including Metered Parking Revenues that are attributable to such Compensation Event) of the Concessionaire's present and future Metered Parking Revenues that are reasonably attributable to such Compensation Event; *provided, however*, that, unless otherwise specified in this Agreement, any claim for Concession Compensation shall be made within 120 Days of the date that the Concessionaire first became aware of such Compensation Event. Any Concession Compensation payable with respect to Losses or lost Metered Parking Revenues (or other revenues) that will occur in the future shall be payable at the time such Compensation Event occurs based on a reasonable determination of the net present value of the impact of such Compensation Event (i) over the period ending on February 28, 2015 in the case of the Compensation Event described in Section 7.1 and (ii) over the remainder of the Term in the case of any other Compensation Event. If the Concessionaire is required to provide its own capital (whether in the form of debt, equity or otherwise) with respect to compliance with or implementation of a City Directive or a modified or changed Operating Standard (other than a modified Operating Standard described in Section 6.3(a)) or any other Compensation Event, then the Concession Compensation, shall, in addition to the components described above, take into account the actual cost to the Concessionaire of such capital and include a then applicable market-based rate of return thereon (which market-based rate of return shall be reasonably commensurate with then-prevailing rates of return for similar assets and similar or analogous financings in the parking industry and shall take account of the percentage that any Quarterly Settlement Amounts owing to the Concessionaire by the City bear to the Concessionaire's total revenues in determining the appropriate discount rate to use in calculating such rate of return). For purposes of the preceding sentence, the market-based rate of return shall be initially proposed in writing by the Concessionaire to the City. The City may, in accordance with the provisions of Article 19, dispute that such market-based rate of return proposed by the Concessionaire is reasonably commensurate with then-prevailing rates of return for similar assets and similar or analogous financings in the parking industry.

"Concession Metered Parking Spaces" means (i) those Metered Parking Spaces so designated by the City from time to time and included in the Metered Parking System operated and maintained by the Concessionaire pursuant to this Agreement, (ii) as of the Effective Date Of First Amendment, the Metered Parking Spaces listed in Amended Schedule 10 and designated thereon as Concession Metered Parking Spaces, and (iii) as of the Effective Date Of Second Amendment, the Metered Parking Spaces located in the Parking Lots listed on Revised Schedule 10A.

"Concession Year" means (i) if the Closing Date occurs on the first day of a calendar month, the 12-month period beginning on the Closing Date or (ii) if the Closing Date does not occur on the first day of a calendar month, the period from the Closing Date through the end of the calendar month in which the Closing Date occurred and the next succeeding 12-month period and, in either case of clause (i) or (ii), each succeeding 12-month period and in any case ending on the End Date.

"Concessionaire" has the meaning ascribed thereto in the preamble to this Agreement.

"Concessionaire Default" has the meaning ascribed thereto in Section 16.1(a).

"Concessionaire Interest" means the interest of the Concessionaire in the Metered Parking System created by this Agreement and the rights and obligations of the Concessionaire under this Agreement (including the interest and franchise described in Section 2.1(b)(i) and the right to receive Concession Compensation).

"Concessionaire Request" means a written request in respect of the Metered Parking System prepared by or on behalf of the Concessionaire and addressed to the City seeking to make a fundamental change in the dimensions, character, quality or location of any part of the Metered Parking System; *provided, however*, that a Concessionaire Request need not be submitted in connection with operations, maintenance or repair of the Metered Parking System in the ordinary course or any other aspects of Metered Parking System Operations permitted or reserved to the Concessionaire under this Agreement, including any modification or change to the Operating Standards pursuant to Section 6.2.

"Consent" means any approval, consent, ratification, waiver, exemption, franchise, license, permit, novation, certificate of occupancy or other authorization, of any Person, including any Consent issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any applicable Law.

"Consideration" has the meaning ascribed thereto in Section 2.1.  For the avoidance of doubt, the term "Consideration" comprises (a) a fee for the grant of the interest and franchise referred to in Section 2.1(b)(i) and (b) consideration for the conveyance referred to in Section 2.1(b)(ii).

"Construction Contract" means any construction contract entered into by the Concessionaire related to the Metered Parking System (or subcontracts thereunder).

"Consultant" means (i) a consulting firm having experience in the operation and management of metered parking systems jointly appointed by the Parties and (ii) with respect to a technical dispute under Section 19.7, any individual having experience in the operation and management of metered parking systems that is selected by such consulting firm to perform the professional services required to be performed by the Consultant under Section 19.7.

"Contractor" means, with respect to a Person, any contractor with whom such Person contracts to perform work or supply materials or labor in relation to the Metered Parking System, including any subcontractor of any tier, supplier or materialman directly or indirectly employed

pursuant to a subcontract with a Contractor.  For the avoidance of doubt, the Operator (if other than the Concessionaire) shall be a Contractor of the Concessionaire.

"County Roads" means those roadways located in the City that are owned by, or are under the jurisdiction of, the County of Cook, Illinois.

"Day" means a calendar day, beginning at 12:01 a.m. in the central time zone of the United States coinciding with the calendar day.

"Defending Party" has the meaning ascribed thereto in Section 12.4(c).

"Delay Event" means (i) an event of Force Majeure, (ii) a failure to obtain, or delay in obtaining, any Authorization from a Governmental Authority (*provided* that such failure or delay could not have been reasonably prevented by technical and scheduling or other reasonable measures of the Concessionaire), (iii) the enactment of a new Law or the modification, amendment or change in enforcement or interpretation of a Law (including a change in the application thereof by any Governmental Authority) arising after the Bid Date, (iv) a delay caused by the performance of works (including the activities authorized by Section 3.7) carried out by a Governmental Authority or any utility or railway operator or Person not acting under the authority or direction of, or pursuant to a contract, sublease or any other agreement or arrangement with the Concessionaire or the Operator, (v) a delay caused by a failure by the City to perform or observe any of its covenants or obligations under this Agreement or (vi) a delay caused by the presence in, on, under or around the Parking Lots of Hazardous Substances, which in each case results in or would result in a delay or interruption in the performance by the Concessionaire of any obligation under this Agreement; except to the extent that the consequences of such delay or the cause thereof is specifically dealt with in this Agreement or arises by reason of (A) the negligence or intentional misconduct of the Concessionaire or its Representatives, (B) any act or omission by the Concessionaire or its Representatives in breach of the provisions of this Agreement or (C) except as contemplated by Section 5.1, lack or insufficiency of funds or failure to make payment of monies or provide required security on the part of the Concessionaire.  For the avoidance of doubt, a Delay Event shall not include any of the exceptions listed in clauses (i) through (iv) of the definition of Force Majeure.

"Delay Event Dispute Notice" has the meaning ascribed thereto in Section 15.1(e).

"Delay Event Notice" has the meaning ascribed thereto in Section 15.1(e).

"Delay Event Remedy" has the meaning ascribed thereto in Section 15.1(d).

"Delayed RVA Calculation Date" means, with respect to a Concession Metered Parking Space which has an Expected Utilization Rate, the March 1 occurring not less than 24 months and not more than or equal to 36 months after the date such Expected Utilization Rate became effective for such Concession Metered Parking Space (but only if a new Expected Utilization Rate has not become effective during the Reporting Year immediately preceding such March 1).

"Department" has the meaning ascribed thereto in Section 11.2(c).

"Depositary" means a savings bank, a savings and loan association or a commercial bank or trust company which would qualify as an Institutional Lender, designated by the Concessionaire, that enters into an agreement with the Concessionaire to serve as depositary pursuant to this Agreement, *provided* that such Depositary shall have an office, branch, agency or representative located in the City of Chicago; *provided, however*, that so long as a Collateral Assignment is in effect, the Depositary under Section 13.3 shall be the institution acting as the collateral agent or depositary under the financing secured by such Collateral Assignment.

"Designated Senior Person" means an individual designated as such by a Party by written notice to the other Party, including the Deputy Mayor, the Chief Financial Officer and/or the Corporation Counsel in the case of the City, and the Chief Executive Officer and/or the General Counsel in the case of the Concessionaire.

"Direct Claim" means any Claim by an Indemnified Party against an Indemnifier that does not result from a Third Party Claim.

"Document" has the meaning ascribed thereto in Section 1.15(c).

"E.E.O./A.A. Plan" has the meaning ascribed thereto in Section 11.8(b).

"Effective Date Of First Amendment" means the later of (i) the effective date of the ordinance of the City Council that approves the First Amendment, and (ii) the date on which the final form of Amended Schedule 10, including Amended Schedule 10A, Amended Schedule 10B and Amended Schedule 10C is mutually agreed between the Parties.

"Effective Date Of Second Amendment" means the date of the Second Amendment to Amended and Restated Chicago Metered Parking System Concession Agreement between the City and the Concessionaire (i.e., March 1, 2019).

"Eligible Investments" means any one or more of the following obligations or securities: (i) direct obligations of, and obligations fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America, the obligations of which are backed by the full faith and credit of the United States of America; (ii) demand or time deposits, federal funds or bankers' acceptances issued by any Institutional Lender (*provided* that the commercial paper or the short-term deposit rating or the long-term unsecured debt obligations or deposits of such Institutional Lender at the time of such investment or contractual commitment providing for such investment have been rated "A" (or the equivalent) or higher by a Rating Agency or any other demand or time deposit or certificate of deposit fully insured by the Federal Deposit Insurance Corporation); (iii) commercial paper (including both non-interest-bearing discount obligations and interest-bearing obligations payable on demand or on a specified date not more than one year after the date of issuance thereof) which has been rated "A" (or the equivalent) or higher by a Rating Agency at the time of such investment; (iv) any money market funds, the investments of which consist of cash and obligations fully guaranteed by the United States of America or any agency or instrumentality of the United States of America, the obligations of which are backed by the full faith and credit of the United States of America and which have been rated "A" (or the equivalent) or higher by a Rating Agency; and (v) other investments then customarily accepted by the City in similar circumstances; *provided, however*, that no instrument

or security shall be an Eligible Investment if such instrument or security evidences a right to receive only interest payments with respect to the obligations underlying such instrument.

"Encumbrance" means any mortgage, lien, judgment, execution, pledge, charge, security interest, restriction, easement, servitude, option, reservation, lease, claim, trust, deemed trust or encumbrance of any nature whatsoever, whether arising by operation of Law, judicial process, contract, agreement or otherwise created.

"End Date" means the date on which this Agreement expires or is terminated.

"Environment" means soil, surface waters, ground waters, land, stream sediments, surface or subsurface strata and ambient air.

"Environmental Laws" means any Laws applicable to the Metered Parking System regulating or imposing liability or standards of conduct concerning or relating to the regulation, use or protection of human health or the Environment.

"EPAL Percentage" means (1) the sum of the Exempt Person Annual Loss and the Actual System Operating Revenue, divided by (2) the Actual System Operating Revenue, expressed as a percentage.

"Equity Participant" means any Person who holds any shares of capital stock, units, partnership or membership interests, other equity interests or equity securities of the Concessionaire.

"Escrow Agent" means a bank, trust company or national banking association selected by the City to hold the Cash Deposit.

"Excess Value Year" has the meaning ascribed thereto in Section 7.2(b).

"Excluded Liabilities" has the meaning ascribed thereto in Section 3.2(c).

"Exempt Persons" means Persons exempted by Law from paying Metered Parking Fees otherwise applicable to members of the general public. The term "Exempt Persons" does not include any Person exempted from paying Metered Parking Fees under any provision of Law exempting service vehicles operated by employees or agents of the Concessionaire, the Operator or any Contractor.

"Exempt Persons Annual Excess Loss" means, with respect to any Reporting Year, the amount, if any, by which the sum of (a) Metered Parking Revenues derived from Concession Metered Parking Spaces for such Reporting Year and (b) the Exempt Persons Annual Loss for such Reporting Year exceeds one hundred six percent (106%) of the Metered Parking Revenues derived from Concession Metered Parking Spaces for such Reporting Year.

"Exempt Persons Annual Loss" means, with respect to any Reporting Year and based upon a statistical sampling of the use of Concession Metered Parking Spaces undertaken and performed by or at the direction of the Concessionaire in accordance with the requirements set forth in Schedule 14, the Metered Parking Revenues, which would have been derived from

- 12 -

Concession Metered Parking Spaces but which were not collected by the Concessionaire by virtue of the use of Concession Metered Parking Spaces by Exempt Persons, including Persons claiming to be Exempt Persons (as reasonably determined by the Concessionaire and Approved by the City).

"Existing Revenue" means, with respect to a Concession Metered Parking Space, as of the first Day of any month, the Revenue Value for the preceding month, except in the following cases: (i) as of March 1, 2013, "Existing Revenue" shall be the Revenue Value of such Concession Metered Parking Space as set forth on Amended Schedule 10; (ii) as of March 1, 2014, "Existing Revenue" shall be determined pursuant to Section 7.15; and (iii) as of March 1, 2015 and any March 1 thereafter, if (x) the Revenue Value for such space was unchanged during the preceding Reporting Year, (y) a new Expected Utilization Rate did not become effective during the preceding Reporting Year (notwithstanding the reversal of any Reserved Power action in accordance with Section 7.9(h)), (z) such Concession Metered Parking Space did not qualify as a CLZ Affected Concession Metered Parking Space with respect to a CLZ Change occurring during the preceding Reporting Year, and (aa) such Concession Metered Parking Space did not qualify as a CLZ Affected Concession Metered Parking Space with respect to a CLZ Change which was reversed by the City during the preceding Reporting Year, "Existing Revenue" shall be the Actual Operating Revenue for the preceding Reporting Year for such Concession Metered Parking Space plus all Required Closure Payments for the preceding Reporting Year for such Concession Metered Parking Space.

"Existing System Revenue" means, as of any time, the sum of the Existing Revenue of all Concession Metered Parking Spaces.

"Expected Utilization Adjustment" means the percentage derived from the quotient of (Measured Utilization Rate minus Expected Utilization Rate) divided by Measured Utilization Rate, except that Expected Utilization Adjustment cannot be greater than zero percent (0%) for the period commencing on the Closing Date and ending on March 1, 2014.

"Expected Utilization Rate" means the Utilization Rate used for purposes of assigning Revenue Value pursuant to Article 7, and which is (i) estimated by the City in connection with a Reserved Power action (other than a Regular Rate Adjustment) based upon the then current Metered Parking Fee, Period of Operation and Period of Stay, and taking into account, where relevant, Metered Parking Spaces that are comparable based on, among other things, their geographic proximity and Metered Parking Fee; and (ii) with respect to an additional Concession Metered Parking Space pursuant to Section 7.8, based on the Utilization Rate of other spaces on the same Block or if there are no other existing spaces on the same Block, then comparable Metered Parking Spaces taking into account, among other things, their geographic proximity and Metered Parking Fee. None of the Utilization Rates set forth on Amended Schedule 10 shall be considered an Expected Utilization Rate.

"Expert Econometrician" has the meaning ascribed thereto in Section 7.14(b)(ii).

"First Amendment" means the First Amendment to Chicago Metered Parking System Concession Agreement dated as of April 27, 2013 between the City and the Concessionaire.

"Force Majeure" means any event beyond the reasonable control of the Concessionaire that delays, interrupts or limits the performance of the Concessionaire's obligations hereunder or the Concessionaire's use of the Metered Parking System, including an intervening act of God or public enemy, war, invasion, armed conflict, act of foreign enemy, blockade, revolution, act of terror, sabotage, civil commotions, interference by civil or military authorities, condemnation or confiscation of property or equipment by any Governmental Authority, nuclear or other explosion, radioactive or chemical contamination or ionizing radiation, fire, tornado, flooding, earthquake or other natural disaster, riot or other public disorder, epidemic, quarantine restriction, strike, labor dispute or other labor protest, stop-work order or injunction issued by a Governmental Authority, governmental embargo, except to the extent that the consequence of such event is otherwise specifically dealt with in this Agreement or arises by reason of (i) the negligence or intentional misconduct of the Concessionaire or its Representatives, (ii) any act or omission by the Concessionaire or its Representatives in breach of the provisions of this Agreement, (iii) except as contemplated by Section 5.1, lack or insufficiency of funds or failure to make payment of monies or provide required security on the part of the Concessionaire or (iv) any strike, labor dispute or other labor protest involving any Person retained, employed or hired by the Concessionaire or its Representatives to supply materials or services for or in connection with the Metered Parking System Operations or any strike, labor dispute or labor protest pertaining to the Concessionaire that is not of general application that is caused by or attributable to any act (including any pricing or other practice or method of operation) or omission of the Concessionaire or its Representatives.

"Full Utilization Amount" means, with respect to a Concession Metered Parking Space as of the first Day of any month, the product of the Period of Operation then in effect (calculated for an entire Reporting Year) and the Metered Parking Fee then in effect for such Period of Operation. For those Concession Metered Parking Spaces for which the Period of Operation or the Metered Parking Fee varies during the Reporting Year, "Full Utilization Amount" means the sum of the product of each Metered Parking Fee in effect for such space multiplied by the applicable Period of Operation for such Metered Parking Fee during the Reporting Year. Any calculation of Full Utilization Amount shall assume that the then current Metered Parking Fee and Period of Operation were implemented as of, and in effect continuously from, March 1 of such Reporting Year. For any Concession Metered Parking Space for which a Regular Rate Adjustment became effective during January (unless an Expected Utilization Rate also became effective for such space during January), the "Full Utilization Amount" as of the first Day of the immediately following February shall exclude the effect of such Regular Rate Adjustment, and such Regular Rate Adjustment instead shall be included in the Full Utilization Amount for such space as of March 1.

"Governmental Authority" means any court, federal, state, local or foreign government, department, commission, board, bureau, agency or other regulatory, administrative, governmental or quasi-governmental authority.

"Hazardous Substance" means any solid, liquid gas, odor, heat, sound, vibration, radiation or other substance or emission which is a contaminant, pollutant, dangerous substance, toxic substance, hazardous waste, subject waste, hazardous material or hazardous substance which is or becomes regulated by applicable Environmental Laws or which is classified as hazardous or toxic under applicable Environmental Laws (including gasoline, diesel fuel or other

petroleum hydrocarbons, polychlorinated biphenyls, asbestos and urea formaldehyde foam insulation).

"Hours of Operation" means, with respect to each Metered Parking Space and with respect to a Metered Parking Fee, the current number of annual hours during which the City permits the parking of a motor vehicle in that Metered Parking Space and requires the payment of a Metered Parking Fee for use of that Metered Parking Space.

"Impacted Concession Metered Parking Spaces" has the meaning ascribed thereto in Section 7.15.

"Implementation Date" has the meaning ascribed thereto in Section 7.15.

"Indemnified Party" means any Person entitled to indemnification under this Agreement.

"Indemnifier" means any Party obligated to provide indemnification under this Agreement.

"Indemnity Payment" has the meaning ascribed thereto in Section 12.7.

"Index" means the "Consumer Price Index – U.S. City Averages for all Urban Consumers, All Items" (not seasonally adjusted) as published by the U.S. Department of Labor, Bureau of Labor Statistics; *provided, however*, that if the Index is changed so that the base year of the Index changes, the Index shall be adjusted in accordance with the conversion factor published by the U.S. Department of Labor, Bureau of Labor Statistics; *provided further* that if the Index is discontinued or revised during the Term, such other index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if the Index had not been discontinued or revised.

"Information" means any and all information relating to the Metered Parking System Operations, including (i) income statements, balance sheets, statements of cash flow and changes in financial position, details regarding Metered Parking Revenues derived from Metered Parking System Operations, operating income, expenses, capital expenditures and budgeted operating results relating to the Metered Parking System Operations, (ii) all certificates, correspondence, data (including test data), documents, facts, files, information, investigations, materials, notices, plans, projections, records, reports, requests, samples, schedules, statements, studies, surveys, tests, test results, parking information (including volume counts, classification counts, and vehicle jurisdiction data) analyzed, categorized, characterized, created, collected, generated, maintained, processed, produced, prepared, provided, recorded, stored or used by the Metered Parking System, the Concessionaire or any of its Representatives in connection with the Metered Parking System or the Metered Parking System Operations and (iii) proper, complete and accurate books, records, accounts and documents of the Concessionaire relating to the Metered Parking System Operations, including any Information that is stored electronically or on computer-related media; *provided, however*, that nothing in this Agreement shall require the disclosure by any Party of Information that is protected by attorney-client or other legal privilege based upon an opinion of counsel reasonably satisfactory to the other Party or acquired by a Party subject to a confidentiality agreement.

"Initial Period" means the period from the Closing Date to and including May 31, 2009.

"Initial Period Percentage" means the percentage obtained by dividing the number of Days in the Initial Period by 365.

"Initial Reporting Year Multiplier" means the fraction the numerator of which is 365 and the denominator of which is the number of Days in the Reporting Year commencing on the Closing Date and ending on February 28, 2010.

"Initial Revenue Value" means the Revenue Value of each Concession Metered Parking Space as of the Bid Date, as set forth in Schedule 10 as revised within 10 Days of the Closing Date pursuant to Section 2.2(c).

"Initial Schedule of Parking Fees" means the fee schedule for Metered Parking Spaces set forth in Schedule 9.

"Institutional Lender" means (a) the United States of America, any state thereof or any agency or instrumentality of either of them, any municipal agency, public benefit corporation or public authority, advancing or insuring mortgage loans or making payments which, in any manner, assist in the financing, development, operation and maintenance of projects, (b) any (i) savings bank, savings and loan association, commercial bank, trust company (whether acting individually or in a fiduciary capacity) or insurance company organized and existing under the laws of the United States of America or any state thereof, (ii) foreign insurance company or commercial bank qualified to do business as an insurer or commercial bank as applicable under the laws of the United States (if such qualification is necessary in connection with the acquisition of Collateral Assignment Debt), (iii) pension fund, foundation or university or college or other endowment fund or (iv) investment bank, pension advisory firm, mutual fund, investment company or money management firm, (c) any "qualified institutional buyer" under Rule 144(A) under the Securities Act or any other similar Law hereinafter enacted that defines a similar category of investors by substantially similar terms or (d) any other financial institution or entity designated by the Concessionaire and Approved by the City (*provided* that such institution or entity, in its activity under this Agreement, shall be acceptable under then current guidelines and practices of the City); *provided, however*, that each such entity (other than entities described in clause (c) of this definition) or combination of such entities if the Institutional Lender shall be a combination of such entities shall have individual or combined assets, as the case may be, of not less than $500,000,000, which shall include, in the case of an investment or advisory firm, assets controlled by it or under management.

"Law" means any order, writ, injunction, decree, judgment, law, ordinance, decision, opinion, ruling, policy, statute, code, rule or regulation of any Governmental Authority.

"Letter of Credit" means an irrevocable, unconditional, commercial letter of credit, in favor of the City, in form and content reasonably acceptable to the City, payable in U.S. dollars upon presentation of a sight draft and a certificate confirming that the City has the right to draw under such letter of credit in the amount of such sight draft, without presentation of any other Document, which letter of credit (i) is issued by a commercial bank or trust company that is a member of the New York Clearing House Association and that has a current credit rating of A1

or better by Standard & Poor's Ratings Services and an equivalent credit rating by another Rating Agency (or an equivalent credit rating from at least two nationally recognized Rating Agencies if the named Rating Agency ceases to publish ratings) (or such other commercial bank or trust company reasonably acceptable to the City and Approved by the City prior to the submission of the letter of credit), and (ii) provides for the continuance of such letter of credit for a period of at least one year or as otherwise provided in this Agreement. The office for presentment of sight drafts specified in the Letter of Credit shall be located at a specified street address within the City of Chicago or other location acceptable to the City. For the avoidance of doubt, the obligations of the account party during the Term to reimburse the issuer for draws under the Letter of Credit may be secured by a Collateral Assignment.

"Loss" means, with respect to any Person, any loss, liability, damage, penalty, charge or out-of-pocket and documented cost or expense actually suffered or incurred by such Person, but excluding any punitive, special, indirect and consequential damages and any contingent liability until such liability becomes actual.

"M./W.B.E.s" has the meaning ascribed thereto in Section 11.8(a).

"Material Adverse Effect" means a material adverse effect on the business, financial condition or results of operations of the Metered Parking System taken as a whole; *provided, however*, that no effect arising out of or in connection with or resulting from any of the following shall be deemed, either alone or in combination, to constitute or contribute to a Material Adverse Effect: (i) general economic conditions or changes therein; (ii) financial, banking, currency or capital markets fluctuations or conditions (either in the United States or any international market and including changes in interest rates); (iii) conditions affecting the financial services or parking industries generally; (iv) any existing event or occurrence of which the Concessionaire has actual knowledge as of the Bid Date; (v) any action, omission, change, effect, circumstance or condition contemplated by this Agreement other than, for purposes of Section 14.3, the exercise of any Reserved Power, or attributable to the execution, performance or announcement of this Agreement or the transactions contemplated hereby (except for any litigation relating thereto or to this Agreement (or the matters contemplated herein)); and (vi) negligence, intentional misconduct or bad faith of the Concessionaire or its Representatives.

"Mayor" means the Mayor of the City or another City official acting under the direction and pursuant to the authority of the Mayor.

"Measured Full Utilization Amount" means, with respect to a Concession Metered Parking Space for any measurement period, the product of the Period of Operation over such measurement period (which shall not include any period during such Period of Operation when the Metering Device for such space was not operating) multiplied by the Metered Parking Fee charged during that Period of Operation. For those Concession Metered Parking Spaces for which the Period of Operation or the Metered Parking Fee varies during such measurement period, "Measured Full Utilization Amount" means the sum of the product of each Metered Parking Fee in effect for such space during any part of such measurement period multiplied by the applicable Period of Operation for such Metered Parking Fee.

- 17 -

"Measured Utilization Rate" means, with respect to a Concession Metered Parking Space and as of the first Day of a Reporting Year commencing with the second Reporting Year, the percentage obtained by dividing (i) the sum of the Actual Operating Revenue allocated to such space for the preceding Reporting Year plus all Required Closure Payments allocated to such space for the preceding Reporting Year, by (ii) the Measured Full Utilization Amount for such space for the preceding Reporting Year.

"Metered Parking Fee" means the fee established by the City, and revised from time to time, as consideration for the privilege of parking a motor vehicle.

"Metered Parking Revenues" means, during the Term, the revenues derived from Metered Parking Fees collected by the Concessionaire from the operation of Concession Metered Parking Spaces and Reserve Metered Parking Spaces, and shall be determined from collection data maintained by the Concessionaire in accordance with the Operating Standards.

"Metered Parking Services" means the services to be provided by the Concessionaire as grantee of the concession under this Agreement.

"Metered Parking Spaces" means (i) those spaces or places that the City designates from time to time as parking spaces or places where, during certain periods of time, the City requires the payment of a Metered Parking Fee for parking a motor vehicle at that space or place for a limited period of time and such designation is effective for all purposes of this Agreement notwithstanding that Exempt Persons (such as Persons with disabilities) using that parking space or place may be exempted from paying the Metered Parking Fee otherwise applicable to members of the general public; and (ii) Commercial Loading Zones.  Unless otherwise agreed to in writing by the City, each Metered Parking Space (other than Commercial Loading Zones) shall have a length of no less than 18 feet but no more than 22 feet; *provided, however,* that if such Metered Parking Space is adjacent to only one other Metered Parking Space, it shall be no less than 17 feet in length.  The length of each Commercial Loading Zone shall be the length of the area designated for such Commercial Loading Zone on its respective Block.

 "Metered Parking System" means the Metering Devices, supporting structures, computer systems and software used in connection with the administration of Concession Metered Parking Spaces and Reserve Metered Parking Spaces and the collection of Metered Parking Fees therefrom as described on Schedule 5, and all improvements of any and every kind whatsoever forming a part of and used in connection with the operation and maintenance of (i) the metering system associated with the Concession Metered Parking Spaces and Reserve Metered Parking Spaces (including all Metering Devices but excluding any interest in the streets, sidewalks, paving or similar real property) and (ii) Parking Lots (including paving and boundary fences).

"Metered Parking System Assets" means, (i) as of the time immediately prior to the Time of Closing, the personal property of the City used in connection with operations of the Metered Parking System set forth on Schedule 4 and (ii) from and after the Time of Closing, the personal property of the Concessionaire or the Operator used in connection with the operations of the Metered Parking System.

"Metered Parking System Concession Value" means, at any given date, the fair market value of the Concessionaire Interest at the time of the occurrence of the relevant Adverse Action or City Default or any event of termination, cancellation, rescinding or voiding referred to in Section 16.5 (but excluding the effect of such Adverse Action or City Default or such other event referred to in Section 16.5) and taking into account reasonably foreseeable improvements to the Metered Parking System and the operations and revenues thereof, as determined pursuant to a written appraisal by an independent third party appraiser that is nationally recognized in appraising similar assets and that is acceptable to the City and the Concessionaire; *provided, however*, that the Metered Parking System Concession Value shall in no event be less than the amount of all Collateral Assignment Debt (including Breakage Costs) on the End Date. If the Parties fail to agree upon such a single appraiser within 30 Days after a Party requests the appointment thereof, then the City and the Concessionaire shall each appoint an independent third party appraiser and both such appraisers shall be instructed jointly to select a third independent third party appraiser to make the appraisal referred to above. The City shall pay the reasonable costs and expenses of any appraisal.

"Metered Parking System Contracts" means the agreements to which the City is a party relating to the operations of the Metered Parking System that are set forth on Schedule 1.

"Metered Parking System Operations" means (i) the operation, management and maintenance of the Metered Parking System and (ii) all other actions relating to the Metered Parking System that are performed by or on behalf of the Concessionaire pursuant to this Agreement.

"Metered Parking System Ordinance" has the meaning ascribed thereto in the recitals to this Agreement.

"Metering Devices" means, with respect to the Concession Metered Parking Spaces and the Reserve Metered Parking Spaces, the parking meters, pay and display stations, electronic metering devices, and other similar devices that may be used from time to time in connection with the Metered Parking System Operations.

"Monthly Full Utilization Amount" means, with respect to a Concession Metered Parking Space as of the first Day of a month, the sum of the product of each Metered Parking Fee in effect for such space during any part of such month multiplied by the applicable Period of Operation for such Metered Parking Fee during such month.

"Monthly System in Service Percentage" means, for any month, the System in Service Percentage as of the first Day of the month.

"Municipal Code" means the Municipal Code of Chicago, as amended.

"New Agreement" has the meaning ascribed thereto in Section 18.5(a).

"Non-Impacted Concession Metered Parking Spaces" has the meaning ascribed thereto in Section 7.15.

"Notice Period" has the meaning ascribed thereto in Section 12.4(b).

"Off Street Parking Spaces" means Metered Parking Spaces that are located in City owned parking lots, including Parking Lots.

"Offsets" has the meaning ascribed thereto in Section 12.11(a).

"On Street Parking Spaces" means Metered Parking Spaces that are located in and along the public way, including in and along public streets.

"Operating Agreement" means any material agreement, contract or commitment to which the Concessionaire is a party relating to the Metered Parking System Operations as in force from time to time (including any warranties or guaranties) but excluding any Collateral Assignment and any finance documents related thereto.

"Operating Agreements and Plans" has the meaning ascribed thereto in Section 3.14.

"Operating Expenses" means any and all operating expenses of the Metered Parking System Operations determined in accordance with generally accepted accounting principles, including: supplies, material and parts costs, employee salaries, employee benefits, costs of any interns and independent contractors, advertising, marketing and public relations costs and commissions, janitorial and cleaning expenses, data processing costs, the incremental costs of procuring, administering and maintaining the insurance required hereunder directly attributable to the Metered Parking System (including the costs of premiums and deductibles), amounts expended to procure and maintain permits and licenses, charges, Taxes to the extent required to be paid by the Concessionaire, excises, professional fees, printing and stationary costs, postage and freight costs, equipment rental costs, computer equipment leases and line charges, repair and maintenance costs, security expenses, snow and ice removal, the cost of employee uniforms, safety and medical expenses, exterminator and waste disposal costs, costs related to the maintenance of signage, inventory and systems, costs related to compliance with Laws and costs incurred under agreements, commitments, licenses and contracts executed in the Concessionaire's name; *provided* that Operating Expenses shall not include (i) costs of compliance with the M./W.B.E. requirements imposed under this Agreement, (ii) expenses related to Concessionaire or Operator personnel based outside the City of Chicago, (iii) severance for Concessionaire or Operator employees, (iv) relocation expenses of Concessionaire or Operator employees, (v) Construction Contracts and (vi) any costs or expenses required to be paid by the City under the terms of this Agreement.

"Operating Standards" means the standards, specifications, policies, procedures and processes that apply to the operation of, maintenance of, rehabilitation of and capital improvements to, the Metered Parking System set forth in Schedule 3, including any plans submitted by the Concessionaire to the City as required therein. To the extent that any term or provision set forth in Schedule 3 or incorporated by reference in Schedule 3 conflicts with any term or provision specified in this Agreement, then such term or provision of this Agreement shall govern and shall supersede any such conflicting term or provision.

"Operator" has the meaning ascribed thereto in Section 3.3.

"Other Metered Parking Spaces" means Metered Parking Spaces that are not Concession Metered Parking Spaces or Reserve Metered Parking Spaces.

"Parking Lots" means the parking lots owned by the City where Metered Parking Spaces are located, which are (i) as of the Effective Date Of First Amendment, the Parking Lots listed in Amended Schedule 10A and, (ii) as of the Effective Date Of Second Amendment, the Parking Lots listed on Revised Schedule 10A.

"Parking Taxes" means taxes imposed on customers of the Metered Parking System or the operation of the Parking Lots by any Governmental Authority pursuant to (i) Section 4-236 of the Municipal Code, (ii) the Cook County Parking Lot and Garage Operations Tax, (iii) any similar tax imposed on the privilege of parking a motor vehicle or operating a parking lot or parking garage, but not including Taxes of general application such as a general sales tax, or (iv) any other fee or additional charge imposed on customers of the Metered Parking System that is added to the Metered Parking Fee or included as part of the Metered Parking Fee to the extent that such fee or charge must be remitted to the City or to another political subdivision at the direction of the City.

"Parking Zones" means those geographic areas of the City as set forth in Schedule 15.

"Party" means a party to this Agreement and "Parties" means both of them.

"Pay-by-Cell" means a system that allows a customer to pay a Metered Parking Fee by cellular telephone or other device without using a pay and display station or other Metering Device physically located at or near such space, the implementation of which does not require modification of the existing Metered Parking System other than as provided in Section 4.7 or as may be directed by the City pursuant to Section 5.1.

"Pay-by-Cell Operator" has the meaning ascribed thereto in Section 4.7(g).

"Pay-by-Cell Proposed Change(s)" has the meaning ascribed thereto in Section 4.7(d)(iv).

"Pay-by-Cell Review Date" means each date that is every eighteen (18) months after the implementation of Pay-by-Cell.

"Pay-by-Cell Threshold" has the meaning ascribed thereto in Section 4.7(d)(ii).

"Pay-by-Cell Trigger Event" has the meaning ascribed thereto in Section 4.7(d)(iv).

"Period of Operation" means, with respect to each Metered Parking Space, the Days and the period or periods of time during each Day that the City permits the parking of a motor vehicle in that Metered Parking Space and requires the payment of a Metered Parking Fee for use of that Metered Parking Space.

"Period of Stay" means, with respect to each Metered Parking Space, the period or periods of time that the same motor vehicle may remain continuously parked in such Metered Parking Space.

"Permitted City Encumbrance" means, with respect to the Metered Parking System: (i) the Concessionaire Interest; (ii) any Encumbrance that is being contested, or being caused to be

contested, by the City in accordance with Section 3.5(b) (but only for so long as such contest effectively postpones enforcement of any such Encumbrance); (iii) inchoate materialmen's, mechanics', workmen's, repairmen's, employees', carriers', warehousemen's or other like Encumbrances arising in the ordinary course of business of the Metered Parking System or the City's performance of any of its rights or obligations hereunder, and either (A) not delinquent or (B) which are being contested, or are being caused to be contested, by the City in accordance with Section 3.5(b) (but only for so long as such contest effectively postpones enforcement of any such Encumbrance); (iv) any easement, covenant, condition, right-of-way, servitude, or any zoning, building, environmental, health or safety Law relating to the development, use or operation of the Metered Parking System (or other similar reservation, right and restriction) or other defects and irregularities in the title to the Metered Parking System (including, without limitation, the Parking Lots) that do not materially interfere with the Metered Parking System Operations or the rights and benefits of the Concessionaire under this Agreement or materially impair the value of the Concessionaire Interest; (v) the Reserved Powers; (vi) the police and regulatory powers of the State of Illinois with respect to State Roads; (vii) the police and regulatory powers of the County of Cook, Illinois with respect to County Roads; (viii) any right reserved to or vested in any Governmental Authority (other than the City) by any statutory provision or under common law (it being understood and agreed that nothing in this clause (viii) shall limit or otherwise affect the City's obligations or the Concessionaire's rights hereunder); (ix) any other Encumbrance permitted hereunder; (x) any Encumbrances created, incurred, assumed or suffered to exist by the Concessionaire or any Person claiming through it; (xi) any rights reserved to or vested in the City by any statutory provision (it being understood and agreed that nothing in this definition shall limit or otherwise affect the City's obligations or the Concessionaire's rights hereunder); and (xii) any amendment, extension, renewal or replacement of any of the foregoing.

"Permitted Concessionaire Encumbrance" means, with respect to the Concessionaire Interest:  (i) any Encumbrance that is being contested in accordance with Section 3.5(a) (but only for so long as such contest effectively postpones enforcement of any such Encumbrance); (ii) any (A) lien or security interest for obligations not yet due and payable to a Contractor or other Person, (B) any statutory lien, deposit or other non-service lien or (C) lien, deposit or pledge to secure mandatory statutory obligations or performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or for purposes of like general nature, any of which are incurred in the ordinary course of business of the Metered Parking System Operations and either (A) not delinquent or (B) which are being contested by the Concessionaire in accordance with Section 3.5(a) (but only for so long as such contest effectively postpones enforcement of any such Encumbrance); (iii) inchoate materialmen's, mechanics', workmen's, repairmen's, employees', carriers', warehousemen's, or other like Encumbrances arising in the ordinary course of business of the Metered Parking System or the Concessionaire's performance of any of its rights or obligations hereunder, and either (A) not delinquent or (B) which are being contested by the Concessionaire in accordance with Section 3.5(a) (but only for so long as such contest effectively postpones enforcement of any such Encumbrance); (iv) any right reserved to or vested in any Governmental Authority by any statutory provision or under common law; (v) any Collateral Assignment and any other Encumbrance permitted hereunder; (vi) liens incurred in the ordinary course of business in connection with workers' compensation, unemployment insurance, social security and other governmental rules and that do not in the aggregate materially impair the use, value or operation of the Metered Parking System; (vii) any

Encumbrances created, incurred, assumed or suffered to exist by the City or any Person claiming through the City; and (viii) any amendment, extension, renewal or replacement of any of the foregoing.  No Permitted Concessionaire Encumbrance shall be permitted to attach to the fee simple interest in any Parking Lot or any part of the public right of way.

"Person" means any individual (including, the heirs, beneficiaries, executors, legal representatives or administrators thereof), corporation, partnership, joint venture, trust, limited liability company, limited partnership, joint stock company, unincorporated association or other entity or a Governmental Authority.

"Property Taxes" means any ad valorem property Tax (including property Taxes under the State of Illinois Property Tax Code, 35 ILCS 200/1-1 et seq.) attributable to the Metered Parking System or the Concessionaire Interest (other than any Tax charged imposed or assessed in connection with (i) any Transfer during the Term of all or a portion of the Concessionaire Interest or (ii) any purported leasehold interest of the Concessionaire in the Metered Parking System, fixtures or improvements, to the extent the Metered Parking System, fixtures or improvements, are not used for the purpose of parking as stated in 35 ILCS 200/15-185(b) as in effect on the Bid Date).

"Public Passenger Vehicle" means a motor vehicle which is used for the transportation of passengers for hire.

"Quarter" means (i) the Initial Period and (ii) on and after June 1, 2009, each of the three-month periods in a Reporting Year ending respectively on the last Days of May, August, November and February of that Reporting Year.

"Quarterly Settlement Amount" means, (i) for any Quarter other than the Initial Period, the sum of (a) any Required Closure Payments accrued in that Quarter plus (b) [twenty-five percent (25%) multiplied by the Settlement System Revenue Value multiplied by (one plus the Annual Percentage Adjustment) multiplied by (one minus the Quarterly System in Service Percentage)]; and (ii) for the Initial Period, the sum of (a) any Required Closure Payments accrued in that Quarter plus (b) [the Initial Period Percentage of the Settlement System Revenue Value multiplied by (one plus the Annual Percentage Adjustment) multiplied by (one minus the Quarterly System in Service Percentage)].

"Quarterly System in Service Percentage" means, for any Quarter, the simple average of each of the Monthly System in Service Percentages for that Quarter.

"Rate to Fine Multiple" means, with respect to any Concession Metered Parking Space, the amount of the fine imposed for a parking violation divided by the hourly Metered Parking Fee with respect to such Concession Metered Parking Space.

"Rate to Fine Multiple Factor" means the adjustment (if any) to the Revenue Value of a Concession Metered Parking Space required by Section 7.9(e).

"Rating Agency" means any of Standard & Poor's Corporation, Moody's Investors Service, Inc. or Fitch Investors Service, Inc. or any similar entity or any of their respective successors.

"Regular Rate Adjustment" means any revision in the Metered Parking Fee for a Concession Metered Parking Space that (i) decreases the Metered Parking Fee, or (ii) during the period from the Closing Date to and including December 31, 2013, increases the Metered Parking Fee in accordance with and by no more than the Initial Schedule of Parking Fees or (iii) after December 31, 2013 increases the Metered Parking Fee to a Metered Parking Fee that is no more than $0.25 greater than the Metered Parking Fee for such Concession Metered Parking Space that was in effect on December 31, 2013, Adjusted for Inflation to the date the revised Metered Parking Fee takes effect, or if such Concession Metered Parking Space was not designated as a Concession Metered Parking Space on December 31, 2013, then the date such Concession Metered Parking Space was so designated, Adjusted for Inflation to the date the revised Metered Parking Fee takes effect.

"Remaining Amortized Value" means an amount of money equal to the Consideration, Adjusted for Inflation from the Closing Date to the Reversion Date, multiplied by a fraction the numerator of which is the number of Days to elapse from the Reversion Date established as a result of the Concessionaire's election to terminate this Agreement pursuant to Section 14.3(e) to February 29, 2084 (or such later date if the Term has been extended pursuant to Section 15.1(d) and the denominator of which is the number of Days from the Closing Date to February 29, 2084 (or such later date if the Term has been extended pursuant to Section 15.1(d)).

"Replacement Letter of Credit" has the meaning ascribed thereto in Section 16.3(c).

"Reporting Year" means each annual period from the Closing Date to the End Date, except that the first Reporting Year shall be a period commencing on the Closing Date and ending on February 28, 2010 and the last Reporting Year shall be a partial Reporting Year commencing March 1st of such Reporting Year and ending on the End Date.

"Representative" means, with respect to any Person, any director, officer, employee, official, partner, member, owner, agent, lawyer, accountant, auditor, professional advisor, consultant, engineer, Contractor, other Person for whom such Person is at law responsible or other representative of such Person and any professional advisor, consultant or engineer designated by such Person as its "Representative."

"Required Closure" means an interruption to or the suspension of Metered Parking System Operations by the City with respect to a Concession Metered Parking Space during the Period of Operation of such Concession Metered Parking Space established by the City due to street closures, the closure of a street to vehicular traffic, emergency parking bans, weather related closures, sidewalk closures related to building construction, sidewalk construction or repair, street construction or repair, utility work and similar activities.

"Required Closure Allowance" means (i) with respect to a Concession Metered Parking Space located within the Central Business District and a Reporting Year, eight percent (8%) of the number of Days during such Reporting Year that such Concession Metered Parking Space was a designated Concession Metered Parking Space for Metered Parking System Operations, and (ii) with respect to a Concession Metered Parking Space not located within the Central Business District and a Reporting Year, four percent (4%) of the number of Days during such Reporting Year that such Concession Metered Parking Space was a designated Concession

Metered Parking Space for Metered Parking System Operations, in each case rounded to the nearest number of Days, and in either case based upon the assumption that such Concession Metered Parking Space will continue to be a Concession Metered Parking Space for the remainder of such Reporting Year.

"Required Closure Payment" means, with respect to a Concession Metered Parking Space and for the Quarter during which the Required Closure Allowance for the Reporting Year is first exceeded and for each subsequent Quarter during the Reporting Year, an amount of money calculated as provided in Schedule 6 and in accordance with the rules set forth in Section 7.9(c).

"Required Coverages" has the meaning ascribed thereto in Section 13.1.

"Reserve Metered Parking Spaces" means those Metered Parking Spaces so designated by the City that the Concessionaire operates and maintains on behalf of the City pursuant to this Agreement and with respect to which the City is paid the net Metered Parking Revenues.

"Reserve Metered Parking Spaces Payment" has the meaning ascribed thereto in Section 7.1.

"Reserved Powers" means the exercise by the City of those police and regulatory powers with respect to Metered Parking Spaces, including Concession Metered Parking Spaces and Reserve Metered Parking Spaces, and the regulation of traffic, traffic control and the use of the public way including the exclusive and reserved rights of the City to (i) designate the number and location of Metered Parking Spaces and to add and remove Metered Parking Spaces; (ii) establish and revise from time to time the schedule of Metered Parking Fees for the use of Metered Parking Spaces; (iii) establish and revise from time to time the Periods of Operation and Periods of Stay of Metered Parking Spaces; (iv) establish a schedule of fines for parking violations; (v) administer a system for the adjudication and enforcement of parking violations and the collection of parking violation fines and (vi) establish and administer peak period pricing, congestion pricing or other similar plans.

"Reserved Powers Action Date" has the meaning ascribed thereto in Section 7.4.

"Reserved Powers Adverse Action" has the meaning ascribed thereto in Section 14.3(b).

"Reserved Powers Adverse Action Compensation" has the meaning ascribed thereto in Section 14.3(a).

"Reserved Powers System Impact" means one minus (Aggregate Revenue Value divided by Existing System Revenue).

"Restoration" has the meaning ascribed thereto in Section 13.3(a).

"Restoration Funds" has the meaning ascribed thereto in Section 13.3(a).

"Revenue Distribution Percentage" means, with respect to any Concession Metered Parking Space as of the first Day of any month, an amount equal to the Monthly Full Utilization

Amount for such space divided by the sum of the Monthly Full Utilization Amounts for all Concession Metered Parking Spaces served by the same Metering Device.

"Revenue Value" means, with respect to each Concession Metered Parking Space, the value of such Concession Metered Parking Space computed and determined pursuant to Schedule 6, as such value may be determined or adjusted pursuant to Section 7.4, Section 7.8, Section 7.9, and Section 7.14.

"Revenue Value Adjustment" means on the first Day of each Reporting Year beginning on March 1, 2015 and with respect to a Concession Metered Parking Space, the value computed and determined pursuant to Schedule 6, Section 7.9 and Section 7.14. On every other Day, the Revenue Value Adjustment for any Concession Metered Parking Space is zero.

"Reversion Date" means the Business Day immediately following the End Date.

"Revised Schedule 10A" means that portion of Amended Schedule 10 as described in Section 7.2(a).

"RPA Determination" has the meaning ascribed thereto in Section 7.14(a).

"RPA Determination Proceeding" has the meaning ascribed thereto in Section 7.14(a).

"RP-Dispute Notice" has the meaning ascribed thereto in Section 14.3(d).

"RP-Notice" has the meaning ascribed thereto in Section 14.3(d).

"RP-Preliminary Notice" has the meaning ascribed thereto in Section 14.3(d).

"RVA Calculation Date" means a Scheduled RVA Calculation Date or a Delayed RVA Calculation Date.

"Schedule" means a schedule attached hereto and incorporated in this Agreement, unless otherwise expressly indicated by the terms of this Agreement.

"Scheduled RVA Calculation Date" means, with respect to a Concession Metered Parking Space which has an Expected Utilization Rate, the March 1 occurring not less than 12 months and not more than or equal to 24 months after the date such Expected Utilization Rate became effective for such Concession Metered Parking Space (but only if a new Expected Utilization Rate has not become effective during the Reporting Year immediately preceding such March 1).

"Securities Act" means the United States Securities Act of 1933, as amended.

"Settlement Credit" has the meaning ascribed thereto in Section 7.6(b).

"Settlement System Revenue Value" means (i) on any date from March 1, 2013 to February 28, 2014, both dates inclusive, Aggregate Revenue Value as of March 1, 2013 as shown on Amended Schedule 10 divided by the Monthly System in Service Percentage as of

March 1, 2013, and (ii) on or after March 1, 2014, Actual System Operating Revenue for the preceding Reporting Year, divided by the simple average of the Monthly System in Service Percentages for the preceding Reporting Year, plus the sum of all Required Closure Payments due for the preceding Reporting Year.

"Special Event" means any event that (i) does not occur annually or more frequently than annually, (ii) has an expected average daily attendance of more than 100,000 Persons and (iii) in the reasonable judgment of the City, requires the provision of temporary parking facilities to provide for public safety at the event or for the safety of Persons expected to attend the event.

"State Roads" means those roadways located in the City that are owned by, or are under the jurisdiction of, the State of Illinois.

"System in Service Percentage" means: (a) as of March 1, 2013, the percentage set forth as the Monthly System in Service Percentage as of March 1, 2013 in Schedule 6; (b) as calculated as of any March 1 thereafter, the System in Service Percentage for the immediately preceding month multiplied by (one minus the Reserved Powers System Impact) multiplied by [one divided by (one plus the Annual Percentage Adjustment)]; and (c) as calculated monthly on the first Day of any other month, the System in Service Percentage for the immediately preceding month multiplied by (one minus the Reserved Powers System Impact); *provided, however*, that with respect to (b) and (c) such calculations shall be subject to the adjustments set forth in Section 7.9 and Section 7.14, where applicable.

"Tax" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, permit fees, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, parking, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax, levy, impost, stamp tax, duty, fee, withholding or similar imposition of any kind payable, levied, collected, withheld or assessed at any time, including any interest, penalty or addition thereto, whether disputed or not.

"Term" means the term of the concession and franchise referred to in Section 2.1.

"Termination Damages" has the meaning ascribed thereto in Section 14.2(a).

"Third Party Claim" means any Claim asserted against an Indemnified Party by any Person who is not a Party or an Affiliate of such a Party.

"Time of Closing" means 10:00 a.m. (Chicago time) on the Closing Date or such other time on that date as the City and the Concessionaire agree in writing that the Closing shall take place.

"Transaction" has the meaning ascribed thereto in Section 2.1.

"Transfer" means to sell, convey, assign, lease, sublease, mortgage, encumber, transfer or otherwise dispose of.

- 27 -

"Transferee" means any Person who obtains the Concessionaire Interest pursuant to a Transfer.

"True-Up Adjustment" means a Quarterly Settlement Amount minus the portion of such Quarterly Settlement Amount that is a Required Closure Payment accrued in such Quarter.

"Unaffected Concession Metered Parking Space" means, as of the first Day of a Reporting Year, a Concession Metered Parking Space with respect to which an Expected Utilization Rate did not become effective during the two immediately preceding Reporting Years.

"Unaffected System Utilization Rate" means, with respect to Unaffected Concession Metered Parking Spaces and as of any March 1, the percentage obtained by dividing (i) the total amount of Actual Operating Revenue derived from the operation of such spaces during the preceding Reporting Year plus the Required Closure Payments for such spaces for the preceding Reporting Year, by (ii) the total of the Measured Full Utilization Amounts for such spaces during that Reporting Year.

"Utilization Rate" means, with respect to a Concession Metered Parking Space:  (i) as of March 1, 2013, the Utilization Rate assigned to the Concession Metered Parking Space on Amended Schedule 10; and (ii) as of any other date, the percentage obtained by dividing the Revenue Value (but without any deduction for the Rate to Fine Multiple Factor) by the Full Utilization Amount.

Section 1.2.    **Number and Gender**.  In this Agreement words in the singular include the plural and vice versa and words in one gender include all genders.

Section 1.3.    **Headings**.  The division of this Agreement into articles, sections and other subdivisions are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.  The headings in this Agreement are not intended to be full or precise descriptions of the text to which they refer and shall not be considered part of this Agreement.

Section 1.4.    **References to this Agreement**.  The words "herein," "hereby," "hereof," "hereto" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular portion of it.  The words "Article," "Section," "paragraph," "sentence," "clause" and "Schedule" mean and refer to the specified article, section, paragraph, sentence, clause or schedule of or to this Agreement.

Section 1.5.    **References to Any Person**.  A reference in this Agreement to any Person at any time refers to such Person's permitted successors and assignees.

Section 1.6.    **Meaning of Including**.   In this Agreement, the words "include," "includes" or "including" mean "include without limitation," "includes without limitation" and "including without limitation," respectively, and the words following "include," "includes" or "including" shall not be considered to set forth an exhaustive list.

**Section 1.7.    Meaning of Discretion**.  In this Agreement, the word "discretion" with respect to any Person means the sole and absolute discretion of such Person.

**Section 1.8.    Meaning of Notice**.  In this Agreement, the word "notice" means "written notice," unless specified otherwise.

**Section 1.9.    Consents and Approvals**.  Unless specified otherwise, wherever the provisions of this Agreement require or provide for or permit an approval or consent by either Party, such approval or consent, and any request therefor, must be in writing (unless waived in writing by the other Party).

**Section 1.10.  Trade Meanings**.  Unless otherwise defined herein, words or abbreviations that have well-known trade meanings are used herein in accordance with those meanings.

**Section 1.11.  Laws**.  Unless specified otherwise, references to a Law are considered to be a reference to (i) such Law as it may be amended from time to time, (ii) all regulations and rules pertaining to or promulgated pursuant to such Law, (iii) the successor to the Law resulting from recodification or similar reorganizing of Laws and (iv) all future Laws pertaining to the same or similar subject matter.  Nothing in this Agreement shall fetter or otherwise interfere with the right and authority of the City to enact, administer, apply and enforce any Law.

**Section 1.12.  Currency**.  Unless specified otherwise, all statements of or references to dollar amounts or money in this Agreement are to the lawful currency of the United States of America.

**Section 1.13.  Generally Accepted Accounting Principles**.  All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with generally accepted accounting principles in the United States of America, consistently applied.

**Section 1.14.  Calculation of Time**.  For purposes of this Agreement, a period of Days shall be deemed to begin on the first Day after the event that began the period and to end at 5:00 p.m. (Chicago time) on the last Day of the period.  If, however, the last Day of the period does not fall on a Business Day, the period shall be deemed to end at 5:00 p.m. (Chicago time) On the next Business Day.

**Section 1.15.  Approvals, Consents and Performance by the City.**

(a)     *Procedures*.  Wherever the provisions of this Agreement require or provide for or permit an approval or consent by the City of or to any action, Person, Document, or other matter contemplated by this Agreement, the following provisions shall apply: (i) such request for approval or consent must (1) contain or be accompanied by any documentation or information required for such approval or consent in reasonably sufficient detail, as reasonably determined by the City, (2) clearly set forth the matter in respect of which such approval or consent is being sought, (3)form the sole subject matter of the correspondence containing such request for approval or consent, and (4) state clearly that such approval or consent is being sought; (ii)such approval or consent shall not be unreasonably or arbitrarily withheld, conditioned or delayed

(unless such provision provides that such approval or consent may be unreasonably or arbitrarily withheld, conditioned or delayed or is subject to the discretion of the City); (iii) the City shall, within such time period set forth herein (or if no time period is provided, within 45 Days, subject to the City's right to extend such period for an additional 15 Days) after the giving of a notice by the Concessionaire requesting an approval or consent, advise the Concessionaire by notice either that it consents or approves or that it withholds its consent or approval, in which latter case it shall (unless such provision provides that such approval or consent may be unreasonably or arbitrarily withheld, conditioned or delayed or is subject to the discretion of the City) set forth, in reasonable detail, its reasons for withholding its consent or approval, which reasons may include the insufficiency, as determined by the City acting reasonably, of the information or documentation provided; (iv) if the responding notice mentioned in clause (iii) of this Section 1.15(a) indicates that the City does not approve or consent, the Concessionaire may take whatever steps may be necessary to satisfy the objections of the City set out in the responding notice and, thereupon, may resubmit such request for approval or consent from time to time and the provisions of this Section 1.15 shall again apply until such time as the approval or consent of the City is finally obtained; (v) if the disapproval or withholding of consent mentioned in clause (iv) of this Section 1.15(a) is subsequently determined pursuant to Article 19 to have been improperly withheld or conditioned by the City, such approval or consent shall be deemed to have been given on the date of such final determination; and (vi) for the avoidance of doubt, any dispute as to whether or not a consent or approval has been unreasonably withheld, conditioned or delayed shall be resolved in accordance with the provisions of Article 19.

(b)     *Authority of the City*.  Wherever this Agreement provides that an act is to be taken or performed or approval or consent is to be given by the City, such act may be taken or performed or approval or consent may be given by the Mayor or the Chief Financial Officer of the City (or if that office is vacant, the City Comptroller) or the Director of the Department of Revenue of the City, without further action by the City Council of the City and the Concessionaire may rely thereon in all respects.

(c)     *Approved Documents*.  Subject to the other provisions hereof, wherever in this Agreement an approval or consent by the City is required with respect to any document, proposal, certificate, plan, drawing, specification, contract, agreement, budget, schedule, report or other written instrument whatsoever (a "Document"), following such Approval such Document shall not be amended, supplemented, replaced, revised, modified, altered or changed in any manner whatsoever without obtaining a further Approval in accordance with the provisions of this Section 1.15.

**Section 1.16.  Enactment, Administration, Application and Enforcement of Laws by the City**.  Nothing in this Agreement shall fetter or otherwise interfere with the right and authority of the City to enact, administer, apply and enforce any Law.  Except for Adverse Actions, Compensation Events and Delay Events or if compensation or other relief is otherwise available or provided for pursuant to applicable Law or this Agreement, the Concessionaire shall not be entitled to claim or receive any compensation or other relief whatsoever as a result of the enactment, administration, application or enforcement of any Law by the City.

**Section 1.17. Incorporation of Schedules and Exhibit**.  The following attached Schedules and Exhibit are made a part of this Agreement:

Schedule 1     Metered Parking System Contracts
Schedule 2     Required Capital Improvements
Schedule 3     Operating Standards
Schedule 4     Metered Parking System Assets
Schedule 5     Metered Parking System
Schedule 6     Article 7 Methodology
Schedule 7     Concession Metered Parking Spaces
Schedule 8     INTENTIONALLY DELETED
Schedule 9     Initial Parking Fees
Schedule 10    Revenue Value
Schedule 11    Form of Legal Opinion of Counsel to the City
Schedule 12    Form of Legal Opinion of Counsel to the Concessionaire
Schedule 13    Financial Information
Schedule 14    Exempt Persons Statistical Sampling Methodology
Schedule 15    Parking Zones
Exhibit A      Metered Parking System Ordinance

In the event of any conflict between the terms of this Agreement and the terms of the Schedules, the terms of this Agreement shall control.

## ARTICLE 2
## THE TRANSACTION; CLOSING; CONDITIONS PRECEDENT; COVENANTS

**Section 2.1.    Grant of Concession**.  Upon the terms and subject to the conditions of this Agreement, effective at the Time of Closing, (a) the Concessionaire shall pay the City the exact amount of $1,156,500,000 in cash (the "Consideration") and (b) the City shall (i) grant the Concessionaire the right, concession and franchise for and during the term (the "Term") commencing on the Closing Date and expiring at 11:59 p.m. on February 29, 2084 (or such later date as may be required to effect a Delay Event Remedy but subject to earlier termination as provided in this Agreement) to provide Metered Parking Services, and in connection therewith (A) to use, operate, manage, maintain and rehabilitate the Metered Parking System; (B) to collect and retain Metered Parking Revenues derived from the Concession Metered Parking Spaces; and (C) to collect Metered Parking Revenues derived from the Reserve Metered Parking Spaces for the benefit of the City and to be compensated by the City for the provision of such Metered Parking Services with respect to Reserve Metered Parking Spaces; and (ii) assign, transfer and otherwise convey to the Concessionaire by bill of sale the Metered Parking System Assets, free and dear of any Encumbrances (other than Permitted City Encumbrances) and the Concessionaire shall accept each such grant, assignment, transfer and conveyance (collectively, the "Transaction").  The rights and franchise granted to the Concessionaire to use, operate, manage, maintain and rehabilitate the Metered Parking System and to collect and retain Metered Parking Revenues as provided in this Section 2.1 are subject to (A) the Reserved Powers of the City, which are expressly reserved to the City for the Term of the Agreement and (B) the provisions of the Coordinated Street Furniture Program Agreement dated June 28, 2002, by and between the City and JCDecaux Chicago, LLC.

No interest in real estate of any kind (whether in the form of ownership, leasehold interest or otherwise) is conveyed by this Agreement. With respect to the Parking Lots, the City grants to the Concessionaire the right to use the Parking Lots for Metered Parking System Operations.

The City reserves the right (i) to operate Other Metered Parking Spaces and (ii) to enter into additional concession agreements with respect to Metered Parking Spaces not then designated as Concession Metered Parking Spaces and not previously designated as a Concession Metered Parking Space at any time within the 20 years immediately preceding the effective date of such additional concession agreement (and the City hereby agrees that it will not enter into additional concession agreements with respect to Metered Parking Spaces that have been previously designated as Concession Metered Parking Spaces within 20 years immediately preceding the effective date of such concession agreement). The City hereby grants to the Concessionaire a right of first refusal with respect to the Metered Parking Spaces to be included in any proposed additional concession agreement for Metered Parking Spaces, which right of first refusal shall remain in effect for the Term of this Agreement. The City agrees, prior to offering a concession or other arrangement to any other Person in respect of such Metered Parking Spaces, to enter into good faith negotiations with the Concessionaire in respect of the terms of a concession arrangement for such additional Metered Parking Spaces. If the City and the Concessionaire are not able to agree on the terms of a concession arrangement in respect of such Metered Parking Spaces after 60 Days of good faith negotiations, the City shall have the right to offer such concession to other Persons. If the City receives a bona fide offer from another Person for such new concession on terms that are acceptable to the City, the City shall offer to the Concessionaire in writing such concession for the same price and on the same terms offered by such third party for a period of 30 Days (for the purposes of this paragraph, the "right of first refusal"). If the Concessionaire has not accepted such written offer during such 30-Day period, the City shall have 60 Days in which to execute a concession agreement with such other Person on the same terms offered to the Concessionaire in writing. If after such 60-Day period the City has not executed a concession agreement on such terms with such other Person, the City shall have the right to offer such concession to any other Party on any other terms, *provided* that any resulting bona fide offer shall be subject to the Concessionaire's right of first refusal, which shall remain in effect for the Term of this Agreement. If pursuant to good faith negotiations or the Concessionaire's right of first refusal, the City grants to the Concessionaire a concession in respect of any such additional Metered Parking Spaces, then such Metered Parking Spaces shall immediately and automatically (after payment to the City of the agreed consideration therefor) be included under the provisions of this Agreement as Concession Metered Parking Spaces and the Parties shall make any amendments to this Agreement necessary in respect thereof.

   **Section 2.2.    Closing**.

   (a)    Subject to the satisfaction of all conditions precedent contained in Section 2.4 or the waiver by the Parties of any unsatisfied condition, the closing of the Transaction (the "Closing") shall take place on the first Business Day immediately after the 90-day period following December 4, 2008 or such other date agreed to in writing by the City and the Concessionaire (the "Closing Date"). The Closing shall be held at the offices of Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661 or such other place agreed to in writing by the City and the Concessionaire. At the Time of Closing, the Concessionaire shall deliver or cause to be delivered to the City same-day funds by wire transfer in the amount of the

Consideration (as adjusted pursuant to Section 2.2(b), Section 2.2(c) and Section 2.2(d)) in full payment of the Transaction, and upon receipt of such payment the Transaction shall be effective. Upon receipt of the funds described in the preceding sentence, the City shall immediately cancel and return the LOC, if any, in accordance with the Concessionaire's instructions.

(b)     All revenues, charges, costs and expenses with respect to Assumed Liabilities shall be prorated between the City and the Concessionaire as of 11:59 p.m. on the Day immediately preceding the Closing Date based upon the actual number of Days in the month and a 365-Day year and the required payment resulting from such proration shall be added to or subtracted from the Consideration accordingly. If final prorations cannot be made at the Closing for any item being prorated under this Section 2.2(b), then the City and the Concessionaire shall allocate such items on a fair and equitable basis as soon as revenue statements, invoices or bills are available, with final adjustment to be made as soon as reasonably possible after the Closing Date. The City and the Concessionaire shall have reasonable access to, and the right to inspect and audit, the other's books to confirm the final prorations to the extent permitted by Law.

(c)     No more than 10 Days prior to the Closing Date, the City shall determine the then current Concession Metered Parking Spaces and shall accordingly adjust Schedule 7 and Schedule 10. If the aggregate Initial Revenue Value taking into account any such adjustment to Schedule 10 varies from the aggregate Initial Revenue Value as of the Bid Date, then the Consideration shall be increased or decreased, as the case may be, by the same percentage as the percentage change in the aggregate Initial Revenue Value; *provided, however*, that any increase in the Consideration may not exceed one half of one percent (0.50%) without the prior written consent of the Concessionaire.

(d)     Using the 30 year, mid-market LIBOR swap rate in the "Money & Investing, Borrowing Benchmarks" section of *The Wall Street Journal*, from the close of business on the Business Day immediately prior to the Bid Date (as published on the Bid Date) through the close of business two Business Days prior to the Closing Date (as published on the Business Day immediately prior to the Closing Date), the amount of the Consideration will be decreased by four hundredths of one percent (4/100 of 1%) for every one basis point increase in the 30 year, mid-market LIBOR swap rate.

**Section 2.3.    Deposit**.

(a)     The City acknowledges receipt from the Concessionaire of cash (the "Cash Deposit") or one or more Letters of Credit with a term of at least 180 Days from December 4, 2008 (the "Closing LOC"), in an aggregate amount equal to, at the election of the Concessionaire, either $75,000,000 or 5% of the Consideration, to be held by the City for the sole purpose described in Section 2.3(b). The City shall deposit any Cash Deposit with the Escrow Agent, which shall invest such amount in Eligible Investments pending the Closing.

(b)     If the City terminates this Agreement pursuant to Section 2.4(d)(iv), then the City shall be entitled to (i) retain the Cash Deposit and all interest accrued thereon or, (ii) without notice to the Concessionaire, immediately draw the full amount of the Closing LOC upon presentation of a sight draft and a certificate confirming that the City has the right to draw under the Closing LOC in the amount of such sight draft, and the City shall be entitled to retain all of

the proceeds of the Closing LOC, in each case as the sole remedy or right of the City against the Concessionaire hereunder (*provided* that this limitation shall not apply in the event of fraud); *provided, however*, that if this Agreement is terminated for any other reason, the City shall return any Cash Deposit and the interest earned thereon in accordance with the Concessionaire's reasonable instructions, or deliver, in accordance with the Concessionaire's reasonable instructions, the Closing LOC and agree to cancel the Closing LOC, in each case, immediately following any such termination (*provided* that this limitation shall not apply in the event of fraud).  Except in cases involving fraud by the Concessionaire, the right of the City to retain the Cash Deposit or to draw the Closing LOC is intended to be, and shall constitute, liquidated damages, and any payment thereof to the City shall terminate the City's rights and remedies in all respects.

(c)      At Closing, upon the satisfaction of the conditions set forth in Sections 2.4(a), 2.4(b) and 2.4(c), the Concessionaire shall be entitled to apply the Cash Deposit (including any accrued interest) as a credit against the Consideration.

### Section 2.4.     Conditions Precedent; Termination.

(a)      *Conditions for the Benefit of the Concessionaire*.  The Concessionaire shall be obligated to complete the Closing only if each of the following conditions has been satisfied in full at or before the Time of Closing, unless waived by the Concessionaire:  (i) the representations and warranties of the City set forth in Section 9.1 shall be true and correct in all material respects on and as of December 4, 2008 and at and as of the Time of Closing with the same force and effect as if made at and as of such time and date except that representations and warranties that by their terms speak only as of December 4, 2008 or some other date need to be true and correct only as of such date; (ii) the City shall not be in material breach of any material covenant on its part contained in this Agreement which is to be performed or complied with by the City at or prior to the Time of Closing; (iii) the Initial Schedule of Parking Fees shall be in full force and effect; (iv) the City shall have delivered to the Concessionaire a legal opinion of counsel to the City, in substantially the form attached hereto as Schedule 11; (v) the City shall have executed and delivered the consents and estoppel certificate contemplated by Section 10.2, (vi) [intentionally deleted]; (vii) the aggregate Initial Revenue Value of all Concession Metered Parking Spaces as of the Closing Date shall not be less than ninety five percent (95%) of the aggregate Initial Revenue Value of all Concession Metered Parking Spaces as of the Bid Date, (viii) no event has transpired between December 4, 2008 and the Closing Date that is not remedied as of the Closing Date and would have constituted an Adverse Action or a Reserved Powers Adverse Action had such event occurred during the Term; and (ix) there shall not have occurred a material casualty loss, destruction or damage to the Metered Parking System.  As used in this Section 2.4(a) and in Section 2.5(i), a material casualty loss, destruction or damage to the Metered Parking System means the casualty, loss, damage or destruction of not less than 2,000 Concession Metered Parking Spaces such that those Metered Parking Spaces are not available as spaces for parking motor vehicles and collecting Metered Parking Fees.

(b)      *Conditions for the Benefit of the City*.  The City shall be obligated to complete the Closing only if each of the following conditions precedent has been satisfied in full at or before the Time of Closing, unless waived by the City:  (i) all representations and warranties of the Concessionaire in Section 9.2 shall be true and correct in all material respects on and as of

December 4, 2008 at and as of the Time of Closing with the same force and effect as if made at and as of such time and date except that representations and warranties that by their terms speak only as of December 4, 2008 or some other date need be true and correct only as of such date; (ii) the Concessionaire shall not be in material breach of any material covenant on its part contained in this Agreement which is to be performed or complied with by the Concessionaire at or prior to the Time of Closing; and (iii) the Concessionaire shall have delivered to the City a legal opinion of counsel to the Concessionaire, in substantially the form attached hereto as Schedule 12.

(c)     *Mutual Conditions*.   The City and the Concessionaire shall be obligated to complete the Closing only if each of the following conditions precedent has been satisfied in full at or before the Time of Closing, unless waived by both the City and the Concessionaire:  (i) there shall be no preliminary or permanent injunction or temporary restraining order or other order issued by a Governmental Authority of competent jurisdiction or other legal restraint or prohibition enjoining or preventing the consummation of the Transaction; and (ii) there shall be no action taken, or any Law enacted, entered, enforced or deemed applicable to the Transaction by any Governmental Authority of competent jurisdiction that makes the consummation of the Transaction illegal.

(d)     *Termination*.   This Agreement may be terminated at any time prior to the Closing:

(i)     by mutual consent of the City and the Concessionaire in a written instrument;

(ii)     by either the City or the Concessionaire, upon notice to the other Party, if (A) any Governmental Authority of competent jurisdiction shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the Transaction, and such order, decree, ruling or other action has become final and nonappealable or (B) a challenge to the validity or enforceability of this Agreement or the City's right or authority to enter into this Agreement or consummate the transaction is filed with any court or other tribunal unless, within a reasonable time after the filing of such challenge, the City shall have agreed in writing to indemnify the Concessionaire and its Representatives for and against any losses, costs, damages and liabilities that may be incurred by or imposed on them as a result of such a challenge if the Concessionaire agrees to close the Transaction; *provided, however*, that the right to terminate this Agreement under this Section 2.4(d)(ii) shall not be available to any Party whose failure to comply with any provision of this Agreement has been the cause of, or resulted in, such action;

(iii)     by the Concessionaire, upon notice to the City, if any condition set forth in Section 2.4(a) is not satisfied at the Time of Closing; *provided, however*, that the Concessionaire shall not have the right to terminate this Agreement under this Section 2.4(d)(iii) if the Concessionaire's failure to comply with any provision of this Agreement has been the cause of, or resulted in, the failure of such condition or conditions to be satisfied; or

(iv)     by the City, upon notice to the Concessionaire, if any condition set forth in Section 2.4(b) is not satisfied at the Time of Closing; *provided, however*, that the City shall not have the right to terminate this Agreement under this Section 2.4(d)(iv) if the City's failure to

comply with any provision of this Agreement has been the cause of, or resulted in, the failure of such condition or conditions to be satisfied.

(e)     *Effect of Termination*.   In the event of termination of this Agreement by either the City or the Concessionaire as provided in Section 2.4(d), this Agreement shall forthwith become void and there shall be no liability or obligation on the part of the City or the Concessionaire or their respective Representatives, except as set forth in Section 2.3(b), this Section 2.4(e), Article 12, Article 19 and Article 20.   In the event that the Concessionaire terminates this Agreement pursuant to Section 2.4(d)(iii), the City will compensate the Concessionaire for up to $2,000,000 of out-of-pocket costs incurred by the Concessionaire in connection with the transaction contemplated by this Agreement.   In the event of termination pursuant to Section 2.4(d)(i), (ii) or (iii), the Cash Deposit and all investment earnings accrued thereon shall be paid to the Concessionaire or the Closing LOC shall be returned undrawn to the Concessionaire marked canceled, as applicable.

**Section 2.5.     Covenants**.

(a)     *Cooperation*.   From December 4, 2008 up to the Time of Closing, the Parties shall cooperate with each other in order to permit the Closing to be consummated on the Closing Date.

(b)     *Reasonable Efforts*.   From December 4, 2008 up to the Time of Closing, each Party shall use all reasonable efforts (i) to take, or cause to be taken, all actions necessary to comply promptly with all requirements under this Agreement and all legal requirements which may be imposed on such Party to consummate the Transaction as promptly as practicable, including, but not limited to, making any necessary filings, and (ii) to obtain (and to cooperate with the other Party to obtain) any Consent of any Governmental Authority or any other public or private third party which is required to be obtained or made by such Party in connection with the consummation of the Transaction.   Each Party shall promptly cooperate with and promptly furnish information to the other in connection with any such efforts by, or requirement imposed upon, any of them in connection with the foregoing.

(c)     *Injunctions*.   If any Governmental Authority of competent jurisdiction issues a preliminary or permanent injunction or temporary restraining order or other order before the Time of Closing which would prohibit or materially restrict or hinder the Closing, each Party shall use all reasonable efforts to have such injunction, decree or order dissolved or otherwise eliminated or to eliminate the condition that formed the basis for such injunction or order, in each case as promptly as possible and, in any event, prior to the Time of Closing.   Except to the extent provided in Section 2.4(d)(ii), any costs associated with any action taken pursuant to this Section 2.5(c) shall be borne by the Party responsible for such injunction, decree, or order or, in the absence of any such responsibility, then each Party shall bear its own costs.

(d)     *Operation of the Metered Parking System*.   From December 4, 2008 up to the Time of Closing, the City shall operate the Metered Parking System in the ordinary course in a manner consistent with past practice, which shall include using all reasonable efforts to preserve the goodwill of the Metered Parking System and to maintain good business relationships with Persons having business dealings with the Metered Parking System, to maintain the Metered Parking System Assets in normal operating condition and repair in accordance with past practice

(ordinary wear and tear excepted), to perform (or cause to be performed) in all material respects all of the City's obligations under the Metered Parking System Contracts and to cause the Metered Parking System to be operated in all material respects in accordance with all applicable Laws (except to the extent any non-compliance is being contested in good faith by appropriate proceedings), all to the end that the Metered Parking System as a going concern shall be unimpaired and delivered to the Concessionaire at the Time of Closing in a condition not materially worse than the condition as of December 4, 2008; *provided, however*, that the City shall not amend, modify, renew, execute or otherwise negotiate any contracts relating to the Metered Parking System or the Metered Parking System Operations (exclusive of any contract for the enforcement of parking violations) after December 4, 2008 up to the Time of Closing without the prior written approval of the Concessionaire. The City, shall, up to and including the Time of Closing, be entitled to all of the cash or cash equivalents in or generated by the Metered Parking System (subject to the terms of Section 2.2(b) in the case of any cash or cash equivalents that are paid prior to the Time of Closing but are allocable to periods after the Time of Closing). Without limiting the foregoing, the City shall not terminate, amend, modify or agree to a waiver of the terms of any Authorization related to the Metered Parking System after December 4, 2008 and before the Time of Closing without the Concessionaire's consent, which shall not be unreasonably withheld, conditioned or delayed.

(e)    *Metered Parking System Contracts*.  The Metered Parking System Contracts are listed on Schedule 1.  At least 30 Days prior to the Closing Date, the Concessionaire shall designate any such Metered Parking System Contracts as Metered Parking System Contracts to be assigned to the Concessionaire by the City on the Closing Date.  Following the Concessionaire's designation, the City shall designate any remaining Metered Parking System Contracts that are not to be assigned to the Concessionaire as Metered Parking System Contracts to be retained by the City following the Closing Date (so long as such retained Metered Parking System Contracts do not adversely affect the Concessionaire or the Metered Parking System or otherwise interfere with the operation of the Metered Parking System (or any of the rights or remedies of the Concessionaire hereunder and should not bind the Concessionaire or the Metered Parking System to any obligations)).  All other Metered Parking System Contracts shall be terminated by the City, effective at the Time of Closing.  Any liability under or related to any Metered Parking System Contract retained by the City following the Closing Date or terminated by the City on the Closing Date (including any liability resulting from the termination thereof), and any liability under or related to any Metered Parking System Contract that is assigned to the Concessionaire on the Closing Date attributable to periods prior to the effectiveness of the assignment thereof to the Concessionaire, shall be solely for the account of the City.

(f)    *Disclosure of Changes*.

(i)    From December 4, 2008 up to the Time of Closing, each Party shall immediately disclose in writing to the other Party any matter which becomes known to it which is inconsistent in any material respect with any of the representations or warranties contained in Article 9.  No such disclosure, however, shall cure any misrepresentation or breach of warranty for the purposes of Section 2.4 or Article 12; and

(ii)    From December 4, 2008 up to the Time of Closing, the City may supplement or amend the Schedules hereto, including one or more supplements or amendments

to correct any matter which would constitute a breach of any representation, warranty, covenant or obligation contained herein. No such supplement or amendment shall be deemed to cure any breach for purposes of Section 2.4(a) or, subject to the following sentence, for any other purpose. Notwithstanding the previous sentence, if the Closing occurs, then, subsequent to the Time of Closing, any such supplement or amendment with respect to any representation or warranty contained in Section 9.1(d), (e), (f), (g), (i), (j) and (k) relating to a matter arising after December 4, 2008 will be effective to cure and correct for all purposes any inaccuracy in, or breach of, any such representation or warranty which would exist if the City had not made such supplement or amendment, and all references to any Schedule hereto which is supplemented or amended as provided in this Section 2.5(f)(ii) shall (subject to the foregoing limitation) for all purposes after the Time of Closing be deemed to be a reference to such Schedule as so supplemented or amended.

(g)     *Access to Information*.  From December 4, 2008 up to the Time of Closing, but subject to confidentiality obligations binding on the City with respect to any Person (provided that the City has disclosed to the Concessionaire the existence of the applicable Document that is subject to such confidentiality limitation in order to enable the Concessionaire to evaluate the materiality and significance of the lack of disclosure based on such limitations)the City shall (i) give the Concessionaire and its Representatives reasonable access during normal business hours and on reasonable notice to the Metered Parking System, subject to the City's policies and regulations regarding safety and security and any other reasonable conditions imposed by the City, (ii) permit the Concessionaire and its Representatives to make such inspections as they may reasonably request and (iii) to furnish the Concessionaire and its Representatives with such financial and operating data and other information that is available with respect to the Metered Parking System as they may from time to time reasonably request.  The Concessionaire shall hold and will cause its Representatives to hold in strict confidence all Documents and information concerning the Metered Parking System to the extent and in accordance with the terms and conditions of the confidentiality agreement between the City and the Concessionaire in connection with the Transaction.  After the Closing Date, the Concessionaire shall at the request of the City, in connection with claims or actions brought by or against third parties based upon events or circumstances concerning the Metered Parking System, (A) provide reasonable assistance in the collection of information or Documents and (B) make the Concessionaire's employees available when reasonably requested by the City; *provided, however*, that the City shall reimburse the Concessionaire for all reasonable out-of-pocket and documented costs and expenses incurred by the Concessionaire in providing said assistance and will not unduly interfere with the Concessionaire's operations.

(h)     *Transition*.  From December 4, 2008 up to the Time of Closing, the Parties shall cooperate with each other to ensure the orderly transition of control, custody, operation, management, maintenance of, and the right to charge and collect Metered Parking Revenues in connection with, the Metered Parking System at the Time of Closing.  The City shall take all efforts as may be necessary in order to ensure such orderly transition and provide to the Concessionaire with all Information and Documents related to the Metered Parking System Operations.  At the request of the Concessionaire, the City will provide to the Concessionaire, for up to four months following the Closing, the services of any employee whose primary responsibilities relate to the Metered Parking System (or the services of other City employees who are assigned for such purpose).  All such services shall be provided for an amount equal to

the actual cost to the City (including employment costs and related overhead expenses allocable to such employees, as reasonably determined by the City), which amount shall be billed to the Concessionaire as soon as reasonably practicable following the end of each month and shall be payable by the Concessionaire within 30 Days of receipt of any such statement, and upon such other reasonable terms and conditions as the City and the Concessionaire may agree.

(i) *Casualty Loss Prior to Closing*. If prior to the Time of Closing, a material casualty loss, destruction or damage to the Metered Parking System has occurred and this Agreement has not been terminated under Section 2.4(d), then the City shall either (i) promptly and diligently repair and rebuild the affected parts of the Metered Parking System to restore them to at least the same condition in which they were before the occurrence of such casualty loss, destruction or damage or (ii) authorize the Concessionaire to repair the Metered Parking System and assign to the Concessionaire all insurance and other proceeds (if any) payable by third-party insurers or other third parties in respect of such casualty loss, destruction or damage and enforce (with the cooperation of the Concessionaire) all of its rights, remedies and privileges under any applicable insurance policies with third-party insurers; *provided* that if no insurance exists or such insurance proceeds are not sufficient to repair and rebuild the affected parts of the Metered Parking System to its prior condition, then the City shall reimburse the Concessionaire for that amount representing the difference between the cost to repair and the amount of any insurance proceeds.

(j) *Policies of Insurance*. From December 4, 2008 up to the Time of Closing, the City shall continue in force all applicable policies of insurance maintained by the City in respect of the Metered Parking System. At the Time of Closing, all such policies of insurance shall terminate and the Concessionaire shall be responsible for obtaining insurance for the Metered Parking System in accordance with the terms hereof.

(k) *Damage or Destruction*. The City shall not perform or fail to perform any act which as a result would cause material damage to or the destruction of the Metered Parking System and such damage or destruction would have a Material Adverse Effect. For the avoidance of doubt whether or not sufficient insurance is in place shall be disregarded for the purposes of this Section 2.5(k).

(l) *Operational Matters*. The City shall consult with the Concessionaire with respect to any Metered Parking System operation matters of a material nature prior to the Time of Closing.

**Section 2.6.    Intended Treatment for Federal and State Income Tax Purposes**. This Agreement is intended for United States federal and state income Tax purposes to be a sale of the Metered Parking System and the Metered Parking System Assets to the Concessionaire and the grant to the Concessionaire of a right for and during the Term to collect and retain Metered Parking Revenues. Payments made by the City to the Concessionaire in connection with Quarterly Settlement Amounts, or payments made by the Concessionaire to the City in connection with the generation of a Settlement Credit pursuant to Section 7.6(b) shall for United States federal and state income tax purposes be deemed to be an adjustment to the Consideration for such sale of the Metered Parking System (but not the Metered Parking System Assets) and the grant of the rights to collect and retain Metered Parking Revenues with respect to Concession

Metered Parking Spaces. The City and the Concessionaire agree that the Consideration will be allocated among the assets that the Concessionaire is obtaining the use of pursuant to this Agreement using the residual allocation provisions of Section 1060 of the Internal Revenue Code of 1986, in the following order: (i) no allocation to Class I assets; (ii) no allocation to Class II assets; (iii) no allocation to Class III assets; (iv) no allocation to Class IV assets; (v) (A) an allocation equal to $33,824,950 to the tangible value of the Metered Parking System Assets described in clause (i) of the definition thereof (other than Parking Lots), which is an allocation equal to the fair market value of such Class V assets based on the higher of the City's original cost for such Class V assets minus any depreciation taken on such Class V assets or the replacement costs for such Class V assets as determined by the City, (B) an allocation equal to fair market value to the tangible property included in the Metered Parking System other than the property described in subclause (A) of this clause (v), and (C) an allocation equal to fair market value to any intangible assets acquired from the City other than intangible assets described in Section 197 of the Internal Revenue Code of 1986 (or any comparable successor provision); (vi) an allocation equal to fair market value to any Class VI asset; and (vii) any remaining portion of the Consideration allocated to Class VII assets. This allocation is made pursuant to Section 1060 of the Internal Revenue Code of 1986 and Section 1.1060-1 (c)(4) of the Income Tax Regulations.

Section 2.7. **Closing Deliveries**. At the Time of Closing, each Party shall execute and deliver all assets, agreements, bills of sale, assignments, endorsements, instruments and Documents as are reasonably necessary in the opinion of the other Party to effect the Transaction (and in form and substance that are reasonably satisfactory to such other Party).

Section 2.8. **Effective Date of Amended and Restated Agreement**. Notwithstanding Section 2.4, this Agreement becomes effective as of the date of signing by each party, not to be a date prior to the Effective Date Of First Amendment.


# ARTICLE 3
# TERMS OF THE CONCESSION

Section 3.1. **Right to Use and Present Condition.**

(a) *Right to Use*. The City agrees that, subject to the City's remedies upon a Concessionaire Default, the Concessionaire shall, at all times during the Term, be entitled to and shall have the use of the Metered Parking System and the rights and privileges granted to the Concessionaire hereunder, subject to (i) the provisions contained in this Agreement and (ii) the police and regulatory powers of the City including the Reserved Powers. The City and the Concessionaire acknowledge that the Concessionaire's rights to use the Metered Parking System, to collect and retain Metered Parking Revenues from the Concession Metered Parking Spaces and to be compensated for operating and maintaining the Reserve Metered Parking Spaces, are subject to the right of the City, in accordance with the terms of this Agreement, to monitor compliance with this Agreement to ensure that the Metered Parking System is used and operated as required by this Agreement. The City shall, at all times during the Term, defend (i) its lawful right to impose fees and charges for the privilege of parking motor vehicles in Metered Parking

Spaces and to impose and collect fines for violations of parking rules and regulations related to Metered Parking Spaces and (ii) the rights granted to the Concessionaire hereunder, or any portion thereof, against any Person claiming any interest adverse to the City or the Concessionaire in the Metered Parking System, or any portion thereof, or the Reserved Powers of the City, except where such adverse interest arises as a result of the act, omission, negligence, misconduct or violation of Law of the Concessionaire, its Affiliates or their respective Representatives.

(b)     *Present Condition*.  Without limiting any rights or remedies of the Concessionaire in connection with a breach of the representation and warranty in Section 9.1(g)(i) the Concessionaire understands, agrees and acknowledges that the Concessionaire (i) by the execution of this Agreement, agrees to accept the Metered Parking System "AS IS" at the Time of Closing and (ii) has inspected the Metered Parking System and is aware of its condition and acknowledges that the City neither has made nor is making any representation or warranty, express or implied, regarding the condition of the Metered Parking System (or any part thereof) or its suitability for the Concessionaire's proposed use, except for representations explicitly provided in Section 9.1.

### Section 3.2.    Metered Parking System Operations.

(a)     *Use*.  Except as otherwise specifically provided herein, the Concessionaire shall, at all times during the Term, (i) be responsible for all aspects of the Metered Parking System Operations, and (ii) cause the Metered Parking System Operations to be performed in accordance with the provisions of this Agreement and applicable Law.  The Concessionaire shall, at all times during the Term, cause the Metered Parking System to be continuously operational for use during the applicable Periods of Operation of Concession Metered Parking Spaces and Reserve Metered Parking Spaces by all members of the public except that the Concessionaire shall not be obligated to conduct Metered Parking System Operations with respect to a Metered Parking Space (A) during any period of time during which the City has suspended Metered Parking System Operations with respect to such Metered Parking Space including, but not limited to, any suspension resulting from a Required Closure, (B) as specifically permitted under this Agreement, (C) as required by applicable Law, (D) as necessary to comply with any other requirement of this Agreement (including closures related to the performance of capital improvements or maintenance or repair activities as required by the Operating. Standards), (E) as necessary for temporary closures required to address emergencies, public safety, temporary events or closures undertaken to maintain the public way or (F) as necessary to perform maintenance or repairs of the Metering Devices.

(b)     *Costs and Expenses*.  Except as otherwise specifically provided herein, the Concessionaire shall, at all times during the Term, pay or cause to be paid all costs and expenses relating to the Metered Parking System Operations as and when the same are due and payable.

(c)     *Assumed Liabilities*.  The Concessionaire agrees to assume and discharge or perform when due, all debts, liabilities and obligations whatsoever relating to the Metered Parking System or the Metered Parking System Operations that occur, arise out of or relate to, or are based on facts or actions occurring, during the Term, but only to the extent such debts, liabilities or obligations do not arise from or relate to any breach by the City of any covenant,

representation or warranty set forth in this Agreement (collectively, the "Assumed Liabilities"); *provided, however*, that the Assumed Liabilities shall not include, and the City shall perform or cause to be performed and discharge or cause to be discharged as and when due, any debts, liabilities and obligations (i) with respect to the City's obligations under this Agreement, (ii) arising out of Metered Parking System Operations (including with respect to any Metered Parking System Contracts) prior to the Time of Closing, (iii) under any Environmental Law arising out of or relating to the ownership, operation or condition of the Metered Parking System at any time prior to the Time of Closing or any Hazardous Substance or other contaminant that was present or released on or migrated or escaped or was released from the Metered Parking System or otherwise existed at any time prior to the Time of Closing and including any known or unknown environmental conditions and any pre-existing conditions prior to the Time of Closing the manifestation of which occurs following the Time of Closing, or (iv) under any Environmental Law arising out of or relating to the ownership, operation or condition of the Parking Lots or any Hazardous Substance or other contaminant that was present or released on or migrated or escaped or was released from the Parking Lots and including any known or unknown environmental conditions (collectively, the "Excluded Liabilities").

(d) *Right of Entry and Access to the Public Way*.  The City hereby grants to the Concessionaire and its Representatives the right to enter upon, in, under, over and across the streets, alleys, sidewalks in the public way, all to such extent and at such times as shall be necessary or desirable for the Concessionaire to access the Metered Parking System (including the Metering Devices and all supporting structures and appurtenances thereto, and the Parking Lots) in order to conduct Metered Parking System Operations, including operating, maintaining, inspecting, repairing and managing Metered Parking System properties, constructing, installing, replacing, testing, dismantling and removing Metering Devices and all supporting structures and appurtenances thereto, interconnecting the same to any electric utility, telephonic or other communication lines, collecting Metered Parking Revenues, and installing monitoring or observation technology or equipment reasonably necessary for Metered Parking System Operations.  The rights granted to the Concessionaire under this Section 3.2(d) do not create a priority in favor of the Concessionaire over any other user of the public way and are subject to the Operating Standards and all provisions of Law, including, but not limited to, applicable City permit requirements, relating to the conduct of a private business or franchise in the public way.

(e)  *Issuance of Parking Tickets*.  The City retains the exclusive right to establish and to revise from time to time all parking rules and regulations in accordance with Section 7.7.  The Concessionaire shall have the right, at its sole cost and expense, to issue parking tickets or citations for violations of the parking rules and regulations with respect to the Concession Metered Parking Spaces and Reserve Metered Parking Spaces (including Commercial Loading Zones), provided that such tickets or citations must be in the form prescribed by the City, that the issuance of such tickets and citations shall otherwise be subject to applicable City rules and regulations and the performance by the Concessionaire must conform to the Operating Standards.  The City shall provide to the Concessionaire, at the Concessionaire's sole cost and expense, parking ticket books or rolls and other items and materials reasonably necessary to enable the Concessionaire to issue parking tickets or citations as contemplated by this Section 3.2(e).  The City retains the right and responsibility to provide all other enforcement of parking rules and violations.  Parking tickets issued by the Concessionaire pursuant to this Section 3.2(e) shall have the same legal efficacy as parking tickets issued by the City.

**Section 3.3.    Operator**.

(a)    *Engagement*.  The Metered Parking System Operations shall, at all times during the Term, be under the direction and supervision of an active operator with the expertise, qualifications, experience, competence, skills and know-how to perform the Metered Parking System Operations in accordance with this Agreement (an "<u>Operator</u>") who may be (but is not required to be) the Concessionaire itself or its Affiliate.  The Operator on the first day of the Term shall be the Concessionaire unless the Concessionaire has designated another Person to be the Operator in the response to the request for Metered Parking System concessionaire qualifications delivered by or on behalf of the Concessionaire to the City in connection with the execution of this Agreement.  The Concessionaire shall not engage or appoint a replacement Operator unless the City has Approved such Operator or such Operator and replacement Operator are Affiliates of the Concessionaire in which case no such Approval shall be required; *provided, however*, that (i) a Change in Control of an Operator shall be deemed to be the appointment of a replacement Operator subject to the City's Approval and (ii) if the City does not provide the Concessionaire with the relevant Approval, the Concessionaire shall be entitled to appoint an interim Operator without the City's Approval for a period of up to 180 Days from the date of appointment of such interim Operator.  The Operator shall at all times be subject to the direction, supervision and control (by ownership, contract or otherwise) of the Concessionaire, and any delegation to an Operator shall not relieve the Concessionaire of any obligations, duties or liability hereunder.  The Concessionaire shall immediately notify the City upon the termination or resignation of an Operator.  Any agreement between the Concessionaire and any Operator shall by its terms terminate without penalty at the election of the City or the Operator upon three Business Days' notice to such Operator or the City, as applicable, upon the termination of this Agreement.  The Operator shall have no interest in or rights under this Agreement or the Metered Parking System unless the Operator is the Concessionaire itself.

(b)    *Approval*.  The City's Approval of a proposed replacement Operator may be withheld if the City reasonably determines that the engagement of such proposed Operator is prohibited by applicable Law or such proposed Operator is not capable of performing the Metered Parking System Operations in accordance with this Agreement, which determination may be based upon, or take into account, one or more of the following factors:  (i) the financial strength and integrity of the proposed Operator, its direct or indirect beneficial owners and each of their respective Affiliates; (ii) the capitalization of the proposed Operator; (iii) the experience of the proposed Operator in operating on street metered parking systems; (iv) the background and reputation of the proposed Operator, its direct or indirect beneficial owners, each of their respective officers, directors and employees and each of their respective Affiliates (including the absence of criminal, civil or regulatory claims or actions against any such Person and the quality of any such Person's past or present performance on other projects); and (v) the proposed terms of the engagement of the Operator.  The City shall have the right to reasonably condition its Approval of a proposed replacement Operator.

**Section 3.4.    Authorizations; Qualifications.**

(a)    *Compliance*.  The Concessionaire shall obtain, comply with, promptly renew and maintain in good standing all Authorizations; *provided, however*, that if the Concessionaire is, at any time during the Term, required to obtain any Authorization from a Governmental Authority

that the City was not required to obtain in connection with its operation of the Metered Parking System prior to the Time of Closing, the City shall use its reasonable efforts to assist the Concessionaire in obtaining such Authorization. Nothing in this Agreement, including Section 2.1, shall be deemed to waive or modify any Authorization required to be obtained by the Concessionaire or any other Person in connection with the Metered Parking System, the Metered Parking System Operations or any activities generating Metered Parking Revenues.

(b)     *Qualifications*.  The Concessionaire shall, at all times during the Term, maintain in full force and effect its existence and all qualifications necessary to carry on its business pertaining to the Metered Parking System Operations, including all rights, franchises, licenses, privileges and qualifications required in connection with the Metered Parking System Operations.  For the avoidance of doubt, the foregoing shall not prohibit or limit the Concessionaire from changing its organizational form or status, subject to the terms of Section 17.1(e).

**Section 3.5.     No Encumbrances**.

(a)     *By the Concessionaire*.  The Concessionaire shall not do any act or thing that will create any Encumbrance (other than a Permitted Concessionaire Encumbrance) against the Metered Parking System and shall promptly remove any Encumbrance (other than a Permitted Concessionaire Encumbrance) against the Metered Parking System, unless the Encumbrance came into existence as a result of an act of or omission by the City or a Person claiming through it which in turn was not caused by an act or omission of the Concessionaire.  The Concessionaire shall not be deemed to be in default hereunder if the Concessionaire continuously, diligently and in good faith contests any such Encumbrance, or the validity thereof (or causes such contest), by appropriate legal proceedings that shall operate to prevent the foreclosure of any such Encumbrance, *provided* that the Concessionaire has given (i) advance notification to the City that it is the intent of the Concessionaire to contest the validity or collection thereof or cause such contest and (ii) unless a bond or other security is provided in connection with such proceedings, a satisfactory indemnity to the City or deposited with the City a Letter of Credit, indemnity bond, surety bond, cash or Eligible Investment reasonably satisfactory to the City in an amount equal to the amount of the claim or Encumbrance, plus such interest and penalties, court costs, or other charges as the City may reasonably estimate to be payable by the Concessionaire at the conclusion of such contest or as is required to provide insurance over any potential Encumbrance; *provided*, *however*, that in the event such Letter of Credit bond, cash or Eligible Investment shall be so deposited, the same shall be held by the City until such claim or other imposition shall have been released and discharged and shall thereupon be promptly returned to the Concessionaire, less any amounts reasonably expended by the City to procure such release or discharge, or any loss, cost, damage, reasonable attorneys' fees or expense incurred by the City by virtue of the contest of such Encumbrance.

(b)     *By the City*.  The City shall not do any act or thing that will create any Encumbrance (other than a Permitted City Encumbrance) against the Metered Parking System and shall promptly remove any Encumbrance (other than a Permitted City Encumbrance) against the Metered Parking System that came into existence as a result of an act of or omission by the City or a Person claiming through the City.  The City shall not be deemed to be in default hereunder if the City continuously, diligently and in good faith contests any such Encumbrance,

or the validity thereof (or causes such contest), by appropriate legal proceedings that shall operate to prevent the foreclosure of any such Encumbrance, *provided* that the City has given advance notification to the Concessionaire that it is the intent of the City to contest the validity or collection thereof or cause such contest.

(c)     *Removal*.   Each Party, if requested by the other Party and at such other Party's costs and expense, shall use its reasonable efforts to assist such other Party in attempting to remove any Encumbrance that has come into existence as a result of an act of or omission by such other Party; *provided* that nothing herein shall obligate the City to waive, modify or otherwise limit or affect the Reserved Powers or the enforcement by the City of any applicable Law with respect to the Metered Parking System or any activities generating Metered Parking Revenues.

**Section 3.6.    Single Purpose Covenants**.  The Concessionaire shall, at all times during the Term, (i) be formed and organized solely for the purpose of owning the Concessionaire Interest and using, possessing, operating and collecting Metered Parking Revenues with respect to and otherwise dealing with the Metered Parking System (and carrying out the Metered Parking Services and other activities permitted pursuant to this Agreement (and any activities reasonably incidental thereto)), (ii) not engage in any business unrelated to clause (i) above, (iii) not have any assets other than those related to its activities in accordance with clauses (i) and (ii) above, (iv) except as appropriate for Tax reporting purposes or in connection with consolidated financial statements, maintain its own separate books and records and its own accounts, (v) observe all corporate, limited partnership or limited liability company, as applicable, formalities and do all things necessary to preserve its existence, (vi) not guarantee or otherwise obligate itself with respect to the debts of any other Person *provided that* the Concessionaire may guarantee or otherwise obligate itself with respect to the debt of any Person who is a special purpose entity formed and organized solely for the purpose of engaging in the business of providing parking for motor vehicles and *provided further*, if the Collateral Assignment Debt is incurred at the holding company level (that is, by the Concessionaire's parent entity), then the Concessionaire shall have the right to guarantee such parent entity's obligations and liabilities in respect of such Collateral Assignment Debt, so long as such parent entity is in itself a special purpose entity formed and organized solely for the purpose of owning the Concessionaire and other single purpose affiliates of the Concessionaire engaged in the business of providing parking for motor vehicles), (vii) except as expressly permitted hereby or by any Collateral Assignment or in connection in the ordinary course of business of the Metered Parking System, not pledge its assets for the benefit of any other Person and (viii) maintain adequate capital in light of its contemplated business operations.

**Section 3.7.    Rights of the City to Access and Perform Work on the Metered Parking System.**

(a)     *Reservation of Rights*.   The City (and its Representatives, grantees, tenants, licensees and others claiming by, through or under the City) shall, at all times during the Term, retain all property rights associated with the City's ownership of the Parking Lots.  The City shall have access to the Metered Parking System and each and every part thereof (provided that no access is granted to the cash collections, Metering Device keys and locks, or any software or

intangibles) at all reasonable times and upon reasonable prior notice to perform each of the following at the City's own cost and expense (other than if pursuant to clause (ii) or (iii)):

(i)      to inspect the Metered Parking System (including the Parking Lots) or determine whether or not the Concessionaire is in compliance with its obligations under this Agreement or applicable Law pursuant to Section 8.3;

(ii)      if a Concessionaire Default then exists, to make any necessary repairs to the Metered Parking System and the Parking Lots and perform any work therein pursuant to Section 16.1(b)(iii);

(iii)      in the event of an emergency or danger that threatens to cause injury to individuals (or damage to property) or to impair the continuous operation of the Metered Parking System or to impair the enforcement of parking violations or traffic control regulations and if the Concessionaire is not then taking all necessary steps to rectify or deal with said emergency or danger, to take actions as may be reasonably necessary to rectify such emergency or danger (in which case, no notice shall be necessary);

(iv)      to use the Parking Lots or any part thereof for any and all purposes;

(v)      to (A) install, design, manage, maintain, repair and rehabilitate any existing or future utilities or similar services (whether provided by the City or third parties at the City's instruction) in, on, under, across, over or through the Parking Lots (including water and sewer lines, power transmission lines, fiber optic cable, other communications and other equipment), (B) grant easements and rights on, over, under or within the Parking Lots for the benefit of suppliers or owners of any such utilities or services and (C) use the Metered Parking System in connection with any such installation, design, management, maintenance, repair or rehabilitation (*provided* that notwithstanding the foregoing clauses (A), (B) and (C) the Concessionaire shall have the right, at all times during the Term, to install, design, manage, maintain, repair and rehabilitate utilities or other services for its own account (and not for lease, resale or service to third parties) to the extent that the said utilities or services are necessary for the Metered Parking System Operations); and

(vi)      to, solely in accordance with the terms hereof, do any other act or thing that the City may be obligated to do or have a right to do under this Agreement;

*provided, however*, that the City shall use reasonable efforts to minimize interference with the Metered Parking System Operations or the value of the Metered Parking System Assets in connection with any entry on the Parking Lots pursuant to this Section 3.7(a).

(b)      *Access Rights*.   The City and any of its Representatives, grantees, tenants, licensees and others claiming by, through or under the City, during the progress of any work referred to in this Section 3.7 shall have all necessary access rights and may keep and store at the Parking Lots all necessary materials, tools, supplies, equipment and vehicles, in a reasonably neat and orderly fashion in compliance with all Laws and so as to not unreasonably interfere with the Concessionaire's conduct of business.   To the extent that the City undertakes work or repairs under this Section 3.7 or any other provision of this Agreement, such work or repairs shall be commenced and diligently completed in a good and workmanlike manner, in accordance with

any applicable Operating Standards and in such a manner as not to unreasonably interfere with the conduct of business in or use of such space.

(c)     *Effect of Reservation*.   Any reservation of a right by the City and any of its Representatives, grantees, tenants, licensees and others claiming by, through or under the City to enter the Metered Parking System and to make or perform any repairs, alterations, Restoration or other work in, to, above, or about the Metered Parking System which is the Concessionaire's obligation pursuant to this Agreement, shall not be deemed to (i) impose any obligation on the City to do so, (ii) render the City liable to the Concessionaire or any other Person for the failure to do so or (iii) relieve the Concessionaire from any obligation to indemnify the City as otherwise provided in this Agreement.   Nothing in this Agreement shall impose any duty upon the part of the City to do any work required to be performed by the Concessionaire hereunder and performance of any such work by the City and any of its Representatives, grantees, tenants, mortgagees, licensees and others claiming by, through or under the City shall not constitute a waiver of the Concessionaire's default in failing to perform the same.

**Section 3.8.    Intentionally deleted.**

**Section 3.9.    Intentionally deleted.**

**Section 3.10.    Payment of Taxes**.   Except as otherwise provided in this Section 3.10 and Section 7.1, the Concessionaire shall pay when due all Taxes payable during the Term in respect of the use or conduct of business with respect to the Metered Parking System, including any Parking Taxes, which the Concessionaire is obligated to collect from customers of the Metered Parking System and remit to the City or other Governmental Authority, as required by the applicable Law, it being understood that the Concessionaire shall have discharged its obligation to pay Parking Taxes in respect of the Parking Lots by remitting any Parking Taxes collected from customers of the Parking Lots to the City.   The City reserves the right, without being obligated to do so, to pay the amount of any such Taxes not timely paid and which are not being contested by the Concessionaire, and the amount so paid by the City shall be deemed additional consideration hereunder, due and payable by the Concessionaire within 10 Business Days after written demand by the City.   The Concessionaire shall have the right to contest in good faith the validity or amount of any Taxes which it is responsible to pay under this Section 3.10; *provided, however,* that (i) the Concessionaire has given prior notice to the City of each such contest, (ii) no contest by the Concessionaire may involve a reasonable possibility of forfeiture or sale of the Metered Parking System, and (iii) upon the final determination of any contest by the Concessionaire, if the Concessionaire has not already done so, the Concessionaire shall pay any amount found to be due, together with any costs, penalties and interest.   The Concessionaire shall not be liable for, and the City shall indemnify and hold the Concessionaire (and with respect to any New Agreement, the Collateral Assignee) harmless from and against, any (A) sales, use or similar Tax imposed by the State of Illinois, the City or any other unit of local government in the State of Illinois on the Consideration; (B) transfer, stamp, deed recording or similar Tax imposed by the State of Illinois, the City or any other unit of local government in the State of Illinois by reason of the execution and delivery of this Agreement or any grant or transfer to the Concessionaire by the City at Closing or any New Agreement and (C) Property Taxes.

**Section 3.11. Utilities**. The Concessionaire shall pay when due all charges (including all applicable Taxes and fees) for gas, electricity, light, heat, power, telephone, water and other utilities and services used in the Metered Parking System Operations or supplied to the Metered Parking System during the Term; *provided, however,* that with respect to the Parking Lots, the Concessionaire shall pay all such charges only as applicable to the Metering Devices for such lots. Upon request of the City, the Concessionaire shall forward to the City, within 15 Days following the respective due dates, official receipts, photocopies thereof, or other evidence satisfactory to the City, acting reasonably, of the payment required to be made by the Concessionaire in accordance with this <u>Section 3.11</u>.

**Section 3.12. Competing Off-Street Parking.**

(a) Subject to <u>Section 3.12(b)</u> and <u>Section 3.12(c)</u>, the City will not operate, and will not permit the operation of, a "Competing Public Parking Facility." A "<u>Competing Public Parking Facility</u>" means any off-street public parking lot or public parking garage that (i) is (A)owned or operated by the City or (B)operated by any Person and located on land owned by the City, or leased to the City, (ii) is within one mile of a Concession Metered Parking Space, (iii)is used primarily for general public parking; (iv) has a schedule of fees for parking motor vehicles that is less than three times the highest Metered Parking Fees then in effect for Concession Metered Parking Spaces in the same area; and (v) was not used for general public parking on December 4, 2008.

(b) As used in <u>Section 3.12(a)</u>, the term "Competing Public Parking Facility" does not include (i) any parking lot or parking garage located at, or providing parking for motor vehicles in connection with the regular operations of public buildings and facilities including, but not limited to, any airport, courthouse, correctional facility, police station, fire station, administrative building, public school, public library, public park or recreational facility, public hospital or similar government building; (ii) any parking facility located at, or within one-half mile of, any sports stadium or sports arena having a seating capacity in excess of 15,000; (iii) park and ride facilities that are used primarily by mass transit passengers; (iv) temporary parking facilities used for Special Events; (v) any parking facility that is used primarily to provide parking for an affordable housing development or a public housing project; and (vi) any Parking Lots.

(c) If the City undertakes or permits a Competing Public Parking Facility in violation of <u>Section 3.12(a)</u>, such action shall constitute a Compensation Event requiring the payment of Concession Compensation. Such action shall not constitute a City Default, an Adverse Action or a Reserved Powers Adverse Action. No interest in real estate is conveyed by <u>Section 3.12</u>.

**Section 3.13. Notices of Defaults and Claims.**

(a) *Notice by the Concessionaire*. The Concessionaire shall promptly give notice to the City (i) if the Concessionaire becomes aware that a Concessionaire Default has occurred under this Agreement (*provided, however*, that the failure to give such notice shall not constitute an independent Concessionaire Default) and (ii) of all material claims, proceedings, disputes (including labor disputes) or litigation in respect of the Concessionaire pertaining to the Metered Parking System, the Metered Parking System Operations or the City (whether or not such claim,

- 48 -

proceeding or litigation is covered by insurance) of which the Concessionaire is aware (other than as a result of a notice to the Concessionaire from the City). The Concessionaire shall provide the City with all reasonable information requested by it from time to time concerning the status of such claims, proceedings or litigation.

(b) *Notice by the City*. The City shall promptly give notice to the Concessionaire (i) if the City becomes aware that a City Default has occurred under this Agreement (*provided, however*, that the failure to give such notice shall not constitute an independent City Default) and (ii) of all material claims, proceedings, disputes (including labor disputes) or litigation in respect of the City pertaining to the Metered Parking System, the Metered Parking System Operations or the Concessionaire (whether or not such claim, proceeding or litigation is covered by insurance) of which the City is aware (other than as a result of a notice to the City from the Concessionaire). The City shall provide the Concessionaire with all reasonable information requested by it from time to time concerning the status of such claims, proceedings or litigation.

**Section 3.14. Assignment of Operating Agreements and Plans**. At the request of the City, the Concessionaire shall collaterally assign, to the extent reasonably practicable, to the City, in form and substance satisfactory to the City, acting reasonably, all of the right, title and interest of the Concessionaire in, to and under all or any of the Operating Agreements and all present and future specifications, plans, drawings, information and documentation in relation to the Metered Parking System Operations except to the extent any of the foregoing involve proprietary information (collectively, the "Operating Agreements and Plans") as collateral security to the City for the observance and performance by the Concessionaire of its covenants and obligations under this Agreement. The Concessionaire covenants that it shall cause all of the right, title and interest of the Concessionaire in, to and under all Operating Agreements and Plans entered into or created after the Time of Closing to be collaterally assignable to the City for the purposes of this Section 3.14. The City acknowledges that the Operating Agreements and Plans may also be assigned as security to a Collateral Assignee and that each of the City and such Collateral Assignee shall be entitled to use the Operating Agreements and Plans in enforcing their respective security as hereinafter provided. Without limiting the generality of the foregoing, but subject to the City's assumption of future liabilities under the Operating Agreements and Plans and to Article 18, the City shall be entitled to use the Operating Agreements and Plans in each of the following events: (i) if the City terminates this Agreement without a concession agreement being granted to a Collateral Assignee or nominee thereof pursuant to the provisions of Article 18; and (ii) if the City elects to use the Operating Agreements and Plans to remedy a Concessionaire Default under this Agreement. Notwithstanding the foregoing, in the event that any such Collateral Assignee has entered into possession or is diligently enforcing and continues to diligently enforce its security, whether by way of appointment of a receiver or receiver and manager, foreclosure or power of sale in accordance with Article 18, or otherwise, and is using the Operating Agreements and Plans in respect of the Metered Parking System Operations, the City shall not be entitled to use the Operating Agreements and Plans in enforcing its security, it being acknowledged that any assignment of the Operating Agreements and Plans to a Collateral Assignee shall have priority at all times over any assignment of the Operating Agreements and Plans to the City. The Concessionaire shall promptly deliver to the City, at the sole cost and expense of the Concessionaire, forthwith after completion or execution and delivery, a copy of each item of the Operating Agreements and Plans.

**Section 3.15. City Use of Information and Records**. In connection with the exercise of its Reserved Powers, the City shall be entitled to access to all records, electronic data and other information collected and retained by the Concessionaire with respect to the Metered Parking System Operations to the extent needed or useful to the City in connection with the enforcement of traffic and parking regulations, the identification of parking violations, the imposition and collection of parking fines and the adjudication of parking enforcement cases.

**Section 3.16. Metering Devices**. The Concessionaire shall be required to maintain and operate the Metering Devices in accordance with the Operating Standards. The Concessionaire will inspect all Metering Devices in a manner designed to identify and promptly repair or replace defective or inoperative Metering Devices. The Concessionaire shall establish a method pursuant to which members of the general public may report inoperative and defective Metering Devices and shall display, at or near each Metering Device, a telephone number and internet address for the reporting of inoperative and defective Metering Devices and other operational problems related to Metered Parking System Operations. To facilitate the Concessionaire's maintenance, operation and inspection of Metering Devices, the City shall grant designated employees of the Concessionaire login access to the City's CANVAS meter maintenance database or to any subsequent meter maintenance database.

**Section 3.17. Payments by the City**. The Concessionaire acknowledges and agrees that if the City is required under applicable Law of general application to withhold a portion of any payment that the City is obligated to make to the Concessionaire under this Agreement, the City will be deemed to have satisfied such payment obligation to the Concessionaire to the extent of such withholding by the City. If any such withheld amounts are permitted to be paid to the Concessionaire, the City shall pay such amounts to the Concessionaire whenever permitted by Law. The City shall notify the Concessionaire in writing at least five Business Days prior to the withholding of any amount pursuant to this Section 3.17.

**Section 3.18. Naming Rights and Commercial Advertisements and Activities**. The City retains the exclusive naming rights with respect to the Metered Parking System and the exclusive right to register and own the naming rights as the "Chicago Metered Parking System." The City also retains the exclusive rights with respect to commercial advertisements, including (but not limited to) billboards in the Parking Lots, advertising on Metering Devices and advertisements dispensed from Metering Devices. The City also retains the exclusive rights with respect to any other commercial activities, other than the collection of Metered Parking Fees, to be derived from the Metered Parking System. The City shall retain all proceeds and other consideration derived from such naming rights, commercial advertisements or other commercial activities derived from the Metered Parking Operations, other than the collection of Metered Parking Fees. Any action taken by the City pursuant to this Section 3.18 is not a Compensation Event or an Adverse Action. The City shall not use or permit to be used, any name or mark in connection with the Metered Parking System that may reasonably be odious or offensive to the Concessionaire or otherwise be reasonably likely to result in a negative association by the general public.

Notwithstanding the foregoing provisions of this Section 3.18, the City grants to the Concessionaire a non-exclusive, non-transferable, royalty free license during the Term to use any names associated with the Metered Parking System together with all existing and future

developed logos and marks (not including the City seal or, without the Approval of the City, other logos and marks used by the City for general municipal purposes) used in connection with the Metered Parking System Operations, solely in connection with the performance by the Concessionaire or any Operator of their obligations under the Agreement and in the provision of Metered Parking Services.

**Section 3.19. Administration of the Public Way**.  The City agrees, and the Concessionaire acknowledges and accepts, that the City holds and administers the public way in trust under the public trust doctrine for the non-discriminatory benefit of all Persons and interests, including the Concessionaire and the Concessionaire Interest.  In the administration of its public trust with respect to the public way, the City will not take any action in contradiction of the public trust doctrine that is intended to discriminate against the Concessionaire or the Concessionaire Interest.  The foregoing provisions of this Section 3.19 are not a limitation of any provision of Article 7 or Section 14.3.

**Section 3.20. Reversion of Metered Parking System**.  On the Reversion Date, the Concessionaire shall surrender and deliver to the City all of its rights, title and interest in the Metered Parking System (including all improvements to the Metered Parking System, the Metered Parking System Assets and all tangible and intangible personal property of the Concessionaire (including inventories) that is included in the Metered Parking System and used in connection with the Metered Parking System Operations, subject, however, as to any intellectual property included in the Metered Parking System, to any restrictions or prohibitions to disclosure, transfer or sharing thereof and any other rights of third parties with respect thereto, all in accordance with the provisions of Section 16.4.

**Section 3.21.  Parking Lot Fees**.  The City agrees that it will constitute a Compensation Event if the City charges a Metered Parking Fee for any hour, with respect to any Reserve Metered Parking Spaces located within a Parking Lot listed on Revised Schedule 10A, that is lower than the Metered Parking Fee then in effect for such hour for Concession Metered Parking Spaces on Blocks that are contiguous to such Parking Lot (or, if there are no Concession Metered Parking Spaces on contiguous Blocks, then on the Block containing Concession Metered Parking Spaces nearest to such Parking Lot); *provided, however,* that monthly parking rates at or above those in effect as of the Effective Date Of First Amendment shall not constitute a Compensation Event. Such action shall not constitute a City Default, an Adverse Action or a Reserved Powers Adverse Action. For the avoidance of doubt, as of the Effective Date Of Second Amendment, all Metered Parking Spaces located within the Parking Lots listed on Revised Schedule 10A are designated as Concession Metered Parking Spaces.

## ARTICLE  4
## CAPITAL IMPROVEMENTS

**Section 4.1.  Concessionaire Responsibility for Capital Improvements**.  The Concessionaire shall be responsible for all capital improvements with respect to the Metered Parking System required to be completed during the Term in accordance with the terms of this Agreement, including as required by the Operating Standards.  As provided in Section 7.2(c), the installation of Metering Devices for Reserve Metered Parking Spaces shall be at the sole cost and expense of the City.

**Section 4.2.    Authorizations    Related    to    Capital    Improvements**.    The Concessionaire's obligation to perform capital improvements shall be subject to the issuance by the City of any and all Authorizations to be issued by the City and as required by the City with respect thereto and the City agrees not to unreasonably withhold, condition or delay the issuance of any such Authorizations, and to use its reasonable efforts to assist the Concessionaire in obtaining such Authorizations.  Without limiting the generality of the foregoing, the City agrees that it will reasonably assist and cooperate with the Concessionaire in obtaining any and all Authorizations (including any required rights of access over real property that is owned or controlled by the City) in order for the Concessionaire to perform capital improvements.

**Section 4.3.    Intentionally deleted.**

**Section 4.4.    Required Payment Options**.  Any Concession Metered Parking Space or Reserve Metered Parking Space with a Metered Parking Fee of at least $1.50 per hour must have a payment option at the point of sale other than the cash payment of the Metered Parking Fee. The Concessionaire shall provide such payment option by use of a credit card or a debit card or similar methods with respect to each Concession Metered Parking Space and each Reserve Metered Parking Space no later than 180 Days after the first Day that the Metered Parking Fee for such Metered Parking Space is at least $1.50 per hour.

**Section 4.5.    Closure of Parking Lots**.  Pursuant to the exercise of its Reserved Powers and at the sole cost and expense of the City, the City may close one or more of the Parking Lots at any time or from time to time and may also remove Reserve Metered Parking Spaces from the Parking Lots.  Any action taken by the City pursuant to this <u>Section 4.5</u> is not an Adverse Action and is not a Compensation Event.

**Section 4.6.    Maintenance of Parking Lots**.  The City shall be responsible for operating and maintenance costs of the Parking Lots, including driveway permits, business licenses, resurfacing, de-icing, snow removal, insurance premiums and sub-surface capital improvements.  The Concessionaire shall be responsible only for operating and maintenance costs of the Metering Devices and signage in connection with the Parking Lots.

**Section 4.7.    New Technology.**  In addition to and without limiting the City's rights pursuant to <u>Section 5.1</u>, the Parties from time to time may implement new technology to assist in the operation of or collection of revenue from the Metered Parking System, but only if they first mutually agree in writing; *provided, however,* that the foregoing is not intended to waive or limit any right of the Concessionaire to change Metering Devices pursuant to <u>Section 5.2</u> and consistent with the Operating Standards; *provided further* that the Concessionaire shall not have the right to change Metering Devices to accept license plate data without the City's Approval.

*Pay-By-Cell Technology*.  The Concessionaire shall implement (and thereafter maintain) Pay-by-Cell for Metered Parking Spaces, which shall meet common parameters for technology and convenience consistent with comparable systems used in other cities as of the Effective Date Of First Amendment; *provided, however,* that such obligation of the Concessionaire to implement (and thereafter maintain) Pay-by-Cell shall be conditioned upon the City equipping its meter readers with handheld devices and employing additional meter readers if and to the extent necessary to enforce its parking rules and regulations with respect to Pay-by-Cell, with such

enforcement to include the ability to review both license plates for those using Pay-by-Cell and paper receipts for customers using the Metering Devices. The Concessionaire shall implement Pay-by-Cell as soon as reasonably practicable, but in no event later than May 1, 2014 (as extended, for the avoidance of doubt, day by day as a result of any Delay Event), plus an additional period of up to ninety (90) Days, as may be necessary to implement Pay-by-Cell; *provided, however*, that, if the City does not approve the Concessionaire's agreement with the Pay-by-Cell Operator within sixty (60) Days after the Concessionaire delivers such agreement to the City under <u>Section 4.7(g)</u>, the Concessionaire shall implement Pay-by-Cell by no later than the date that is the same number of Days after May 1, 2014 as the number of Days in excess of sixty (60) that the City takes to approve such Pay-by-Cell Operator agreement.

(a) *Convenience Fee*. A convenience fee of 35 cents will be charged on any single Pay-by-Cell transaction with a time duration of less than 120 minutes. Convenience fees shall not be included in calculating the Quarterly Settlement Amount.

(b) *Minimum Transaction Time*. The minimum time duration for any Pay-by-Cell transaction shall be: (i) 30 minutes for Metered Parking Spaces which are not Commercial Loading Zones and which are located in the area bounded by the south side of Roosevelt Road on the south, Lake Michigan on the east, the north side of North Avenue on the north and the west side of Halsted Street on the west, (ii) 15 minutes for all Commercial Loading Zones, and (iii) 15 minutes for all other Metered Parking Spaces.

(c) *Receipts*. No paper receipts shall be used in Pay-by-Cell transactions; instead, receipts shall be provided to customers by text messages, emails or other electronic systems.

(d) *Investment Costs, Operating Revenue and Profit Limitation*.

(i) Pay-by-Cell shall require an investment in technology by the Concessionaire, including a database and software that interfaces with the City's existing enforcement system, the ability to enforce parking restrictions through the use of license plate data, and the ability to assign each Pay-by-Cell transaction to the nearest Metering Device, and may result in decreased Metered Parking Revenues to the Concessionaire. The Concessionaire shall be responsible for such investment costs and bear the risk of such decreased Metered Parking Revenues, but shall be entitled (subject to the following terms) to earn and retain any amount attributable to convenience fee revenue as provided in <u>Section 4.7(a)</u> and interest from monies held in customer accounts as provided in <u>Section 4.7(e)</u>.

(ii) If in any Reporting Year, (A) the amount the Concessionaire receives in convenience fee revenue under <u>Section 4.7(a)</u> and interest from monies held in customer accounts under <u>Section 4.7(e)</u>, less (B) any per transaction cost imposed or incurred by the Pay-by-Cell Operator (*provided, however*, that credit card processing and credit card transaction fees shall be limited to the proportion of any given transaction that Pay-by-Cell convenience fees bear to all fees and charges for such parking transaction (such that, for example, a $0.35 Pay-by-Cell convenience fee for a transaction that includes $3.50 of total convenience and parking fees would permit 10% of the applicable credit card processing and credit card transaction fees for such transaction to be included in the Pay-by-Cell Threshold calculation)), and the costs of signage and decals relating solely to Pay-by-Cell and any direct costs of data service, data

hosting and IT support relating solely to Pay-by-Cell (*provided, however,* that such Concessionaire's direct costs of signage and decals and data service, data hosting and IT support shall not exceed $100,000, as Adjusted for Inflation from the date upon which the Concessionaire first commences service for Pay-by-Cell) (such difference, the "Pay-by-Cell Threshold"), exceeds an amount equal to $2,000,000 as Adjusted for Inflation from the date upon which the Concessionaire first commences service for Pay-by-Cell, then the Concessionaire shall pay to the City within thirty (30) Days following the completion of such Reporting Year, 100% of the amount of such excess.

(iii)     The City and the Concessionaire agree that at least twice during each Reporting Year, in connection with the quarterly meetings described in Section 20.17, the Concessionaire shall use its reasonable best efforts to analyze and report to the City the impact of the minimum time duration described in Section 4.7(b) on Metered Parking Revenues. In addition, from time to time, but not less than once every six months, the Concessionaire shall test the impact of a reduction in the minimum time duration on Metered Parking Revenues. If such a reduction of the minimum time duration can be implemented without decreasing Metered Parking Revenues, then the Concessionaire shall implement such reduction in the minimum time duration, but only to the number of minutes that the Concessionaire has reasonably determined will not decrease Metered Parking Revenues.

(iv)     The Concessionaire may analyze and report to the City three months prior to each Pay-by-Cell Review Date whether (a) the impact of the implementation and maintenance of Pay-by-Cell is to decrease Metered Parking Revenues below what they would have been in the absence of Pay-by-Cell and such decrease exceeds the Pay-by-Cell Threshold plus $500,000, or (b) the Pay-by-Cell Threshold plus $500,000 is a negative amount (each a "Pay-by-Cell Trigger Event"), and if the Concessionaire reasonably determines that there has been a Pay-by-Cell Trigger Event, may propose changes to Pay-by-Cell, including (x) the convenience fee described in Section 4.7(a), including the minimum period for the convenience fee to apply, and (y) the minimum time duration described in Section 4.7(b), to eliminate such Pay-by-Cell Trigger Event from occurring on a going-forward basis (the "Pay-by-Cell Proposed Change(s)"). If the Concessionaire reasonably determines that a Pay-by-Cell Trigger Event has occurred, and provides the City with such analysis and report, together with the bases for such determination and such supporting detail and information as was considered by the Concessionaire in reaching such determination, then the Parties shall attempt to agree on such Pay-by-Cell Proposed Changes or such other change(s) as will address the Pay-by-Cell Trigger Event. In the event the Parties are unable to agree, notwithstanding their reasonable best efforts, on such change(s) within three (3) months after the Concessionaire provides the City with such analysis and report and supporting detail and information, the Concessionaire shall have the option to terminate Pay-by-Cell on the relevant Pay-by-Cell Review Date. Notwithstanding anything to the contrary herein, if there is a change in Law or an exercise of Reserved Power that results in a Pay-by-Cell Trigger Event, the Concessionaire may initiate the process set forth in this Section 4.7(d)(iv) without waiting until the three month period prior to a Pay-by-Cell Review Date.

(e)     *Wallet*. Pay-by-Cell may include a requirement that the customer's account at all times have a minimum credit of $20.00 and that additional deposits into the account shall be in a minimum amount of $20.00 and such additional deposits may be automatically debited from a customer's nominated source once the balance on the customer's account falls below $10.00.

Interest on such deposits shall not be included in calculating the Quarterly Settlement Amount. The Concessionaire shall deposit, or cause to be deposited, such customer funds into a segregated deposit account or securities account maintained with a bank or other financial institution located in the United States of America which has been given a long-term unsecured debt rating of "A" (or equivalent) or higher by a Rating Agency. The credit balance of such deposit account or securities account shall be invested only in the Eligible Investments referred to in clause (i) and (iv) of the definition thereof.

(f)     *Adjustment of fees and other amounts*.  The amount of the convenience fee, the minimum required credit amount and the minimum deposit amount may be Adjusted for Inflation on an annual basis, subject to approval by the City Council; *provided, however,* that the failure to make such adjustments shall constitute a Compensation Event; *provided further* that Concession Compensation shall be limited to the amount of such adjustments during the period such adjustments were not made.

(g)     *City Approval*.  The Concessionaire may engage an operator to operate, manage and maintain Pay-by-Cell (the "Pay-by-Cell Operator") who may be (but is not required to be) the Concessionaire itself or its Affiliate.  The Concessionaire's agreement with the Pay-by-Cell Operator shall include terms customary for such agreements in the industry, and the City shall have the right to Approve such terms.  A successor agreement shall be presented to the City for approval not less than three (3) months prior to the expiration of the prior agreement, and shall likewise include terms customary for such agreements in the industry, and the City shall have the right to Approve such terms.  If the City does not approve any successor agreement prior to the expiration of the preceding agreement, the Concessionaire shall have the option to terminate Pay-by-Cell; *provided, however,* that the Parties shall use their reasonable best efforts to agree upon a mutually satisfactory alternative to the termination of Pay-by-Cell (including finding another Pay-by-Cell Operator that will accept terms that are reasonably acceptable to both Parties).

(h)     *Reserved Power Actions*.  The City expressly reserves its right to exercise Reserved Power actions with respect to Pay-by-Cell.  If such exercise of Reserved Power terminates Pay-by-Cell, or results in a Pay-by-Cell Trigger Event that the Parties are not able to resolve pursuant to <u>Section 4.7(d)(iv)</u>, such exercise shall constitute a Compensation Event; *provided, however*, that in calculating Concession Compensation, any lost profits shall be limited to no more than $2,000,000, as Adjusted for Inflation from the date upon which the Concessionaire first commences service for Pay-by-Cell.

## ARTICLE 5
## MODIFICATIONS

**Section 5.1.   City Directives**.  The City may, at any time during the Term, issue a City Directive to the Concessionaire.  Subject to the City making available to the Concessionaire sufficient funds to perform the work required to implement such City Directive at or before the time payment for such work is required to be made, and the Concessionaire having obtained (with the cooperation of the City) all relevant Authorizations from all relevant Governmental Entities required for the relevant work, the Concessionaire shall perform the work required to implement such City Directive, and the City shall pay to the Concessionaire the Concession Compensation with respect thereto.  The addition of or the removal of Concession Metered

- 55 -

Parking Spaces and Reserve Metered Parking Spaces by the City (including any direction to install or remove Metering Devices) is not a City Directive and shall not result in Concession Compensation, but shall be governed by the provisions of <u>Article 7</u>.

**Section 5.2. Concessionaire Requests**. If the Concessionaire wishes at any time during the Term to make a material change in the dimensions, character or quality of any part of the Metered Parking System, then the Concessionaire may submit to the City, for Approval, a Concessionaire Request with respect to such change and shall submit to the City for its Approval specific plans with respect to any such work. The Concessionaire shall not in any event be required to submit a Concessionaire Request, and no Approval shall be required, with respect to any Concessionaire's actions so long as such actions comply with applicable Operating Standards. The Concessionaire shall be responsible for all amounts required to implement an Approved Concessionaire Request (and any Losses incurred in connection therewith). No Concessionaire Request shall be implemented unless and until such Concessionaire Request has been Approved by the City.

**Section 5.3. Performance of Modifications**. Subject to the other provisions of this <u>Article 5</u>, the Concessionaire shall ensure that City Directives and Approved Concessionaire Requests are performed in a good and workmanlike manner and diligently complied with and implemented in such manner that the costs (in the case of City Directives only) and delays relating thereto are minimized.

## ARTICLE 6
## OPERATING STANDARDS

**Section 6.1. Compliance with Operating Standards**. The Concessionaire shall, at all times during the Term, cause the Metered Parking System Operations to, comply with and implement the Operating Standards in all material respects (including any changes or modifications to the Operating Standards pursuant to the terms of this Agreement). The City and the Concessionaire acknowledge and agree that the Operating Standards shall be construed flexibly in light of their objectives. The Concessionaire shall have in place procedures that are reasonably designed to achieve compliance with the Operating Standards. The Operating Standards shall not be deemed to be violated by immaterial acts or omissions, including an immaterial failure to comply with specific requirements set forth in the Operating Standards other than actions or omissions that endanger the public health or safety. Except as specifically set forth herein, the Concessionaire shall perform all work required to comply with and implement the Operating Standards (including the capital improvements described therein) as part of the Metered Parking System Operations and at its sole cost and expense.

**Section 6.2. Proposed Operating Standards**. If the Concessionaire, at its cost and expense, wishes to implement and use operating standards other than the Operating Standards, the Concessionaire must provide notice of such proposed operating standards to the City for Approval. The Concessionaire's proposed operating standards must be accompanied by an explanation of the Concessionaire's rationale for making its proposal and all relevant supporting information, certificates, reports, studies, investigations and other materials as are necessary to demonstrate that the Concessionaire's proposed operating standards are reasonably designed to achieve the objectives of the applicable Operating Standards. The City may request any

- 56 -

additional supporting information, certificates, reports, studies, investigations and other materials as are reasonably required by the City to determine if the Concessionaire's proposed operating standards are reasonably designed to achieve the objectives of the applicable Operating Standards. Until the City provides its Approval for the implementation of the Concessionaire's proposed operating standards, the Concessionaire shall not implement the proposed operating standards and shall implement and comply with the Operating Standards. The Concessionaire's proposed operating standards shall be deemed incorporated into the Operating Standards upon Approval by the City in accordance with the terms hereof. If the City refuses to Approve any proposed operating standards and the Concessionaire disagrees with such refusal, the Concessionaire may submit the matter to arbitration under the provisions of Article 19.

Section 6.3.    Modified Operating Standards.

(a)    The City shall have the right, at any time during the Term, to modify or change the Operating Standards upon notice to the Concessionaire to comply with any new Law (other than a Law of the City) applicable to the Metered Parking System Operations. In the event the City modifies the Operating Standards in accordance with the immediately preceding sentence, the Concessionaire, at its cost and expense, shall perform all work required to implement and shall comply with all such modifications and changes and in no event shall the Concessionaire be excused from compliance with any such modification or change. The Concessionaire shall have the right to challenge pursuant to Article 19 any modified Operating Standard on the grounds that it does not meet the requirement of this Section 6.3(a).

(b)    If during the Term the City is of the opinion that a modification or change to the Operating Standards is necessary or desirable but such modification or change is not subject to Section 6.3(a), the City may upon reasonable written notice to the Concessionaire modify or change the Operating Standards; *provided, however*, that the City shall pay to the Concessionaire the Concession Compensation with respect thereto at the time such modification or change is implemented. At the City's request, the Concessionaire shall perform all work required to implement and shall comply with all such modifications and changes, and in no event shall the Concessionaire be excused from compliance with any such modification or change. The City shall have the right to undertake the work, upon reasonable notice to the Concessionaire, necessary to ensure implementation of and compliance with any such modification or change to the Operating Standards if the Concessionaire fails to do so within a reasonable period of time; *provided, however*, that to the extent that such work is undertaken by the City, the Concessionaire shall pay to the City within 10 Business Days following demand therefor, or the City may offset from amounts owing to the Concessionaire in connection with such modification or change, the costs of the portion of the work performed in order to comply with the Operating Standards existing immediately prior to such modification or change, and the City shall be responsible only for the incremental costs of the additional work required in order to implement such proposed modification or change to the Operating Standards and, without duplication with the foregoing, the Concession Compensation with respect to such modification or change.

## ARTICLE 7
## PARKING REVENUES AND CONCESSION VALUE

**Section 7.1     Metered Parking Fees.**     The City has (and shall retain during the Term) the Reserved Power to establish and revise from time to time the Metered Parking Fees that shall be imposed and charged in respect of motor vehicles using Metered Parking Spaces, including Concession Metered Parking Spaces and Reserve Metered Parking Spaces. Pursuant to the Metered Parking System Ordinance the City has approved and adopted the Initial Schedule of Parking Fees. At or before the Time of Closing the City shall place in effect the Initial Schedule of Parking Fees, and the City agrees that it will constitute a Compensation Event if, prior to December 31, 2013, the City (without the prior written approval of the Concessionaire) places into effect a revised schedule of Metered Parking Fees that (without regard to (i) any Expected Utilization Adjustments and (ii) any other changes to the Concession Metered Parking Spaces resulting from the exercise by the City of its Reserved Powers) results in a reduction in the Aggregate Revenue Value from the Aggregate Revenue Value as of the time immediately prior to the effective date of such revised schedule.

The exercise by the City of its Reserved Power to establish Metered Parking Fees shall not be used to favor the use by the general public of any Other Metered Parking Space located within one mile of any Concession Metered Parking Space or any Reserve Metered Parking Space over the use by the general public of any Concession Metered Parking Space. Without limiting the generality of the foregoing, the City agrees that it will constitute a Compensation Event if, at any time after August 2, 2017, the City places into effect any CLZ Change; *provided, however,* that, if the City reverses such CLZ Change within 60 days of such CLZ Change coming into effect, the Concession Compensation payable with respect to such Compensation Event shall include only Losses (to the extent provided in the definition of "Concession Compensation") in respect of the period during which such CLZ Change was in effect and shall not include any estimated net losses of the Concessionaire's future Metered Parking Revenues that are reasonably attributable to such Compensation Event.  Further, the City shall pay to the Concessionaire, as part of Concession Compensation in connection with a CLZ Change which is not reversed by the City within such 60-day period, on the Agreed Date the estimated net losses of the Concessionaire's future Metered Parking Revenues that are reasonably attributable to such CLZ Change.

The Concessionaire shall, during the Term, have the right to collect and retain all of the Metered Parking Revenues derived from the Concession Metered Parking Spaces, and the right to pledge and assign such Metered Parking Revenues as security for any indebtedness incurred by the Concessionaire pursuant to a Collateral Assignment (and related financing documents).

During the Term, the City shall have the right to retain (or to receive from the Concessionaire) all of the Metered Parking Revenues derived from the operation of Reserve Metered Parking Spaces net of any amounts to be paid to the Concessionaire as consideration for its operation and management of the Reserve Metered Parking Spaces. The consideration to be paid to the Concessionaire for the operation and management of a Reserve Metered Parking Space shall be an amount equal to fifteen percent (15%) of the gross revenues from such Reserve Metered Parking Space; for this purpose, "gross revenues" shall not include any Parking Taxes collected by the Concessionaire from customers of the Reserve Metered Parking Spaces and

- 58 -

remitted to the City or other Governmental Authority pursuant to Section 3.10. The net revenues derived from Reserve Metered Parking Spaces shall be calculated by the Concessionaire and shall be paid to the City by the second Business Day next following the Day of collection of such Metered Parking Revenues (the "Reserve Metered Parking Spaces Payment"). If in the reasonable opinion of the Concessionaire the operation and management costs together with a reasonable profit margin relating to a Reserve Metered Parking Space exceeds fifteen percent (15%) of the gross revenues related to a Reserve Metered Parking Space, then the Concessionaire shall have the right to elect that the City and the Concessionaire consult with a Consultant on what a reasonable increase in operation and management fees would be under the then current market conditions. The decision of the Consultant shall be binding on both the City and the Concessionaire for a period of two years. The Concessionaire shall pay the costs and expenses of the Consultant.

The Concessionaire shall be obligated to charge and collect the full amount of the Metered Parking Fees imposed by the City with respect to each Concession Metered Parking Space and each Reserve Metered Parking Space and may not initiate any plan or program of discounts or surcharges from the schedule of Metered Parking Fees as in effect from time to time. In accordance with <u>Section 3.10</u>, the Concessionaire shall be obligated to charge and collect all Parking Taxes that the Concessionaire is obligated to collect from customers of the Metered Parking System and shall be obligated to remit such Parking Tax collections to the City.

### Section 7.2.    Designation and Removal of Metered Parking Spaces.

(a)        *Designation*.  The designation of Metered Parking Spaces is a Reserved Power of the City and the City shall have the right to designate, and to remove from such status, from time to time, each Metered Parking Space, Concession Metered Parking Space and Reserve Metered Parking Space; *provided, however,* that (i) the City's right to increase the number of Concession Metered Parking Spaces is limited by the provisions of <u>Section 7.2(b)</u>, and (ii) except as hereinafter described for Commercial Loading Zones, if the City designates Reserve Metered Parking Spaces on the same Block as Concession Metered Parking Spaces, all Metered Parking Spaces on such Block shall be designated Reserve Metered Parking Spaces.   If the City designates a Commercial Loading Zone on a Block that also contains (at the time of designation of such Commercial Loading Zone) Concession Metered Parking Spaces, the City shall have the right to retain the designation of such Concession Metered Parking Spaces as Concession Metered Parking Spaces or to change (at the time of designation of the Commercial Loading Zone or thereafter) the designation of such Concession Metered Parking Spaces to Reserve Metered Parking Spaces; provided however, that thereafter the City shall retain the Reserved Power to further change, from time to time, the designation of all such spaces (but not including the Commercial Loading Zone) to either Concession Metered Parking Spaces or Reserve Metered Parking Spaces; *provided further, however*, that all spaces on a Block, other than the Commercial Loading Zone, shall have the same designation at the same time.  Subject to Section 7.1, the City shall also retain the Reserved Power to establish the Period of Operation and Period of Stay of Metered Parking Spaces.  Any designation or direction of the City pursuant to this <u>Section 7.2</u> shall be provided in writing to the Concessionaire.  Any Commercial Loading Zones shall be designated only as Reserve Metered Parking Spaces and not as Concession Metered Parking Spaces unless the City and the Concessionaire otherwise agree in writing.

The City hereby designates (i) the Concession Metered Parking Spaces located in the Parking Lots, identified on Amended Schedule 10A, as Reserve Metered Parking Spaces; and (ii) the Reserve Metered Parking Spaces, identified on Amended Schedule 10B as Concession Metered Parking Spaces. Each such designation shall be effective as of the Effective Date Of First Amendment. As of the Effective Date Of Second Amendment, the City hereby designates the Reserve Metered Parking Spaces located in the Parking Lots, identified on Revised Schedule 10A, as Concession Metered Parking Spaces, with the Expected Utilization Rates shown on Revised Schedule 10A for such Concession Metered Parking Spaces. Following the Effective Date Of Second Amendment, if the City designates any Metered Parking Spaces in a Parking Lot as Reserve Metered Parking Spaces, all Metered Parking Spaces in such Parking Lot shall be designated Reserve Metered Parking Spaces; thereafter, if the City designates any Reserve Metered Parking Spaces in a Parking Lot as Concession Metered Parking Spaces, all Metered Parking Spaces in such Parking Lot shall be designated Concession Metered Parking Spaces.

The City hereby designates the Reserve Metered Parking Spaces, identified on Amended Schedule 10C as Concession Metered Parking Spaces. Such designation shall be effective as of December 1, 2012, and the City shall pay to the Concessionaire the Metered Parking Revenues attributable to such spaces received by the City since December 1, 2012, after deducting rental fees paid by the City for Metering Devices for such spaces for the period following December 1, 2012.

(b)     *Limitation on Concession Metered Parking Spaces*.  The number of Concession Metered Parking Spaces designated and operating at any time may not exceed 45,000 without the prior written consent of the Concessionaire.  During any Excess Value Year, any increase in the number of Concession Metered Parking Spaces (other than an increase resulting from the exercise by the Concessionaire of its right of first refusal pursuant to Section 2.1) is subject to the written consent of the Concessionaire.  As used in this Section 7.2(b), the term "Excess Value Year" means the 12-month period beginning on June 1 of a year immediately following a period of two consecutive Reporting Years in which the average System in Service Percentage was greater than one hundred five percent (105%).

(c)     *Metering Devices*.  All Metering Devices shall be purchased and owned by the Concessionaire.  The Concessionaire shall be obligated to install promptly Metering Devices with respect to all newly designated Concession Metered Parking Spaces and Reserve Metered Parking Spaces.  If a Concession Metered Parking Space or a Reserve Metered Parking Space ceases to be designated by the City as a Metered Parking Space, then the Concessionaire must immediately cease to collect Metered Parking Fees with respect to such parking space and, upon the direction of the City, shall proceed to remove all Metering Devices with respect thereto.  The installation and the removal of Metering Devices shall be undertaken in accordance with the Operating Standards.

(d)     *Costs*.  With respect to the payment of the costs of installation of Metering Devices for newly designated Concession Metered Parking Spaces when no Metering Device then exists to service such Metered Parking Space, the first 4,000 installations in any Reporting Year shall be at the sole cost and expense of the Concessionaire and any additional installations in such Reporting Year in excess of the first 4,000 installations shall be paid by the Concessionaire and reimbursed by the City.  Such reimbursement shall be paid by the City

within 60 Days after the Concessionaire shall have filed with the City a written request for payment together with such information as the City may reasonably request to confirm the claim for reimbursement. For the purpose of determining the number of such installations in any Reporting Year, the date of installation of a Metering Device shall be the Day such Metering Device is placed in service in accordance with the Operating Standards. The Concessionaire shall be obligated to pay all other costs and expenses related to the installation of Metering Devices for Concession Metered Parking Spaces, including, but not limited to, any required installation of a new Metering Device pursuant to Section 4.4 and any reinstallation of a Metering Device after a Required Closure. Any removal of a Metering Device with respect to any Concession Metered Parking Space that is undertaken because such Metered Parking Space is no longer designated by the City as a Metered Parking Space shall be at the sole cost and expense of the City. The installation and removal of Metering Devices with respect to Reserve Metered Parking Spaces shall be undertaken by the Concessionaire at the cost and expense of the City. When a Metering Device is used with respect to a Reserve Metered Parking Space, the City shall pay a monthly rental fee to the Concessionaire for the use of such Metering Device. The monthly rental fee shall be an amount equal to two percent (2%) of the invoiced acquisition cost of the Metering Device (or allocated portion of such acquisition cost if the Metering Device services other Metered Parking Spaces) and shall be payable on the first Business Day after such Metering Device is placed in service with respect to such Reserve Metered Parking Space and thereafter as of the first Business Day of each month during the time such Reserve Metered Parking Space remains designated as a Reserve Metered Parking Space. If the End Date occurs prior to the date falling on the last Day of the 50th month following the first Business Day after such Metering Device is placed in service with respect to such Reserve Metered Parking Space, then the remaining unpaid portion of the invoiced acquisition cost of the Metering Device (or allocated portion of such allocation cost) shall be reimbursed by the City. If in any Reporting Year, the aggregate invoiced acquisition cost of all Metering Devices placed in service during such Reporting Year with respect to Reserve Metered Parking Spaces (other than, subject to Section 7.2(f), such spaces on a Block containing a Commercial Loading Zone) exceeds the Acquisition Cost Limitation for such Reporting Year, then the City shall reimburse the Concessionaire for any such aggregate invoiced acquisition cost in excess of the Acquisition Cost Limitation for such Reporting Year. Each such reimbursement shall be paid by the City within 60 Days after the Concessionaire shall have filed with the City a written request for payment together with such information as the City may reasonably request to confirm the claim for reimbursement. The City shall not be obliged to reimburse the Concessionaire for the cost of installing or removing, or pay a monthly rental fee in respect of, a Metering Device used with respect to a Commercial Loading Zone except as required by Section 7.2(f).

(e)     *Deemed Removal*. A Metered Parking Space shall be deemed to be removed by the City for the purposes of this Article 7 (and the provisions of Section 14.3) if the City takes any action that has the practical effect of removing such Metered Parking Space from service or making it unusable (or fails to take an action that is necessary to be taken in order to preserve a designated Metered Parking Space as a useable parking space) and such condition continues for a period of 180 consecutive Days, whether or not the City officially or formally removes such a space from designation as a Metered Parking Space (or formally declares a Required Closure), and whether or not any specific notice of such removal or closure is provided by the City. Notwithstanding the foregoing, the Concessionaire shall not remove any Metered Parking Devices from a Metered Parking Space unless and until such Metered Parking Space is formally

- 61 -

removed by the City from being designated as a Metered Parking Space and notice of such removal is provided by the City to the Concessionaire in accordance with Section 7.2(a).

(f)    *Costs concerning Commercial Loading Zones*.    If the City designates a Commercial Loading Zone on a Block with existing Metered Parking Spaces; the City shall pay the Concessionaire for the reasonable costs of upgrading a Metering Device to add such Commercial Loading Zone, including all reasonable costs associated with on-street customer service personnel, website changes, programming changes to the rates and changes to the Pay-by-Cell related to the implementation and maintenance of such Commercial Loading Zone; the City shall not be required to pay a rental fee to the Concessionaire in connection with the Metering Device in relation to such Commercial Loading Zone.  If, at the time of designation of the Commercial Loading Zone, there are no existing Metered Parking Spaces on that Block, the installation of a Metering Device with respect to such Reserve Metered Parking Spaces shall be undertaken by the Concessionaire at the cost and expense of the City (including all reasonable costs associated with on-street customer service personnel, website changes, programming changes to the rates and changes to the Pay-by-Cell related to the implementation and maintenance of such Commercial Loading Zone) and the City shall pay the Concessionaire a rental fee for such Metering Device; *provided, however,* that if the City thereafter adds four or more Concession Metered Parking Spaces on such Block, no rental fee shall be due and owing by the City as of the date of designation of the fourth Concession Metered Parking Space; *provided further, however*, that if the City thereafter designates one or more Reserve Metered Parking Spaces on such Block, the City shall continue to pay a rental fee for such Metering Device.  The amount and timing for payment of the rental fee pursuant to this subsection (f) shall be the same as for rental fees charged pursuant to subsection (d) above.

**Section 7.3.    Notice of Exercise of Reserved Powers**.    The City shall provide the Concessionaire with timely written notice of any changes in Metered Parking Fees pursuant to Section 7.1 and of any actions taken by the City pursuant to Section 7.2.  The City shall use reasonable best efforts to provide the Concessionaire with timely written notice of any Required Closure other than a Required Closure that is disregarded pursuant to Section 7.9(c) and, no later than ten (10) Days following the end of any month, information in the City's possession concerning the location, type, and effective date of any Required Closures that occurred during the preceding month.  The City shall provide the Concessionaire with timely written notice of any proposed designation or removal of Metered Parking Spaces, any proposed changes in Metered Parking Fees, Periods of Operation, Periods of Stay, Required Closures or fines for parking violations and any other Reserved Power actions (other than emergency actions) that could reasonably be expected to have the effect of resulting in a reduction in Revenue Value of at least five percent (5%).

**Section 7.4.    Revenue Value**.

(a)    *General Rule.*  The Revenue Value of each Concession Metered Parking Space as of March 1, 2013 shall be the Revenue Value set forth on Amended Schedule 10.  These values have been determined by the City based upon and after taking into account the Metered Parking Fee, the Period of Operation, the Period of Stay, and the Utilization Rate of such Concession Metered Parking Space measured over the course of the Reporting Year commencing March 1, 2012 (and adjusted to reflect, for Impacted Concession Metered Parking Spaces, new Periods of

Operation and seasonal factors), and the Rate to Fine Multiple Factor determined in accordance with Section 7.9(e). Thereafter, the Revenue Value for each Concession Metered Parking Space will be determined as of the first Day of each month in accordance with the methodology set forth in Schedule 6.

For the avoidance of doubt, as of every March 1 beginning March 1, 2015, the Utilization Rate of every Concession Metered Parking Space shall be adjusted to equal (A) the sum of the Actual Operating Revenue for the preceding Reporting Year allocated to such space plus the Required Closure Payments for the preceding Reporting Year allocated to such space, divided by (B) the Full Utilization Amount for such space as of February 1 of the preceding Reporting Year, except where (x) the Revenue Value for such space was changed during the preceding Reporting Year or (y) an Expected Utilization Rate became effective with respect to such space during the preceding Reporting Year (notwithstanding the reversal of any Reserved Power action in accordance with Section 7.9(h)).

(b)     *Reserved Power Actions Affecting Revenue Values*.  The Revenue Value calculations in Section 7.4(a) are based on the dates on which a Regular Rate Adjustment or an Expected Utilization Rate becomes effective.  The following rules shall apply in determining such effective dates for Section 7.4(a) and otherwise for the purposes of this Agreement:  (i) any designation of a new Concession Metered Parking Space or change in Metered Parking Fees, Periods of Operation or Periods of Stay that requires the installation of a new Metering Device shall be deemed effective as the earlier of the date the Metering Device is placed in service in accordance with the Operating Standards or the 120th Day following the Reserved Powers Action Date; (ii) any removal of the designation of a Metered Parking Space as a Concession Metered Parking Space shall be deemed effective as of the second Business Day immediately following the Reserved Powers Action Date; (iii) any change in Metered Parking Fees, Periods of Operation or Periods of Stay that does not require the installation of a new Metering Device shall be deemed effective as of the earlier of the Day the Metering Device as modified to reflect such change is placed in service in accordance with the Operating Standards or the 60th Day following the Reserved Powers Action Date; (iv) any designation of a Concession Metered Parking Space that does not require the installation of a new Metering Device or the modification of the then installed Metering Device (including an informational sticker or display) shall be deemed effective as of the second Business Day after the Reserved Powers Action Date.  The Concessionaire shall provide the City with prompt written notice of the placed in service date of each new Metering Device installed pursuant to clause (i) of this paragraph and of each Metering Device that is modified pursuant to clause (iii) of this paragraph.  As used in this Section 7.4, "Reserved Powers Action Date" means (A) (i) the effective date of the Reserved Power action as determined in the ordinance or resolution of the City Council authorizing such Reserved Powers action or (ii) if no such effective date is determined in such ordinance or resolution, then the date such ordinance or resolution takes effect or (B) if the exercise of such Reserved Power has been delegated by action of the City Council to the City Comptroller or other designated official, the date such delegated authority is exercised by the City Comptroller or such designated official by written notice to the Concessionaire.  The provisions of this paragraph relate only to the effective dates for the determination or adjustment of Revenue Values and are not a limitation on any provision or requirement of the Operating Standards.

(c)     *Change In Revenue Value Not a Compensation Event*.  Any change in Revenue Value (other than as set forth in Section 7.1 with respect to the Initial Schedule of Parking Fees) is not a Compensation Event and will not result in Concession Compensation.

(d)     *Dates for Reporting Calculations and Making Objections Regarding Quarterly Settlement Amounts*.  The City will calculate and report in writing to the Concessionaire: the Monthly System in Service Percentages, the Quarterly System in Service Percentage, and the Quarterly Settlement Amount for each Quarter no later than the first Business Day of the third month after the end of the Quarter; and the Settlement System Revenue Value no later than the first Business Day of August of each Reporting Year.

For a period of ten (10) Days following the submission by the City of any of the foregoing reports, the Concessionaire may provide the City with comments or objections to the report and the City agrees to meet with the Concessionaire and its Representatives to discuss any of the matters presented in the report.  Within thirty (30) Days after the initial submission of any report, unless the Concessionaire is disputing any element of the report, the City shall deliver to the Concessionaire the report in final form.

**Section 7.5.     Allocation of Actual Operating Revenue and Required Closure Payments to Concession Metered Parking Spaces**.  Actual Operating Revenue and Required Closure Payments shall be allocated to individual Concession Metered Parking Spaces as follows

(a)     *Actual Operating Revenue*.  As of the last Day of each month, the Actual Operating Revenue collected by the Metering Device for such space during such month shall be allocated to each Metered Parking Space (whether subject to a Required Closure or not during such month) which is served by such Metering Device by multiplying such Actual Operating Revenue by such space's Revenue Distribution Percentage as of the first Day of such month.

(b)     *Required Closure Payments*.  As of the last Day of each month, the Required Closure Payments derived from Days of Required Closure occurring during such month for any Concession Metered Parking Space served by the same Metering Device shall be added together and such total shall then be allocated to each Concession Metered Parking Space (whether subject to a Required Closure or not during such month) which is served by the same Metering Device by multiplying such total by such space's Revenue Distribution Percentage as of the first Day of such month.

(c)     *Assignment of Spaces to Metering Devices*.  Except as provided in Section 7.5(e), each Metered Parking Space as of the Effective Date Of First Amendment has been assigned to a Metering Device on Amended Schedule 10, with those spaces on a Block where there is one Metering Device assigned to such Metering Device and, where there is more than one Metering Device, to the Metering Device closest to such Metered Parking Space.   Such assignments of existing Metered Parking Spaces shall not be changed without the agreement of the Parties.  Except as provided in Section 7.5(e), each Metered Parking Space added by the City in accordance with Section 7.8 shall be assigned to the Metering Device servicing that Block where there is one such Metering Device and, to the extent such Metered Parking Space is on a Block serviced by more than one Metering Device, to the Metering Device on such Block closest to such Metered Parking Space.

(d)    *Allocation of Revenue for Commercial Loading Zones*.  Notwithstanding any other provision herein to the contrary, each Metering Device designated for use in connection with a Commercial Loading Zone shall include a mechanism for allocating Metered Parking Fees paid for use of such Commercial Loading Zone separately from Metered Parking Fees paid for use of any other Metered Parking Spaces on the same Block.  For purposes of this Section and the Revenue Distribution Percentage, each Commercial Loading Zone shall be deemed to be served by a different Metering Device than the Metering Device serving the Concession Metered Parking Spaces on the same Block.

(e)    *Allocation of Metered Parking Revenue for Parking Lots*.  As of the Effective Date of Second Amendment, each Metered Parking Space in a Parking Lot has been assigned to the Metering Device servicing that Parking Lot, and for any Parking Lot serviced by more than one Metering Device, each Metered Parking Space in such Parking Lot has been assigned to the Metering Device as identified on the map for such Parking Lot on Revised Schedule 10A.  Such assignments of existing Metered Parking Spaces in the Parking Lots shall not be changed without the agreement of the Parties.  As of the last Day of each month, the Actual Operating Revenue collected by the Metering Device for each Concession Metered Parking Space in a Parking Lot during such month shall be allocated to each Metered Parking Space (whether subject to a Required Closure or not during such month) which is serviced by such Metering Device by multiplying such Actual Operating Revenue by such space's Revenue Distribution Percentage as of the first Day of such month.  As of the last Day of each month, Metered Parking Revenue from monthly parking permits issued pursuant to Section 9-64-208 of the Municipal Code and sold during such month shall be allocated to each Metered Parking Space (whether subject to a Required Closure or not during such month) in the Parking Lot identified on such monthly parking permit (regardless of whether such permit is eligible for use in more than one Parking Lot) by (i) for a Parking Lot with one Metering Device, such space's Revenue Distribution Percentage as of the first Day of such month and (ii) for a Parking Lot with more than one Metering Device, the percentage, with respect to each Metered Parking Space as of the first day of such month, of the Monthly Full Utilization Amount for such Metered Parking Space divided by the sum of the Monthly Full Utilization Amounts for all Concession Metered Parking Spaces in such Parking Lot. For purposes of this Section 7.5(e), the Revenue Distribution Percentage and Monthly Full Utilization Amount for any Metered Parking Space in a Parking Lot shall be determined by using only the applicable hourly Metered Parking Fee(s) for such space and not the monthly rate authorized under Section 9-64-208 of the Municipal Code.

### Section 7.6.    Settlements.

(a)    *City Settlement Payment*.  If the Quarterly Settlement Amount for any Quarter is a positive number, then the City shall owe the Concessionaire the Quarterly Settlement Amount for that Quarter.  Each such Quarterly Settlement Amount shall bear interest at the Bank Rate from the last Day of the Quarter in which such amount is calculated until such amount is discharged.  Any such Quarterly Settlement Amount shall be reduced by the application of the amount of any available Settlement Credit and any Quarterly Settlement Amount remaining after such reduction must be paid within 60 Days following the final determination of such Quarterly Settlement Amount in accordance with Section 7.4 or Section 7.15.

(b)     *Concessionaire Settlement Payment or Credit*.    If the Quarterly Settlement Amount is a negative number for that Quarter, then the Concessionaire shall owe the City the Quarterly Settlement Amount for that Quarter.  Any Quarterly Settlement Amount due to the City by the Concessionaire shall accrue as a credit (the "Settlement Credit") against future Quarters in which the City owes a Quarterly Settlement Amount to the Concessionaire.  Any balance of a Settlement Credit shall bear interest at the Bank Rate from the last Day of its respective Quarter until applied or discharged.  On any date, the Concessionaire, at its option, may pay to the City all or any portion of the Settlement Credit, including accrued interest thereon, due to the City.  On the End Date, the amount of any such accrued Settlement Credit, including accrued interest, shall constitute the final settlement amount to be paid by the Concessionaire to the City on the End Date; *provided, however*, that such amount shall be deemed discharged and no such payment shall be required if the End Date is on or after February 29, 2084.  Notwithstanding Section 12.11(a), such payment amount shall in no event be offset against any obligation of the City to pay the Metered Parking System Concession Value pursuant to this Agreement.

### Section 7.7.    Parking Fines and Enforcement.

(a)     *General Provisions*.    The Parties acknowledge and agree that effective enforcement of parking rules and regulations by the City and the adjudication and punishment of Persons that violate such rules and regulations are material to the Parties and to the administration of this Agreement. The Concessionaire acknowledges and agrees that the City's system for the enforcement of parking rules and regulations as in effect on the date of execution of this Agreement satisfies the requirements of this Section 7.7 and that the City will incur no liability to the Concessionaire during such period as such system remains unchanged and in effect, except for the City's enforcement efforts with respect to Pay-by-Cell, which are addressed in Section 4.7.  The City covenants that it will enforce parking rules and regulations, as in effect from time to time, in accordance with the provisions of this Section 7.7 and acknowledges that its failure to do so may result in losses to the Concessionaire and thereby may constitute a Compensation Event.  The Concessionaire acknowledges and agrees that the adjudication of parking violations and the punishment of violators is a judicial or quasi-judicial matter and that the outcome of such adjudications (and the methods employed by the City with respect thereto) and the punishments, if any, imposed, may not be compensated for under this Agreement and will not give rise to a Compensation Event or result in Concession Compensation in any event. During the Term and pursuant to its Reserved Powers, but subject to applicable provisions of the Illinois Vehicle Code, the City shall adopt and enforce rules and regulations with respect to the Metered Parking Spaces.  Violations of parking rules and regulations shall be enforced by the City in accordance with Law.  The City agrees to establish, maintain and undertake procedures for the enforcement of parking rules and regulations that are designed to deter parking violations, including through the use of license plate data and including procedures for the collection of unpaid parking tickets by such means as then permitted by Law, including notification to the Illinois Secretary of State of Persons subject to license suspension proceedings pursuant to Section 6-306.5 of the Illinois Vehicle Code.  In addition, the City shall at all times during the Term maintain a vehicle immobilization program if then permitted by Law (the form and method of which may be determined from time to time by the City or another Governmental Authority). In no event shall this prevent the City from using alternative methods of deterrence and immobilization which are not currently being used as of the date of this Agreement.  The amount

of the fines imposed for violations with respect to Metered Parking Spaces shall be established by the City and revised from time to time as necessary to deter parking violations. The City shall establish and maintain a system for the adjudication and punishment of those Persons that commit parking violations. With respect to parking by Exempt Persons, the City will penalize abuse of such parking permits through significant fines and other appropriate measures and will take all reasonable measures to ensure that levels of counterfeit parking permits are minimized.

(b)     *Specific Undertakings*.    In the administration of its vehicle immobilization program, the City will not discriminate between tickets issued for metered parking violations and tickets issued for other parking violations or between tickets issued by the City and tickets issued by the Concessionaire pursuant to Section 3.2(e). Whenever a metered parking violation has neither been contested or paid and the City has obtained accurate and complete registration information with respect to the registered owner of the vehicle, the City will mail notices of violation, determination and final determination to the registered owner of the cited vehicle in accordance with the following schedule: (i) a notice of violation, within 21 Days of the receipt of accurate and complete registration information, (ii) a notice of determination, within 35 Days of the receipt of accurate and complete registration information, and (iii) a notice of final determination, within 45 Days of the receipt of accurate and complete registration information. The City grants to the Concessionaire the right to provide the City with registration information, if the City is unable to obtain complete and accurate registration information within 45 Days following the date of the data entry of the ticket information. The City agrees to use the information provided by the Concessionaire for enforcement purposes if, in the reasonable judgment of the City, such information is accurate and complete. If the City is unable to collect the amount of any unpaid metered parking violation fine or penalty within 180 Days following the final adjudication of such fine or penalty, and the aggregate amount due to the City equals or exceeds the amount of the fine for the violation, then the City shall refer such collection to a law firm or collection agency.

(c)     *Compensation Events*.    Each of the following shall constitute a Compensation Event: (i) if the City requires more than three final determinations of parking violation liability for a passenger vehicle to become eligible for vehicle immobilization, *provided, however*, that nothing in this clause (i) limits the City from enacting dollar thresholds for vehicle immobilization eligibility as long as the average fine and penalty value is less than or equal to the average value of three final determinations of parking violation liability, and (ii) if the City offers Persons with unpaid parking fines or penalties the option of paying an amount as full satisfaction of the fine and penalty if that amount is less than ten times the then weighted average hourly Metered Parking Fee for Concession Metered Parking Spaces.

**Section 7.8.     Additional Concession Metered Parking Spaces**.    During the Term and subject to the provisions of Section 7.2(b), the City may designate additional Concession Metered Parking Spaces and each additional Concession Metered Parking Space shall immediately become part of the Metered Parking System; *provided, however*, that the City will not designate a Block of Reserve Metered Parking Spaces as Concession Metered Parking Spaces unless each Metering Device which serves such Block of Reserve Metered Parking Spaces generates minimum annual total Metered Parking Revenues of at least $2,000, as Adjusted for Inflation from the Effective Date Of First Amendment, for the Reporting Year immediately preceding the date of designation. The City may add new Blocks of Concession

Metered Parking Spaces, *provided, however,* that in respect of each Metering Device which serves such a Block, if the Concession Metered Parking Spaces assigned to that Metering Device shall have an aggregate amount of Actual Operating Revenue plus Required Closure Payments below $2,000, as Adjusted for Inflation from the Effective Date Of First Amendment, during each of the first two Reporting Years following the addition of such Concession Metered Parking Spaces, the City shall designate the Concession Metered Parking Spaces on such Block as Reserve Metered Parking Spaces.  The $2,000 threshold set forth above does not apply to the existing Blocks of Concession Metered Parking Spaces set forth on Amended Schedule 10 or the addition of Concession Metered Parking Spaces on existing Blocks of Concession Metered Parking Spaces.  The Concessionaire shall promptly undertake to install (if needed) a Metering Device for such additional Concession Metered Parking Spaces and to commence Metered Parking Operations with respect to such Concession Metered Parking Spaces.

For each Concession Metered Parking Space designated by the City in accordance with this Section 7.8, the City shall assign a Revenue Value as of the first Day of the month following the date the designation is deemed effective in accordance with Section 7.4(b), taking into account the then current Metered Parking Fee, Period of Operation, Period of Stay, Rate to Fine Multiple Factor and Expected Utilization Rate, pursuant to the methodology set forth in Schedule 6.  The City shall also calculate an Expected Utilization Adjustment and a Revenue Value Adjustment for each such additional Concession Metered Parking Space in accordance with Section 7.9(a) and Section 7.9(b).

### Section 7.9.    Adjustments to Revenue Values.

(a)    *Expected Utilization Rate*.    Subject to Section 7.9(i), the City shall set, and notify the Concessionaire of, an Expected Utilization Rate for a Concession Metered Parking Space whenever: (i) there is a change in the Metered Parking Fee (other than a Regular Rate Adjustment) or the Period of Operation or the Period of Stay; (ii) a new Concession Metered Parking Space is designated pursuant to Section 7.8; or (iii) the City adjusts the Utilization Rate for such space as provided in Section 7.9(f). Such Expected Utilization Rate shall remain in effect until the earlier of (x) a new Expected Utilization Rate becomes effective for such space or (y) the March 1 as of which a Revenue Value Adjustment is determined for such space. As of the date of a Revenue Value Adjustment, a space shall no longer have an Expected Utilization Rate. No Expected Utilization Rate shall be set in connection with a Regular Rate Adjustment. Whenever the City designates one or more Metered Parking Spaces as Concession Metered Parking Spaces or removes or is deemed to have removed one or more Metered Parking Spaces from the status of Concession Metered Parking Spaces, Expected Utilization Rates shall not be set for other Concession Metered Parking Spaces assigned to the same Metering Device.

(b)    *Expected Utilization Adjustments and Revenue Value Adjustments*.  An Expected Utilization Adjustment and a Revenue Value Adjustment shall be calculated only for a Concession Metered Parking Space which has an Expected Utilization Rate.  Such Expected Utilization Adjustment and Revenue Value Adjustment shall be calculated by the City as of the Scheduled RVA Calculation Date for such Concession Metered Parking Space; *provided, however,* that such calculation of an Expected Utilization Adjustment and a Revenue Value Adjustment shall not be done on such Scheduled RVA Calculation Date but shall be done on the Delayed RVA Calculation Date for such Concession Metered Parking Space, if (A) such

Concession Metered Parking Space qualified as a CLZ Affected Concession Metered Parking Space with respect to a CLZ Change occurring during the Reporting Year immediately preceding such Scheduled RVA Calculation Date or (B) such Concession Metered Parking Space qualified as a CLZ Affected Concession Metered Parking Space with respect to a CLZ Change which was reversed by the City during the Reporting Year immediately preceding such Scheduled RVA Calculation Date. As of a RVA Calculation Date, the City shall adjust Aggregate Revenue Value by the Revenue Value Adjustment, if any, for such Concession Metered Parking Space pursuant to the methodology set forth in Schedule 6. For purposes of adjusting Aggregate Revenue Value by the Revenue Value Adjustment, the Expected Utilization Rate in effect as of the first Day of the month immediately preceding such date of adjustment shall be used in calculating the Expected Utilization Adjustment.

(c)      *Required Closure*. If as a result of a Required Closure, Metered Parking System Operations for a Concession Metered Parking Space are suspended for a number of Days in the Reporting Year in excess of the Required Closure Allowance, then for the current and any subsequent Quarter during such Reporting Year the City shall be obligated to make a Required Closure Payment. A Required Closure Payment arising in connection with any Quarter shall be due and payable as part of the Quarterly Settlement Amount for such Quarter. Any Required Closure of an aggregate duration of greater than six hours in any Day shall be treated as a Required Closure for the entire Day and any Required Closure of an aggregate duration of six hours or less shall be disregarded; *provided, however,* that any Required Closure of an aggregate duration of six hours or more that occurs over a period of three consecutive Days within the same Reporting Year (with each of the three consecutive Days counted for this purpose and with no single Day Required Closure of greater than six hours) shall be treated as a Required Closure for the first Day of such three-Day period. For any such three-Day period, at least two of the Days shall have a Required Closure of some duration not exceeding six hours. In no event shall any of the three Days be used to calculate more than one Day of Required Closure.

(d)      *Parking Tax Imposition or Increase*. If a Parking Tax is imposed with respect to Concession Metered Parking Spaces that are On Street Parking Spaces, then the Revenue Value of each such Concession Metered Parking Space shall be promptly reduced to reflect that the Metered Parking Fee expected to be derived by the Concessionaire from such Concession Metered Parking Space will be net of the Parking Tax. If, after the Closing Date, an existing Parking Tax is increased or a new Parking Tax is imposed on a Concession Metered Parking Space that is an Off Street Parking Space, then a similar reduction shall be made in the Revenue Value of that Concession Metered Parking Space.

(e)      *Rate to Fine Multiple*. The Revenue Value of a Concession Metered Parking Space shall be promptly reduced by ten percent during any period of time that the Rate to Fine Multiple is less than ten; by twenty-five percent during any period of time that the Rate to Fine Multiple is less than five and by eighty percent during any period of time that the Rate to Fine Multiple is less than three.

(f)      *Utilization Adjustment*. Whenever in the reasonable opinion of the Concessionaire, the exercise by the City of its Reserved Powers, other than a change in Metered Parking Fees, Periods of Operation, Periods of Stay or Rate to Fine Multiple factor, has caused a reduction in both the Utilization Rate of the Concessionaire Metered Parking Spaces and

Aggregate Revenue Value, measured over a period of at least 60 Days, then, upon the written request of the Concessionaire, the City shall, after taking into account information provided by the Concessionaire with respect to the Utilization Rate over such 60 Day period (i) evaluate the Utilization Rate of all Concession Metered Parking Spaces as needed to adjust the then current Revenue Value of each Concession Metered Parking Space, taking into account such exercise by the City of its Reserved Powers and (ii) promptly make such adjustments in the Utilization Rate of Concession Metered Parking Spaces in accordance with the results of such evaluation.

(g)     *Meter Adjustment*.  Schedule 10 shall also be promptly adjusted whenever a Metered Parking Space is added or removed as a Concession Metered Parking Space.  The Revenue Value of any such Concession Metered Parking Space shall also be subject to all of the other adjustments required under this Section 7.9.

(h)     *City's option to reverse the effect of a Reserved Power action on System in Service Percentage*.

(i)     The Parties acknowledge that there may be circumstances in which the City elects to take a Reserved Power action that it expects (A) to increase the System in Service Percentage but such Reserved Power action does not have that effect or increases the System in Service Percentage less than the City expected or (B) to decrease the System in Service Percentage but such Reserved Power action reduces the System in Service Percentage by more than the City expected when it took such action.  In all such cases, the City has the power to reverse such Reserved Power action.  Without prejudice to the rights of the Concessionaire and obligations of the City under Section 14.3, the Parties intend for this Section 7.9(h) to provide the City with the option to eliminate the past or future effect of such Reserved Power action on the System in Service Percentage; *provided, however,* that the City reimburses the Concessionaire for any loss of Revenue Value during the period such Reserved Power action was in effect, as provided below.

(ii)     At any time prior to the first Day of the Reporting Year that occurs not less than 12 months and not more than 24 months after the month an Expected Utilization Rate for a Concession Metered Parking Space is set on account of a Reserved Power pursuant to Section 7.9(a), the City has the option to reverse the effect such Reserved Power action has on the System in Service Percentage by reverting the Period of Operation, Metered Parking Fee or Period of Stay changed by virtue of such Reserved Power action to the Period of Operation, Metered Parking Fee or Period of Stay immediately preceding the Reserved Power action (and then, if applicable, adjusting such Metered Parking Fee for any subsequent Regular Rate Adjustments), and adjusting the Utilization Rate for such space to be the Utilization Rate in effect for such space as of the first Day of the month the Reserved Power action became effective pursuant to Section 7.4; *provided, however*, that (A) if the City has exercised one or more subsequent Reserved Power actions (other than Regular Rate Adjustments) with respect to such space during the period prior to the first Day of the Reporting Year that occurs not less than 12 months and not more than 24 months after the month an Expected Utilization Rate for the Concession Metered Parking Space is set on account of a Reserved Power pursuant to Section 7.9 and such subsequent Reserved Power actions have not been reversed under this Section 7.9(h), the City shall only have the option to reverse the effect of the last Reserved Power action (other than a Regular Rate Adjustment) on the System in Service Percentage; and (B) if the

Reserved Power action in question concerns more than one Concession Metered Parking Space, this <u>Section 7.9(h)</u> will not apply unless the City reverses such Reserved Power action as to all of the spaces as to which such Reserved Power action was taken.  The Parties agree that at the time of such a reversal, the System in Service Percentage will be adjusted as necessary to remove any decrease or increase in the System in Service Percentage attributable to the reversed Reserved Power action; *provided, however,* that if a Regular Rate Adjustment shall have occurred subsequent to the exercise of the Reserved Power action and prior to the date of such reversal, the System in Service Percentage shall reflect the effect of the Regular Rate Adjustment.  The Parties further agree that any payments or credits attributable to the reversed Reserved Power action will be returned or cancelled on the date of payment of the next Quarterly Settlement Amount following the Reserved Power reversal.

(iii)	If the City elects to exercise its option to reverse the effect of a Reserved Power action on the System in Service Percentage pursuant to this <u>Section 7.9(h)</u>, the City will calculate, and if a positive figure, the City will pay as of the date of payment of the next Quarterly Settlement Amount following the Reserved Power reversal, the difference between (1) the product of 1/12 of the Revenue Value of such Concession Metered Parking Space as of the first Day of the month immediately preceding the Reserved Power action and the number of months the Reserved Power action was in effect, and (2) the Actual Operating Revenue and Required Closure Payments for such space during the period in which the Reserved Power action was in effect.  No payment shall be due to either Party if the figure is negative.  The Expected Utilization Rate set in connection with a Reserved Power action that has been reversed shall not result in a Revenue Value Adjustment.

(iv)	This <u>Section 7.9(h)</u> shall not apply to the designation of new Concession Metered Parking Spaces.

(i)	*Exercise of Commercial Loading Zone Reserved Powers.*	The Parties agree that, if the City changes the Metered Parking Fee or the Period of Operation or the Period of Stay of, or exercises any other Reserved Power in respect of, any Commercial Loading Zone (each a "<u>Commercial Loading Zone Reserved Power</u>"): (i) the City shall not set a new Expected Utilization Rate pursuant to Section 7.9(a); and (ii) the Concessionaire's right to request the City to adjust the Utilization Rate pursuant to Section 7.9(f) shall not apply, in each case in  respect of any Concession Metered Parking Spaces to take into account the exercise of such Commercial Loading Zone Reserved Power.

**Section 7.10.  Incentive to Modernize Metering Devices**.  Any increase in the number of On-Street Parking Spaces resulting from the replacement of traditional single bay and double bay electronic or mechanical Metering Devices by the installation of pay and display Metering Devices or other Metering Devices that eliminate or reduce the need for stanchions and other structures in the public way will not constitute an increase in the number of Concession Metered Parking Spaces for the purpose of any calculation of Revenue Value.

**Section 7.11.  Reduction in Concession Metered Parking Spaces**.  A Reserved Powers Adverse Action shall have occurred if (i) for any Reporting Year the average daily number of Concession Metered Parking Spaces is less than 30,000; *provided, however,* that spaces designated as Reserve Metered Parking Spaces serviced by a Metering Device that generates

total Metered Parking Revenues of less than $2,000, as Adjusted for Inflation from the Effective Date Of First Amendment, for the Reporting Year immediately preceding such Reporting Year, shall be treated as Concession Metered Parking Spaces for purposes of determining the average daily number of Concession Metered Parking Spaces under this Section 7.11, or (ii) for any Reporting Year ending prior to March 1, 2073, the average of the Monthly System in Service Percentages for such Reporting Year is less than eighty percent (80%).

**Section 7.12. Excessive Use By Exempt Persons**. The amount of any Exempt Persons Annual Excess Loss for a Reporting Year shall accrue interest at the Bank Rate from the last day of the applicable Reporting Year and shall be paid by the City to the Concessionaire no later than 90 Days following the determination of the amount of such Exempt Persons Annual Excess Loss.

**Section 7.13. Right to Challenge**. If a Party objects to any determination made by the other Party pursuant to this Article 7, the objecting Party shall have the right to submit such determination (at any time including after the date of such determination) for resolution by technical arbitration pursuant to Section 19.7; *provided, however,* that any item disputed under Section 7.14 shall not be eligible for a technical arbitration pursuant to Section 19.7.

**Section 7.14. RPA Determination Concerning Revenue Value Adjustment.**

(a) *Conditions for Seeking an RPA Determination Concerning Revenue Value Adjustment*. The Parties acknowledge that there may be circumstances in which a Revenue Value Adjustment may reflect economic effects on the Metered Parking System other than those caused by the City's exercise of Reserved Powers. Accordingly, if any of the conditions outlined in Section 7.14(a)(i)-(v), Section 7.14(a)(vii) or Section 7.14(a)(viii)is satisfied, either Party may initiate a proceeding (such proceeding, and the process with respect to such proceeding as described in this Section 7.14, the "RPA Determination Proceeding"), and if the condition outlined in Section 7.14(a)(vi) is satisfied, the Concessionaire may initiate an RPA Determination Proceeding, for an Expert Econometrician to determine (such determination, the "RPA Determination") the amount that the Revenue Value Adjustment in question would have been had the effects of the amounts caused by factors other than the exercise of Reserved Powers been excluded from such calculation; provided, however, that neither Party may initiate an RPA Determination Proceeding with respect to any Reserved Power the effect of which the City reversed pursuant to Section 7.9(h).

(i) As to any Quarter commencing with the Reporting Year that commences March 1, 2015, if there has been an event during the two-year period immediately preceding the Quarter which is beyond the reasonable control of the Parties and such event would have constituted a Force Majeure within the meaning of Section 1.1 if it had affected the Concessionaire's performance or use of the Metered Parking System, and such event impacted Actual System Operating Revenue during some or all of such two-year period. Such events shall include an intervening act of God or public enemy, war, invasion, armed conflict, act of foreign enemy, blockade, revolution, act of terror, sabotage, civil commotion, interference by civil or military authorities, condemnation or confiscation of property or equipment by any Governmental Authority, nuclear or other explosion, radioactive or chemical contamination or ionizing radiation, fire, tornado, flooding, earthquake or other natural disaster, riot or other

- 72 -

public disorder, epidemic or quarantine restriction; *provided, however,* that no event arising out of or in connection with or resulting from any of the following shall provide a basis for initiating an RPA Determination Proceeding (unless such event is specifically enumerated in this paragraph): (A) general economic conditions or changes therein; (B) financial, banking, currency or capital markets fluctuations or conditions (either in the United States or any international market and including changes in interest rates); and (C) conditions affecting the financial services or parking industries generally.

(ii)     As to the first Quarter of any Reporting Year commencing with the Reporting Year that commences March 1, 2015, if during the Reporting Year ending one year and one Day prior to such Quarter the City changed the Period of Stay or increased the Period of Operation of Concession Metered Parking Spaces that (A) are equal to or more than 10% of the total number of Concession Metered Parking Spaces as of the last Day of such Reporting Year or (B) the combined Revenue Value of such changed spaces is equal to or more than 10% of the combined Revenue Value of all Concession Metered Parking Spaces as of the last Day of such Reporting Year; *provided, however,* that the RPA Determination shall be limited to the amount of the Revenue Value Adjustment attributable to such spaces.

(iii)     As to the first Quarter of any Reporting Year commencing with the Reporting Year that commences March 1, 2015, if (A) the True-Up Adjustment increases or decreases by more than the greater of $250,000, as Adjusted for Inflation from the Effective Date Of First Amendment, or 15% from the True-Up Adjustment in the fourth Quarter of the preceding Reporting Year and (B) the Unaffected System Utilization Rate increases or decreases by more than 10% from the Unaffected System Utilization Rate for the preceding Reporting Year; *provided, however,* that this condition shall not be deemed satisfied for purposes of the City's right to initiate an RPA Determination Proceeding unless the Unaffected Concession Metered Parking Spaces included in the calculation of Unaffected System Utilization Rate shall have a combined Revenue Value that is equal to or greater than 50% of the combined Revenue Value of all Concession Metered Parking Spaces as of the last Day of the Reporting Year over which such Unaffected System Utilization Rate is measured.

(iv)     As to the first Quarter of the Reporting Year commencing March 1, 2015, if (A) the number of Affected Concession Metered Parking Spaces is equal to or more than 5% of the total number of Concession Metered Parking Spaces as of February 28, 2014, or (B) the combined Revenue Value of the Affected Concession Metered Parking Spaces is equal to or more than 5% of the combined Revenue Value of all Concession Metered Parking Spaces as of February 28, 2014; *provided, however,* that for purposes of making the RPA Determination (x) the "exercise of Reserved Powers" shall exclude the changes in Hours of Operation to the Impacted Concession Metered Parking Spaces that are effective as of the Implementation Date, and (y) the RPA Determination shall exclude the amount of the Revenue Value Adjustment, if any, that was caused by the City's implementation of Public Act 097-0845, which limits the number of Exempt Persons effective January 1, 2014.

(v)     As to the first Quarter of the Reporting Year commencing March 1, 2015, if (A) the number of Affected Concession Metered Parking Spaces is equal to or more than 10% of the total number of Concession Metered Parking Spaces in either Zone 4 or Zone 5 (as defined in Schedule 15) as of February 28, 2014, (B) the combined Revenue Value of the Affected

Concession Metered Parking Spaces is equal to or more than 10% of the combined Revenue Value of Concession Metered Parking Spaces in either Zone 4 or Zone 5 (as defined in Schedule 15) as of February 28, 2014; *provided, however,* that for purposes of making the RPA Determination (x) the "exercise of Reserved Powers" shall exclude the changes in Hours of Operation to the Impacted Concession Metered Parking Spaces that are effective as of the Implementation Date, (y) the RPA Determination shall exclude the amount of the Revenue Value Adjustment, if any, that was caused by the City's implementation of Public Act 097-0845, which limits the number of Exempt Persons effective January 1, 2014 and (z) the RPA Determination shall be limited to such Parking Zone(s).

(vi)     As to the first Quarter of each of the Reporting Years commencing March 1, 2015, March 1, 2016 and March 1, 2017, if (A) the number of Affected Concession Metered Parking Spaces in a Parking Zone is equal to or more than 25% of the total number of Concession Metered Parking Spaces in such Parking Zone as of the last Day of the Reporting Year ending one year and one Day prior to such first Quarter; or (B) the combined Revenue Value of the Affected Concession Metered Parking Spaces in such a Parking Zone is equal to or more than 25% of the combined Revenue Value of all Concession Metered Parking Spaces in such Parking Zone as of the last Day of the Reporting Year ending one year and one Day prior to such first Quarter; *provided, however,* that the RPA Determination shall be limited to such Parking Zone(s).

(vii)     As to the first Quarter of any Reporting Year commencing with the Reporting Year that commences March 1, 2018, if (A) (x) the number of Affected Concession Metered Parking Spaces in a Parking Zone is equal to or more than 25% of the total number of Concession Metered Parking Spaces in such Parking Zone as of the last Day of the Reporting Year ending one year and one Day prior to such first Quarter; or (y) the combined Revenue Value of the Affected Concession Metered Parking Spaces in a Parking Zone is equal to or more than 25% of the combined Revenue Value of all Concession Metered Parking Spaces in such Parking Zone as of the last Day of the Reporting Year ending one year and one Day prior to such first Quarter, and (B) the Concessionaire has conducted a statistical sampling of the use of Concession Metered Parking Spaces and calculated the Exempt Person Annual Loss in accordance with the requirements of this Agreement and Schedule 14 during each of the two immediately preceding Reporting Years, and the EPAL Percentage has changed by more than six (6) percentage points (e.g., a decrease from 125% to 119%) from the prior Reporting Year; *provided, however,* that if the EPAL Percentage for the first of the two Reporting Years is (i) 112% or less,  then this condition shall not be satisfied with respect to the Concessionaire, and (ii) less than 106%, then in determining whether this condition is satisfied with respect to the City, only the percentage point change above 106% shall be considered; *provided further* that the RPA Determination shall be limited to those Parking Zone(s) that satisfy the requirement of Section 7.14(a)(vii)(A) above.

(viii)     As to any Quarter, if there has been a Revenue Value Adjustment for any Concession Metered Parking Space at any time prior to such Quarter and such Concession Metered Parking System qualifies as a CLZ Affected Concession Metered Parking Space in connection with a CLZ Change occurring since the previous Revenue Value Adjustment for such Concession Metered Parking Space.

(b)     *RPA Determination Proceeding*.

(i)     A Party shall initiate the RPA Determination Proceeding by providing written notice to the other Party, within 30 Days after the date on which the City delivers the report of the Quarterly Settlement Amount for such Quarter pursuant to Section 7.4.  Such notice shall (A) demonstrate that one or more of the conditions set forth in Section 7.14(a) has been satisfied and (B) notify the other Party of its intent to seek an RPA Determination.

(ii)     The RPA Determination Proceeding shall be conducted by a nationally recognized econometrician (the "Expert Econometrician") jointly selected by the City and the Concessionaire (and, if the Parties fail to agree upon an Expert Econometrician within 10 Business Days after the notice of commencement, then the Expert Econometrician shall be appointed by the International Institute for Conflict Prevention & Resolution (CPR), 575 Lexington Avenue, 21st Floor, New York New York 10022).  Each Party shall engage an expert, who shall serve as such Party's representative in the RPA Determination Proceeding.  No later than 60 Days after the selection of the Expert Econometrician, each Party's expert shall submit to the Expert Econometrician (with a copy to the other Party) a signed report, together with any calculations or other supporting information or exhibits, setting forth his or her position on the amount that the Revenue Value Adjustment would have been had the effects of the amounts caused by factors other than the exercise of Reserved Powers been excluded from the calculation.  No later than 30 Days after the Parties' initial expert submissions (or the expiration of the deadline for such submissions, if earlier), each Party's expert may (but shall not be required to) submit a response to the report previously submitted by the expert of the other Party.  The Expert Econometrician may ask either Party questions concerning their submissions and may request such additional information or analysis as it deems appropriate, and each Party agrees to cooperate with (and to cause their respective expert to cooperate with) such requests; *provided, however*, that a copy of such request or response shall be provided to the other Party promptly after such request or response is given.   The Parties will direct the Expert Econometrician to hold a conference with the Parties and their experts as soon as practicable, but not later than 30 Days after the Parties' response submissions.  Only the experts appointed by the Parties shall be permitted to actively present and discuss matters with the Expert Econometrician at the conference (with any other representatives of the Parties having only a right of observation).   The Expert Econometrician shall determine the length and procedures of such conference, and shall have the opportunity to ask such questions of the Parties' experts as it deems appropriate.  The Parties' experts shall be permitted to respond to the positions of the other Party's expert taken at the conference.  The Parties shall direct the Expert Econometrician to finalize and deliver to the Parties the RPA Determination no later than 30 Days after the completion of such conference.  The RPA Determination shall be in writing and state the reasons upon which it is based, with such supporting detail as the Expert Econometrician deems appropriate; *provided, however*, that the RPA Determination shall include a statement that specifically determines and states the amount that the Revenue Value Adjustment would have been had the effects of the amounts caused by factors other than the exercise of Reserved Powers been excluded from the calculation.  Within three Business Days after its receipt of the decision, any Party may request the Expert Econometrician to interpret the decision or to correct any clerical, typographical or computation errors therein.   The other Party shall have a right to respond to such request for interpretation and/or correction within three Business Days of its receipt of such request.  If the Expert Econometrician considers the request justified, it shall

- 75 -

comply with such request within three Business Days after its receipt of such request. The correction and/or interpretation of the decision shall take the form of an addendum and shall constitute part of the RPA Determination.

(iii)     Upon an RPA Determination by the Expert Econometrician, the City shall adjust retroactively the Revenue Value Adjustment, Aggregate Revenue Value, System in Service Percentages and Quarterly Settlement Amount(s) for the Quarter in question and subsequent Quarters (if any) to conform to the change in the Revenue Value Adjustment set forth in the RPA Determination. If the RPA Determination concludes that the Revenue Value Adjustment should be decreased, the Concessionaire shall return such portion of the Quarterly Settlement Amount paid to the City (if applicable) or, if there is no amount to be returned to the City, the City will receive a Settlement Credit in the amount of the reduced Quarterly Settlement Amount. If the RPA Determination concludes that the Revenue Value Adjustment should be increased, the City shall pay the increased Quarterly Settlement Amount to the Concessionaire or, if appropriate, any existing Settlement Credit shall be reduced by the amount of the increased Quarterly Settlement Amount.

(iv)     The RPA Determination shall be final and binding on the Parties, and shall be non-appealable. In no case shall any Revenue Value Adjustment with respect to a particular Quarter be the subject of more than one RPA Determination Proceeding. The Parties shall each bear their own costs with respect to the RPA Determination Proceeding and shall bear equally the cost of the Expert Econometrician. No Party shall engage in ex parte communication with the Expert Econometrician; *provided, however,* that the Expert Econometrician shall be permitted to ask questions of, and to discuss the Parties' respective submissions and positions with, the Parties' experts on an ex parte basis.

**Section 7.15. Special Rule for the Reporting Year Commencing March 1, 2014**. In connection with its election to enter into the First Amendment, the City has changed the Hours of Operation for certain Metered Parking Spaces to reflect no Hours of Operation on Sundays for certain spaces and increased Hours of Operation for certain other spaces, all as indicated on Amended Schedule 10 (collectively, the "Impacted Concession Metered Parking Spaces"; all other Concession Metered Parking Spaces, the "Non-Impacted Concession Metered Parking Spaces"). The Concessionaire will implement such changes by no later than (i) July 1, 2013, if the City Council approves the First Amendment on or before June 8, 2013, or (ii) six weeks after City Council approval of the First Amendment, if such approval occurs after June 8, 2013. The Concessionaire shall notify the City in writing when all such changes are implemented. The date on which all such changes are implemented and the Impacted Concession Metered Parking Spaces operate at the Hours of Operation set forth on Amended Schedule 10 is referred to as the "Implementation Date." The Parties anticipate that these changes in Hours of Operation will have an effect on the Utilization Rates for the Concession Metered Parking Spaces and have agreed that (i) the provisions of this Section 7.15 and not the ordinary rules of Article 7 shall control for purposes of determining Existing Revenue as of March 1, 2014, and (ii) either Party may initiate an RPA Determination Proceeding as provided in Section 7.14(a)(iv).

For the Reporting Year commencing March 1, 2014, the City shall determine Revenue Values, System in Service Percentages and Quarterly Settlement Amounts and shall make such payments of Quarterly Settlement Amounts (or receive such Settlement Credits), all as provided

in the other <u>Sections</u> of <u>Article 7</u> and in accordance with the methodology for calculating Existing Revenue for this period set forth in <u>Schedule 6</u>.

**ARTICLE 8**
**REPORTING; AUDITS; INSPECTIONS**

**Section 8.1.    Reports**.

(a)    *Incident Management and Notifications*.  The Concessionaire shall provide notice to the City within 24 hours of all emergencies, known to the Concessionaire or the Operator, and promptly provide notice to the City of all material accidents and incidents occurring with respect to the Metered Parking System, and of all claims in excess of $50,000 made by or against the Concessionaire, or potential claims in excess of $50,000 that the Concessionaire reasonably expects to make against, or to be made against it by, third parties.

(b)    *Intentionally deleted*.

(c)    *Financial Reports*.  The Concessionaire shall deliver to the City within 120 Days after the end of each calendar year a copy of the audited balance sheets of the Concessionaire at the end of each such calendar year, and the related audited statements of income, changes in equity and cash flows for such calendar year, including in each case the notes thereto, together with the report thereon of the independent certified public accountants of the Concessionaire, in each case in a manner and containing information consistent with the Concessionaire's current practices and certified by the Concessionaire's chief financial officer that such financial statements fairly present the financial condition and the results of operations, changes in equity and cash flows of the Concessionaire as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States consistently applied.  Such financial statements shall reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements.

**Section 8.2.    Information**.

(a)    *Furnish Information*.  At the request of the City, the Concessionaire shall, at the Concessionaire's cost and expense and at any and all reasonable times during the Term:  (i) make available or cause to be made available (and, if requested by the City, furnish or cause to be furnished) to employees designated by the City all Information relating to the Metered Parking System Operations, this Agreement or the Metered Parking System as may be specified in such request and as shall be in the possession or control of the Concessionaire or its Representatives and (ii) permit the City, after giving ten (10) Business Days' prior notice to the Concessionaire (which notice shall identify the Persons the City requests to be present for an interview and describe with reasonable specificity the subject matter to be raised in the interview), to discuss the obligations of the Concessionaire under this Agreement with any of the directors, officers, employees or managers of the Concessionaire, the Operator or their respective Representatives (it being agreed that the Concessionaire shall have the right to be present during any such discussions with the Operator or Representatives of the Concessionaire or the Operator), for the purpose of enabling the City to determine whether the Concessionaire is in compliance with this

- 77 -

Agreement; *provided, however,* that, in the case of investigations of possible criminal conduct or City ordinance violations, no prior notice shall be required to the Concessionaire and the Concessionaire shall not have the right to be present during any discussions with the Operator or Representatives of the Concessionaire or the Operator. For the avoidance of doubt, this Section 8.2(a) does not impose a requirement to retain Information not otherwise retained in the normal course of business or required to be retained by applicable Law.

(b)     *Furnish Data Necessary for Revenue Value Reports.* By no later than July 1, 2013 the Concessionaire shall provide employees designated by the City: (i) on a daily basis, in respect of information and data collected for the Day three (3) Days prior to the Day of delivery, via an automated export to a mutually agreed-upon secure electronic file transport mechanism, (a) individual transaction information for Metered Parking Spaces showing the start and end time at which the transaction occurred, the allotment of time purchased in the transaction, the amount paid, and the location and Metering Device associated with the transaction, and (b) revenue data associated with Pay-by-Cell or any other technology implemented pursuant to Section 4.7; (ii) no later than ten (10) Days following the end of any month, (a) a monthly inventory of individual Metering Devices, (b) monthly parking permit revenue data, (c) collections data, (d) red alarm reports or other reports that specify when individual Metering Devices were out of service, and (e) information in the Concessionaire's possession concerning the location, type and effective date of Reserved Power actions that occurred during the preceding month; and (iii) no later than sixty (60) Days following the end of any Quarter, information in the Concessionaire's possession concerning closures (including start date and time and end date and time, associated Metered Parking Space and location of that space, and supporting data) that occurred during the preceding Quarter. Notwithstanding the foregoing, the Concessionaire shall not be required to provide the information and data contemplated by Section 8.2(b)(i) until the Concessionaire has received the internet protocol address and other information, if any, it reasonably requires from the City (*provided, however,* that the Concessionaire shall provide any request for such information not later than May 31, 2013) to enable it to provide the information and data and the City has the software and equipment to enable it to receive the information and data. The costs associated with providing the data and information outlined in this Section 8.2(b) shall be at the Concessionaire's own cost and expense; *provided, however,* that any costs the City incurs to enable it to receive such data and information, including any updates to or maintenance of, any software or equipment of the City, shall be at the City's own cost and expense. If the Concessionaire is unable or inadvertently fails to provide such information within the foregoing time periods, the Concessionaire will not be in breach of this Section 8.2(b) if it provides such information as soon as possible thereafter and in any event within thirty (30) Days after the deadlines set forth above.

(c)     *Confidentiality.* Unless disclosure is required by applicable Law, the City shall keep confidential any Information obtained from the Concessionaire or its Representatives that (i) pursuant to Section 7(1)(g) of the Illinois Freedom of Information Act, 5 ILCS 140/7(1)(g), constitutes trade secrets or commercial or financial information (A) where the trade secrets or commercial or financial information are proprietary, privileged or confidential, or (B) where disclosure of the trade secrets or commercial or financial information may cause competitive harm and (ii) is designated as such by the Concessionaire in writing to the City; *provided, however*, that the City shall have the right to determine, in its reasonable discretion, whether Section 7(1)(g) of the Illinois Freedom of Information Act applies to any such Information;

*provided, further* that in the event the City determines that Section 7(1)(g) of the Illinois Freedom of Information Act does not apply to any such Information, the City shall provide reasonable notice to, and shall consult with, the Concessionaire prior to disclosure of such Information. In the event that the Concessionaire requests the City to defend an action seeking the disclosure of Information that the City determines to be confidential pursuant to this <u>Section 8.2(c)</u>, the Concessionaire shall reimburse the City for the reasonable costs and expenses (including attorneys' fees of the prevailing party) incurred by the City in defending any such action. Notwithstanding anything to the contrary herein, the City and the Concessionaire may disclose the United States federal tax treatment and tax structure of the Transaction.

**Section 8.3. Inspection, Audit and Review Rights of the City.**

(a) *Audit Right*. In addition to the rights set out in <u>Section 8.2</u>, the City may, at all reasonable times, upon 10 Business Days' prior notice, except in the case of investigations of possible criminal conduct or City ordinance violations, in which case no prior notice shall be required, cause a Representative designated by it to, carry out an Audit of the Information required to be maintained or delivered by the Concessionaire under this Agreement in connection with the performance of the Metered Parking System Operations for the purpose of verifying the information contained therein and shall be entitled to make copies thereof and to take extracts therefrom, at the City's expense, but, in any event, subject to <u>Section 8.2(c)</u>. The Concessionaire, at the cost and expense of the Concessionaire, shall, at reasonable times, make available or cause to be made available to the City or its designated Representative such information and material as may reasonably be required by the City or its designated Representative for its purposes and otherwise provide such cooperation as may be reasonably required by the City in connection with the same.

(b) *Inspection Right*. The City and its Representatives shall, at all reasonable times and upon reasonable prior notice, have access to the Metered Parking System and every part thereof (*provided* that no access is permitted to the cash collections, Metering Device keys and locks, or any software or other intangibles) and the Concessionaire, at the reasonable cost and expense of the Concessionaire, shall and shall cause its Representatives to, furnish the City with every reasonable assistance for inspecting the Metered Parking System and the Metered Parking System Operations for the purpose of Auditing the Information or ascertaining compliance with this Agreement and applicable Law (including Section 4-236-050 of the Municipal Code).

(c) *Tests*. The City and its Representatives shall, with the prior consent of the Concessionaire (which shall not be unreasonably withheld, conditioned or delayed), except in the case of investigations of possible criminal conduct or City ordinance violations, in which case no consent shall be required, be entitled, at the sole cost and expense of the City, and at any time and from time to time, to perform or cause to be performed any test, study or investigation in connection with the Metered Parking System or the Metered Parking System Operations as the City may reasonably determine to be necessary in the circumstances and the Concessionaire, at the cost and expense of the Concessionaire, shall, and shall cause its Representatives to, furnish the City or its Representatives with reasonable assistance in connection with the carrying out of such tests, procedures, studies and investigations.

(d)     *No Waiver*.  Failure by the City or its Representatives to inspect, review, test or Audit the Concessionaire's responsibilities under this Agreement or any part thereof, or the performance by the Concessionaire of the Metered Parking Services, or the Information, shall not constitute a waiver of any of the rights of the City hereunder or any of the obligations or liabilities of the Concessionaire hereunder.  Inspection, review, testing or Audit not followed by a notice of Concessionaire Default shall not constitute a waiver of any Concessionaire Default or constitute an acknowledgement that there has been or will be compliance with this Agreement and applicable Law.

(e)     *No Undue Interference*.  In the course of performing its inspections, reviews, tests and Audits hereunder, the City shall minimize the effect and duration of any disruption to or impairment of the Metered Parking System Operations or the Concessionaire's rights or responsibilities under this Agreement, having regard to the nature of the inspections, reviews, tests and Audits being performed, except as necessary in the case of investigations of possible criminal conduct or City ordinance violations.

**Section 8.4.    Audits, Assistance, Inspections and Approvals**.  Wherever in this Agreement reference is made to the City or its Representatives providing assistance, services, Approvals or consents to or on behalf of the Concessionaire or its Representatives or to the City or its Representatives performing an Audit or inspecting, testing, reviewing or examining the Metered Parking System, the Metered Parking System Operations or any part thereof or the books, records, Documents, budgets, proposals, requests, procedures, certificates, plans, drawings, specifications, contracts, agreements, schedules, reports, lists or other instruments of the Concessionaire or its Representatives, such undertaking by the City or its Representatives shall not relieve or exempt the Concessionaire from, or represent a waiver of, any requirement, liability, Concessionaire Default, covenant, agreement or obligation under this Agreement or at law or in equity and shall not create or impose any requirement, liability, covenant, agreement or obligation (including an obligation to provide other assistance, services or Approvals) on the City or its Representatives not otherwise created or imposed pursuant to the express provisions of this Agreement.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

**Section 9.1.    Representations and Warranties of the City**.  The City makes the following representations and warranties to the Concessionaire and acknowledges that the Concessionaire and its Representatives are relying upon such representations and warranties in entering into this Agreement:

(a)     *Organization*.  The City is a municipality and home rule unit of local government, duly organized and existing under the Constitution and laws of the State of Illinois.

(b)     *Power and Authority*.  The City Council of the City has (i) duly adopted the Metered Parking System Ordinance, which remains in full force and effect, (ii) duly authorized and approved the execution and delivery of this Agreement and (iii) duly authorized and approved the performance by the City of its obligations contained in this Agreement.  The City has the power and authority to adopt the Metered Parking System Ordinance, to enter into this

- 80 -

Agreement and to do all acts and things and execute and deliver all other documents as are required hereunder to be done, observed or performed by it in accordance with the terms hereof *provided, however*, that the power and authority of the City over County Roads is subject to the exercise by the County of Cook, Illinois of its police and regulatory powers and over State Roads is subject to the exercise by the State of Illinois of its police and regulatory powers.

(c)  *Enforceability*.  This Agreement has been duly authorized, executed and delivered by the City and constitutes a valid and legally binding obligation of the City, enforceable against the City in accordance with the terms hereof, subject only to applicable bankruptcy, insolvency and similar laws affecting the enforceability of the rights of creditors generally and to general principles of equity.

(d)  *Title*.  At the Time of Closing, the City will have good and sufficient title to the Metered Parking System necessary for the Metered Parking System Operations pursuant to this Agreement, subject only to Permitted City Encumbrances and Permitted Concessionaire Encumbrances (other than the Permitted Concessionaire Encumbrances specified in clause (iv), clause (vii) and clause (viii) as it pertains to clauses (iv) and (vii), of the definition of the term "Permitted Concessionaire Encumbrances").  Subject to any and all Permitted City Encumbrances and Permitted Concessionaire Encumbrances (other than the Permitted Concessionaire Encumbrances specified in clause (iv), clause (vii) and clause (viii) as it pertains to clauses (iv) and (vii), of the definition of the term "Permitted Concessionaire Encumbrances") existing at the Time of Closing, there is no recorded or unrecorded agreement, contract, option, commitment, right, privilege or other right of another binding upon, or which at any time in the future may become binding upon, the City to sell, transfer, convey, subject to lien, charge, grant a security interest in, or in any other way dispose of or materially encumber the Metered Parking System.  Subject to any and all permitted City Encumbrances, the recorded or unrecorded restrictions, exceptions, easements, rights of way, reservations, limitations, interests and other matters that affect title to the Metered Parking System (or any portion thereof) do not materially adversely affect the Concessionaire's ability to operate the Metered Parking System in accordance with the terms hereof.  No indebtedness for borrowed money of the City is or will be secured by any right or interest in the Metered Parking System or the revenues or income therefrom (other than the revenues payable to the City from the operation of Reserve Metered Parking Spaces) and no judgment lien exists or shall exist in any revenue derived from or generated with respect to the Metered Parking System.

(e)  *No Conflicts*.  The adoption of the Metered Parking System Ordinance, execution and delivery of this Agreement by the City, the consummation of the transactions contemplated hereby (including the operation of the Metered Parking System in accordance with the terms of this Agreement) and the performance by the City of the terms, conditions and provisions hereof has not and will not contravene or violate or result in a breach of (with or without the giving of notice or lapse of time, or both) or acceleration of any material obligations of the City under (i) any applicable Law or (ii) any agreement, instrument or document to which the City is a party or by which it is bound.

(f)  *Consents*.  No Consent is required to be obtained by the City from, and no notice or filing is required to be given by the City to or made by the City with, any Person (including

any Governmental Authority) in connection with the execution, delivery and performance by the City of this Agreement or the consummation of the transactions contemplated hereby.

(g)     *Compliance with Law; Litigation; Environmental Matters*.

(i)     The City operated the Metered Parking System prior to the Closing Date in compliance, in all material respects, with all applicable Laws and the City is not in breach of any applicable Law that would have a material adverse effect on the operations of the Metered Parking System or on the Concessionaire Interest.   There are no Authorizations from any Governmental Authority necessary for the operation of the Metered Parking System as currently being operated.

(ii)     Except as previously disclosed to the Concessionaire, there is no action, suit or proceeding, at law or in equity, or before or by any Governmental Authority, pending nor, to the best of the City's knowledge, threatened against the City prior to or at the Time of Closing, which will have a material adverse effect on the operations of the Metered Parking System. Except as previously disclosed to the Concessionaire, as of the date of this Agreement, there is no action, suit or proceeding, at Law or in equity, or before or by any Governmental Authority, pending nor, to the best of the City's knowledge, threatened against the City which could materially affect the validity or enforceability of this Agreement.

(iii)     No environmental permits are necessary for the current operation of the Parking Lots by the City.

(h)     *Financial Information*.   The financial information of the City relating to the Metered Parking System for the periods ended December 31, 2003, 2004, 2005, 2006 and 2007, and for the stub period from January 1, 2008 to June 30, 2008, all attached hereto as Schedule 13, fairly presents the revenues, operating expenses and net revenues of the Metered Parking System as of the dates and for the periods stated in such financial information.

(i)     *Metered Parking System Contracts*.   Each Metered Parking System Contract was in full force and effect prior to the Closing Date, was made available for review by the Concessionaire and subject to Section 2.5(e) was terminated at the Time of Closing in accordance with Section 2.5(e) without liability or obligation to the Concessionaire.   As of the date of termination of each Metered Parking System Contract, the City was not in material breach of its obligations under any such Metered Parking System Contract, and no act or event had occurred which, with notice or lapse of time, or both, would have constituted a material breach thereof, and to the knowledge of the City no other party to any Metered Parking System Contract was in material breach of its obligations under any Metered Parking System Contract, and no act or event had occurred with respect to any such party, which with notice or lapse of time, or both, would have constituted or would have reasonably been expected to constitute a material breach thereof.   As of the Closing Date, the Metered Parking System Contracts were all of the material contracts and agreements (i) to which the City was a party that related to the Metered Parking System Operations or (ii) that bound the Metered Parking System in any material respect.

(j)     *Absence of Changes*.  Since June 30, 2008, there has not been any transaction or occurrence that has resulted or is reasonably likely to result in a Material Adverse Effect.

(k)     *Brokers*.  Except for William Blair & Company, L.L.C., Gardner Rich & Company and Samuel A. Ramirez & Co., Inc., whose fees will be paid by the City, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the City who might be entitled to any fee or commission from the City in connection with the transactions contemplated by this Agreement.

(l)     *Accuracy of Information*.  To the knowledge of the City, the factual and past historical information regarding the Metered Parking System that the City provided to the Concessionaire in the virtual data room at www.eki-dataroom.com was accurate in all material respects at the time such information was provided.

**Section 9.2.     Representations and Warranties of the Concessionaire**.  The Concessionaire makes the following representations and warranties to the City (and acknowledges that the City is relying upon such representations and warranties in entering into this Agreement):

(a)     *Organization*.  The Concessionaire is duly organized, validly existing and in good standing under the laws of the state of its organization.  The capital stock, units, partnership or membership interests and other equity interests or securities of the Concessionaire (including options, warrants and other rights to acquire any such equity interests) are owned by the Persons set forth in the written certification that the Concessionaire delivered to the City prior to the date of this Agreement.

(b)     *Power and Authority*.  The Concessionaire has the power and authority to enter into this Agreement and to do all acts and things and execute and deliver all other documents as are required hereunder to be done, observed or performed by it in accordance with the terms hereof.

(c)     *Enforceability*.  This Agreement has been duly authorized, executed and delivered by the Concessionaire and constitutes a valid and legally binding obligation of the Concessionaire, enforceable against it in accordance with the terms hereof, subject only to applicable bankruptcy, insolvency and similar laws affecting the enforceability of the rights of creditors generally and to general principles of equity.

(d)     *No Conflicts*.  The execution and delivery of this Agreement by the Concessionaire, the consummation of the transactions contemplated hereby and the performance by the Concessionaire of the terms, conditions and provisions hereof has not and will not contravene or violate or result in a material breach of (with or without the giving of notice or lapse of time, or both) or acceleration of any material obligations of the Concessionaire under (i) any applicable Law, (ii) any material agreement, instrument or document to which the Concessionaire is a party or by which it is bound or (iii) the articles, bylaws or governing documents of the Concessionaire.

(e)     *Consents*.  No Consent is required to be obtained by the Concessionaire from, and no notice or filing is required to be given by the Concessionaire to or made by the

Concessionaire with, any Person (including any Governmental Authority) in connection with the execution and delivery by the Concessionaire of this Agreement or the consummation of the transactions contemplated hereby, except for such consents which have been obtained and notices which have been given as of the date of this Agreement.

(f)     *Compliance with Law; Litigation*.  The Concessionaire is not in breach of any applicable Law that could have a material adverse effect on the operations of the Metered Parking System.  Neither the Concessionaire nor any Affiliate of the Concessionaire is listed on any of the following lists maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the Bureau of Industry and Security of the U.S. Department of Commerce or their successors, or on any other list of Persons with which the City may not do business under applicable Law: the Specially Designated Nationals List, the Denied Persons List, the Unverified List, the Entity List and the Debarred List.  Except as previously disclosed to the City, there is no action, suit or proceeding, at law or in equity, or before or by any Governmental Authority, pending nor, to the best of the Concessionaire's knowledge, threatened against the Concessionaire prior to or at the Time of Closing, which will have a material adverse effect on (i) the transactions contemplated by this Agreement or (ii) the validity or enforceability of this Agreement.

(g)     *Operator*.   To the extent the Operator is not the Concessionaire, the Concessionaire represents and warrants as follows: To the best knowledge of the Concessionaire: (i) the Operator is duly organized, validly existing and in good standing under the laws of the state of its organization; (ii) the capital stock of the Operator (including options, warrants and other rights to acquire capital stock) is owned by the Persons set forth in the written certification that the Concessionaire delivered to the City prior to the date of this Agreement; (iii) the Operator has the power and authority to do all acts and things and execute and deliver all other documents as are required hereunder to be done, observed or performed by it in connection with its engagement by the Concessionaire; (iv) the Operator has all necessary expertise, qualifications, experience, competence, skills and know-how to perform the Metered Parking System Operations in accordance with this Agreement; and (v) the Operator is not in breach of any applicable Law that would have a material adverse effect on the operations of the Metered Parking System.

(h)     *Economic Disclosure Statement; RFQ*.  All of the information in the economic disclosure statements and the response to the request for Metered Parking System concessionaire qualifications delivered by or on behalf of the Concessionaire to the City in connection with the execution of this Agreement is true, accurate and correct in all material respects.

(i)     *Brokers*.  Except for any broker or advisor whose fees will be paid by the Concessionaire or its Affiliates, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Concessionaire or any of its Affiliates who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

**Section 9.3.     Non-Waiver**.  No investigations made by or on behalf of any Party at any time shall have the effect of waiving, diminishing the scope of or otherwise affecting any representation or warranty made by the other Party in this Agreement or pursuant to this

Agreement. No waiver by a Party of any condition, in whole or in part, shall operate as a waiver of any other condition.

**Section 9.4.    Survival**.

(a)    *City's Representations and Warranties*.  The representations and warranties of the City contained in Section 9.1 shall survive and continue in full force and effect for the benefit of the Concessionaire as follows: (i) as to the representations and warranties contained in Sections 9.1(a) through 9.1(g), inclusive, without time limit; and (ii) as to all other matters, for a period of 24 months following the Closing Date unless a bona fide notice of a Claim shall have been given, in writing in accordance with Section 20.1, prior to the expiry of that period, in which case the representation and warranty to which such notice applies shall survive in respect of that Claim until the final determination or settlement of that Claim, provided such determination or settlement is being pursued diligently and in good faith by the applicable Party.

(b)    *Concessionaire's Representations and Warranties*.  The representations and warranties of the Concessionaire contained in Section 9.2 shall survive and continue in full force and effect for the benefit of the City as follows:  (i) as to the representations and warranties contained in Sections 9.2(a) through 9.2(h), inclusive, without time limit; and (ii) as to all other matters, for a period of 24 months following the Closing Date unless a bona fide notice of a Claim shall have been given, in writing in accordance with Section 20.1, before the expiry of that period, in which case the representation and warranty to which such notice applies shall survive in respect of that Claim until the final determination or settlement of that Claim, provided such determination or settlement is being pursued diligently and in good faith by the applicable party.

## ARTICLE  10
## FINANCE OBLIGATIONS

**Section 10.1.  Concessionaire's Obligations**.  Except with respect to the City's funding of costs and expenses related to City Directives as contemplated by Section 5.1, the Concessionaire shall be responsible for obtaining any financing for the performance of its obligations under this Agreement, which financing shall comply with all requirements of this Agreement.

**Section 10.2.  City's Obligations**.  The City shall, to the extent consistent with applicable Law and at the sole cost and expense of the Concessionaire, cooperate with the Concessionaire with respect to documentation reasonably necessary to obtain, maintain and replace financing for the performance of the obligations of the Concessionaire hereunder.  The City's cooperation may include reviewing, Approving and executing documents which substantiate the terms of this Agreement (including any consents and agreements necessary to confirm that the debt evidenced by the relevant financing constitutes Collateral Assignment Debt) and making information and material available to the Concessionaire's lenders to facilitate financing to the extent permitted by applicable Law and contractual obligations with third parties and to the extent reasonable in the circumstances.  If requested to do so by the Concessionaire, the City shall, at the sole cost and expense of the Concessionaire, use its reasonable efforts to cause the City's independent public accountants to consent to the preparation, use and inclusion of certain financial information regarding the Metered Parking System in connection with the

Concessionaire's public or private offering of securities, as the case may be.  In addition, the City shall, promptly upon the request of the Concessionaire or any Collateral Assignee, execute, acknowledge and deliver to the Concessionaire, or any of the parties specified by the Concessionaire, standard consents and estoppel certificates with respect to this Agreement which may be qualified to the best of the knowledge and belief of a designated Representative of the City.  Nothing herein shall require the City to incur any additional obligations or liabilities (unless the City shall have received indemnification, as determined in the City's discretion, with respect thereto) or to take any action, give any consent or enter into any document inconsistent with the provisions of this Agreement.

Section 10.3.  **Concessionaire's Obligation for Estoppel Certificates**.  The Concessionaire shall, promptly upon the request of the City, execute and deliver to the City, or any of the parties specified by the City, standard consents and estoppel certificates with respect to this Agreement which may be qualified to the best of the knowledge and belief of a designated Representative of the Concessionaire.  Nothing herein shall require the Concessionaire to incur any additional obligations or liabilities or to take any action, give any consent or enter into any document inconsistent with the provisions of this Agreement or applicable Law.

Section 10.4.  **Prohibited Tax Shelter Transactions**.  The Concessionaire covenants and agrees that it shall not enter into any lease, sublease, concession, management agreement, operating agreement or other similar arrangement or other transaction that would cause the City to become a party to a "prohibited tax shelter transaction" within the meaning of Section 4965 of the Internal Revenue Code of 1986 (it being agreed that, for purposes of this Section 10.4, the City shall not be treated as having become a party to any such transaction solely by virtue of the execution of this Agreement).  A violation of this Section 10.4 by the Concessionaire shall entitle the City to (a) recover from the Concessionaire, to the extent permitted by applicable Law, the amount of any Tax liability to which the City or any City official is subject and (b) require the Concessionaire, at the Concessionaire's expense, to prepare timely all statements and returns, and to maintain all lists and similar information that the City becomes obligated to disclose, file or maintain with any taxing authority or participant or otherwise as a result of such transaction.

## ARTICLE 11
## COMPLIANCE WITH LAWS

Section 11.1.  **Compliance with Laws**.  The Concessionaire must at all times at its own cost and expense observe and comply, in all material respects, and cause the Metered Parking System Operations to observe and comply, in all material respects, with all applicable Laws now existing or later in effect that are applicable to it or such Metered Parking System Operations, including those Laws expressly enumerated in this Article 11, and those that may in any manner apply with respect to the performance of the Concessionaire's obligations under this Agreement. The Concessionaire must notify the City within seven days after receiving notice from a Governmental Authority that the Concessionaire may have violated any Laws as described above.

Section 11.2.  **Non-Discrimination**.

(a)    *Federal Non-Discrimination Laws*.  The Concessionaire shall comply with all applicable federal Laws regarding non-discrimination, including:  (i) the Civil Rights Act of 1964, 42 U.S.C. § 2000 <u>et</u> <u>seq</u>. (1981); (ii) the Civil Rights Act of 1991, P.L. 102-166; (iii) Executive Order Number 11246, 30 Fed. Reg. 12,319 (1965), reprinted in 42 U.S.C. § 2000(e) note, as amended by Executive Order Number 11375, 32 Fed. Reg. 14,303 (1967) and by Executive Order Number 12086, 43 Fed. Reg. 46,501 (1978); (iv) the Age Discrimination Act, 42 U.S.C. §§ 6101-6106 (1981); (v) the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 (1967); (vi) the Rehabilitation Act of 1973, 29 U.S.C. §§ 793-794 (1981); and (vii) the Americans with Disabilities Act, 42 U.S.C. § 12101 <u>et</u> <u>seq</u>. (1990).

(b)    *State Non-Discrimination Laws*.  The Concessionaire shall comply with all applicable Illinois Laws regarding non-discrimination, including:  (i) the Illinois Human Rights Act, 775 ILCS 5/1-101 <u>et</u> <u>seq</u>. (1990), and any rules and regulations promulgated in accordance with it, including the Equal Employment Opportunity Clause, 44 Ill. Admin. Code § 750, Appendix A, which is included in <u>Section 11.2(c)</u>; (ii) the Public Works Employment Discrimination Act, 775 ILCS 10/0.01 <u>et</u> <u>seq</u>. (1990); and (iii) the Environmental Barriers Act, 410 ILCS 25/1 <u>et</u> <u>seq</u>. (1985).

(c)    *Illinois Human Rights Act Equal Employment Opportunity Clause*.  The following Equal Employment Opportunity Clause is included herein pursuant to 44 Ill. Admin. Code § 750.10: In the event of the Concessionaire's non-compliance with the provisions of this Equal Employment Opportunity Clause, the Illinois Human Rights Act, or the Rules and Regulations of the Illinois Department of Human Rights (the "<u>Department</u>"), the Concessionaire may be declared ineligible for future contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations, and this Agreement may be canceled or voided in whole or in part, and such other sanctions or penalties may be imposed or remedies invoked as provided by statute or regulation.  During the performance of this Agreement, the Concessionaire agrees as follows:  (i) that it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from the military services and further that it will examine all job classifications to determine if minority persons or women are underutilized and will take appropriate affirmative action to rectify any such underutilization; (ii) that if it hires additional employees in order to perform its obligations under this Agreement, it will determine the availability (in accordance with the Department's Rules) of minorities and women in the area(s) from which it may reasonably recruit and it will hire for each job classification for which employees are hired in such a way that minorities and women are not underutilized; (iii) that, in all solicitations or advertisements for employees placed by it or on its behalf, it will state that all applicants will be afforded equal opportunity without discrimination because of race, color, religion, sex, marital status, national origin or ancestry, age, physical or mental handicap unrelated to ability, or an unfavorable discharge from military service; (iv) that it will send to each labor organization or representative of workers with which it has or is bound by collective bargaining or other agreements, a notice advising such labor organization or representative of its obligation under the Illinois Human Rights Act and the Department's Rules, and if any such labor organization or representative fails or refuses to cooperate with it in its efforts to comply with such Act and Rules, it will promptly so notify the Department and the contracting agency and will recruit employees from other sources when necessary to fulfill its obligations thereunder; (v) that it will submit reports as required by the

Department's Rules, furnish all relevant information as may from time to time be reasonably requested by the Department or the City, and in all respects comply with the Illinois Human Rights Act and the Department's Rules; (vi) that it will permit access to all relevant books, records, accounts and work sites by personnel of the City and the Department for purposes of investigation to ascertain compliance with the Illinois Human Rights Act and the Department's Rules; and (vii) that it will (A) include, verbatim or by reference, the provisions of this Equal Employment Opportunity Clause in every subcontract it awards under which any portion of the obligations are undertaken or assumed, so that such provisions will be binding upon such Contractor, (B) be liable for compliance with applicable provisions of this clause by its Contractors, (C) promptly notify the City and the Department in the event any Contractor fails or refuses to comply therewith and (D) not utilize any Contractors declared by the Illinois Human Rights Commission to be ineligible for contracts or subcontracts with the State of Illinois or any of its political subdivisions or municipal corporations, including the City.

(d)     *City Non-Discrimination Laws*.  The Concessionaire shall comply with all applicable City Laws regarding non-discrimination, including the Chicago Human Rights Ordinance, Chapter 2-160, Section 2-160-010 et seq. of the Municipal Code, and shall furnish such reports and information as requested by the Chicago Commission on Human Relations.

**Section 11.3.  Non-Collusion, Bribery of a Public Officer or Employee**.  The Concessionaire shall comply with Section 2-92-320 of the Municipal Code, as follows:

(a)     *Prohibition on Contracts with Persons or Business Entities Convicted of Bribery or Collusive Activities*.  No Person shall be awarded a contract or subcontract if that Person:  (i) has been convicted of bribery or attempting to bribe a public officer or employee of the City, the State of Illinois or any agency of the federal government or any state or local government in the United States of America, in that officer's or employee's official capacity; (ii) has been convicted of agreement or collusion among bidders or prospective bidders in restraint of freedom of competition by agreement to bid a fixed price, or otherwise; or (iii) has made an admission of guilt of such conduct described in clause (i) or (ii) above which is a matter of record but has not been prosecuted for such conduct.

(b)     *Ability to Charge Business Entity with Conduct of its Employees or Affiliates*. Where an official, agent or employee of a business entity has committed any offense described in Section 11.3(a) on behalf of such an entity and pursuant to the direction or authorization of a responsible official thereof, the business entity shall be chargeable with the conduct.  A business entity may be chargeable with the conduct of an Affiliated entity, as defined in Section 2-92-320 of the Municipal Code, if such Affiliated entity has committed any offense described in Section 11.3(a).

(c)     *Period of Ineligibility*.  A Person shall be ineligible for a contract or subcontract pursuant to Section 2-92-320 of the Municipal Code for three years following a conviction or admission.  The period of ineligibility may be reduced, suspended or waived as specified in Section 2-92-320 of the Municipal Code.

**Section 11.4.**  Cooperation with City Inspector General.

(a)     *Duty to Cooperate with Inspector General*.  The Concessionaire shall comply with all provisions of Chapter 2-56 of the Municipal Code, including cooperating with the City Office of Inspector General in any investigation or hearing undertaken pursuant to Chapter 2-56 of the Municipal Code.

(b)     *Duty to Inform Contractors*.  All contracts entered into by the Concessionaire shall inform Contractors of Chapter 2-56 of the Municipal Code and require understanding of and compliance with such Chapter 2-56 of the Municipal Code.

**Section 11.5.  Ethics and Conflict of Interest Requirements.**

(a)    *Compliance with City Governmental Ethics Ordinance*.  The Concessionaire shall comply with Chapter 2-156 of the Municipal Code, entitled "Governmental Ethics."

(b)    *Prohibition on Certain Financial Interests and Inducements*.  The Concessionaire represents and warrants that:  (i) no officer, agent or employee of the City is employed by the Concessionaire or has a financial interest directly or indirectly in this Agreement or the compensation to be paid in connection with this Agreement except as may be permitted in writing by the Board of Ethics established under Chapter 2-156 of the Municipal Code, and (ii) no payment, gratuity or offer of employment will be made in connection with this Agreement by or on behalf of any Contractor to the Concessionaire or anyone associated with them, as an inducement for the award of a contract, subcontract or order.

**Section 11.6.  Prevailing Wage**.

(a)    *Requirement to Pay Prevailing Wage Rates in Connection with Metered Parking System Construction Activities*.  In connection with any construction activities related to the Metered Parking System during the Term, the Concessionaire shall pay all of its employees that are employed in connection with such construction activities, and shall ensure that all of its Contractors pay all of their employees, the prevailing wage rates as ascertained from time to time by the Illinois Department of Labor (or its successors).

(b)    *Prevailing Wage Rates*.  Prevailing wage rates as of execution of this Agreement are those applicable to Cook County, State of Illinois, as listed on the Illinois Department of Labor website for the month in which this Agreement is executed.  All contracts shall list or otherwise reference the specified rates to be paid to all laborers, workers and mechanics for such craft or type of worker or mechanic employed in the contract.  If the Illinois Department of Labor revises such prevailing wage rates, the revised rates shall apply to all such contracts.

(c)    *Definition of Prevailing Wages*.  The term "prevailing wages," when used in this Agreement, means the hourly cash wages plus fringe benefits for health and welfare, insurance, vacations and pensions paid generally, in the locality in which the work is being performed, to employees engaged in work of a similar character on public works.

**Section 11.7.  Living Wage**.  The Concessionaire shall comply with and shall cause its Contractors to comply with, the living wage requirements of Section 2-92-610 of the Municipal Code, as it may be amended from time to time, so long as such requirements are in full force and effect.  If an employee of the Concessionaire or a Contractor is required to be paid a living wage pursuant to this Section 11.7 and is also subject to payment of a prevailing wage pursuant to Section 11.6 of this Agreement, then the Concessionaire or the Contractor, as appropriate, shall pay the employee the higher of the prevailing wage or the living wage.

**Section 11.8.  MBE/WBE, Affirmative Action and City Resident Requirements.**

(a)    *Minority-Owned And Women-Owned Business Enterprises*.  The Concessionaire shall comply with the following Minority-Owned And Women-Owned Business Enterprises ("M./W.B.E.") requirements so long as the M./W.B.E. requirements of Section 2-92-420 et seq.

of the Municipal Code and the M./W.B.E. construction program requirements of Section 2-92-650 et seq. of the Municipal Code are in full force and effect:

(i)     *General Requirements*.    The Concessionaire shall provide for the participation of M./W.B.E.s in its Metered Parking System Operations.    To this end, the Concessionaire shall establish a policy for the utilization of M./W.B.E.s, goals for the annual utilization of M/W.B.E.s, and a reporting procedure agreeable to the Concessionaire and the City.

(ii)     *Policy*.    The following statement shall represent the Concessionaire's policy regarding Equal Opportunity and an M./W.B.E. program:

> The Concessionaire is committed to providing fair and representative opportunities for minorities, women and M./W.B.E.s in its Metered Parking System Operations.    Neither the Concessionaire nor its Contractors shall discriminate on the basis of race, color, religion, sex or national origin in Metered Parking System Operations.    Furthermore, affirmative action will be taken, consistent with sound procurement policies and applicable Law, to ensure that M./W.B.E.s are afforded a fair and representative opportunity to participate in the Concessionaire's Metered Parking System Operations.

This policy shall be stated in all contracts related to the Metered Parking System, circulated to all employees of the Concessionaire in affected departments, and made known to minority and women entrepreneurs.

(iii)     *Liaison*.    To ensure compliance and the successful management of the Concessionaire's M./W.B.E. program, the Concessionaire shall establish a M./W.B.E. liaison for the Metered Parking System with the City.    Further, all personnel of the Concessionaire and all others with responsibilities in the supervision of Metered Parking System Operations are to see that actions are performed consistent with the M./W.B.E. goals of this Section 11.8.

(iv)     *Goals*.    The goals to be met by the Concessionaire in Metered Parking System Operations shall be met with utilization of M./W.B.E.s certified by the City subject to the availability of M./W.B.E.s capable of performing the work related to the Metered Parking System Operations.    These goals shall be administered in a manner to assure the City and the Concessionaire that: (1) Metered Parking System projects shall be completed at a reasonable and acceptable cost to the Concessionaire, (2) Metered Parking System projects shall be completed on a reasonable and acceptable timetable to the Concessionaire and the City, and (3) the quality of Metered Parking System projects shall be reasonable and acceptable to the Concessionaire and the City.    The goals of the Concessionaire for annual participation by M./W.B.E.s in Metered Parking System Operations shall be consistent with the applicable goals for the City under the Municipal Code, so long as such requirements are in full force and effect; *provided* that in no event shall the goals exceed the percentages set forth below.    As of the Closing Date, the goals for dollar value of M./W.B.E. participation in Metered Parking System Operations during each calendar year, not including Construction Contracts, shall be:

| M.B.E.s: | W.B.E.s: |
|---|---|
| at least 25% of annual Operating Expenses, excluding annual Construction Contracts. | at least 5% of annual Operating Expenses, excluding annual Construction Contracts. |

As of the Closing Date, the goals for dollar value of M./W.B.E. participation in Construction Contracts related to Metered Parking System Operations during each calendar year, shall be:

| M.B.E.s: | W.B.E.s: |
|---|---|
| at least 24% of annual Construction Contracts. | at least 4% of annual Construction Contracts. |

(v)     *Eligibility*.  Only those Persons certified by the City as an M.B.E. and/or a W.B.E. pursuant to Section 2-92-420 et seq. of the Municipal Code shall be eligible for purposes of meeting the goals established by Section 11.8(a)(iv) with respect to annual Operating Expenses and only those Persons certified by the City as an M.B.E. and/or a W.B.E. pursuant to Section 2-92-650 et seq. of the Municipal Code shall be eligible for purposes of meeting the goals established by Section 11.8(a)(iv) with respect to annual Construction Contracts.

(vi)     *Reporting*.  The Concessionaire shall submit to the City a M./W.B.E. progress report annually, on forms or on a format established by the City and agreeable to the Concessionaire, that lists separately for annual Operating Expenses and for annual Construction Contracts the following items:  (1) the total amount of Operating Expenses and Construction Contracts during the year, the total accumulation of work awarded to M./W.B.E.s, the name of each M./W.B.E. and the amount of work awarded to each M./W.B.E.; (2) a projection of the total amount of Operating Expenses and Construction Contracts and of work to be awarded to M./W.B.E.s during the next year; (3) all M./W.B.E. work that has been completed and for which final payment has been made during the year; (4) an evaluation of the overall progress to date towards the M./W.B.E. goals for Metered Parking System Operations; and (5) in the event that the progress report indicates that the M./W.B.E. goals for Metered Parking System Operations are not being met, either (A) a plan for achieving the specified minimum participation as soon as possible or (B) a request that the City waive the Concessionaire's M./W.B.E. goal for the calendar year on the basis that it is impracticable or excessively costly to obtain qualified M./W.B.E.s to perform sufficient work to fulfill the Concessionaire's M./W.B.E. goal for the calendar year.

(b)     *Equal Employment Opportunity and Affirmative Action Plan*.  In connection with any construction activities related to the Metered Parking System during the Term, so long as the requirements of Section 2-92-390 of the Municipal Code are in full force and effect, the Concessionaire shall establish, maintain and implement a written Equal Employment Opportunity and Affirmative Action Plan (the "E.E.O./A.A. Plan"), which plan is acceptable to the City and the Concessionaire.  The E.E.O./A.A. Plan will provide for the following goals for employment of women and minorities:

| Minority Employment: | Women's Employment: |
|---|---|
| 25% of skilled hours | 7% of skilled hours |
| 40% of laborer hours | 10% of laborer hours |

(c)     *Chicago Residency Requirements*.  The Concessionaire shall comply with, and shall cause its Contractors to comply with, the residential preference requirements of Section 2-92-330 of the Municipal Code, as it may be amended from time to time, so long as such requirements are in full force and effect; *provided, however*, that for purposes of this Agreement such requirements shall apply (i) to all employees of the Concessionaire and to all employees of the Operator working at the Metered Parking System, such that at least 50% of such employees shall be actual Chicago residents and (ii) with respect to any construction project related to the Metered Parking System, such that the total hours worked on the site of the construction project by employees of Contractors shall be performed at least 50% by actual residents of the City of Chicago.

(d)     *Reporting and Compliance*.  The Concessionaire shall submit to the City progress reports annually on forms or on a format established by the City and agreeable to the Concessionaire, that provide required information concerning the Concessionaire's compliance with the Concessionaire's E.E.O. and Affirmative Action Plan and Chicago residency requirements.

**Section 11.9.  MacBride Principles**.  If the Concessionaire conducts business operations in Northern Ireland, the Concessionaire is required during the Term to make all reasonable and good faith efforts to conduct any such business operations in accordance with the MacBride Principles for Northern Ireland as defined in Illinois Public Act 85-1390 (1988 Ill. Laws 3220), so long as the MacBride Ordinance in Section 2-92-580 of the Municipal Code is in full force and effect.

**Section 11.10. Executive Order 2005-1**.  The Concessionaire shall comply with and shall cause its Owners, as defined in Executive Order 2005-1, and its Contractors to comply with the requirements of Executive Order 2005-1, as it may be amended from time to time, so long as such requirements are in full force and effect.  For purposes of Executive Order 2005-1, the term "domestic partner" has the meaning set forth in Chapter 2-152 of the Municipal Code.

**Section 11.11. Cooperation with City Office of Compliance**.  The Concessionaire hereby acknowledges that it understands and shall comply with all provisions of Chapter 2-26 of the Municipal Code and any regulations and procedures promulgated thereunder, including cooperating with the City Office of Compliance in any investigation or hearing undertaken pursuant to Chapter 2-26 of the Municipal Code.  All contracts entered into by the Concessionaire shall inform Contractors of such Chapter 2-26 of the Municipal Code and require understanding of and compliance with such Chapter 2-26 of the Municipal Code.

**Section 11.12. Intentionally deleted**.

## ARTICLE 12
## INDEMNIFICATION

**Section 12.1. Indemnification by the Concessionaire**. The Concessionaire shall indemnify and hold harmless the City and each of its Representatives from and against any Losses actually suffered or incurred by the City or any such Representative, based upon, arising out of, occasioned by or attributable to (i) any failure by the Concessionaire, the Operator or each of their respective Representatives to comply with, observe or perform any of the covenants, obligations, agreements, terms or conditions in this Agreement or, subject to Section 9.4(b), any breach by the Concessionaire of its representations or warranties set forth herein, (ii) any Assumed Liabilities, (iii) any Tax or recording charge attributable to any Transfer of the Concessionaire Interest or any part thereof by the Concessionaire (other than a Transfer to the City pursuant to this Agreement) or (iv) any claim for brokerage commissions, fees or other compensation by any Person who acted on behalf of the Concessionaire or its Representatives in connection with this Agreement, any Transfer of the Concessionaire Interest or any part thereof or any other matter affecting the Metered Parking System; *provided, however*, that, except with respect to Claims resulting from Third Party Claims, Claims are made in writing within a period of three years following the expiration of the Term or earlier termination of this Agreement or within such shorter period as may be prescribed by the applicable statute of limitations.

**Section 12.2. Indemnification by the City**. The City shall indemnify and hold harmless the Concessionaire and each of its Representatives and Collateral Assignee against and from and against any Losses actually suffered or incurred by the Concessionaire or any such Representative or Collateral Assignee, based upon, arising out of, occasioned by or attributable to (i) any failure by the City or its Representatives to comply with, observe or perform any of the covenants, obligations, agreements, terms or conditions in this Agreement or, subject to Section 9.4(a), any breach by the City of its representations or warranties set forth herein, (ii) any Excluded Liabilities, (iii) any claim for brokerage commissions, fees or other compensation by any Person who acted on behalf of the City or any of its Representatives in connection with this Agreement, or any other matter affecting the Metered Parking System; *provided, however*, that, except with respect to Claims resulting from Third Party Claims, Claims are made in writing within a period of three years of the expiration of the Term or earlier termination of this Agreement or within such shorter period as may be prescribed by the applicable statute of limitations.

**Section 12.3. Agency for Representatives**. Each of the City and the Concessionaire agrees that it accepts each indemnity in favor of any of its Representatives, as agent and trustee of that Representative and agrees that each of the City and the Concessionaire may enforce an indemnity in favor of its Representatives on behalf of that Representative. As used in this Section 12.3, the term "Representative," in the case of the Concessionaire, includes the Collateral Assignee.

**Section 12.4. Third Party Claims**.

(a) *Notice of Third Party Claim*. If an Indemnified Party receives notice of the commencement or assertion of any Third Party Claim, the Indemnified Party shall give the Indemnifier reasonably prompt notice thereof, but in any event no later than 30 Days after receipt

of such notice of such Third Party Claim. Such notice to the Indemnifier shall describe the Third Party Claim in reasonable detail (and include a copy of any complaint or related documents) and shall indicate, if reasonably practicable, the estimated amount of the Loss that has been or may be sustained by the Indemnified Party.

(b)     *Defense of Third Party Claim*. The Indemnifier may participate in or assume the defense of any Third Party Claim by giving notice to that effect to the Indemnified Party not later than 30 Days after receiving notice of that Third Party Claim (the "Notice Period"). The Indemnifier's right to do so shall be subject to the rights of any insurer or other Party who has potential liability in respect of that Third Party Claim. The Indemnifier agrees to pay all of its own expenses of participating in or assuming each defense. The Indemnified Party shall co-operate in good faith in the defense of each Third Party Claim, even if the defense has been assumed by the Indemnifier and may participate in such defense assisted by counsel of its own choice at its own expense. If the Indemnified Party has not received notice within the Notice Period that the Indemnifier has elected to assume the defense of such Third Party Claim, the Indemnified Party may assume such defense, assisted by counsel of its own choosing and the Indemnifier shall be liable for all reasonable costs and expenses paid or incurred in connection therewith and any Loss suffered or incurred by the Indemnified Party with respect to such Third Party Claim.

(c)     *Assistance for Third Party Claims*. The Indemnifier and the Indemnified Party will use all reasonable efforts to make available to the Party which is undertaking and controlling the defense of any Third Party Claim (the "Defending Party"), (i) those employees whose assistance, testimony and presence is necessary to assist the Defending Party in evaluating and in defending any Third Party Claim, and (ii) all Documents, records and other materials in the possession of such party reasonably required by the Defending Party for its use in defending any Third Party Claim, and shall otherwise cooperate with the Defending Party. The Indemnifier shall be responsible for all reasonable expenses associated with making such Documents, records and materials available and for all expenses of any employees made available by the Indemnified Party to the Indemnifier hereunder, which expense shall not exceed the actual cost to the Indemnified Party associated with such employees.

(d)     *Settlement of Third Party Claims*. If an Indemnifier elects to assume the defense of any Third Party Claim in accordance with Section 12.4(b), the Indemnifier shall not be liable for any legal expenses subsequently incurred by the Indemnified Party in connection with the defense of such Third Party Claim. However, if the Indemnifier fails to take reasonable steps necessary to defend diligently such Third Party Claim within 30 Days after receiving notice from the Indemnified Party that the Indemnified Party bona fide believes on reasonable grounds that the Indemnifier has failed to take such steps, the Indemnified Party may, at its option, elect to assume the defense of and to compromise or settle the Third Party Claim assisted by counsel of its own choosing and the Indemnifier shall be liable for all reasonable costs and expenses paid or incurred in connection therewith. The Indemnified Party shall not settle or compromise any Third Party Claim without obtaining the prior written consent of the Indemnifier unless such settlement or compromise is made without any liability to, and does not require any action on the part of, the Indemnifier.

**Section 12.5. Direct Claims**.   Any Direct Claim shall be asserted by giving the Indemnifier reasonably prompt notice thereof, but in any event not later than 90 Days after the Indemnified Party becomes aware of such Direct Claim.  The Indemnifier shall then have a period of 30 Days within which to respond in writing to such Direct Claim.  If the Indemnifier does not so respond within such 30-Day period, the Indemnifier shall be deemed to have rejected such Claim, and in such event the Indemnified Party may submit such Direct Claim to the dispute resolution process set forth in Article 19.

**Section 12.6. Failure to Give Timely Notice**.   A failure to give timely notice in accordance with this Article 12 shall not affect the rights or obligations of any Party except and only to the extent that, as a result of such failure, a Party which was entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or was otherwise directly and materially damaged as a result of such failure.  However, this Section 12.6 shall have no effect whatever on the survival provisions set out in Section 9.4 and the rights of the Parties with respect thereto.

**Section 12.7. Reductions and Subrogation**.  If the amount of any Loss incurred by an Indemnified Party at any time subsequent to the making of an indemnity payment hereunder (an "Indemnity Payment") is reduced by any recovery, settlement or otherwise under or pursuant to any insurance coverage, or pursuant to any claim, recovery, settlement or payment by or against any other Person, the amount of such reduction (less any costs, expenses (including Taxes) or premiums incurred in connection therewith), together with interest thereon from the date of payment thereof at the Bank Rate, shall promptly be repaid by the Indemnified Party to the Indemnifier.  Upon making a full Indemnity Payment, the Indemnifier shall, to the extent of such Indemnity Payment, be subrogated to all rights of the Indemnified Party against any third party in respect of the Loss to which the Indemnity Payment relates.   Until the Indemnified Party recovers full payment of its Loss, any and all claims of the Indemnifier against any such third party on account of such Indemnity Payment shall be postponed and subordinated in right of payment to the Indemnified Party's rights against such third party.

**Section 12.8. Payment and Interest**.   All amounts to be paid by an Indemnifier hereunder shall bear interest at a rate per annum equal to the Bank Rate, calculated annually and payable monthly, both before and after judgment, from the date that the Indemnified Party disbursed funds, suffered damages or losses or incurred a loss, liability or expense in respect of a Loss for which the Indemnifier is liable to make payment pursuant to this Article 12, to the date of payment by the Indemnifier to the Indemnified Party.

**Section 12.9. Limitation on Certain Claims**.   No Claim may be made by the Concessionaire or its Representatives against the City under Section 12.2 for the breach of any representation or warranty made or given by the City in Section 9.1 unless (i) the Loss suffered or incurred by the Concessionaire or its Representatives in connection with such breach is in excess of $10,000 and (ii) the aggregate of all Losses suffered or incurred by the Concessionaire or its Representatives in connection with breaches of representations and warranties in Section 9.1 exceeds $2,000,000 in the aggregate, in which event the amount of all such Losses in excess of such amount may be recovered by the Concessionaire or its Representatives; *provided, however*, that the maximum aggregate liability of the City to the Concessionaire or its Representatives in respect of such Losses shall not exceed 50% of the Consideration; *provided*

*further* that this Section 12.9 shall not apply to Claims for the breach of the representations or warranties in Section 9.1(a), (b), (c), (d), (e), (f) or (g) or to Claims for fraud, intentional misrepresentation or intentional breach of the representations or warranties in Section 9.1.

**Section 12.10. Other Matters**.  To the extent permissible by applicable Law, the Concessionaire waives any limits to the amount of its obligations to defend, indemnify, hold harmless or contribute to any sums due under any Losses, including any claim by any employee of the Concessionaire, that may be subject to the Workers Compensation Act, 820 ILCS 305/1 et seq. or any other related law or judicial decision (such as, Kotecki v. Cyclops Welding Corporation, 146 Ill. 2d 155 (1991)).

**Section 12.11. Offset Rights; Limitations on Certain Damages.**

(a)    Except as provided in Section 7.6(b) with respect to offset, each Party's obligations under this Agreement are subject to, and each Party shall have the benefit of, all defenses, counterclaims, rights of offset or recoupment or other claims and rights, including the right to deduct payments due to the other Party hereunder (collectively, "Offsets") which such Party may have at any time against such other Party (or any of their respective successors and assigns) or any transferee or assignee of any such other Party's rights as against such Party or any part thereof or interest therein, whether the claim or right of such Party relied upon for such purpose is matured or unmatured, contingent or otherwise, and no transfer or assignment of this Agreement or any other obligation of such other Party, or of any rights in respect thereof, pursuant to any plan of reorganization or liquidation or otherwise shall affect or impair the availability to each Party of the Offsets.

(b)    In no event shall any Party be liable to the other Party under this Agreement for consequential, indirect, exemplary or punitive damages (except for claims for fraud or for intentional misrepresentation or intentional breach).

**Section 12.12. Survival**.  This Article 12 shall remain in full force and effect in all circumstances and shall not be terminated by any breach (fundamental, negligent or otherwise) by any Party of its representations, warranties or covenants hereunder or by any termination or rescission of this Agreement by any Party.

**ARTICLE 13**
**INSURANCE**

**Section 13.1.  Insurance Coverage Required**.  The Concessionaire shall provide and maintain at the Concessionaire's own expense, or cause to be maintained, during the Term and during any time period following expiration if the Concessionaire is required to return and perform any additional work, the insurance coverages and requirements specified below, insuring the Metered Parking System and all Metered Parking System Operations (the "Required Coverages").

(a)    *Workers' Compensation and Employer's Liability*.  The Concessionaire shall provide or cause to be provided Workers' Compensation Insurance, as prescribed by applicable Law, covering all employees who agree to provide a service under this Agreement and

Employer's Liability Insurance coverage with limits of not less than $1,000,000 each accident or illness or disease.

(b)     *Commercial General Liability (Primary and Umbrella)*.  The Concessionaire shall provide or cause to be provided Commercial General Liability Insurance or equivalent with limits of not less than $10,000,000 per occurrence for bodily injury, personal injury and property damage liability.   Coverage shall include the following: all premises and operations, products/completed operations, explosion, collapse, underground, separation of insureds, defense and contractual liability.  The City is to be named as an additional insured on a primary, non-contributory basis for any liability arising under or in connection with this Agreement.

(c)     *Automobile Liability (Primary and Umbrella)*.  When any motor vehicles (owned, non-owned or hired) are used in connection with work to be performed, the Concessionaire shall provide or cause to be provided Automobile Liability Insurance with limits of not less than $5,000,000 per occurrence for bodily injury and property damage.  The City is to be named as an additional insured on a primary, non-contributory basis.

(d)     *Builder's Risk*.  When the Concessionaire undertakes any construction, including improvements, betterments, rehabilitation, maintenance and/or repairs, the Concessionaire shall provide or cause to be provided, All Risk Builder's Risk Insurance at replacement cost for materials, supplies, equipment, machinery and fixtures that are or will be part of the Metered Parking System.  Coverage shall include, but not be limited to, the following:  material stored off-site and in-transit, water including overflow, leakage, sewer backup, and seepage, debris removal, flood, faulty workmanship or materials when applicable.  The City is to be named as an additional insured and, subject to the claims of any Collateral Assignee if applicable, as loss payee.

(e)     *Professional Liability*.  When any architects, engineers, construction managers or any other professional consultants perform work in connection with this Agreement, Professional Liability Insurance covering acts, errors or omissions shall be maintained with limits of not less than $1,000,000.  When policies are renewed or replaced, the policy retroactive date shall coincide with, or precede, start of work in connection with this Agreement.  A claims-made policy which is not renewed or replaced shall have an extended reporting period of two years.

(f)     *Property*.  The Concessionaire shall be responsible for all loss or damage to the Metered Parking System at full replacement cost unless such loss or damage was caused by, or resulted from any action by, the City or any of its Representatives.  The Concessionaire shall be responsible for all loss or damage to City property caused by, or resulting from any action by, the Concessionaire or any of its Representatives at full replacement cost.  The Concessionaire shall be responsible for all loss or damage to personal property (including materials, equipment, tools and supplies) owned, rented or used by the Concessionaire unless such loss or damage was caused by, or resulted from any action by, the City or any of its Representatives.   The Concessionaire shall not be required to have, obtain or maintain insurance coverage for property loss or damage to City property.

(g)     *Railroad Protective Liability*.  When any work is to be done adjacent to or on railroad or transit property, the Concessionaire shall provide, with respect to the operations that

- 98 -

the Concessionaire or Contractors perform, Railroad Protective Liability Insurance in the name of the applicable railroad or transit entity. The policy shall have limits of not less than the requirement of the operating railroad for losses arising out of injuries to or death of all persons, and for damage to or destruction of property, including the loss of use thereof.

**Section 13.2. Additional Requirements**.

(a) *Evidence of Insurance*. The Concessionaire shall deliver or cause to be delivered to the City of Chicago, Department of Finance, Risk Management Office, 333 South State Street, Room 400, Chicago, Illinois 60604, and any other such City Department designated in writing by the City, original Certificates of Insurance evidencing the Required Coverages on or before the Closing Date, and shall provide or cause to be provided, promptly following renewal and not more than five Business Days following renewal of the then current coverages (or such other period as is agreed to by the City), Renewal Certificates of Insurance, or such similar evidence, if such coverages have an expiration or renewal date occurring during the Term. The receipt of any certificate does not constitute agreement by the City that the insurance requirements in this Agreement have been fully met or that the insurance policies indicated on the certificate are in compliance with all requirements of this Agreement. The failure of the City to obtain certificates or other insurance evidence from the Concessionaire shall not be deemed to be a waiver by the City. The Concessionaire shall advise all insurers of provisions of this Agreement regarding insurance. Non-conforming insurance shall not relieve the Concessionaire of the obligation to provide insurance as specified herein. Except as otherwise expressly set forth herein, each Required Coverage may be reviewed by the City for compliance with the terms of this Agreement. Each Required Coverage shall be signed by the insurer responsible for the risks insured against or by the insurer's authorized representative. All Required Coverages shall be placed with insurers reasonably acceptable to the City; *provided* that all such insurers, at a minimum, shall have a rating of A(VII) or better by A.M. Best Company (unless the City consents to waive this requirement).

(b) *Notice of Cancellation, Material Change or Violation*. All Required Coverages shall provide for 60 Days (or in the case of cancellation for non-payment of premiums, 10 Days) prior written notice to be given to the City by the insurer in the event coverage is substantially changed, canceled or non-renewed. The City shall be permitted (but not obligated) to pay any delinquent premiums before the cancellation date specified by the insurer in any notice of cancellation for non-payment of premium in order to maintain such coverage in full force and effect and the Concessionaire shall reimburse the City for any delinquent premiums paid by the City on demand without any Days of grace and without prejudice to any other rights and remedies of the City hereunder. The Concessionaire shall not cancel, terminate, materially change to the detriment of the City any Required Coverage.

(c) *Deductibles*. All Required Coverages may contain deductibles or self-insured retentions not to exceed amounts reasonably acceptable to the City. Any and all deductibles or self-insured retentions on Required Coverages shall be borne by the Concessionaire or its Contractors.

(d) *Inflation Adjustment*. The amounts of coverage required by Section 13.1 shall be Adjusted for Inflation each succeeding fifth anniversary of the Closing Date.

(e)     *Waiver of Subrogation by Insurers*.  Each of the Required Coverages shall include a waiver by the insurer of its rights of subrogation against the City, its employees, elected officials, agents or representatives.

(f)     *City's Right to Insure*.  If the Concessionaire fails to obtain and maintain or cause to be obtained and maintained the insurance required by this Article 13, the City shall have the right (without any obligation to do so), upon two Business Days' notice to the Concessionaire in a non-emergency situation or forthwith in an emergency situation and without assuming any obligation in connection therewith, to effect such insurance and all costs and expenses of the City in connection therewith shall be payable by the Concessionaire to the City on demand without any Days of grace and without prejudice to any other rights and remedies of the City hereunder. Such insurance taken out by the City shall not relieve the Concessionaire of its obligations to insure hereunder and the City shall not be liable for any loss or damage suffered by the Concessionaire in connection therewith.

(g)     *No Limitation as to Concessionaire Liabilities*.  The Concessionaire expressly understands and agrees that any coverages and limits furnished by the Concessionaire shall in no way limit the Concessionaire's liabilities and responsibilities specified within this Agreement or by Law.

(h)     *No Contribution by City*.  The Concessionaire expressly understands and agrees that any insurance or self-insurance programs maintained by the City shall not contribute with insurance provided by the Concessionaire under this Agreement.

(i)     *Insurance Not Limited by Indemnification*.  The required insurance shall not be limited by any limitations expressed in the indemnification language herein or any limitation placed on the indemnity therein given as a matter of law.

(j)     *Insurance Requirements of Contractors*.  The Concessionaire shall require in each contract with any Contractor (where such Contractor is not covered by the Required Coverages) that such Contractor obtain coverages reasonably comparable to the Required Coverages that are reasonably appropriate in their limits and other terms and conditions to the nature of the contract with the Contractor.  Such coverages shall insure the interests of the City, its employees, elected officials, agents and representatives, the Concessionaire and any other Contractors in respect of the applicable work being performed and shall be subject to the same (or comparable) coverage and administrative requirements as are imposed on the Concessionaire pursuant to this Agreement.  When requested to do so by the City, the Concessionaire shall provide or cause to be provided to the City Certificates of Insurance with respect to such insurance coverages or such other evidence of insurance, as may be reasonably acceptable in form and content to the City.

(k)     *Joint Venture and Limited Liability Company Policies*.  If the legal entity maintaining the Required Coverage is a joint venture or limited liability company, the insurance policies shall specifically name the joint venture or limited liability company as a named insured.

(l)     *Other Insurance Obtained by Concessionaire*.  If the Concessionaire or its Contractors desire coverages in addition to the Required Coverages, the Concessionaire and each

Contractor shall be responsible for the acquisition and cost of such additional coverages. If the Concessionaire or its Contractors obtain any property, liability or other insurance coverages in addition to the Required Coverages ("Additional Coverages"), then the Concessionaire or its Contractors shall (i) notify the City as to such Additional Coverages, (ii) provide the City with any documentation relating to the Additional Coverages, including Certificates of Insurance, that the City reasonably requests and (iii) at the City's election, cause the City and its employees, elected or appointed officials, agents and representatives to be named as additional insureds under such Additional Coverages.

(m) *Cooperation*. The City and the Concessionaire shall do all acts, matters and things as may be reasonably necessary or required to expedite the adjustment of any loss or damage covered by insurance hereunder so as to expedite the release and dedication of proceeds of such insurance in the manner and for the purposes herein contemplated.

(n) *City's Right to Modify*. The City (through its Risk Management Department) shall have the right to modify, delete, alter or change insurance coverage requirements set forth in Section 13.1 (other than any property insurance, which pursuant to Section 13.1(f) is not required to be maintained) and this Section 13.2 to reflect known and established material changes in insurance coverages for operations comparable to the Metered Parking System Operations or known and established material changes in insurance exposures associated with the Metered Parking System provided that the Concessionaire shall not have any obligation to procure or maintain at its cost any additional insurance unless an independent insurance consultant shall have delivered to the Concessionaire its opinion to the effect that the additional coverages are required pursuant to the above-stated criteria and such additional coverages are commercially available at reasonable rates in terms of cost of premium and amount of deductibles. Notwithstanding anything to the contrary herein, if any insurance (including the limits or deductibles thereof) required to be maintained under this Agreement shall not be available at commercially reasonable rates, the Concessionaire shall have the right to request that the City consent to waive such requirement and the City shall not unreasonably withhold, condition or delay such consent. Any such waiver shall be effective only so long as such insurance shall not be available at commercially reasonable rates, *provided* that during the period of such waiver, the Concessionaire maintains the maximum amount of such insurance otherwise available at commercially reasonable rates.

**Section 13.3. Damage and Destruction**.

(a) *Obligations of Concessionaire*. If all or any part of any of the Metered Parking System shall be destroyed or damaged during the Term in whole or in part by fire or other casualty of any kind or nature (including any casualty for which insurance was not obtained or obtainable), ordinary or extraordinary, foreseen or unforeseen, the Concessionaire shall: (i) give the City notice thereof promptly after the Concessionaire receives actual notice of such casualty; (ii) at its sole cost and expense, whether or not insurance proceeds, if any, shall be equal to the estimated cost of repairs, alterations, restorations, replacement and rebuilding (the "Casualty Cost"), proceed diligently to repair, restore or rebuild the same to the condition existing prior to the happening of such fire or other casualty (any such activity being a "Restoration"); and (iii) deposit all insurance proceeds received by the Concessionaire in connection with any Restoration with a Depositary; *provided, however*, that if at any time the Casualty Cost exceeds the net

insurance proceeds actually deposited with the Depositary, then the Concessionaire shall also deposit with the Depository such cash as is sufficient to cover the difference between the Casualty Cost and the net insurance proceeds (collectively, with any interest earned thereon, the "Restoration Funds"); *provided, further,* that the procedures of this clause (iii) of this Section 13.3(a) shall only apply to casualty events in which the cost of Restoration exceeds $1,000,000.

(b)　　*Rights of City*.　If (i) the Concessionaire shall fail or neglect to commence the diligent Restoration of the Metered Parking System or the portion thereof so damaged or destroyed, (ii) having so commenced such Restoration, the Concessionaire shall fail to diligently complete the same in accordance with the terms of this Agreement or (iii) prior to the completion of any such Restoration by the Concessionaire, this Agreement shall expire or be terminated in accordance with the terms of this Agreement, the City may, but shall not be required to, complete such Restoration at the Concessionaire's expense and shall be entitled to be paid out of the Restoration Funds, but such payment shall not limit the Concessionaire's obligation to pay the City's reasonable Restoration expenses, less amounts received by the City from such Restoration Funds.　In any case where this Agreement shall expire or be terminated prior to the completion of the Restoration, the Concessionaire shall (x) account to the City for all amounts spent in connection with any Restoration which was undertaken, (y) pay over or cause the Depositary to pay over to the City, within 30 Days after demand therefor, the remainder, if any, of the Restoration Funds received by the Concessionaire prior to such termination or cancellation and (z) pay over or cause the Depositary to pay over to the City, within 30 Days after receipt thereof, any Restoration Funds received by the Concessionaire or the Depositary subsequent to such termination or cancellation.　The Concessionaire's obligations under this Section 13.3(b) shall survive the expiration or termination of this Agreement.

(c)　　*Payment of Restoration Funds to Concessionaire*.　Subject to the satisfaction by the Concessionaire of all of the terms and conditions of this Section 13.3, the Depositary shall pay to the Concessionaire from time to time, any Restoration Funds, but not more than the amount actually collected by the Depositary upon the loss, together with any interest earned thereon, after reimbursing itself therefrom, as well as the City, to the extent, if any, of the reasonable expenses paid or incurred by the Depositary and the City in the collection of such monies, to be utilized by the Concessionaire solely for the Restoration, such payments to be made as follows:

(i)　　prior to commencing any Restoration, the Concessionaire shall furnish the City with an estimate of the cost of such Restoration, prepared by an architect or engineer;

(ii)　　the Restoration Funds shall be paid to the Concessionaire in installments as the Restoration progresses, subject to Section 13.3(c)(iii), based upon requisitions to be submitted by the Concessionaire to the Depositary and the City in compliance with Section 13.3(d), showing the cost of labor and materials purchased for incorporation in the Restoration, or incorporated therein since the previous requisition, and due and payable or paid by the Concessionaire; *provided, however,* that if any lien (other than a Permitted Concessionaire Encumbrance) is filed against the Metered Parking System or any part thereof in connection with the Restoration, the Concessionaire shall not be entitled to receive any further installment until such lien is satisfied or discharged (by bonding or otherwise); *provided, further,* that notwithstanding the foregoing, but subject to the provisions of Section 13.3(c)(iii), the existence

of any such lien shall not preclude the Concessionaire from receiving any installment of Restoration Funds so long as such lien will be discharged with funds from such installment and at the time the Concessionaire receives such installment the Concessionaire delivers to the City and the Depositary a release of such lien executed by the lien or and in recordable form;

(iii) the amount of any installment to be paid to the Concessionaire shall be (A) the product of (x) the total Restoration Funds and (y) a fraction, the numerator of which is the cost of labor and materials theretofore incurred by the Concessionaire in the Restoration and the denominator of which is the Casualty Cost, less (B) all payments theretofore made to the Concessionaire out of the Restoration Funds and less (C) 10% of the amount determined by the calculation described in clauses (A) and (B) of this Section 13.3(c)(iii), except that no amounts due shall be withheld for architects' or engineers' fees or permitting or other governmental fees in connection with the Restoration or with respect to each Contractor upon the final completion of each such Contractor's respective work, provided that the unapplied portion of the funds held by the Depositary are sufficient to complete the Restoration; *provided, however,* that all disbursements to the Concessionaire shall be made based upon an architect's or engineer's certificate for payment in accordance with industry standards, and disbursements may be made for advance deposits for material and Contractors to the extent that such disbursements are customary in the industry and provided that the unapplied portion of the funds held by the Depositary are sufficient to complete the Restoration; and

(iv) except as provided in Section 13.3(b), upon completion of and payment for the Restoration by the Concessionaire, subject to the rights of any Collateral Assignee, the Depositary shall pay the balance of the Restoration Funds, if any, to the Concessionaire; *provided, however*, that if the insurance proceeds are insufficient to pay for the Restoration (or if there shall be no insurance proceeds), the Concessionaire shall nevertheless be required to make the Restoration and provide the deficiency in funds necessary to complete the Restoration as provided in Section 13.3(a)(iii).

(d) *Conditions of Payment*. The following shall be conditions precedent to each payment made to the Concessionaire as provided in Section 13.3(c):

(i) at the time of making such payment, no Concessionaire Default (other than any Concessionaire Default resulting from the occurrence of the damage or destruction for which such payment is being made or the result thereof) exists;

(ii) the Restoration shall be carried out under the supervision of the architect or engineer, and there shall be submitted to the Depositary and the City the certificate of the architect or engineer (or other evidence reasonably satisfactory to the City) stating that (A) the materials and other items which are the subject of the requisition have been delivered to the Metered Parking System (except with respect to requisitions for advance deposits permitted under Section 13.3(c)(iii)), free and clear of all Encumbrances, and no unsatisfied or unbonded mechanic's or other liens have been claimed, except for any mechanic's lien for claims that will be discharged, by bonding or otherwise, with funds to be received pursuant to such requisition (*provided* that a release of such lien is delivered to the Depositary in accordance with Section 13.3(c)(ii)), or insured over by title insurance reasonably acceptable to the City, (B) the sum then requested to be withdrawn either has been paid by the Concessionaire or is due and payable to

Contractors, engineers, architects or other Persons (whose names and addresses shall be stated), who have rendered or furnished services or materials for the work and giving a brief description of such services and materials and the principal subdivisions or categories thereof and the several amounts so paid or due to each of such Persons in respect thereof, and stating in reasonable detail the progress of the work up to the date of such certificate, (C) no part of such expenditures has been made the basis, in any previous requisition (whether paid or pending), for the withdrawal of Restoration Funds or has been made out of the Restoration Funds received by the Concessionaire, (D) the sum then requested does not exceed the value of the services and materials described in the certificate, (E) the work relating to such requisition has been performed in accordance with this Agreement, (F) the balance of the Restoration Funds held by the Depositary will be sufficient upon completion of the Restoration to pay for the same in full, and stating in reasonable detail an estimate of the cost of such completion and (G) in the case of the final payment to the Concessionaire, the Restoration has been completed in accordance with this Agreement.

(e)     *Payment and Performance Bonds*.  If the Concessionaire obtains payment or performance bonds related to a Restoration (which the Concessionaire may or may not obtain in its discretion), the Concessionaire shall name the City and the Concessionaire and any Collateral Assignee, as their interests may appear, as additional obligees, and shall deliver copies of any such bonds to the City promptly upon obtaining them.

(f)     *Benefit of City*.  The requirements of this <u>Section 13.3</u> are for the benefit only of the City, and no Contractor or other Person shall have or acquire any claim against the City as a result of any failure of the City actually to undertake or complete any Restoration as provided in this <u>Section 13.3</u> or to obtain the evidence, certifications and other documentation provided for herein.

(g)     *Investment of Restoration Funds*.  Restoration Funds deposited with a Depositary shall be invested and reinvested in Eligible Investments at the direction of the Concessionaire, and all interest earned on such investments shall be added to the Restoration Funds.

(h)     *Rights of Collateral Assignee*.  The City acknowledges and agrees that any Restoration Funds not applied to a Restoration as provided in this <u>Section 13.3</u> shall be subject to the lien or liens of any Collateral Assignment.

**ARTICLE  14**
**ADVERSE ACTIONS**

**Section 14.1.  Adverse Action**.

(a)     An "<u>Adverse Action</u>" shall occur if the City, the County of Cook or the State of Illinois (or any subdivision or agency of any of the foregoing) takes any action or actions at any time during the Term (including enacting any Law) and the effect of such action or actions, individually or in the aggregate, is reasonably expected (i) to be principally borne by the Concessionaire or other operators of on-street metered parking systems and (ii) to have a material adverse effect on the fair market value of the Concessionaire Interest (whether as a result of decreased revenues, increased expenses or both), except where such action is in

response to any act or omission on the part of the Concessionaire that is illegal (other than an act or omission rendered illegal by virtue of the Adverse Action) or such action is otherwise permitted under this Agreement; *provided, however*, that none of the following shall be an Adverse Action: (A) any action taken by the City pursuant to its Reserved Powers, (B) other than as a result of any action taken by the City pursuant to its Reserved Powers, the development, redevelopment, construction, maintenance, modification or change in the operation of any existing or new parking facility or mode of parking or of transportation (including a road, street or highway) whether or not it results in the reduction of Metered Parking Revenues or in the number of vehicles using the Metered Parking System, (C) the imposition of a Tax of general application or an increase in Taxes of general application, including parking Taxes of general application imposed on customers or operators of parking facilities, or (D) requirements generally applicable to public parking lot licensees including "public garage-not enclosed" licensees under the Municipal Code.

(b)     If an Adverse Action occurs, the Concessionaire shall have the right to (i) be paid by the City the Concession Compensation with respect thereto (such Concession Compensation, the "AA-Compensation") or (ii) terminate this Agreement and be paid by the City the Metered Parking System Concession Value, in either case by giving notice in the manner described in Section 14.1(c).

(c)     If an Adverse Action occurs, the Concessionaire shall give notice (the "AA-Preliminary Notice") to the City within 30 Days following the date on which the Concessionaire first became aware of the Adverse Action stating an Adverse Action has occurred. Within 180 Days following the date of delivery of the AA-Preliminary Notice, the Concessionaire shall give the City another notice (the "AA-Notice") setting forth (i) details of the effect of said occurrence that is principally borne by the Concessionaire or other operators of on street metered parking systems generally and not by others, (ii) details of the material adverse effect of the said occurrence on the fair market value of the Concessionaire Interest, (iii) a statement as to which right in Section 14.1(b) the Concessionaire elects to exercise, and (iv) if the Concessionaire elects to exercise the right to Concession Compensation under Section 14.1(b), the amount claimed as AA-Compensation and details of the calculation thereof. The City shall, after receipt of the AA-Notice, be entitled by notice to require the Concessionaire to provide such further supporting particulars as the City may reasonably consider necessary. If the City wishes to dispute the occurrence of an Adverse Action or the amount of AA-Compensation, if any, claimed in the AA-Notice, the City shall give notice of dispute (the "AA-Dispute Notice") to the Concessionaire within 30 Days following the date of receipt of the AA-Notice stating in reasonable detail the grounds for such dispute. If neither the AA-Notice nor the AA-Dispute Notice has been withdrawn within 30 Days following the date of receipt of the AA-Dispute Notice by the Concessionaire, the matter shall be submitted to the dispute resolution procedure in Article 19.

(d)     If the Concessionaire has elected to exercise its right to AA-Compensation, the City shall pay the amount of Concession Compensation claimed to the Concessionaire within 60 Days following the date of receipt of the AA-Notice, or if a AA-Dispute Notice has been given, then not later than 60 Days following the date of determination of the AA-Compensation (together with interest at the Bank Rate from the date of receipt of the AA-Dispute Notice to the date on which payment is made), *provided that*, subject to the right of the Concessionaire to

receive interest at the Bank Rate on the payment owed by the City from the date of receipt of the AA-Dispute Notice to the date on which payment is made, the City may defer any such payment for an additional 120 Days if the City determines, in its reasonable discretion, that such additional period is necessary in order to obtain financing or otherwise to obtain the necessary funds to make such a payment. It is acknowledged and agreed that payment of such Concession Compensation shall not release the City from any obligations with respect to any indemnification or other claims by the Concessionaire hereunder that are not related to the events or circumstances that gave rise to such Concessionaire Compensation.

**Section 14.2. Termination**.

(a) If the Concessionaire has elected to exercise its right to terminate this Agreement in connection with an Adverse Action pursuant to <u>Section 14.1</u> this Agreement, subject to <u>Section 14.2(c)</u> and <u>Section 14.4</u>, shall terminate 60 Days following the date of receipt of the AA-Notice by the City, and the City shall pay an amount equal to the aggregate of (i) the Metered Parking System Concession Value as of the date of such termination (which shall be determined as if no Adverse Action has occurred), plus (ii) without duplication, the reasonable out-of-pocket and documented costs and expenses incurred by the Concessionaire as a result of such termination, plus (iii) the Concession Compensation calculated for the period between the date of the Adverse Action and the date of termination less (iv) any insurance or condemnation proceeds received by the Concessionaire in respect of all or any portion of the Metered Parking System as a result of such Adverse Action, (collectively, the "<u>Termination Damages</u>") to the Concessionaire on the Reversion Date or, if the Termination Damages are determined on a date subsequent to the Reversion Date, then not later than 60 Days following the date of determination of the Termination Damages (together with interest at the Bank Rate from the Reversion Date to the date on which payment is made), *provided that*, subject to the right of the Concessionaire to receive interest at the Bank Rate on the payment owed by the City from the date of receipt of the AA-Dispute Notice to the date on which payment is made, the City may defer any such payment for an additional 120 Days if the City reasonably determines that such additional period is necessary in order to obtain financing to make such a payment; *provided, however*, that any amounts received by the Concessionaire or any Collateral Assignee from any insurance policies payable as a result of damage or destruction to the Metered Parking System that has not been remedied prior to the Reversion Date, shall, to the extent not used to remedy such effects, be deducted from the amount payable by the City to the Concessionaire, so long as the City has not received any such amounts pursuant to <u>Section 13.3(b)</u>.

(b) Any dispute arising out of the determination of the Termination Damages shall be submitted to the dispute resolution procedure in <u>Article 19</u>.

(c) This Agreement shall not terminate pursuant to <u>Section 14.2(a)</u> unless the Concessionaire has first obtained and delivered to the City the written consent of the Collateral Assignee to such termination.

(d) Payment of the entire sum of Termination Damages or the AA-Compensation, as the case may be, by the City to the Concessionaire, shall constitute full and final satisfaction of all amounts that may be claimed by the Concessionaire for and in respect of the occurrence of the Adverse Action, as the case may be, and, upon such payment, the City shall be released and

forever discharged by the Concessionaire from any and all liability in respect of such Adverse Action.

**Section 14.3.  Reserved Powers Adverse Actions.**

(a)    *Use of Reserved Powers*.  The Parties acknowledge and agree that (i) it is anticipated that the City will exercise its Reserved Powers during the Term, (ii) the impact of certain of such actions may have a material adverse effect on the fair market value of the Concessionaire Interest; (iii) the provisions of Article 7, including the provisions thereof relating to the payment of Settlement Amounts by the City, are designed to compensate the Concessionaire for changes resulting from the exercise by the City of its Reserved Powers in a manner that will maintain the fair market value of the Concessionaire Interest over the Term and (iv) adverse changes may be mitigated by other Reserved Power actions of the City that will have a favorable impact on the fair market value of the Concessionaire Interest.  The Parties also acknowledge and agree that there may be circumstances when the exercise by the City of its Reserved Powers may have a material adverse effect on the fair market value of the Concessionaire Interest that cannot be compensated fully under the provisions of Article 7 and that under such circumstances the Concessionaire may seek compensation with respect thereto (the "Reserved Powers Adverse Action Compensation").

(b)    *Reserved Powers Adverse Action*.  A "Reserved Powers Adverse Action" shall occur if (i) the City takes any action or actions during the Term that would otherwise have constituted an Adverse Action under Section 14.1 except that such action or actions were taken by the City pursuant to its Reserved Powers, and (ii) such actions, individually or in the aggregate, are reasonably expected (A) to be borne principally by the Concessionaire or other operators of on-street metered parking systems and (B) to have a material adverse effect on the fair market value of the Concessionaire Interest after taking into account the provisions of Article 7.  In addition, the events described in Section 7.11 relating to a reduction of Concession Metered Parking Spaces or to the average of the Monthly System in Service Percentage for certain Reporting Years being less than eighty percent (80%) are each a Reserved Powers Adverse Action.

(c)    *Compensation*.  The amount of Reserved Powers Adverse Action Compensation shall be equal to the reduction in the fair market value of the Concessionaire Interest resulting from such Reserved Powers Adverse Action after taking into account the present value of the amounts paid, or reasonably expected to be paid, over the remaining Term by the City pursuant to Article 7 as a result of such Reserved Powers Adverse Action, as determined pursuant to a written appraisal by an independent third party appraiser that is nationally recognized in appraising infrastructure assets used to provide services to the general public and that is acceptable to the City and the Concessionaire.  If the Parties fail to agree upon such a single appraiser within 30 Days after a Party requests the appointment thereof, then the City and the Concessionaire shall each appoint an independent third party appraiser and both such appraisers shall be instructed jointly to select a third party appraiser to make the fair market value appraisal. The City shall pay the reasonable costs and expenses of any appraisal.

(d)    *Notice and Claim*.  If a Reserved Powers Adverse Action occurs, the Concessionaire shall give notice (the "RP Preliminary Notice") to the City within 30 Days

following the date on which the Concessionaire first became aware of the Reserved Powers Adverse Action stating a Reserved Powers Adverse Action has occurred. Within 180 Days following the date of delivery of the RP-Preliminary Notice, the Concessionaire shall give the City another notice (the "RP-Notice") setting forth (i) details of the effect of said occurrence that is principally borne by the Concessionaire or other operators of on-street metered parking systems generally and not by others, (ii) details of the lasting and material adverse effect of the said occurrence on the fair market value of the Concessionaire Interest, (iii) a statement that the reduction in the fair market value of the Concessionaire Interest cannot be fully compensated under the provisions of Article 7, and the reasons that such statement is correct, and (iv) the amount claimed as Reserved Powers Adverse Action Compensation and details of the calculation thereof. The City shall, after receipt of the RP-Notice, be entitled by notice to require the Concessionaire to provide such further supporting particulars as the City may reasonably consider necessary. If the City wishes to dispute the occurrence of a Reserved Powers Adverse Action or the amount of Reserved Powers Adverse Action Compensation claimed in the RP-Notice, the City shall give notice of dispute (the "RP-Dispute Notice") to the Concessionaire within 30 Days following the date of receipt of the RP-Notice stating in reasonable detail the grounds for such dispute. If neither the RP-Notice nor the RP-Dispute Notice has been withdrawn within 30 Days following the date of receipt of the RP-Dispute Notice by the Concessionaire, the matter shall be submitted to the dispute resolution procedure in Article 19.

(e)     *Option to Terminate*.   If the amount of Reserved Powers Adverse Action Compensation, as determined pursuant to Section 14.3(c) and (d), is greater than twenty-five percent (25%) of the fair market value of the Concessionaire Interest as of the time immediately prior to the Reserved Powers Adverse Action, then the Concessionaire, at its option, may, by written notice to the City, elect to terminate this Agreement and be paid the greater of the Reserved Powers Adverse Action Compensation or the Remaining Amortized Value. Such written notice shall establish an End Date for this Agreement, which shall be no earlier than 120 Days and no later than 180 Days later than the date of delivery of such notice, and shall be accompanied by the written consent of the Collateral Assignee to such termination. The Concessionaire's option to terminate this Agreement pursuant to this Section 14.3(e) does not limit the rights of the City to remedy the occurrence of an Adverse Action or a Reserved Powers Adverse Action as permitted by Section 14.4.

(f)     *Payment of Reserved Powers Adverse Action Compensation*.   If the Concessionaire has elected to exercise its right to Reserved Powers Adverse Action Compensation, the City shall pay the amount of Reserved Powers Adverse Action Compensation claimed to the Concessionaire within 60 Days following the date of receipt of the RP-Notice, or if a RP-Dispute Notice has been given, then not later than 60 Days following the date of determination of the Reserved Powers Adverse Action Compensation (together with interest at the Bank Rate from the date of receipt of the RP-Dispute Notice to the date on which payment is made), *provided that*, subject to the right of the Concessionaire to receive interest at the Bank Rate on the payment owed by the City from the date of receipt of the RP-Dispute Notice to the date on which payment is made, the City may defer any such payment for an additional 120 Days if the City determines, in its reasonable discretion, that such additional period is necessary in order to obtain financing or otherwise to obtain the necessary funds to make such a payment. It is acknowledged and agreed that payment of such Reserved Powers Adverse Action Compensation shall not release the City from any obligations with respect to any indemnification

or other claims by the Concessionaire hereunder that are not related to the events or circumstances that gave rise to such Reserved Powers Adverse Action Compensation.

(g)     *Termination Payment*.  If the Concessionaire has elected to exercise its option to terminate this Agreement, then, on the Reversion Date, the City shall pay the Concessionaire the Remaining Amortized Value or the Reserved Powers Adverse Action Compensation, in accordance with the election made by the Concessionaire pursuant to Section 14.3(e), *provided that*, subject to the Concessionaire's right to receive interest at the Bank Rate on such amount after the Reversion Date, the City may defer any such payment for an additional 60 Days if the City determines, in its reasonable discretion, that such additional period is necessary in order to obtain financing or otherwise to obtain the necessary funds to make such payment.

(h)     *Release of City*.  Payment of the entire sum due under Section 14.3(f) or Section 14.3(g), as the case may be, by the City to the Concessionaire shall constitute full and final satisfaction of all amounts that may be claimed by the Concessionaire for and in respect of the occurrence of the Reserved Powers Adverse Action and upon such payment, the City shall be released and forever discharged by the Concessionaire from any and all liability in respect of such Reserved Powers Adverse Action.

**Section 14.4.   Right of City to Remedy**.  If the City wishes to remedy the occurrence of an Adverse Action or a Reserved Powers Adverse Action, the City shall give notice thereof to the Concessionaire within 30 Days following the date of receipt of the applicable AA-Notice or RP-Notice.  If the City gives such notice it must remedy the applicable Adverse Action or Reserved Powers Adverse Action within 180 Days following the date of receipt of the AA-Notice or RP-Notice or, if a AA-Dispute Notice or RP-Dispute Notice has been given, within 180 Days following the final award pursuant to Article 19 to the effect that an Adverse Action or Reserved Powers Adverse Action occurred.  If the City elects to remedy the occurrence of an Adverse Action within the applicable period of time, the right of the Concessionaire shall be limited to a claim for AA-Compensation with respect to such Adverse Action.  If the City elects to remedy the occurrence of a Reserved Powers Adverse Action within the applicable period of time, the right of the Concessionaire shall be limited to a claim for Reserved Powers Adverse Action Compensation.

**Section 14.5.   Other Actions by Governmental Authorities**.  In the event that any Governmental Authority (other than the City, Cook County or the State of Illinois (or any subdivision or agency of any of the foregoing)) proposes to take any action at any time during the Term (including or enacting any Law) and the effect of such action is reasonably expected (i) to be principally borne by the Concessionaire or other operators of on street metered parking systems (and not by others) and (ii) to have a material adverse effect on the fair market value of the Concessionaire Interest, except where such action is in response to any act or omission on the part of the Concessionaire that is illegal (other than an act or omission rendered illegal by virtue of an Adverse Action or such action by any such other Governmental Authority), then at the request of the Concessionaire the City shall use its reasonable efforts to oppose and challenge such action by any such other Governmental Authority; *provided, however*, that all reasonable out-of-pocket costs and expenses incurred by the City in connection with such opposition or challenge shall be borne by the Concessionaire.

## ARTICLE 15
## DELAY EVENTS AND CONCESSION COMPENSATION

**Section 15.1.  Delay Events**.

(a)     If the Concessionaire is affected by a Delay Event, it shall give notice within 10 Business Days following the date on which it first became aware of such Delay Event to the City (*provided* that in the case of such Delay Event being a continuing cause of delay, only one notice shall be necessary), which notice shall include (i) a statement of which Delay Event the claim is based upon, (ii) details of the circumstances from which the delay arises and (iii) an estimate of the delay in the performance of obligations under this Agreement attributable to such Delay Event and information in support thereof, if known at that time.  The City shall, after receipt of any such notice, be entitled by notice to require the Concessionaire to provide such further supporting particulars as the City may reasonably consider necessary.

(b)     The Concessionaire shall notify the City within 10 Business Days following the date on which it first became aware that a Delay Event has ceased.

(c)     Subject to the Concessionaire giving the notice required in Section 15.1(a), a Delay Event shall excuse the Concessionaire from whatever performance is prevented by the Delay Event referred to in such notice for such appropriate number of Days as the City and the Concessionaire jointly determine, each acting reasonably.  If the City and the Concessionaire cannot agree upon the period of extension, then either Party shall be entitled to refer the matter to the dispute resolution procedure in Article 19.  This Section 15.1(c) shall not excuse the Concessionaire from the performance and observance under this Agreement of all obligations and covenants not affected by the Delay Event.  Notwithstanding the occurrence of a Delay Event, the Concessionaire shall continue its performance and observance under this Agreement of all of its obligations and covenants to the extent that it is reasonably able to do so and shall use its reasonable efforts to minimize the effect and duration of the Delay Event.  Nothing herein shall permit or excuse noncompliance with a change to applicable Laws.

(d)     Except as provided in the immediately following sentence, if a Delay Event occurs that has the effect of causing physical damage or destruction to a material part of the Metered Parking System that results in the Metered Parking System being substantially unavailable for the provision of Metered Parking Services and such effect continues for a period in excess of 120 Days and has a material adverse effect on the fair market value of the Concessionaire Interest, and insurance policies payable (or that should have been payable but for the breach of an obligation to take out and maintain such insurance policy by the Concessionaire) or condemnation or other similar proceeds are insufficient to restore the Concessionaire to the same economic position as it would have been in the absence of such event, then, notwithstanding Section 2.1, the Concessionaire shall have the right to extend the Term for a period that would be sufficient so to compensate the Concessionaire and to restore it to the same economic position as it would have been in had such Delay Event not occurred (a "Delay Event Remedy").  This Section 15.1(d) shall not apply if the applicable Delay Event was caused by the exercise by the City of any of its Reserved Powers, it being acknowledged and agreed that the Concessionaire's remedy in such case shall be as provided in Article 7 or Section 14.3.

(e)     If the Concessionaire elects to exercise the right to the Delay Event Remedy, the Concessionaire shall give notice ("Delay Event Notice") to the City within 30 Days following the date on which the Concessionaire first became aware of its right to the Delay Event Remedy occurring setting forth (i) the details of the Delay Event and its effect on either causing physical damage or destruction to the Metered Parking System that results in the Metered Parking System being substantially unavailable for the provision of Metered Parking Services or suspending the collection of Metered Parking Fees at the Metered Parking System, (ii) the amount claimed as compensation to restore the Concessionaire to the same economic position as it would have been in had such Delay Event not occurred (including the details of the calculation thereof) and (iii) the details of the relationship between such compensation and the Delay Event Remedy that it proposes.  The City shall, after receipt of the Delay Event Notice, be entitled by notice to require the Concessionaire to provide such further supporting particulars as the City may reasonably consider necessary.  If the City wishes to dispute the occurrence of a Delay Event or the Delay Event Remedy claimed in the Delay Event Notice, the City shall give notice to dispute (the "Delay Event Dispute Notice") to the Concessionaire within 30 Days following the date of receipt of the Delay Event Notice stating the grounds for such dispute, and if neither the Delay Event Notice nor the Delay Event Dispute Notice has been withdrawn within 30 Days following the date of receipt of the Delay Event Dispute Notice by the Concessionaire, the matter shall be submitted to the dispute resolution procedure in Article 19.

**Section 15.2.  Relationship to Compensation Event**.  Section 15.1 shall not prevent the Concessionaire from receiving Concession Compensation or any other compensation from the City provided for in this Agreement for any Delay Event that constitutes a Compensation Event pursuant to the terms of this Agreement.

**Section 15.3.  Payment of Concession Compensation.**

(a)     Except as provided elsewhere in this Agreement, if a Compensation Event occurs, the Concessionaire shall give notice (the "CE-Preliminary Notice") to the City within 30 Days following the date on which the Concessionaire first became aware of the Compensation Event stating that a Compensation Event has occurred.  Within 30 Days following the date of delivery of the CE-Preliminary Notice, the Concessionaire shall give the City another notice (the "CE-Notice") setting forth (i) details of the Compensation Event, including an explanation of the reasons that the event constitutes a Compensation Event under the terms of this Agreement and (ii) the amount claimed as Concession Compensation and details of the calculation thereof in accordance with the calculation methodology set forth in the definition of "Concession Compensation"; *provided*, that the failure by the Concessionaire to timely deliver the CE-Preliminary Notice or the CE-Notice shall not limit its remedies hereunder or otherwise reduce the amount of the Concession Compensation.

(b)     All Concession Compensation due to the Concessionaire shall be due and payable by the City within 30 Days of the CE-Notice.

(c)     If the City wishes to dispute the occurrence of a Compensation Event or the amount of Concession Compensation claimed in the CE-Notice issued by the Concessionaire in accordance with Section 15.3(a), then the City shall give notice of dispute (the "CE-Dispute Notice") to the Concessionaire within 30 Days following the date of receipt of the CE-Notice

stating the grounds for such dispute.  If the CE-Dispute Notice has not been withdrawn within 30 Days following the date of receipt of the CE-Dispute Notice by the Concessionaire, the matter shall be submitted to the dispute resolution procedure set forth in Article 19.  Notwithstanding the foregoing, the City shall pay to the Concessionaire any undisputed portion of the Concession Compensation in accordance with the terms of this Agreement during the pendency of any dispute regarding a disputed portion of the Concession Compensation.

# ARTICLE  16
# DEFAULTS; LETTERS OF CREDIT

### Section 16.1.  Default by the Concessionaire.

(a)    *Events of Default*.  The occurrence of any one or more of the following events during the Term shall constitute a "Concessionaire Default" under this Agreement:

(i)    if the Concessionaire fails to comply with, perform or observe any material obligation, covenant, agreement, term or condition in this Agreement, and such failure continues unremedied for a period of 90 Days following notice thereof (giving particulars of the failure in reasonable detail) from the City to the Concessionaire or for such longer period as may be reasonably necessary to cure such failure, *provided*, in the latter case, that the Concessionaire has demonstrated to the satisfaction of the City, acting reasonably, that (A) it is proceeding, and will proceed, with all due diligence to cure or cause to be cured such failure, (B) its actions can be reasonably expected to cure or cause to be cured such failure within a reasonable period of time acceptable to the City, acting reasonably and (C) such failure is in fact cured within such period of time;

(ii)    if this Agreement or all or any portion of the Concessionaire Interest is Transferred in contravention of Article 17 and such Transfer or action continues unremedied for a period of 10 Business Days following notice thereof from the City to the Concessionaire;

(iii)    if the Concessionaire fails to comply with the requirements or directives of a final award in a matter submitted to dispute resolution in accordance with Article 19, and such failure continues unremedied for a period of 30 Days following notice thereof from the City to the Concessionaire, or for such longer period as may be reasonably necessary to cure such failure, *provided*, in the latter case, that the Concessionaire has demonstrated to the satisfaction of the City, acting reasonably, that (A) it is proceeding, and will proceed, with all due diligence to cure or cause to be cured such failure, (B) its actions can be reasonably expected to cure or cause to be cured such failure within a reasonable period of time acceptable to the City, acting reasonably and (C) such failure is in fact cured within such period of time;

(iv)    if the Concessionaire (A) admits, in writing, that it is unable to pay its debts as such become due, (B) makes an assignment for the benefit of creditors, (C) files a voluntary petition under Title 11 of the U.S. Code, or if such petition is filed against it and an order for relief is entered, or if the Concessionaire files any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future U.S. bankruptcy code or any other present or future applicable Law, or shall seek or consent to or acquiesce in or suffer

the appointment of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of the Concessionaire or of all or any substantial part of its properties or of the Metered Parking System or any interest therein, or (D) takes any corporate action in furtherance of any action described in this Section 16.1(a)(iv);

(v)     if within 90 Days after the commencement of any proceeding against the Concessionaire seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future U.S. bankruptcy code or any other present or future applicable Law, such proceeding has not been dismissed, or if, within 90 Days after the appointment, without the consent or acquiescence of the Concessionaire, of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of the Concessionaire or of all or any substantial part of its properties or of the Metered Parking System or any interest therein, such appointment has not been vacated or stayed on appeal or otherwise, or if, within 90 Days after the expiration of any such stay, such appointment has not been vacated;

(vi)     if a levy under execution or attachment has been made against all or any part of the Metered Parking System or any interest therein as a result of any Encumbrance (other than a Permitted Concessionaire Encumbrance) created, incurred, assumed or suffered to exist by the Concessionaire or any Person claiming through it, and such execution or attachment has not been vacated, removed or stayed by court order, bonding or otherwise within 60 Days after the Concessionaire becomes aware of such levy, unless such levy resulted from actions or omissions of the City or its Representatives; or

(vii)     the Concessionaire repudiates in writing any of its material obligations under this Agreement.

(b)     *Remedies of the City Upon Concessionaire Default*.  Upon the occurrence, and during the continuance, of a Concessionaire Default, the City may, by notice to the Concessionaire with a copy to the Collateral Assignee in accordance with the terms hereof, declare the Concessionaire to be in default and may, subject to the provisions of Articles 18 and 19, do any or all of the following as the City, in its discretion, shall determine:

(i)     the City may terminate this Agreement by giving 30 Days' prior notice to the Concessionaire upon the occurrence of (A) a Concessionaire Default that consists of a failure to comply with, perform or observe any Operating Standard if such Concessionaire Default creates a material danger to the safety of Metered Parking System Operations or a material impairment to the Metered Parking System or to the continuing use of the Metered Parking System or (B) any other Concessionaire Default; *provided, however*, that the Concessionaire shall be entitled to cure a Concessionaire Default pursuant to Section 16.1(a)(i) by providing the City with a written work plan within such 30-Day period outlining the actions by which the Concessionaire will ensure future compliance with either (x) the obligation, covenant, agreement, term or condition in this Agreement or (y) the requirements or directives of the issued final award in accordance with Article 19 that the Concessionaire failed to perform or observe, which work plan is Approved by the City, but any failure of the Concessionaire to comply in any material respect with such Approved work plan following 30 Days' notice of such failure from the City to the Concessionaire shall be deemed to be a Concessionaire Default described in

- 113 -

Section 16.1(a)(i) and the entitlement of the Concessionaire to cure such Concessionaire Default by the delivery of an Approved work plan shall not apply thereto;

(ii)     if the Concessionaire Default is by reason of the failure to pay any monies, the City may (without obligation to do so) make payment on behalf of the Concessionaire of such monies, and any amount so paid by the City shall be payable by the Concessionaire to the City within three Business Days after demand therefor;

(iii)     the City may cure the Concessionaire Default (but this shall not obligate the City to cure or attempt to cure a Concessionaire Default or, after having commenced to cure or attempted to cure a Concessionaire Default, to continue to do so), and all costs and expenses reasonably incurred by the City in curing or attempting to cure the Concessionaire Default, together with an administrative fee equal to 15% of such costs and expenses, shall be payable by the Concessionaire to the City within three Business Days after written demand therefor; *provided, however*, that (A) the City shall not incur any liability to the Concessionaire for any act or omission of the City or any other Person in the course of remedying or attempting to remedy any Concessionaire Default and (B) the City's cure of any Concessionaire Default shall not affect the City's rights against the Concessionaire by reason of the Concessionaire Default;

(iv)     the City may seek specific performance, injunction or other equitable remedies, it being acknowledged that damages are an inadequate remedy for a Concessionaire Default;

(v)     the City may seek to recover its Losses arising from such Concessionaire Default and any amounts due and payable under this Agreement and, in connection therewith, exercise any recourse available to any Person who is owed damages or a debt;

(vi)     with respect to those Concessionaire Defaults that entitle the City to terminate this Agreement pursuant to Section 16.1(b)(i), the City may terminate the Concessionaire's right to use, operate, maintain and rehabilitate the Metered Parking System and the Concessionaire's right to collect and retain Metered Parking Revenues, and in such event, the City or the City's agents and servants may immediately or at any time thereafter take possession and control of the Metered Parking System by any available action under law or proceeding at law or in equity, and with or without terminating this Agreement, and undertake any and all of the Metered Parking System Operations; *provided, however,* that no such action by the City shall be construed as an election on its part to terminate this Agreement unless a notice of such intention is given to the Concessionaire; *provided further* that any re-possession of the Metered Parking System or termination of this Agreement made in accordance with this Agreement as against the Concessionaire shall be valid and effective against the Concessionaire even though made subject to the rights of a Collateral Assignee to cure any default of the Concessionaire and continue as in the place of the Concessionaire under this Agreement or a new concession agreement as provided herein; and

(vii)     the City may exercise any of its other rights and remedies provided for hereunder or at law or equity.

**Section 16.2.  Defaults by the City**.

- 114 -

(a)    *Events of Default*.  The occurrence of any one or more of the following events during the Term shall constitute a "City Default" under this Agreement:

(i)    if the City fails to comply with or observe any material obligation, covenant, agreement, term or condition in this Agreement (other than an Adverse Action or a Reserved Powers Adverse Action) and such failure continues unremedied for a period of 90 Days following notice thereof (giving particulars of the failure in reasonable detail) from the Concessionaire to the City or for such longer period as may be reasonably necessary to cure such failure; *provided, however,* in the latter case, that the City has demonstrated to the satisfaction of the Concessionaire, acting reasonably, that (A) it is proceeding with all due diligence to cure or cause to be cured such failure, and (B) its actions can be reasonably expected to cure or cause to be cured such failure within a reasonable period of time acceptable to the Concessionaire, acting reasonably and (C) such failure is in fact cured within such period of time;

(ii)    if the City fails to comply with the requirements or directives of a final award in a matter submitted to dispute resolution in accordance with Article 19 and such default continues unremedied for a period of 30 Days following notice thereof from the Concessionaire to the City, or for such longer period as may be reasonably necessary to cure such failure, *provided*, in the latter case, that the City has demonstrated to the satisfaction of the Concessionaire, acting reasonably, that (A) it is proceeding, and will proceed, with all due diligence to cure or cause to be cured such failure, (B) its actions can be reasonably expected to cure or cause to be cured such failure within a reasonable period of time acceptable to the Concessionaire, acting reasonably and (C) such failure is in fact cured within such period of time;

(iii)    if a levy under execution or attachment has been made against all or any part of the Metered Parking System including the Parking Lots or the Concessionaire Interest as a result of any Encumbrance (other than a Permitted City Encumbrance) created, incurred, assumed or suffered to exist by the City or any Person claiming through it, and such execution or attachment has not been vacated, removed or stayed by court order, bonding or otherwise within a period of 60 Days, unless such levy resulted from actions or omissions of the Concessionaire or its Representatives or if all or a material part of the Metered Parking System shall be subject to a condemnation or similar taking by the City or any agency thereof;

(iv)    if the City (A) admits, in writing, that it is unable to pay its debts as such become due, (B) makes an assignment for the benefit of creditors, (C) files a voluntary petition under Title 9 of the U.S. Code, or if such petition is filed against it and an order for relief is entered, or if the City files any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future U.S. bankruptcy code or any other present or future applicable Law, or shall seek or consent to or acquiesce in or suffer the appointment of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of the City, or of all or any substantial part of its properties (in each case, to the extent applicable to a municipality), or (D) takes any action in furtherance of any action described in this Section 16.2(a)(iv); or if within 90 Days after the commencement of any proceeding against the City seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future U.S. bankruptcy code or any other present or future applicable Law, such

proceeding has not been dismissed, or if, within 90 Days after the appointment, without the consent or acquiescence of the City, of any trustee, receiver, custodian, assignee, sequestrator, liquidator or other similar official of the City or of all or any substantial part of its properties (in each case, to the extent applicable to a municipality), such appointment has not been vacated or stayed on appeal or otherwise, or if, within 90 Days after the expiration of any such stay, such appointment has not been vacated;

      (v)    if (A) a court of competent jurisdiction enters a final and unappealable judgment order against the City in any action, suit or proceeding brought against the City, which action, suit or proceeding was not brought by or supported in any way by the Concessionaire, any Operator, any Representative, any Collateral Assignee or any other Person acting on behalf of any of the foregoing or any other Person having an pecuniary interest in this Agreement, and (B) as a result of such final and unappealable judgment order (i) it becomes unlawful for the City to comply with or observe any material obligation, covenant, agreement, term or condition in this Agreement or (ii) any material obligation, covenant, agreement, term or condition of the City under this Agreement becomes unenforceable against the City; and (C) the Parties, acting in good faith and within a reasonable time, are unable to reform this Agreement to conform to the requirements of such judgment order; provided that the entry of such judgment order shall not constitute a City Default if, within 180 Days following the entry of such judgment order, (i) a Law is enacted that validates or confirms the lawful authority of the City, or grants to the City the lawful authority, to perform its contractual obligations under this Agreement notwithstanding such judgment order or otherwise remedies the City Default and (ii) the City reimburses the Concessionaire for any unreimbursed Losses attributable to such judgment order and accrued during the period from the date of entry of such judgment order to the date of enactment of such Law; or

      (vi)    the City repudiates in writing any of its material obligations under this Agreement.

    (b)    *Remedies of Concessionaire Upon City Default*.  Upon the occurrence, and during the continuance, of a City Default, the Concessionaire may by notice to the City declare the City to be in default and may, subject to the provisions of Article 19, do any or all of the following as the Concessionaire, in its discretion, shall determine:

      (i)    the Concessionaire may terminate this Agreement by giving 30 Days' prior notice to the City; *provided, however*, that the City shall be entitled to cure a City Default pursuant to Section 16.2(a)(i) by (i) agreeing within such 30-Day period to pay any Losses sustained as a result of such City Default or (ii) providing the Concessionaire with a written work plan within such 30-Day period outlining the actions by which the City will ensure future compliance with either (x) the obligation, covenant, agreement, term or condition in this Agreement or (y) the requirements or directives of the issued final award in accordance with Article 19 that the City failed to perform or observe, which work plan is approved by the Concessionaire (which approval shall not be unreasonably withheld, delayed or conditioned), but any failure of the City to comply in any material respect with such approved work plan following 30 Days' notice of such failure from the Concessionaire to the City shall be deemed to be a City Default described in Section 16.2(a)(i) and the entitlement of the City to cure such City Default by the delivery of an approved work plan shall not apply thereto; and upon such termination the

- 116 -

City shall be obligated to pay to the Concessionaire the Metered Parking System Concession Value plus, without duplication, the reasonable out-of-pocket and documented costs and expenses incurred by the Concessionaire as a result of such termination;

(ii)     the Concessionaire may exercise any of its rights or remedies at law or in equity; and

(iii)     the Concessionaire may seek to recover its Losses and any amounts due and payable under this Agreement and, in connection therewith, exercise any recourse available to any Person who is owed damages or a debt.

**Section 16.3.  Letters of Credit**.

(a)     The Concessionaire shall deliver no later than the first day of the Concession Year that is five years prior to the final Concession Year of the Term, a Letter of Credit in the amount then to be calculated equal to the amount that the City reasonably determines is appropriate to cover all costs of capital improvements for the remainder of the Term as set forth in the Concessionaire's capital improvement program required pursuant to the Operating Standards.

(b)     Such Letter of Credit shall be replaced on every anniversary of such Concession Year until the date that is two years after (i) the expiration of the Term and (ii) such time as there being no unresolved disputes with respect to the Concessionaire complying with, performing or observing any obligation, covenant, agreement, term or condition in this Agreement with a Replacement Letter of Credit in the amount of the undrawn balance of such Letter of Credit plus the amount of interest that would have been earned on such balance if invested for the next 12-month period at the Bank Rate.  Subject to Approval, the required amount of any Letter of Credit with respect to a Concession Year (but only with respect to such Concession Year) may be reduced from time to time (at intervals that may be shorter than one year) by the amount that the City reasonably determines is appropriate such that the amount of the Letter of Credit remains sufficient to cover all costs of capital improvements for the remainder of the Term in light of the condition of the Metered Parking System (including the City's assessment of the present and future condition of the Metered Parking System, and all costs and expenses of capital improvements to be performed in connection therewith, during the remaining years of the Term) and the Concessionaire's compliance with this Agreement in connection therewith.  Upon the occurrence of a Concessionaire Default (or if there is a dispute as to the occurrence of a Concessionaire Default, upon the final decision of the arbitral panel pursuant to Article 19 that a Concessionaire Default has occurred), the City shall have the right (in addition to all other rights and remedies provided in this Agreement, but with the understanding that any other monetary damages that the City may recover will be reduced by the amount so drawn, and without the City's exercise of such right being deemed a waiver or a cure of the Concessionaire's failure to perform and whether or not this Agreement is thereby terminated), with three Business Days' prior notice to the Concessionaire, to draw against such Letter of Credit or any replacement thereof, upon presentation of a sight draft and a certificate confirming that the City has the right to draw under such Letter of Credit in the amount of such sight draft, up to the amount due to the City with respect to such Concessionaire Default.

(c)     The Concessionaire shall replace each Letter of Credit with a replacement Letter of Credit (the "Replacement Letter of Credit") at least 30 Days prior to the expiry date of a Letter of Credit which is expiring.  If the Concessionaire does not deliver to the City a Replacement Letter of Credit within such time period, the City shall have the right (in addition to all other rights and remedies provided in this Agreement and without the City's exercise of such right being deemed a waiver or a cure of the Concessionaire's failure to perform and whether or not this Agreement is thereby terminated) to immediately draw the full amount of the Letter of Credit upon presentation of a sight draft and a certificate confirming that the City has the right to draw under such Letter of Credit in the amount of such sight draft.  After the Concessionaire delivers to the City a Replacement Letter of Credit complying with the provisions of this Agreement, the City shall deliver in accordance with the Concessionaire's reasonable instructions the Letter of Credit being replaced (except to the extent that at such time no sight draft under such Letter of Credit is outstanding and unpaid).  Any Replacement Letter of Credit shall be upon the same terms and conditions as the Letter of Credit replaced and satisfy the requirements for a Letter of Credit, but in any event (i) the amount of each Replacement Letter of Credit, except as provided in Section 16.3(a), shall equal or exceed the amount of the Letter of Credit being replaced at the time of replacement and (ii) the date of the Replacement Letter of Credit shall be its date of issuance.  The expiry date of the Replacement Letter of Credit, as referred to in the opening paragraph of such Replacement Letter of Credit, shall be not earlier than one year later than the expiry date of the Letter of Credit being replaced.

(d)     If this Agreement is terminated by the City prior to the expiration of the Term as a result of a Concessionaire Default, the City shall have the right (in addition to all other rights and remedies provided in this Agreement and without the City's exercise of such right being deemed a waiver or a cure of the Concessionaire's failure to perform), with three Business Days' prior notice to the Concessionaire, to draw against any Letter of Credit, upon presentation of a sight draft and a certificate confirming that the City has the right to draw under such Letter of Credit in the amount of such sight draft, up to the amount due to the City pursuant to the terms of this Agreement.

(e)     The City will accept the Letters of Credit to be delivered pursuant to this Section 16.3 (and pursuant to Section 2.3) as security for the Concessionaire's obligations under this Agreement, in place of a cash deposit in the same amount, with the understanding that the Letters of Credit are to be the functional equivalent of a cash deposit.  The Concessionaire's sole remedy in connection with the improper presentment or payment of sight drafts drawn under the Letter of Credit shall be the right to obtain from the City a refund of the amount of any sight draft the proceeds of which were drawn inappropriately or misapplied and the reasonable costs incurred by the Concessionaire as a result of such inappropriate draw or misapplication; *provided, however*, that at the time of such refund, the Concessionaire increases the amount of the Letter of Credit to the amount (if any) then required under the applicable provisions of this Agreement. The Concessionaire acknowledges that the presentment of sight drafts drawn under the Letter of Credit could not under any circumstances cause the Concessionaire injury that could not be remedied by an award of money damages, and that the recovery of money damages would be an adequate remedy therefor.  The Concessionaire shall not request or instruct the issuer of the Letter of Credit to refrain from paying any sight draft drawn under a Letter of Credit.

(f)     If the City desires to assign its rights and obligations in accordance with Section 17.2 of this Agreement, the Concessionaire shall cooperate so that concurrently with the effectiveness of such assignment, either Replacement Letters of Credit as described in Section 16.3(c) for, or appropriate amendments to, the Letters of Credit then held by the City, in either case identifying as beneficiary the appropriate party after the assignment becomes effective, shall be delivered to the City, at no cost to the Concessionaire.

(g)     The Concessionaire shall obtain and furnish all Letters of Credit and Replacement Letters of Credit at its sole cost and expense and shall pay all charges imposed in connection with the City's presentation of sight drafts and drawing against the Letters of Credit or Replacement Letters of Credit.

(h)     In lieu of any Letter of Credit to be provided by the Concessionaire pursuant to the terms of this Section 16.3, the Concessionaire shall, at the Concessionaire's sole discretion, have the option to provide a surety bond or other similar form of security or to deposit with a Depositary for the benefit of the City, as collateral security, cash or Eligible Investments in an amount equal to the amount of such Letter of Credit at the time of such deposit.  Such Depositary shall invest and reinvest such amounts in Eligible Investments at the direction of the City, *provided* that earnings thereon shall be paid to the Concessionaire not less frequently than quarterly.  If, at any time during the Term, the City would have the right to draw any amount on a Letter of Credit for which the Concessionaire has substituted cash or Eligible Investments pursuant to this Section 16.3(h), the Depositary shall pay such amount to the City from such cash deposit or Eligible Investments in accordance with the terms of this Section 16.3 and all rights and remedies of the City and the Concessionaire with respect to such cash deposits or Eligible Investments, if any, shall be the same as those provided in this Section 16.3 with respect to any Letter of Credit; *provided, however*, that the certification that would have been provided by the City with the sight draft had cash or Eligible Investments not been so substituted shall be made to the Depositary and delivered to the Depositary together with the City's written demand for payment.

(i)     If Letters of Credit shall not in the future be available at commercially reasonable terms and rates or shall not be a commercially reasonable form of security in similar transactions, the Concessionaire shall furnish the City with comparable security instruments or Eligible Investments that then are commonly used in similar transactions and which are Approved; and if no such comparable security instruments shall be available, the Concessionaire shall deposit with the City cash as security.

**Section 16.4.  Consequences of Termination or Reversion**.  Upon the termination or expiration of this Agreement, notwithstanding any claims the Parties may have against each other and subject to Section 16.1(b)(v), Section 16.2(b)(iii) and Article 18, the following provisions shall apply:

(a)     the Concessionaire shall, without action whatsoever being necessary on the part of the City, well and truly surrender, transfer and deliver to the City the Metered Parking System (including all improvements to the Metered Parking System), the Metered Parking System Assets and all tangible and intangible personal property of the Concessionaire (including inventories) that is included in the Metered Parking System and used in connection with the

Metered Parking System Operations (subject, however, as to any intellectual property included in the Metered Parking System, to any restrictions or prohibitions to disclosure, transfer or sharing thereof and any other rights of third parties with respect thereto), in good order, condition and repair (reasonable wear and tear excepted), determined reasonably in accordance with the then applicable Operating Standards, free and clear of all Encumbrances other than (w) Permitted Concessionaire Encumbrances set forth in clause (iv), clause (vii) and clause (viii) as it pertains to clauses (iv) and (vii) of the definition of that term, (x) Permitted City Encumbrances, (y) those created by or suffered to exist or consented to by the City or any Person claiming through it, and (z) with respect to any property added to the Metered Parking System after the Time of Closing, title defects affecting such property in existence on the date such property is added to the Metered Parking System;

(b)     the Concessionaire hereby waives any notice now or hereafter required by Law with respect to transfer of the Metered Parking System on the Reversion Date;

(c)     the City shall, as of the Reversion Date, assume full responsibility for the Metered Parking System Operations, and as of such date, the Concessionaire shall have no liability or responsibility for Metered Parking System Operations occurring after such date;

(d)     the Concessionaire shall be liable for all costs, expenses and other amounts for which it is liable or responsible hereunder incurred up to but not including the Reversion Date, and the City shall be liable for all costs, expenses and amounts incurred in connection with the Metered Parking System Operations on and after the Reversion Date;

(e)     the City shall have the option by providing notice to the Concessionaire of requiring that the Concessionaire assign, without warranty or recourse to the Concessionaire, to the fullest extent permitted by Authorizations and applicable Law, all of its right, title and interest in, to and under (in each of the following cases, to the extent assignable) all or any of the Operating Agreements then in effect and all Authorizations to the City or its nominee for the remainder of their respective terms; *provided, however*, that if the City exercises such option, the right, title and interest of the Concessionaire in, to and under such Operating Agreements and Authorizations shall be assigned to the City or its nominee as of the Reversion Date and the Concessionaire shall surrender the Metered Parking System to the City and shall cause all Persons claiming under or through the Concessionaire to do likewise, and the City shall assume in writing, pursuant to an assumption agreement satisfactory to the Concessionaire, the Concessionaire's obligations under the Operating Agreements that arise in respect of, or relate to, any period of time falling on and after the Reversion Date; *provided further* that if the City does not exercise such option, the Concessionaire shall, unless the City has granted to a Collateral Assignee or its nominee a new concession agreement containing the same provisions as are contained in this Agreement, take such steps as are necessary to terminate the Operating Agreements to the extent permitted thereunder and in accordance with the terms thereof;

(f)     the Concessionaire, at its sole cost and expense, shall promptly deliver to the City copies of all records and other documents relating to the Metered Parking Revenues that are in the possession of the Concessionaire or its Representatives and all other then existing records and information relating to the Metered Parking System as the City, acting reasonably, may request;

(g)     the Concessionaire shall execute and deliver to the City a transfer of title documents and other instruments reasonably required by the City to evidence such termination;

(h)     the Concessionaire shall assist the City in such manner as the City may require to ensure the orderly transition of control, operation, management, maintenance and rehabilitation of the Metered Parking System, and shall, if appropriate and if requested by the City, take all steps as may be necessary to enforce the provisions of the Operating Agreements pertaining to the surrender of the Metered Parking System;

(i)     the City and the Concessionaire shall make appropriate adjustments, including adjustments relating to any Operating Agreements assigned to the City, Metered Parking Fees and other similar charges collected on and after the Reversion Date that are incurred prior to the Reversion Date, and utilities, and any adjustments and payment therefor shall be made by the appropriate Party on the Reversion Date, but shall be subject to readjustment if necessary because of error in matters such as information, calculation, payments and omissions that are identified within the period of 180 Days following the Reversion Date; *provided, however*, that the City and the Concessionaire acknowledge that certain adjustments or readjustments may have to be made when a third party provides to the City or the Concessionaire a final adjustment amount in respect of a matter, and for such matters the adjustment and readjustment date shall each be correspondingly extended; and

(j)     if this Agreement is terminated as a result of an Adverse Action or a Reserved Powers Adverse Action, the payment by the City to the Concessionaire of the amounts required under Article 14 or Article 19 shall constitute full and final settlement of any and all Claims the Concessionaire may have against the City for and in respect of the termination of this Agreement and upon such payment, the Concessionaire shall execute and deliver all such releases and discharges as the City may reasonably require to give effect to the foregoing.

This Section 16.4 shall survive the expiration or any earlier termination of this Agreement.

**Section 16.5.  Termination Other Than Pursuant to Agreement**.  If this Agreement is terminated by the City other than pursuant to Section 16.1 or is canceled, rescinded or voided during the Term for any reason over the objection and without action by the Concessionaire, any Collateral Assignee and their respective Affiliates, the City shall pay to the Concessionaire the Metered Parking System Concession Value as of the date of such termination, cancellation, rescinding or voiding, plus, without duplication, the reasonable out-of-pocket and documented costs and expenses incurred by the Concessionaire as a direct result of such termination, cancellation, rescinding or voiding.  The City hereby acknowledges and agrees that it may only terminate this Agreement in accordance with the express terms hereof and shall not, in any event, have the right to terminate this Agreement for convenience.

## ARTICLE  17
## RESTRICTIONS ON TRANSFERS

**Section 17.1.  Transfers by the Concessionaire.**

- 121 -

(a)     The Concessionaire shall not Transfer, or otherwise permit the Transfer of, any or all of the Concessionaire Interest to or in favor of a Transferee, unless (i) the City has Approved (based upon a determination in accordance with Section 17.1(b)) such proposed Transferee (unless it is a Collateral Assignee permitted under Article 18) and (ii) the proposed Transferee (unless it is a Collateral Assignee permitted under Article 18) enters into an agreement with the City in form and substance satisfactory to the City, acting reasonably, wherein the Transferee acquires the rights and assumes the obligations of the Concessionaire and agrees to perform and observe all of the obligations and covenants of the Concessionaire under this Agreement.  Any Transfer made in violation of the foregoing provision shall be null and void ab initio and of no force and effect.

(b)     Approval of a proposed Transferee may be withheld if the City reasonably determines that (i) such proposed Transfer is prohibited by applicable Law, (ii) such proposed Transferee's entering into this Agreement with the City is prohibited by Law, (iii) such proposed Transfer would result in a violation of Law, (iv) such proposed Transfer would result in a Tax liability to the City (unless the City shall have received indemnification, as determined in the City's discretion, with respect thereto) or (v) such proposed Transferee is not capable of performing the obligations and covenants of the Concessionaire under this Agreement, which determination shall be based upon and take into account the following factors:  (a) the financial strength and integrity of the proposed Transferee, its direct or indirect beneficial owners, any proposed managers or operating partners and each of their respective Affiliates; (b) the experience of the proposed Transferee or the Operator to be engaged by the proposed Transferee in operating metered parking systems and performing other relevant projects; (c) the background and reputation of the proposed Transferee, its direct or indirect beneficial owners, any proposed managers or operating partners, each of their respective officers, directors and employees and each of their respective Affiliates (including the absence of criminal, civil or regulatory claims or actions against any such Person and the quality of any such Person's past or present performance on other projects); and (d) the Operator engaged by the proposed Transferee, including the ability of the Operator to meet the operating standards.

(c)     No Transfer of all or any of the Concessionaire Interest (except a Transfer to a Collateral Assignee or its nominee upon its exercise of remedies under its Collateral Assignment and a subsequent transfer to the transferee of the Collateral Assignee that has been Approved under Section 17.1(b)) shall be made or have any force or effect if, at the time of such Transfer there has occurred a Concessionaire Default that has not been remedied or an event that with the lapse of time, the giving of notice or otherwise would constitute a Concessionaire Default.

(d)     A Change in Control of the Concessionaire shall be deemed to be a Transfer of the Concessionaire Interest for purposes of the foregoing provisions.

(e)     Nothing contained in the foregoing shall be deemed to prohibit or limit the Concessionaire from changing its organizational form or status (including a change from a limited liability company to a corporation or limited partnership), *provided* that such change in organizational form or status does not result in a Change of Control of the Concessionaire.

(f)     Neither (i) a change of ownership that is attributable to a concession, management agreement, operating agreement or other similar arrangement that is subject and subordinate in

- 122 -

all respects to the rights of the City under this Agreement, nor (ii) the creation of a trust or any other transaction or arrangement that is solely a transfer of all or part of the Concessionaire's economic interest under this Agreement to another entity shall be deemed to be a Transfer of the Concessionaire Interest for purposes of <u>Section 17.1(a)</u>.

Section 17.2.  **Assignment by the City**.  The City shall have the right to Transfer any or all of the City's interest in the Metered Parking System and this Agreement, *provided* that it shall be jointly and severally liable with the Transferee for the performance and observance of the obligations and covenants of the City under this Agreement and any agreement entered into by the City under this Agreement (including agreeing directly with any Collateral Assignee to be bound by the agreement entered into in accordance with <u>Section 18.3</u>) and that any such Transfer by the City shall not materially limit or reduce any of the Concessionaire's other rights, benefits, remedies or privileges under this Agreement.

## ARTICLE 18
## LENDER'S RIGHTS AND REMEDIES

Section 18.1.  **Collateral Assignments**.  The Concessionaire shall have the right, at its sole cost and expense, to execute and deliver one or more (subject to <u>Section 18.7</u>) Collateral Assignments, if at the time any such Collateral Assignment is executed and delivered to the Collateral Assignee, no Concessionaire Default exists unless any such Concessionaire Default will be cured pursuant to <u>Section 18.3</u> in connection with entering into such Collateral Assignment, and upon and subject to the following terms and conditions:

(a)     a Collateral Assignment may not cover any property of, or secure any debt issued or guaranteed by, any Person other than the Concessionaire (including any debt guaranteed by the Concessionaire in accordance with <u>Section 3.6</u>), but may cover shares or equity interests in the capital of the Concessionaire and any cash reserves or deposits held in the name of the Concessionaire;

(b)     no Person other than an Institutional Lender shall be entitled to the benefits and protections accorded to a Collateral Assignee in this Agreement; *provided, however*, that lenders to the Concessionaire (and lenders to the Collateral Assignee as successor in interest to the Concessionaire under this Agreement) may be Persons other than Institutional Lenders so long as any Collateral Assignment securing the loans made by such Persons is held by an Institutional Lender acting as collateral agent or trustee;

(c)     no Collateral Assignment or other instrument purporting to pledge, encumber, or create a lien, charge or security interest on or against any or all of the Concessionaire Interest shall extend to or affect the fee simple interest in the Parking Lots, the City's interest hereunder or its reversionary interest and estate in and to the Metered Parking System or any part thereof;

(d)     the City shall have no liability whatsoever for payment of the principal sum secured by any Collateral Assignment, or any interest accrued thereon or any other sum secured thereby or accruing thereunder, and, except for violation by the City of express obligations set forth herein, the Collateral Assignee shall not be entitled to seek any damages or other amounts against the City for any or all of the same;

(g)     the Concessionaire shall execute and deliver to the City a transfer of title documents and other instruments reasonably required by the City to evidence such termination;

(h)     the Concessionaire shall assist the City in such manner as the City may require to ensure the orderly transition of control, operation, management, maintenance and rehabilitation of the Metered Parking System, and shall, if appropriate and if requested by the City, take all steps as may be necessary to enforce the provisions of the Operating Agreements pertaining to the surrender of the Metered Parking System;

(i)     the City and the Concessionaire shall make appropriate adjustments, including adjustments relating to any Operating Agreements assigned to the City, Metered Parking Fees and other similar charges collected on and after the Reversion Date that are incurred prior to the Reversion Date, and utilities, and any adjustments and payment therefor shall be made by the appropriate Party on the Reversion Date, but shall be subject to readjustment if necessary because of error in matters such as information, calculation, payments and omissions that are identified within the period of 180 Days following the Reversion Date; *provided, however*, that the City and the Concessionaire acknowledge that certain adjustments or readjustments may have to be made when a third party provides to the City or the Concessionaire a final adjustment amount in respect of a matter, and for such matters the adjustment and readjustment date shall each be correspondingly extended; and

(j)     if this Agreement is terminated as a result of an Adverse Action or a Reserved Powers Adverse Action, the payment by the City to the Concessionaire of the amounts required under Article 14 or Article 19 shall constitute full and final settlement of any and all Claims the Concessionaire may have against the City for and in respect of the termination of this Agreement and upon such payment, the Concessionaire shall execute and deliver all such releases and discharges as the City may reasonably require to give effect to the foregoing.

This Section 16.4 shall survive the expiration or any earlier termination of this Agreement.

**Section 16.5.  Termination Other Than Pursuant to Agreement**.  If this Agreement is terminated by the City other than pursuant to Section 16.1 or is canceled, rescinded or voided during the Term for any reason over the objection and without action by the Concessionaire, any Collateral Assignee and their respective Affiliates, the City shall pay to the Concessionaire the Metered Parking System Concession Value as of the date of such termination, cancellation, rescinding or voiding, plus, without duplication, the reasonable out-of-pocket and documented costs and expenses incurred by the Concessionaire as a direct result of such termination, cancellation, rescinding or voiding.  The City hereby acknowledges and agrees that it may only terminate this Agreement in accordance with the express terms hereof and shall not, in any event, have the right to terminate this Agreement for convenience.

## ARTICLE  17
## RESTRICTIONS ON TRANSFERS

**Section 17.1.  Transfers by the Concessionaire.**

(a)     The Concessionaire shall not Transfer, or otherwise permit the Transfer of, any or all of the Concessionaire Interest to or in favor of a Transferee, unless (i) the City has Approved (based upon a determination in accordance with Section 17.1(b)) such proposed Transferee (unless it is a Collateral Assignee permitted under Article 18) and (ii) the proposed Transferee (unless it is a Collateral Assignee permitted under Article 18) enters into an agreement with the City in form and substance satisfactory to the City, acting reasonably, wherein the Transferee acquires the rights and assumes the obligations of the Concessionaire and agrees to perform and observe all of the obligations and covenants of the Concessionaire under this Agreement.  Any Transfer made in violation of the foregoing provision shall be null and void ab initio and of no force and effect.

(b)     Approval of a proposed Transferee may be withheld if the City reasonably determines that (i) such proposed Transfer is prohibited by applicable Law, (ii) such proposed Transferee's entering into this Agreement with the City is prohibited by Law, (iii) such proposed Transfer would result in a violation of Law, (iv) such proposed Transfer would result in a Tax liability to the City (unless the City shall have received indemnification, as determined in the City's discretion, with respect thereto) or (v) such proposed Transferee is not capable of performing the obligations and covenants of the Concessionaire under this Agreement, which determination shall be based upon and take into account the following factors:  (a) the financial strength and integrity of the proposed Transferee, its direct or indirect beneficial owners, any proposed managers or operating partners and each of their respective Affiliates; (b) the experience of the proposed Transferee or the Operator to be engaged by the proposed Transferee in operating metered parking systems and performing other relevant projects; (c) the background and reputation of the proposed Transferee, its direct or indirect beneficial owners, any proposed managers or operating partners, each of their respective officers, directors and employees and each of their respective Affiliates (including the absence of criminal, civil or regulatory claims or actions against any such Person and the quality of any such Person's past or present performance on other projects); and (d) the Operator engaged by the proposed Transferee, including the ability of the Operator to meet the operating standards.

(c)     No Transfer of all or any of the Concessionaire Interest (except a Transfer to a Collateral Assignee or its nominee upon its exercise of remedies under its Collateral Assignment and a subsequent transfer to the transferee of the Collateral Assignee that has been Approved under Section 17.1(b)) shall be made or have any force or effect if, at the time of such Transfer there has occurred a Concessionaire Default that has not been remedied or an event that with the lapse of time, the giving of notice or otherwise would constitute a Concessionaire Default.

(d)     A Change in Control of the Concessionaire shall be deemed to be a Transfer of the Concessionaire Interest for purposes of the foregoing provisions.

(e)     Nothing contained in the foregoing shall be deemed to prohibit or limit the Concessionaire from changing its organizational form or status (including a change from a limited liability company to a corporation or limited partnership), *provided* that such change in organizational form or status does not result in a Change of Control of the Concessionaire.

(f)     Neither (i) a change of ownership that is attributable to a concession, management agreement, operating agreement or other similar arrangement that is subject and subordinate in

- 122 -

all respects to the rights of the City under this Agreement, nor (ii) the creation of a trust or any other transaction or arrangement that is solely a transfer of all or part of the Concessionaire's economic interest under this Agreement to another entity shall be deemed to be a Transfer of the Concessionaire Interest for purposes of <u>Section 17.1(a)</u>.

**Section 17.2.  Assignment by the City**.  The City shall have the right to Transfer any or all of the City's interest in the Metered Parking System and this Agreement, *provided* that it shall be jointly and severally liable with the Transferee for the performance and observance of the obligations and covenants of the City under this Agreement and any agreement entered into by the City under this Agreement (including agreeing directly with any Collateral Assignee to be bound by the agreement entered into in accordance with <u>Section 18.3</u>) and that any such Transfer by the City shall not materially limit or reduce any of the Concessionaire's other rights, benefits, remedies or privileges under this Agreement.

## ARTICLE  18
## LENDER'S RIGHTS AND REMEDIES

**Section 18.1.  Collateral Assignments**.  The Concessionaire shall have the right, at its sole cost and expense, to execute and deliver one or more (subject to <u>Section 18.7</u>) Collateral Assignments, if at the time any such Collateral Assignment is executed and delivered to the Collateral Assignee, no Concessionaire Default exists unless any such Concessionaire Default will be cured pursuant to <u>Section 18.3</u> in connection with entering into such Collateral Assignment, and upon and subject to the following terms and conditions:

(a)  a Collateral Assignment may not cover any property of, or secure any debt issued or guaranteed by, any Person other than the Concessionaire (including any debt guaranteed by the Concessionaire in accordance with <u>Section 3.6</u>), but may cover shares or equity interests in the capital of the Concessionaire and any cash reserves or deposits held in the name of the Concessionaire;

(b)  no Person other than an Institutional Lender shall be entitled to the benefits and protections accorded to a Collateral Assignee in this Agreement; *provided, however*, that lenders to the Concessionaire (and lenders to the Collateral Assignee as successor in interest to the Concessionaire under this Agreement) may be Persons other than Institutional Lenders so long as any Collateral Assignment securing the loans made by such Persons is held by an Institutional Lender acting as collateral agent or trustee;

(c)  no Collateral Assignment or other instrument purporting to pledge, encumber, or create a lien, charge or security interest on or against any or all of the Concessionaire Interest shall extend to or affect the fee simple interest in the Parking Lots, the City's interest hereunder or its reversionary interest and estate in and to the Metered Parking System or any part thereof;

(d)  the City shall have no liability whatsoever for payment of the principal sum secured by any Collateral Assignment, or any interest accrued thereon or any other sum secured thereby or accruing thereunder, and, except for violation by the City of express obligations set forth herein, the Collateral Assignee shall not be entitled to seek any damages or other amounts against the City for any or all of the same;

(e)    the City shall have no obligation to any Collateral Assignee in the enforcement of the City's rights and remedies herein and by Law provided, except as expressly set forth in this Agreement and unless such Collateral Assignee has provided the City with notice of its Collateral Assignment in accordance with the Collateral Assignee Notice Requirements;

(f)    each Collateral Assignment shall provide that if the Concessionaire is in default under the Collateral Assignment and the Collateral Assignee gives notice of such default to the Concessionaire, then the Collateral Assignee shall give notice of such default to the City;

(g)    subject to the terms of this Agreement, all rights acquired by a Collateral Assignee under any Collateral Assignment shall be subject and subordinate to all of the provisions of this Agreement and to all of the rights of the City hereunder;

(h)    while any Collateral Assignment is outstanding, the City shall not agree to any amendment or modification of this Agreement that could reasonably be expected to have a material adverse effect on the rights or interests of the Collateral Assignee or agree to a voluntary surrender or termination of this Agreement by the Concessionaire without the consent of the Collateral Assignee;

(i)    notwithstanding any enforcement of the security of any Collateral Assignment, the Concessionaire shall remain liable to the City for the payment of all sums owing to the City under this Agreement and the performance and observance of all of the Concessionaire's covenants and obligations under this Agreement; and

(j)    a Collateral Assignee shall not, by virtue of its Collateral Assignment, acquire any greater rights or interest in the Metered Parking System than the Concessionaire has at any applicable time under this Agreement, other than such rights or interest as may be granted or acquired in accordance with Section 18.2, 18.3, 18.4 or 18.5; and each Collateral Assignee, the City and the Concessionaire shall enter into a consent agreement in a form acceptable to all parties; *provided* that such consent agreement shall be in a customary form and shall include the rights and protections provided to the Collateral Assignees in this Agreement.

**Section 18.2.  Notices and Payments to Collateral Assignees**.  Whenever a Collateral Assignment exists as to which the City has been provided notice in accordance with the Collateral Assignee Notice Requirements, the City shall, simultaneously with providing the Concessionaire any required notice under this Agreement, provide a copy of such notice to such Collateral Assignee, and no such notice to the Concessionaire shall be effective against the Collateral Assignee until a copy thereof is duly provided to such Collateral Assignee at its address specified in its notice given to the City in accordance with the Collateral Assignee Notice Requirements (or any subsequent change of address notice given to the City pursuant to the requirements of Section 20.1.).  With respect to a Collateral Assignment regarding which the City has been provided notice in accordance with the Collateral Assignee Notice Requirements, unless the Collateral Assignee has otherwise advised the City in writing, all payments to the Concessionaire to be made by the City under this Agreement shall be made to the institution acting as the collateral agent or depository under the financing secured by such Collateral Assignment.

**Section 18.3.   Collateral Assignee's Right to Cure**.  The Collateral Assignee shall have a period of 60 Days with respect to any Concessionaire Default beyond any cure period expressly provided to the Concessionaire herein, in which to cure or cause to be cured any such Concessionaire Default; *provided, however*, that such 60-Day period shall be extended if the Concessionaire Default may be cured but cannot reasonably be cured within such period of 60 Days, and the Collateral Assignee begins to cure such default within such 60-Day period (or, if possession is necessary in order to effect such cure, the Collateral Assignee commences appropriate lawful action (pursuant to judicial process or otherwise) to take possession or transfer possession (subject to the provisions of Article 17) of the Metered Parking System within 60 Days) and thereafter proceeds with all due diligence to cure such Concessionaire Default (including by proceeding with all due diligence to take possession or effect such transfer) within a reasonable period of time acceptable to the City, acting reasonably; *provided further* that if a Collateral Assignee's right to cure a Concessionaire Default has not expired, and the Collateral Assignee is acting to cure such Concessionaire Default in accordance with this Section 18.3 then the City shall not exercise its right to terminate this Agreement by reason of such Concessionaire Default.   In furtherance of the foregoing, the City shall permit the Collateral Assignee and its Representatives the same access to the Metered Parking System as is permitted to the Concessionaire hereunder.   The City shall accept any such performance by a Collateral Assignee as though the same had been done or performed by the Concessionaire.   Any payment to be made or action to be taken by a Collateral Assignee hereunder as a prerequisite to keeping this Agreement in effect shall be deemed properly to have been made or taken by the Collateral Assignee if such payment is made or action is taken by a nominee, agent or assignee of the rights of such Collateral Assignee.

**Section 18.4.   Rights of the Collateral Assignee.**

(a)     Subject to the provisions of this Agreement including, but not limited to, the Reserved Powers, a Collateral Assignee may (i) enforce its Collateral Assignment in any lawful way, (ii) acquire the Concessionaire Interest in any lawful way or (iii) take control of in any lawful way and manage the Metered Parking System.   Upon exercise of any contractual or statutory power of sale or possession under such Collateral Assignment and subject to the provisions of Article 17 (applied to the Collateral Assignee as if it were the Concessionaire), a Collateral Assignee may Transfer the Concessionaire Interest; *provided, however*, that no Transfer by a Collateral Assignee shall be effective unless the Transfer is made in accordance with Section 17.1.   Any Person to whom the Collateral Assignee Transfers the Concessionaire Interest (including such Collateral Assignee) shall take the Concessionaire Interest subject to any of the Concessionaire's obligations under this Agreement.

(b)     Except as provided in Section 18.3, unless and until a Collateral Assignee (i) forecloses upon or has otherwise taken ownership of the Concessionaire Interest or (ii) has taken possession or control of the Concessionaire Interest, whether directly or by an agent as a mortgagee in possession or a receiver or receiver and manager has taken possession or control of the Concessionaire Interest by reference to the Collateral Assignment, the Collateral Assignee shall not be liable for any of the Concessionaire's obligations under this Agreement or be entitled to any of the Concessionaire's rights and benefits contained in this Agreement, except by way of security.   If the Collateral Assignee itself or by an agent or a receiver or a receiver and manager is the owner, or is in control or possession of, the Concessionaire Interest, it shall be bound by all

- 125 -

liabilities and obligations of the Concessionaire under this Agreement (including the obligation to engage an Operator). Once the Collateral Assignee goes out of ownership, possession or control of the Concessionaire Interest or Transfers the Concessionaire Interest to another Person in accordance with the provisions of this Agreement, the Collateral Assignee shall cease to be liable for any of the Concessionaire's obligations under this Agreement accruing thereafter and shall cease to be entitled to any of the Concessionaire's rights and benefits contained in this Agreement, except, if the Collateral Assignment remains outstanding, by way of security.

**Section 18.5.  City's Termination of this Agreement; New Agreement.**

(a)  Without prejudice to the rights of a Collateral Assignee under Section 18.3, if this Agreement is terminated prior to the expiration of the Term due to a Concessionaire Default (in which case the City shall notify the Collateral Assignee of such termination) or if this Agreement is rejected or disaffirmed pursuant to any bankruptcy Law or proceeding or other similar Law or proceedings affecting creditors' rights generally with respect to a bankruptcy proceeding relating to the Concessionaire or otherwise, the City agrees to enter into a new concession agreement of the Metered Parking System with the Collateral Assignee (or its designee or nominee, *provided* that such designee or nominee either is controlled by the Collateral Assignee or is Approved by the City as Transferee under Section 17.1) for the remainder of the original stated Term upon all of the covenants, agreements, terms, provisions and limitations of this Agreement (the "New Agreement"), effective as of the date of such termination, but only on and subject to the satisfaction of all of the following requirements and conditions:  (i) such Collateral Assignee commits in writing to the City, in a notice delivered to the City, within 30 Days after the City delivers the termination notice to the Collateral Assignee (or, if later, upon the termination of any cure period granted to the Collateral Assignee pursuant to Section 18.3) or within 30 Days after the effective date of such rejection or disaffirmation, as the case may be, that the Collateral Assignee (or its designee or nominee) will enter into the New Agreement, which notice is accompanied by a copy of such New Agreement, duly executed and acknowledged by the Collateral Assignee (or its designee or nominee); (ii) provided the City notifies the Collateral Assignee in advance, the Collateral Assignee (or its designee or nominee) pays or causes to be paid to the City, at the time of the execution and delivery of the New Agreement, all amounts which, at the time of the execution and delivery thereof, would have been past due or due and payable in accordance with the provisions of this Agreement but for such termination; (iii) provided the City furnishes a statement or invoice for such costs the Collateral Assignee pays or causes to be paid to the City all reasonable costs and expenses (including legal fees), Taxes, fees, charges and disbursements paid or incurred by the City in connection with such defaults and termination, the recovery of possession from the Concessionaire, and in connection with the preparation, execution and delivery of the New Agreement and related agreements and documents specified in such statement or invoice; and (iv) such Collateral Assignee (or its designee or nominee), at the time of such written request, cures all defaults under this Agreement (curable by the payment of money) existing immediately prior to the termination of this Agreement, or, if such defaults cannot be cured by the payment of money, such Collateral Assignee (or its designee or nominee) commits to the City in the New Agreement to proceed both promptly and diligently, upon the execution of the New Agreement, to cure all such other defaults and, if possession is necessary in order to cure such other Concessionaire Defaults, to proceed both promptly and diligently to obtain the possession required to cure any such other defaults (and such cure shall be a covenant in the New Agreement).

(b)     Nothing contained in this Section 18.5 shall be deemed to limit or affect the City's interest in and to such Metered Parking System upon the expiration of the Term of the New Agreement.  The provisions of this Section 18.5 shall survive the termination of this Agreement and shall continue in full force and effect thereafter to the same extent as if this Section 18.5 were a separate and independent contract made by the City, the Concessionaire and the Collateral Assignee and, if the Collateral Assignee satisfies the conditions to a New Agreement from the effective date of such termination of this Agreement to the date of execution and delivery of the New Agreement, the Collateral Assignee may operate the concession created by this Agreement without hindrance by the City, but only on and subject to the terms and provisions of this Agreement.

Section 18.6.  **Right to Arbitration**.  In each case specified in this Agreement in which resort to arbitration is authorized, the Collateral Assignee shall have the right and privilege if an event of default under the Collateral Assignment then exists and notice has been given to the City as contemplated by Section 18.1(f), in the Concessionaire's name, place and stead, to obtain and participate in such arbitration upon notice to the City in accordance with Section 20.1, provided that the Collateral Assignee agrees to be bound by the decision of the arbitration panel.

Section 18.7.  **Recognition by the City of Collateral Assignee**.  If there is more than one Collateral Assignee, only that Collateral Assignee, to the exclusion of all other Collateral Assignees, whose notice was earliest received by the City pursuant to the Collateral Assignee Notice Requirements, shall have the rights as a Collateral Assignee under this Article 18, unless such Collateral Assignee has designated in writing another Collateral Assignee to exercise such rights.

Section 18.8.  **City's Right to Purchase Indebtedness Secured by Collateral Assignment.**

(a)     If any default by the Concessionaire has occurred under a Collateral Assignment, or any act, condition or event has occurred which would permit a Collateral Assignee to declare all or part of the indebtedness secured by a Collateral Assignment to be immediately due and payable, then the City shall have 30 Days after the date on which such Collateral Assignee shall serve notice upon the City in writing ("Collateral Assignee's Notice") that such Collateral Assignee intends to commence proceedings to exercise its rights or remedies under the Collateral Assignment (stating the calculation of the purchase price pursuant Section 18.8(c)), during which 30-Day period the City shall have the right and option (the "City's Option") to purchase from all Collateral Assignees the indebtedness secured by all Collateral Assignments, upon the terms and subject to the conditions contained in this Section 18.8.

(b)     The City's Option shall be exercised by notice served upon the Concessionaire and all Collateral Assignees within such 30-Day period.  Time shall be of the essence as to the exercise of the City's Option.  If the City's Option is duly and timely exercised, the City shall purchase on the date which is 60 Days after the date on which a Collateral Assignee's Notice is served upon the City.  The closing shall take place at a mutually convenient time and place.

(c)     The purchase price payable by the City shall be equal to the aggregate amounts secured by such Collateral Assignments (including principal, interest, fees, premiums, breakage

and other costs, expenses (including attorneys' fees) and any other amounts secured thereby) as of the closing date of the purchase. The purchase price shall be paid in full in cash at closing by wire transfer or other immediately available funds. The purchase price shall be paid by the City to each respective Collateral Assignee, to be applied by the Collateral Assignee to the indebtedness secured by the Collateral Assignment owed to such Collateral Assignee, subject to the priorities of the security interests created by such Collateral Assignments.

(d)     At the closing and upon payment in full of the purchase price each Collateral Assignee shall assign its Collateral Assignment to the City, together with any security interest held by it in the Concessionaire Interest, without recourse, representations, covenants or warranties of any kind, *provided* that such Collateral Assignments and security interests shall be deemed modified to secure the amount of the aggregate purchase price paid by the City to all Collateral Assignees (rather than the indebtedness theretofore secured thereby) payable on demand, with interest and upon the other items referred to in this Section 18.8(d). The City shall be responsible for paying any Taxes payable to any Governmental Authority upon such assignment.

(e)     Any Collateral Assignment shall contain an agreement of the Collateral Assignee to be bound by the provisions of this Section 18.8.

(f)     The City shall have the right to receive all notices of default under any Collateral Assignment, but the City shall not have the right to cure any default under any Collateral Assignment, except to the extent provided in this Section 18.8.

## ARTICLE 19
## DISPUTE RESOLUTION

**Section 19.1. Scope**.  Any dispute arising out of, relating to, or in connection with this Agreement, including any question as to whether such dispute is subject to arbitration, shall be resolved as set forth in this Article 19.

**Section 19.2. Informal Dispute Resolution Procedures**.  The Parties shall attempt in good faith to resolve such dispute within 15 Business Days following receipt by one Party of notice of such dispute from the other Party.  If the Parties are unable to resolve the dispute within such period of 15 Business Days, and upon notice by either Party to the other, the dispute shall be referred to the Designated Senior Person of each Party.  The Designated Senior Persons shall negotiate in good faith to resolve the dispute, conferring as often as they deem reasonably necessary.  Statements made by representatives of the Parties during the dispute resolution procedures set forth in this Section 19.2 and in Section 19.3 and documents specifically prepared for such dispute resolution procedures shall be considered part of settlement negotiations and shall not be admissible as evidence in any arbitration or other litigation proceeding between the Parties without the mutual consent of the Parties.

**Section 19.3. Mediation**.  Mediation of a dispute under this Agreement may not be commenced until the earlier of:  (i) such time as both of the Designated Senior Persons, after following the procedures set forth in Section 19.2, conclude in good faith that amicable resolution through continued negotiation of the matter does not appear likely; or (ii) 15 Business

Days after the notice referring the dispute to the Designated Senior Persons pursuant to <u>Section 19.2</u> has been received by both Designated Senior Persons. If, after such time period, the dispute remains unresolved, the Parties shall attempt to resolve the dispute through mediation administered by the AAA under its Commercial Mediation Procedures before resorting to binding arbitration, as provided by <u>Section 19.4</u>.

**Section 19.4. Arbitration**. If the procedures described in <u>Section 19.2</u> and <u>Section 19.3</u> do not resolve the dispute within 30 Business Days following a reference to mediation, the dispute shall be exclusively and finally settled by arbitration administered by the AAA in accordance with the AAA Rules. Either Party may initiate the arbitration, as provided in the AAA Rules. The place of arbitration shall be Chicago, Illinois unless the Parties agree otherwise. The arbitral panel shall determine the rights and obligations of the Parties in accordance with the substantive laws of the State of Illinois and without regard to conflicts of laws principles thereof. Except as agreed by the Parties, the arbitral panel shall have no power to alter or modify any terms or provisions of this Agreement, or to render any award that, by its terms or effects, would alter or modify any term or provision of this Agreement. The Parties shall be entitled to reasonable production of relevant, non-privileged documents, carried out expeditiously. If the Parties are unable to agree upon same, the arbitral panel shall have the power, upon application of any Party, to make all appropriate orders for production of documents by any Party. At the request of either Party, the arbitral panel shall have the discretion to order the examination by deposition of any witness to the extent the arbitral tribunal deems such examination appropriate or necessary. The arbitral panel shall be composed of three arbitrators, one to be selected by the City, one to be selected by the Concessionaire and the third (who shall act as chairman of the panel) to be selected by the two previously-selected arbitrators. If, within 15 Business Days, the two previously-selected arbitrators cannot agree on the selection of the third arbitrator, then the third arbitrator shall be selected by the AAA pursuant to the AAA Rules. Once the arbitral panel has been composed, the arbitrators shall act as neutrals and not as party arbitrators, and no Party shall engage in any *ex parte* communication with any member of the arbitral panel. Each Party shall bear its own attorney fees, expenses, and costs. Any award of monetary damages shall include interest at the Bank Rate from the date of any breach or violation of this Agreement or the incurring of any obligation as determined in the arbitral award until paid in full. Any award of monetary damages shall be in writing and state the reasons upon which it is based. The award shall be final and binding on the Parties. Judgment on the award may be entered by any court with competent jurisdiction. The Federal Arbitration Act, 9 U.S.C. § 1 <u>et seq</u>., shall govern any arbitration conducted pursuant to this <u>Section 19.4</u>.

**Section 19.5. Provisional Remedies**. No Party shall be precluded from initiating a proceeding in a court of competent jurisdiction for the purpose of obtaining any emergency or provisional remedy to protect its rights that may be necessary and that is not otherwise available under this Agreement, including temporary and preliminary injunctive relief and restraining orders and the appointment of a receiver or receiver and manager in connection with the collection and retention of Metered Parking Revenues.

**Section 19.6. Tolling**. If a Party receiving a notice of default under this Agreement contests, disputes or challenges the propriety of such notice by making application to the dispute resolution procedure in this <u>Article 19</u>, any cure period that applies to such default shall be tolled for the time period between such application and the issuance of a final award or determination.

### Section 19.7.  Technical Arbitration.

(a)      *Informal Dispute Resolution by Consultant*.  The Parties may agree to submit any technical dispute under this Agreement, including any technical dispute with respect to Article 7 that is submitted pursuant to Section 7.13 to the Consultant, which submission may be made without submitting the technical dispute to technical arbitration pursuant to Section 19.7(b) or to the dispute resolution process described in Section 19.2, Section 19.3 and Section 19.4 and once such technical dispute has been submitted to the Consultant then the time limits set out in Section 19.2, Section 19.3 and Section 19.4 shall no longer apply.  The Consultant shall determine any unresolved disputed items within three Business Days of the submission of such dispute to the Consultant, unless the Consultant has good cause to extend such date for determination.  The submission shall be in the form of written statements of position by one or both of the Parties, which statements shall be provided to both the other Party and the Consultant, with each Party having an opportunity to respond to such written statements of the other Party and any requests for statements or information by the Consultant, including in-person meetings.  The Parties shall each bear their own costs with respect to the submission of such dispute to the Consultant and shall bear equally the cost of the Consultant with respect to such dispute.  The Consultant's award shall be in writing and state the reasons upon which it is based.  The decision of the Consultant shall be final and binding on the Parties, unless either Party expressly reserves the right to submit the dispute to technical arbitration pursuant to Section 19.7(b) or to the dispute resolution process described in Section 19.2, Section 19.3 and Section 19.4.  Within one Business Day after its receipt of the decision, any Party may request the Consultant to interpret the decision or to correct any clerical, typographical or computation errors therein.  The other Party shall have a right to comment within one Business Day of its receipt of the requesting Party's request for interpretation and/or correction.  If the Consultant considers the request justified, it shall comply with such request within three Business Days after its receipt of such request.  The correction and/or interpretation of the decision shall take the form of an addendum and shall constitute part of the decision.

(b)      *Technical Arbitration*.  The Parties may agree to submit any technical dispute under this Agreement to technical arbitration, which submission may be made without submitting the technical dispute to the Consultant pursuant to Section 19.7(a) or to the dispute resolution process described in Section 19.2, Section 19.3 and Section 19.4.  Such technical arbitration shall be conducted by a Consultant, serving as an independent technical arbitrator, acceptable to the City and the Concessionaire (and if the Parties fail to agree upon the independent technical arbitrator within five Business Days after the Parties agree to submit the dispute to technical arbitration, then the City and the Concessionaire shall each appoint an independent technical arbitrator and both such arbitrators shall be instructed to select a third independent technical arbitrator to conduct the technical arbitration).  If the Party-appointed technical arbitrators are unable to agree upon a third technical arbitrator within five Business Days after they are instructed by the Parties to select a third arbitrator, the Consultant shall select the independent technical arbitrator to conduct the technical arbitration as soon as possible.  Such submission shall be in the form of written statements of position by one or both of the Parties, which statements shall be provided to both the other Party and the independent technical arbitrator, with each Party having an opportunity to respond to such written statements of the other Party and any requests for statements or information by the independent technical arbitrator, including in-person meetings; *provided, however*, that all such submissions by a Party

shall be made within 10 Business Days of appointment of the independent technical arbitrator and, notwithstanding any provision herein to the contrary, any unresolved disputed items shall be determined by the independent technical arbitrator within seven Business Days of receipt by the independent technical arbitrator of the Parties' submissions of information unless such independent technical arbitrator has good cause to extend such date for determination. The Parties shall each bear their own costs with respect to the arbitration of any such technical dispute and shall bear equally the cost of retaining such independent technical arbitrator. The independent technical arbitrator's award shall be in writing and state the reasons upon which it is based. Within one Business Day after its receipt of the decision, any Party may request the independent technical arbitrator to interpret the decision or to correct any clerical, typographical or computation errors therein. The other Party shall have a right to comment within one Business Day of its receipt of the requesting Party's request for interpretation and/or correction. If the independent technical arbitrator considers the request justified, it shall comply with such request within three Business Days after its receipt of such request. The correction and/or interpretation of the decision shall take the form of an addendum and shall constitute part of the decision. The independent technical arbitrator's award shall be final and binding on the Parties, except in the event of fraud, partiality, or manifest error, or if the independent technical arbitrator has exceeded its mandate or otherwise lacked jurisdiction. Any Party that wishes to challenge the award must initiate arbitration in accordance with Section 19.4 within seven Business Days of its receipt of the award and the arbitral panel must accept such matter for arbitration. The submission must set forth one or more of the limited grounds set out in this provision as the basis for its challenge in its request for arbitration, failing which the award shall be final and binding. In the event an arbitral panel composed pursuant to Section 19.4 decides that the award is not final and binding because of one or more grounds set out in this provision, it may proceed to determine the underlying issue *de novo* and its award shall constitute a final and binding determination of the dispute. Except in the event of a challenge to the award in accordance with this provision, each Party shall give effect to the award starting as of the eighth Day of its receipt of the award, including by paying the amount, if any, which becomes payable as a result of the award. If the amount payable as a result of the award is not so paid, interest will accrue on that amount at the Bank Rate. Judgment on the award may be entered in any court with competent jurisdiction. The independent technical arbitrator's award shall be final and binding on the Parties.

**Section 19.8. Undisputed Amounts**. Notwithstanding any other provision of this Article 19, in relation to a monetary claim brought by a Party, the other Party shall pay to that Party any undisputed portion of the claim during the pendency of any dispute regarding a disputed portion of that claim, and the arbitral panel appointed under Section 19.4 or a Consultant appointed under Section 19.7 shall issue an interim award in favor of the relevant Party in relation to the undisputed amount.

## ARTICLE 20
## MISCELLANEOUS

**Section 20.1. Notice**. All notices, other communications and approvals required or permitted by this Agreement shall be in writing, shall state specifically that they are being given pursuant to this Agreement and shall be delivered, sent by certified or registered mail (return receipt requested and postage prepaid), addressed as follows:

(a)     in the case of the City:

>Corporation Counsel
>City of Chicago
>6th Floor City Hall
>121 North LaSalle Street
>Chicago, Illinois 60602
>Attention:     Finance and Economic Development Division

>with a copy to:

>City of Chicago
>Department of Finance
>33 North LaSalle Street, 6th Floor
>Chicago, Illinois 60602
>Attention:     Chief Financial Officer

(b)     in the case of the Concessionaire:

>Chicago Parking Meters, LLC
>1585 Broadway, 39th Floor
>New York, New York 10036
>Attention:     John Watt

or such other persons or addresses as either Party may from time to time designate by notice to the other. A notice, other communication or approval shall be deemed to have been sent and received (i) on the Day it is delivered, or if such Day is not a Business Day or if the notice is received after ordinary office hours (time of place of receipt), the notice, other communication or approval shall be deemed to have been sent and received on the next Business Day, or (ii) on the fourth Business Day after mailing if sent by U.S. registered or certified mail.

**Section 20.2. Entire Agreement**. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior agreements, negotiations, discussions and understandings, written or oral, between the Parties. There are no representations, warranties, conditions or other agreements, whether direct or collateral, or express or implied, that form part of or affect this Agreement, or that induced any Party to enter into this Agreement or on which reliance is placed by any Party, except as specifically set forth in this Agreement. The Parties acknowledge and agree that (i) each has substantial business experience and is fully acquainted with the provisions of this Agreement, (ii) the provisions and language of this Agreement have been fully negotiated and (iii) no provision of this Agreement shall be construed in favor of any Party or against any Party by reason of such provision of this Agreement having been drafted on behalf of one Party rather than the other.

**Section 20.3. Amendment**. This Agreement may be amended, changed or supplemented only by a written agreement signed by the Parties.

**Section 20.4.  Waiver of Rights**.  Any waiver of, or consent to depart from, the requirements of any provision of this Agreement shall be effective only if it is in writing and signed by the Party giving it, and only in the specific instance and for the specific purpose for which it has been given.  No failure on the part of any Party to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver of such right.  No single or partial exercise of any such right shall preclude any other or further exercise of such right or the exercise of any other right.

**Section 20.5.  Severability**.  Each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by applicable Law.  The invalidity of any one or more phrases, sentences, clauses or sections contained in this Agreement shall not affect the remaining portions of this Agreement or any part thereof.  If any provision of this Agreement or the application thereof to any Person or circumstance is held or deemed to be or determined to be invalid, inoperative or unenforceable in any particular case in any particular jurisdiction or jurisdictions because it conflicts with any other provision or provisions hereof or of any applicable Law, or public policy, or for any other reason, (i) such circumstance shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatever, and (ii) the Parties shall negotiate in good faith to amend this Agreement to implement the provisions set forth herein.  If the Parties cannot agree on an appropriate amendment, either Party may refer the matter for determination pursuant to the dispute resolution procedure in Article 19.  If, by means of the dispute resolution procedure, the Parties are unable, as a result of applicable Law, to resolve the matter in a manner that effectively entitles the City to have the same rights after the aforesaid determination of invalidity or unenforceability as before, the City shall have the right to enact, and cause to come into force, any Law to provide for the same or substantially the same rights as were determined to be invalid or unenforceable.

**Section 20.6.  Governing Law**.  This Agreement shall be governed by, and interpreted and enforced in accordance with, the laws in force in the State of Illinois (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction).

**Section 20.7.  Submission to Jurisdiction**.  Subject to Article 19, any action or proceeding against the Concessionaire or the City relating in any way to this Agreement may be brought and enforced in the federal or state courts in the State of Illinois in the County of Cook, and each of the Concessionaire and the City hereby irrevocably submits to the jurisdiction of such courts with regard to any such action or proceeding, and irrevocably waives, to the fullest extent permitted by applicable Law, any objection it may have now or hereafter have to the laying of venue of any such action or proceeding in such courts and any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum. Service of process on the City may be made, either by registered or certified mail addressed as provided for in Section 20.1 or by personal delivery on the City Clerk of the City.  Service of process on the Concessionaire may be made either by registered or certified mail addressed as provided for in Section 20.1 or by delivery to the Concessionaire's registered agent for service of process in the State of Illinois.  If the Concessionaire is presented with a request for Documents by any administrative agency or with a *subpoena duces tecum* regarding any Documents which

may be in its possession by reason of this Agreement, the Concessionaire shall give prompt notice to the Corporation Counsel of the City. The City may contest such process by any means available to it before such Documents are submitted to a court or other third party; *provided, however*, that the Concessionaire shall not be obligated to withhold such delivery beyond that time as may be ordered by the court or administrative agency or required by Law, unless the *subpoena* or request is quashed or the time to produce is otherwise extended.

**Section 20.8. Further Acts**. The Parties shall do or cause to be done all such further acts and things as may be reasonably necessary or desirable to give full effect to this Agreement. Without limiting the foregoing, each Party will, at any time and from time to time, execute and deliver or cause to be executed and delivered such further instruments and assurances and take such further actions as may be reasonably requested by the other Party in order to cure any defect in the execution and/or delivery of this Agreement.

**Section 20.9. Costs**. Except as otherwise provided in this Agreement, each Party shall be responsible for its own costs and expenses incurred in connection with performing and observing its obligations and covenants under this Agreement.

**Section 20.10. Interest**. Any amount payable under this Agreement and not paid when due shall bear interest at a variable nominal rate per annum equal on each day to the Bank Rate then in effect, from the date such payment is due until payment and both before and after judgment.

**Section 20.11. Inurement and Binding Effect**. This Agreement shall inure to the benefit of the Parties and their respective permitted successors and assigns and be binding upon the Parties and their respective successors and assigns.

**Section 20.12. No Partnership or Third Party Beneficiaries**. Except as expressly provided herein to the contrary (including with respect to such rights as are expressly granted to each Collateral Assignee pursuant to this Agreement), nothing contained in this Agreement shall constitute or be deemed to create a partnership, joint venture or principal and agent relationship between the City and the Concessionaire, nor shall any term or provision hereof be construed in any way to grant, convey or create any rights or interests to any Person not a party to this Agreement.

**Section 20.13. Cumulative Remedies**. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

**Section 20.14. Non-Liability of Public Officials**. The Concessionaire and any assignee or Contractor may not charge any official, officer, employee, advisor or consultant of the City personally with any liability or expenses of defense or hold any official, officer, employee, advisor or consultant of the City personally liable to them under any term or provision of this Agreement or because of the City's execution, attempted execution or any breach of this Agreement.

**Section 20.15. Conflicts of Interest**.

- 134 -

(a)     No member of the governing body of the City or other unit of government and no other official, officer, employee, advisor or consultant of the City or other unit of government who exercises any functions or responsibilities in connection with the Metered Parking Services is permitted to have any personal interest, direct or indirect, in this Agreement.  No member of or delegate to the Congress of the United States or the Illinois General Assembly and no alderman of the City or City employee is allowed to be admitted to any share or part of this Agreement or to any financial benefit to arise from it.

(b)     The Concessionaire represents and covenants that it, and to the best of its knowledge, its Contractors if any, presently have no direct or indirect interest and will not acquire any interest, direct or indirect, in any project or contract that would conflict in any manner or degree with the performance of the Metered Parking Services.  It is acknowledged and agreed that nothing in this <u>Section 20.15</u> shall prevent or restrict the Concessionaire, the Operator or their owners or Affiliates from bidding on or engaging (or seeking to engage) in any other projects or other transactions with the City or the City's departments.

(c)     The Concessionaire further covenants that, in the performance of this Agreement, no Person having any conflicting interest will be assigned to perform any Metered Parking Services.  If the City determines that any of the Concessionaire's services for others conflict with the Metered Parking Services, the Concessionaire is to render for the City under this Agreement, the Concessionaire must terminate such other services immediately upon request of the City.

**Section 20.16. Counterparts; Facsimile Execution**.  This Agreement may be executed in any number of counterparts which, taken together, shall constitute one and the same agreement.  This Agreement shall be effective when it has been executed by each Party and delivered to both Parties.  To evidence the fact that it has executed this Agreement, a Party may send a copy of its executed counterpart to the other Party by facsimile transmission.  Such Party shall be deemed to have executed and delivered this Agreement on the date it sent such facsimile transmission.  In such event, such Party shall forthwith deliver to the other Party an original counterpart of this Agreement executed by such Party.

**Section 20.17. Collaboration**.  Each Party agrees to use its reasonable best efforts to notify the other in advance of taking an action or making a change that is likely to have a material effect on this Agreement or the Metered Parking System, and will make available one or more of its respective Designated Senior Persons to discuss such action or change.  In addition, both the City and the Concessionaire will make available Designated Senior Persons to discuss on a quarterly basis the operations and economics of the Metered Parking System, including the impact of the implementation of Pay-by-Cell, or this Agreement (it being understood that this mechanism is being established to provide improved communications and not to replace or subordinate any rights of the Parties or any dispute resolution procedures set forth in <u>Article 19</u>). This Section in no way provides the Concessionaire with veto power over a municipal decision

(Intentionally Left Blank)

**IN WITNESS WHEREOF**, the City has caused this Agreement to be duly executed on its behalf by its duly authorized officer and the Concessionaire has caused this Agreement to be duly executed pursuant to due authorization, all as of the day and year first above written.

CITY OF CHICAGO

By: _____
     Stephen R. Patton
     Corporation Counsel

CONCESSIONAIRE:

CHICAGO PARKING METERS, LLC

By: _____
     Dennis Pedrelli
     Chief Executive Officer

**SCHEDULES TO THE CONCESSION AGREEMENT**

It is acknowledged and agreed by the City and the Concessionaire that the following Schedules are subject to the terms of the Concession Agreement to which they are attached, and that in the event of any conflict between the terms of any of such Schedules and the terms of the Concession Agreement, the terms and provisions of the Concession Agreement shall control.

**SCHEDULE 1**

**METERED PARKING SYSTEM CONTRACTS**

1.      Contract (PO) Number 10062 with Duncan Parking Technologies, Inc.:
        Metering Devices and Replacement Parts (Duncan Meters).

2.      Contract (PO) Number 10061 with MacKay Meters, Inc.:
        Metering Devices and Replacement Parts (MacKay Meters).

3.      Contract (PO) Number 10060 with Metro Parking Solutions, LLC:
        Metering Devices and Replacement Parts (POM Meters).

4.      Contract (PO) Number 1145 with Parkeon, Inc.:
        Pay-and-Display meter parts (for Stelios).

5.      Contract (PO) Number 3466 with Parkeon, Inc:
        Parkfolio Service (for Stelios).

6.      Contract (PO) Number 12010 with Chicago United Industries, Ltd.:
        Parking Meter Pedestal C-Bases and Related Parts.

7.      Contract (PO) Number 13090 with Dunbar Armored, Inc.:
        Coin Counting Services.

8.      Contract (PO) Number 12395 with Enforcement Technologies, Inc.:
        Maintenance Services for Existing AutoCITES.

9.      Contract (PO) Number T28236 with IBM Corporation:
        Parking and Administrative Hearings Management.

10.     Contract (PO) Number 9929 with Johnson Pipe & Supply Co.:
        Pipe, Fittings, Valves, and Accessories.

11.     Contract (PO) Number 14852 with Serco, Inc.:
        Parking Enforcement Officer Services.

12.     Contract (PO) Number 12534 with Serco, Inc.:
        Parking Meter Collection Services.

13.     Contract (PO) Number 14784 with Fifth Third Bank:
        Credit Card Payment Transaction Processor.

14.     Contract (PO) Number 15047 with Oak Park Cyclery*:
        Trek Bicycle Parts and Repair Services for Enforcement Personnel.

15.     Contract (PO) Number 13305 with Speedy Gonzalez Landscaping: Snow Plowing and
        De-icing Services (includes Parking Lots).

16.      Contract (PO) Number 11852 with Christy Webber Landscapes:
    Comprehensive Landscape Services.

17.      Contract (PO) Number S028870 with Andrews Decal Co.:
    Parking Meter Decals.

18.      Purchase Order with ParkMagic:
    Pay Parking by Phone (in-car meter pilot program).

19.      Agreement with International Association of Machinists and Aerospace Workers, Local No. 126:
    Labor Agreement.

20.      Agreement with International Union of Operating Engineers, Local No. 150:
    Labor Agreement.

21.      Contract (PO) Number 15028 with Silk Screen Express*:
    Various Work and Business "Uniforms.

22.      Contract (PO) Number 16630 with Equity Industrial Supply, Inc.*:
    High Visibility Protective Clothing.

23.      Contract (PO) Number 10074 with Root Brother Manufacturing and Supply Company*:
    Small Tools and Industrial Tools.

24.      Contract (PO) Number 10196 with Unisource/Jefco Group Inc.*:
    Small Tools and Industrial Tools.

25.      Lease No. 14180 for Ashland Facility*.

*Contracts relating to the general operations of the City of Chicago Department of Revenue in addition to the Metered Parking System.

**SCHEDULE 2**

**REQUIRED CAPITAL IMPROVEMENTS**

General.        The Concessionaire shall be responsible for all capital improvements with respect to the Metered Parking System required to be completed during the Term in accordance with the terms of the Concession Agreement, including as required by the Operating Standards set out in Schedule 3 and the provisions of this Schedule 2.  To the extent that there is any inconsistency between the terms set out in Articles 1 through 20 and this Schedule 2 the terms set out in Articles 1 through 20 shall govern.

Installation of Time Differential Metering Software and Hardware Systems.

With respect to a Metering Device relating to more than two Metered Parking Spaces ("Multi-Space Metering Device"), the Concessionaire shall install such time differential metering software and hardware systems acceptable to the City ("Time Differential Metering Systems"), which allows the City to select a reasonable number of peak and non-peak demand periods, and provide for a Metered Parking Fee schedule specific to each period.  The Time Differential Metering Systems must allow the City to set period lengths in increments as small as 15 minutes or as long as 24 hours.  Customers must be able to select the amount of time they want to park, as opposed to selecting the total Metered Parking Fee to be paid, and the equipment must display the appropriate amount being debited.

The Time Differential Metering Systems shall provide only for City designated time-limits.  The Time Differential Metering Systems shall not provide for artificial limits based on the amount of the Metered Parking Fee.  Customers shall not be prohibited from purchasing multiple hours of parking across varying rate schedules unless the City designates a time-limit.  If the City selects a limit, the limit must be based on increments as small as 15 minutes or as long as 24 hours.  The City must be able to select specific hours during the day when time limits will be enforced.

The Time Differential Metering Systems shall allow the City to choose to either allow motorists arriving and paying multiple hours prior to the start time of each designated peak period to (1) pay a reduced or non-peak Metered Parking Fee as an incentive for arriving early, even if the motorist remains parked during peak hours or (2) pay the peak period Metered Parking Fee during the hours the motorist remains parked during peak hours.  Customers must be able to select the amount of time they want to park, as opposed to selecting the total Metered Parking Fee to be paid, and the equipment must display the appropriate amount being debited.

The Time Differential Metering Systems should allow for the implementation of variable rate structures to create or reduce vehicle turnover.  The City must be able to either increase or decrease the Metered Parking Fee for every subsequent hour that a customer purchases to park.  Customers must be able to select the amount of time they want to park, as opposed to selecting the total Metered Parking Fee to be paid, and the equipment must display the appropriate amount being debited.

The Time Differential Metering Systems should allow for the setting of increments of time to be purchased as small as 15 minutes and as large as 24 hours, provided that increments as

small as 5 minutes will be allowed if required in the aggregate to constitute a whole value of time.  The City must be able to assign different incremental values based upon the time of day.

**SCHEDULE 3**

**OPERATING STANDARDS**

The Metered Parking System shall, at a minimum, be operated and maintained in compliance with the standards set forth within this Schedule 3. To the extent there is any inconsistency between the terms set forth in Articles 1 through 20 and this Schedule 3, the terms set forth in Articles 1 through 20 shall govern.

COMPLIANCE WITH APPLICABLE LAWS

The Concessionaire shall operate or shall cause the Metered Parking System to be operated pursuant to the terms of the Concession Agreement, these Operating Standards, applicable provisions of the Municipal Code of Chicago, including but not limited to Chapters 2-80, 3-54, 4-232, 9-8, 9-64, 9-68, 9-80, 9-100, 10-8, 10-20, 10-28, 10-29, 13-128, and 17-11 as amended from time to time, and all other applicable laws, ordinances, rules, regulations and executive orders of federal, state and local government.

CUSTOMER SERVICE

1.      The Concessionaire shall establish and maintain a 24/7 customer service system for customer complaints and inquiries, which system may be maintained with live persons, or other system approved in advance by the City, including a web-based system, an interactive voice response (IVR) system, or other automated system.

2.      The Concessionaire shall have and maintain each Metering Device in the Metered Parking System and shall provide the name of the Operator and a toll free phone number on each Metering Device.

3.      The Concessionaire will provide the City with access to information concerning the operability of specific Metering Devices for purposes of adjudicating violations of the Chicago Municipal Code.

CUSTOMER PAYMENTS

1.      The Concessionaire shall implement and maintain cashless alternatives, in accordance with the Schedule 2 (Required Capital Improvements).

2.      The Concessionaire shall implement time differential metering systems upon the City request, including demand-based pricing models and progressive rates, in accordance with the Schedule 2 (Required Capital Improvements).

3.      The Concessionaire shall be obligated to charge and collect the full amount of the Metered Parking Fees imposed by the City, in accordance with Section 7.1 of the Concession Agreement.

4.      All Metering Device receipts issued to customers to display must have an adhesive backing (or other system acceptable to the City which allows them to stay attached to

motorcycles and scooters). Upon the implementation of Pay-by-Cell as described in <u>Section 4.7</u> of the Agreement, Metering Device receipts shall no longer be required to have an adhesive backing; *provided, however,* that if Pay-by-Cell is removed at the election of the Concessionaire under <u>Section 4.7</u>, the Concessionaire shall, at the City's option, either (A) pay the City $425,000 per year, as Adjusted for Inflation for each year from the date of such termination and for as long as Metering Device receipts are utilized; or (B) reintroduce receipts with an adhesive backing at the Concessionaire's own expense.

 5. All Metering Device receipts and graphics must be approved in advance and writing by the City prior to installation or use.

 6. The Concessionaire shall be allowed to implement a "pay-by-space" payment and collection system.

<u>COLLECTION</u>

The Concessionaire shall establish meter collection routes and schedules that ensure the continuous operation of the Metered Parking System, subject to normal course of business interruptions to metered system operations, including, but not limited to, wear and tear, vandalism, accidents, maintenance activities and coin collection activities.

<u>METERED PARKING SYSTEM RECORDS</u>

 1. The Concessionaire shall maintain books and records for the operation and maintenance of the Metered Parking System during the Term and for a period of 10 years following the Term, including, but not limited to the following: asset tag number, location, price, hours of operation, maintenance history and utilization.

 2. The Concessionaire shall maintain an online map database of the Metered Parking System, including the location of Metering Devices and Metered Spaces and rates for customer access ("Concession Metered Parking Database") during the Term and for a period of one year following the Term.

 3. The Concessionaire shall provide designated City personnel with view-only 24/7 access to the Concession Metered Parking Database.

 4. The Concessionaire shall be required to provide weekly reports to the City showing frequency of meter usage during various hours of the day for all areas throughout the City.

<u>METERING DEVICE INSTALLATION, REMOVAL AND REPAIR</u>

 1. All Metering Devices, support poles and bases installed following the Closing Date are to be black in color. "C" bases are to have a nine inch diameter. Support poles are to have a two inch diameter. All Metering Devices installed by the Concessionaire must satisfy ADA compliance requirements.

2. All sign poles and bases installed following the Closing Date are to be black in color. Signs are to be installed at a minimum height of seven feet to the bottom of the sign and a maximum of eight feet to the bottom of the sign. "C" bases for signs are to have a twelve inch diameter. Sign poles are to have a two inch diameter, and ten feet in length maximum.

3. Metering Devices located on the street ("Street Metering Devices") shall be installed on the same side of the street as the customer parking. Metering Devices located within the Parking Lots shall be installed in the best possible area to maximize revenue, at the reasonable discretion of the Concessionaire in consultation with the City.

4. Multi-Space Metering Devices shall be installed at or near the center of the parking area being covered by that particular Multi-Space Metering Device, except that the City reserves the right to allowing the installation of two Multi-Space Metering Devices within the same block, as long as customer convenience is not adversely affected.

5. Multi-Space Metering Devices shall not operate more than 15 parking spaces on street or 50 parking spaces off street, except within the area bounded by the west side of Ashland Avenue on the east, the east side of Damen Avenue on the west, the south side of Roosevelt Road on the north and the south side of 15th Place on the south, where Multi-Space Metering Devices shall not operate more than 30 parking spaces on a street. Any Parking Lot with more than 50 Metered Spaces shall have at least 2 Multi-Space Metering Devices.

6. Meter technology developed by the Concessionaire must allow for visual enforcement. In the case of customers using Pay-by-Cell, the City agrees that enforcement through the use of license plate data complies with these Operating Standards, including this Section 6. In any other case, the Concessionaire may propose alternatives to visual enforcement, including the use of license plate data, which shall be subject to City Approval.

7. The Concessionaire must develop and implement a plan to reduce the number of Metering Devices on, along and about the street and public way by greater than one-half by the second anniversary of the Closing Date.

8. Improvements to the Metered Parking System cannot include ground loops or other street construction unless pre-approved by City.

9. Should the Concessionaire implement pay by phone options, it must allow for peak period pricing, in accordance with the Schedule 2 (Required Capital Improvements).

10. Unless consented to in writing by the City, each new stall of a single-bay Metering Device shall be no less than 18 feet, but no more than 22 feet in length.

11. Unless consented to in writing by the City, each new stall of a single-bay Metering Device that is at the end of the parking area (as vehicles are not allowed to park in front of or behind the stall) shall be no less than 17 feet, but no more than 22 feet in length.

12. Unless consented to in writing by the City, each new stall of a double-bay Metering Device shall be no less than 18 feet, but no more than 22 feet in length.

13.    Unless consented to in writing by the City, each new stall of a double-bay Metering Device that is at the end of a parking area (as vehicles are not allowed to park in front of or behind the stall) shall be no less than 17 feet, but no more than 22 feet in length.

14.    Subject to paragraph 15 below, new Street Metering Devices shall be installed 2' from curb and shall be installed so that customers are facing traffic while paying.

15.    New Street Metering Devices shall be installed 18 inches from curb on sidewalks that are less than 9 feet in width.

16.    All installations and removals of Metering Devices shall be upon the requests of the City and shall be subject to the standards and procedures set forth in Paragraphs 17-22 of this section.

17.    The Concessionaire shall give written notice to the City three business days prior to the installation of new Metering Devices, as required by the City, except that, based upon the specific circumstances and within the City's reasonable discretion, the City may extend the period for such installation.  New Metering Devices shall be posted with an initial enforcement date of the next business day.

18.    Upon the installation of a new Metering Device, the Concessionaire shall install a placard with the City seal on the Metering Device which indicates that the Metering Device was recently installed and provides the day on which enforcement will commence, in accordance with Paragraph 17 above.

19.    The Concessionaire will be required to remove Metering Devices and signs within two business days of the City's removal request, except that, based upon the specific circumstances (including the number of Metering Devices and/or signs to be removed), and within the City's reasonable discretion, the City may extend the period for such removal.

20.    The Concessionaire shall repair or replace Metering Devices that are not fully functioning, including all payment options and display functions, within two business days following notification, except that, based upon the specific circumstances (including causes by Force Majeure, a Delay Event or excessive vandalism) and within the City's reasonable discretion, the City may extend the period for such repair or replacement.

21.    The Concessionaire shall maintain maintenance records for all Metering Devices or Metering Device replacement equipment in the Metered Parking System.  The Concessionaire shall make said records available to the City within five business days following a written request by the City.

22.    The installation, removal and repair of Metering Devices shall be further subject to the following requirements of the City:

(a)    The Committee on Traffic Control and Safety makes recommendations to City Council regarding the installation and removal of Metering Devices.  The Committee meets regularly at City Hall, with the times of the meetings and agendas posted in advance online.  It shall be the responsibility of the

Concessionaire to send a representative to such meetings and to obtain information regarding pending City action that may affect the Concession Agreement. Information obtained from the Committee of Traffic Control and Safety may be used for preliminary planning projects only. Final approval must come from the full City Council.

(b)     If an ordinance (or the direction of the City Comptroller or his/her designee) authorizes the installation of new Metering Devices, the Concessionaire shall install the Metering Devices within 120 Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

(c)     If an ordinance (or the direction of the City Comptroller or his/her designee) authorizes the installation of new street signs related to newly designated Concession Metered Parking, the Concessionaire shall install such signs within thirty (30) Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

(d)     If an ordinance (or the direction of the City Comptroller or his/her designee) authorizes changes to the placement of existing signs on a Block to add additional Metered Parking Spaces, the Concessionaire shall move such signs within five (5) Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

(e)     If an ordinance (or the direction of the City Comptroller or his/her designee) authorizes the reinstallation of one or more Metering Devices following a closure or other project requiring removal of such Metering Devices, the Concessionaire shall reinstall such Metering Device(s) within thirty (30) Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

(f)     If an ordinance (or the direction of the City Comptroller or his/her designee) authorizes changes to existing Hours of Operation or Periods of Operation, the Concessionaire shall make all necessary modifications to the Metering Devices and post necessary and appropriate notification, including meter stickers, within thirty (30) Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

(g)     If an ordinance (or the direction of the City Comptroller or his/her designee) authorizes changes to existing Metered Parking Fees, the Concessionaire shall make all necessary modifications to the Metering Devices and post necessary and appropriate notification, including meter stickers, within sixty (60) Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

(h)     If an ordinance (or the direction of City Comptroller or his/her designee) authorizes changes to existing Periods of Stay, the Concessionaire shall make all necessary modifications to the Metering Devices and post necessary and

appropriate notification, including meter stickers, within sixty (60) Days of the effective date of such ordinance or direction, as such period may be extended by the City in writing.

MOTORCYCLE PARKING

The Concessionaire shall comply with all current and future City standards and Applicable Laws regarding motorcycle parking.

RECYCLING

With respect to the Metered Parking System, the Concessionaire shall manage and maintain a battery recycling program to help to protect the environment and remain in compliance with all applicable laws, including environmental laws. The Concessionaire shall handle all the necessary logistics, shipping, receiving, recycling, and proper documentation relating to the recycling program. The Concessionaire shall recycle the following, including, but not limited to:

- 1. Regular household batteries, used in meters or otherwise both rechargeable and non-rechargeable, such as D-cell, C-cell, AA, AAA, 9-volt, and button cells.

- 2. Rechargeable battery packs used in meter equipment, cell phones, cameras, laptop computers, power tools, etc.

- 3. Handheld electronics, including but not limited to cell phones, iPods, PDAs and pagers; and

- 4. Any other dry-cell batteries.

VEHICLE USE

1. All service vehicles utilized by the Concessionaire are required to conspicuously display the following identification decals and contact information on both sides of each vehicle: Company name; vehicle (fleet) number; area code/phone number; web address. A "How Am I Driving" (or equivalent) customer complaint/compliment decal and access number, along with a third vehicle (fleet) number decal which will be displayed only on the rear of each vehicle.

2. All service vehicles utilized by the Concessionaire must be cleaned and maintained on a regular basis to ensure safe operation.

3. The Concessionaire is required to equip all service vehicles, at its expense (including initial and period product enhancements), with any electronic location safety devices or equipment (GPS, etc.) as the City deems reasonably necessary.

4. All service vehicle operators must possess a valid Illinois driver's license and retain in their personal possession at all times of vehicle operation.

5.　　The Concessionaire is required to comply with all local, state and federal vehicle licensing regulations.  All vehicles must display, at all times, the current license plate, and any plate and city stickers and must carry insurance certification required by Law.

6.　　The Concessionaire is responsible for ensuring safe operation of all owned or leased service vehicles.

7.　　The Concessionaire is responsible for ensuring timely payment to the City of all service vehicle parking and "moving" violations.

8.　　All service vehicles will display any and all safety awareness stickers as reasonably deemed necessary and appropriate by the City.

9.　　Vehicle operator and passenger smoking in or around all service vehicles are prohibited at all times.

10.　　Unauthorized passengers are not permitted in any Concessionaire service vehicle, at any time including family, friends, "hitchhikers", etc.

11.　　Vehicle use for illegal activity including the transportation or storage of weapons, hazardous chemicals or illegal substances is prohibited.

12.　　Vehicle operators are required to adhere to all established vehicle "moving" and parking regulations at all times.  Parking of vendor service vehicles within bus stops, tow zones, on private property, etc. is prohibited.

13.　　Vehicle operators will be permitted to park service vehicles at authorized paid Metering Devices and areas without payment only while performing professional duties with respect to the operation of the Metered Parking System.

14.　　In accordance with City ordinance, the Concessionaire's operators are required to use hands-free devices when using cellular phones or 2-way communication devices in any service vehicles.

15.　　All drivers and passengers must wear seat belts in all service vehicles at all times.

16.　　The Concessionaire is required to immediately report all service vehicle accidents to the City within 48 hours following any accident that may impact the City's interest or liability.

17.　　Concessionaire is responsible for all costs necessary to transport personnel and equipment.

18.　　At outset, all vehicles used by Concessionaire shall be new or like-new.

19.　　All vehicles will bear similar markings and shall be the same color.

20.　　All vehicles used primarily for enforcement purposes must be equipped with fully operational Mars lights (or a DOR approved equivalent) with flashing yellow caution lights.

21.     All vehicles that are not equipped with rear windows must utilize video when backing up.

SIGNAGE

1.      The Concessionaire shall be responsible for all installation, removal and repair of signage relating to the Metered Parking System (such as signs regarding parking rates and parking spaces), in accordance with the provisions of this section.  The Concessionaire shall not be responsible for the installation, removal and repair of signage not relating to the Metered Parking System (such as signs regarding: no standing/stopping, bus/taxi zones, traffic control, etc.).

2.      The Concessionaire shall be prohibited from erecting signs in the public way for single and double bay meter systems unless otherwise authorized by the City in writing.

3.      The Concessionaire shall only erect signage for Pay and Display, "pay-by-space" or similar multi-parking space systems.  Unless otherwise approved in writing by the City, the maximum number of signs per block shall be:

- Three sign poles where the metered parking zone is 100 feet or less; or

- Five sign poles where the metered parking zone is 100 feet or more or divided by an alley or restricted parking area (loading zones, bus stops, etc.).

4.      Signs shall be 18" by 24" in size consisting of a reflective white background and green overlay (pantone #342C unless otherwise approved by the City in writing) for symbols and text.

5.      All signage design, installation, removal and repair must (i) be reviewed and approved by Chicago Department of Transportation and any other agency of the City having jurisdiction over the area relating to such sign design, installation, removal and/or repair, and (ii) meet the standards contained in the Manual on Uniform Traffic Control Devices (MUTCD).

PARKING LOT MAINTENANCE, REPAIR AND IMPROVEMENTS

1.      Concessionaire shall engage in practices that ensure that the Parking Lots remain open and accessible to customers during posted operating hours, subject to exceptions provided in the Concession Agreement.

2.      Concessionaire shall maintain all Parking Lots revenue collection, control systems and components at all times.

ENFORCEMENT

In accordance with Section 3.2(e) of the Concession Agreement, the Concessionaire may issue parking tickets or citations for violations of the parking rules and regulations with respect to the Concession Metered Parking Spaces and Reserve Metered Parking Spaces, but must meet the following standards:

a.    Concessionaire's enforcement efforts must have stated goal of reducing unpaid meters through deterrence within the City's city limits.

b.    City shall not pay or reimburse the Concessionaire for any of Concessionaire's enforcement activities.

c.    The City's ability to manage the Concessionaire's enforcement personnel is limited.

d.    Concessionaire must provide the Department of Revenue ("DOR") designee with weekly enforcement routes (as well as collection and maintenance routes if collection and maintenance personnel issue meter violations) no later than Wednesday of the prior week, except that under certain circumstances, such route information may be provided to DOR within a shorter period of time acceptable to DOR.

    i.    The routes must include a schedule of when personnel will be located in different areas. This schedule will allow DOR to schedule its staff in a manner that is consistent with Concessionaire enforcement and ensure high productivity.

    ii.    City may limit the number of times the Concessionaire can ticket on a given block in a given hour (the limits shall be no higher than every 15 minutes).

    iii.    Concessionaire can issue only one ticket per period of stay to a vehicle that has parked in excess of the allowed limit.

        Example: If a vehicle is parked at a 2 hour meter, it can only be ticketed every 2 hours.

    iv.    City may consider limiting the total number of tickets that a single vehicle can be ticketed in a day.

e.    Concessionaire must equip its personnel and vehicles with GPS, preferably Nextel or similar technology, at its expense. DOR must have access to GPS coordinates and view the location of Concessionaire personnel via the Internet in real-time or near real-time on a map through software, preferably Xora GPS Time Track or similar technology.

    i.    This tool will allow DOR to assign its staff more effectively and address complaints in the field.

    ii.    The GPS functionality must enable DOR to select different tracking features, including the definition of geographic boundaries that would provide DOR with alerts when Concessionaire personnel have left those boundaries.

    iii. The GPS functionality must allow DOR to generate reports. The data to be reported upon must be searchable and archived by the Concessionaire for six-months at no cost to the City.

    iv. The GPS reports must be able to identify individuals and plot progression over time.

    v. GPS reports must also include total distance traveled and times with no apparent movement.

f. Concessionaire must furnish and provide communications devices to all field staff.

    i. Concessionaire must furnish spare batteries, battery-charging equipment, and GPS requisites for its communication equipment. Repair and replacement of communication devices and related equipment are the responsibility of the Concessionaire.

    ii. Concessionaire shall provide up to five communication devices to the DOR managers for monitoring purposes.

g. Concessionaire personnel must have a unique uniform so that they are easily distinguishable from Police, DOR, and OEMC.

    i. Concessionaire personnel shall be required to wear unique and distinctive safety vests.

    ii. Concessionaire personnel must have Concessionaire identification with name, photo, and contact information for the Concessionaire. The identification must be worn so that it is clearly visible at all times.

    iii. All Concessionaire personnel must maintain a professional appearance at all time while performing under this Agreement.

h. Concessionaire must use handheld technology to support ticket issuance using file formats and transfer processes dictated by the City. Photographic evidence of a violation is required, which in respect of Pay-by-Cell will be a photograph of the relevant license plate.

    i. Handheld technology must be purchased or leased by the Concessionaire. All handheld devices and related hardware and software must be properly maintained.

    ii. Handheld technology reduces the number of tickets that cannot be processed due to illegibility or missing or erroneous data. Data collected at the time of ticket issuance must include at a minimum:
        (1) The license plate number, or, if not available, vehicle identification number (VIN)

(2) Type of plate
(3) State of issuance for the license plate
(4) License plate expiration
(5) Vehicle make
(6) Code violated
(7) The parking meter asset number
(8) Violation date
(9) Violation time
(10) Violation location
(11) Unit number (to be determined by DOR)
(12) Concessionaire employee identification number
(13) Signature of issuer (can include electronic signature)

iii. The handheld must generate an image of the citation that can be passed electronically to DOR for processing. That image must include the issuer's signature.

iv. Data transfers must occur on a daily basis.

i. Concessionaire must be responsible for monthly performance management reporting.

i. Concessionaire shall prepare using Microsoft Excel or another DOR approved format and provide monthly summary reports including:
(1) The number of tickets issued per day;
(2) The number of tickets passed to the DOR electronically daily;
(3) The number of stolen license plates recorded, provided the City provides access to such data;
(4) Daily reports by issuing agent;
(5) The number of service requests identified by Concessionaire personnel.

ii. The DOR will monitor percentages of tickets spoiled, paid, unable to be processed because of vehicle make match errors, unable to be processed because no match exists with the applicable department of motor vehicles, etc.

iii. If Concessionaire issues tickets in error (as determined by the DOR and the Concessionaire, not the Department of Administrative Hearings), Concessionaire is liable for the fine amounts.

(1) Example 1: Concessionaire issues tickets to 30 vehicles parked on Clark Street during hours when parking is not governed by meters.

(2) Example 2: Concessionaire issues tickets to 25 vehicles parked in a lot when the pay and display is malfunctioning.

      iv.     Concessionaire must present documentation that individuals performing poorly (lowest 5%) have received training or discipline.

      v.     Concessionaire personnel must treat all persons and property with due care and respect.

      vi.     The DOR has the right to request the removal of personnel for poor performance in the issuance of tickets or citations or for inappropriate conduct.

      vii.     Concessionaire must perform background checks on all personnel enforcing meter restrictions.

j.     The Concessionaire must address (by written report) complaints concerning meter enforcement within 24 hours.

      i.     Meters must bear the Concessionaire's contact information (telephone and e-mail) and instructions about how enforcement can be requested.

      ii.     Complaints must be registered in a log and their resolution documented and shared with DOR weekly.

k.     The DOR will train up to 3 management personnel of Concessionaire. DOR will provide those personnel with information and instruction regarding meter enforcement.

      i.     Concessionaire management personnel will be responsible for training all Concessionaire field staff.

      ii.     Concessionaire shall develop additional training material, as necessary, and submit updated training material to DOR for approval.

      iii.     Concessionaire will provide DOR with training dates. DOR reserves the right to attend Concessionaire's training sessions.

l.     The Concessionaire must receive training to identify other issues in the field, including homelessness, illegal activities, dangerous conditions, etc.

      i.     In the course of performing enforcement activities, the Concessionaire's enforcement personnel must use handhelds to identify stolen vehicles (to the extent such information is available to Concessionaire) and report them to the Department of Police immediately. Such vehicles should not be ticketed.

      ii.     The Concessionaire may program the Nextels (or other communications devices) and handhelds of personnel to receive information about Amber Alerts and must report instances to the Department of Police immediately.

m.  The Concessionaire must hold the City harmless from any damage caused to both City property and private vehicles through its enforcement efforts. Concessionaire and personnel must hold City harmless for any injuries in the field.

n.  Concessionaire must conduct enforcement activities so as to cause a minimum of noise and disruption to traffic flows. Whenever the DOR determines that the enforcement activities constitute nuisances, Concessionaire will immediately proceed to conduct its operations in an approved manner.

METER VIOLATION DATABASE AND ADJUDICATION PROCESS REQUIREMENTS

The Concessionaire shall maintain a database system capable of providing information to the Department of Administrative Hearings for purposes of adjudicating cases involving meter violations (the "Adjudication Database"). The Adjudication Database should be web-based allowing the Department of Administrative Hearings real-time access to meter data (as described herein). The Adjudication Database shall contain the following functional capabilities:

1.0   Meter Search – ability to search by:
    1.1   meter number
    1.2   street address
    1.3   area number
    1.4   provides navigation to Meter Detail
    1.5   provides navigation to Block Detail
    1.6   provides navigation to Area Detail

2.0   Meter Detail – displays information which includes:
    2.1   meter number and area
    2.2   installation date
    2.3   street address
    2.4   meter zone (for Park Magic reference)
    2.5   days and hours of operation
    2.6   rate and time limit information (ie: $0.25 for 1 hour, 2 hour max)
    2.7   stall number (associated with the meter number)
    2.8   manufacturer information
        2.8.1   meter type (old style mechanical operation, alkaline or lithium battery powered digital)
        2.8.2   meter description (whether the meter is a single head, single stall; single head, double stall; double head; or a pay and display box)
    2.9   contains a field which identifies any stickers, decals or verbiage on the meter such as:
        2.9.1   Meter hours 9 AM - 6PM unless otherwise posted
        2.9.2   No parking permitted during rush hour
        2.9.3   Park Magic Zone sticker
    2.10   provides navigation to Meter Search
    2.11   provides navigation to Block Detail
    2.12   provides navigation to Area Detail
    2.13   provides navigation to Meter List of Problem calls
    2.14   provides navigation for Administrative Law Officers ("ALO") to Add Problem calls

3.0   Block Detail – displays information about a specific block and the meter locations associated with that block, and includes:
    3.1   a description of the block location, including intersecting streets
    3.2   days and hours of operation
    3.3   rate and time limit information (i.e.: $0.25 for 1 hour, 2 hour max)
    3.4   stall number (associated with the meter number)

3.5     list of addresses within a particular block and the corresponding meter number and description (single head, single stall; single head, double stall; double head, double stall; pay and display box)

3.6     provides navigation to Meter Search

3.7     provides navigation to Meter Detail

4.0     <u>Area Detail</u> – displays block by block information with intersecting cross streets, and:

4.1     days and hours of operation

4.2     rate and time limit information (i.e.: $0.25 for 1 hour, 2 hour max)

4.3     provides navigation by selection of a specific block to Meter Block Detail (which often lists bus stops, loading zones, etc.)

5.0     <u>Meter List of Problem Calls</u> – provides a comprehensive list of all calls by:

5.1     meter number and area

5.2     meter location

5.3     manufacturer information

    5.3.1   meter type (old style mechanical operation, alkaline or lithium battery powered digital)

    5.3.2   meter description (whether the meter is a single head, single stall; single head, double stall; double head; or a pay and display box)

5.4     a list ordered by date and time of problem calls which displays

    5.4.1   the most recent problem call date and time first

    5.4.2   provides the repair date and time for each problem

    5.4.3   a brief description of the problem

    5.4.4   and does not limit the number of entries which-can be displayed

5.5     the source of the problem call

    5.5.1   Customer Service Representatives

    5.5.2   Citizens via 311 operator

    5.5.3   Parking Enforcement Officers via handheld Autocites

    5.5.4   Citizens via the Voice Response Unit

    5.5.5   Administrative Law Officers' e-mail requests to check meter status

    5.5.6   Citizen e-mails reporting meter problems received via the City's web page

    5.5.7   found during routine maintenance

5.6     provides navigation to Meter Search

5.7     provides navigation to Meter Detail

5.8     provides navigation to Meter Problem Call Detail

5.9     provides navigation for ALOs to Add Problem Calls, which sends an e-mail to the meter operations vendor to dispatch maintenance personnel to check a specific meter number or street address

6.0     <u>Meter Problem Call Detail</u> – displays the details of a problem with a specific meter and includes:

6.1     meter number and area

6.2     meter location

6.3     manufacturer information

    6.3.1   meter type (old style mechanical operation, alkaline or lithium battery powered digital)

        6.3.2    meter description (whether the meter is a single head, single stall; single head, double stall; double head; or a pay and display box)

6.4      a user friendly, detailed description of

        6.4.1    the date, time and source of specific problem reported

        6.4.2    specific information about the type of problem reported

        6.4.3    the condition of the meter upon arrival of the repair technician (and whether or not the meter was broken upon arrival)

        6.4.4    the steps taken to repair the meter if it was broken

        6.4.5    date and time specific problem resolved and the meter was placed back in service as operable

6.5      a user friendly, detailed description of

        6.5.1    the date and time of routine maintenance and repairs

        6.5.2    a note indicating whether or not the meter remained operable during that maintenance and repair

        6.5.3    the date and time specific maintenance and repairs were completed and the meter was placed back in service as operable

6.6      provides navigation to Meter Search

6.7      provides navigation to Meter Detail

6.8      provides navigation to Meter List of Problem Calls

6.9      provides navigation for ALOs to Add Problem Calls, which sends an e-mail to the meter operations vendor to dispatch maintenance personnel to check a specific meter number or street address

7.0      <u>Meter Add Problem Call</u> – allows ALOs and authorized Department of Administrative Hearings staff to report a meter problem directly to the meter vendor for repair technician dispatch and includes:

7.1      meter number and area

7.2      meter location

7.3      manufacturer information

        7.3.1    meter type (old style mechanical operation, alkaline or lithium battery powered digital)

        7.3.2    meter description (whether the meter is a single head, single stall; single head, double stall; double head; or a pay and display box)

7.4      a field which defaults to and populates the current date and time for purposes of problem reporting

7.5      a field which automatically captures and populates the name and user ID of the person reporting the problem (Problem Source)

7.6      a user friendly problem description field with a drop down menu of common problems to choose from

        7.6.1    if "Other" is selected in the drop down problem description menu, a pop up message will appear that a note is required

        7.6.2    the user's cursor then defaults to the notes field for entry of a short description of any meter problem not contained in the drop down menu

7.7      a separate comments field allows users to make inquiries and include specific notes to the meter repair technician

<u>Additional Requirements</u>:

1.) For security purposes, the Concessionaire must obtain and store in retrievable form the user ID, name or some other identifier of the vendor employee or other person creating the problem call.

2.) The Concessionaire must provide user training and user training manuals and materials specifically designed for Administrative Law Officers which include a glossary of terms, repair codes, etc.

**SCHEDULE 4**

**METERED PARKING SYSTEM ASSETS**

METERING DEVICES

Reference is hereby made to SCHEDULE 5 and the column entitled "No. of Metering Devices."

EQUIPMENT, SOFTWARE, COMMUNICATION SYSTEMS AND SPARE PARTS
INVENTORY

To the extent located within the Metered Parking System, the equipment, software, hardware, communications systems and spare parts inventory relating to and used solely in connection with the operations of the Metered Parking System, except for that certain equipment, software, hardware, communications systems and spare parts to be utilized by the City in connection with the fulfillment of its obligations and enforcement of its rights under the Concession Agreement.

**SCHEDULE 5**

**METERED PARKING SYSTEM**

**SCHEDULE 6**

**ARTICLE 7 METHODOLOGY**

To the extent that there is any inconsistency between the terms set forth in Articles 1 through 20 and <u>Schedule 6</u>, the terms set forth in Articles 1 through 20 shall govern.

---

## 1. SETTLEMENT SYSTEM REVENUE VALUE

---

This is the hypothetical amount of revenue that would have been produced in the preceding Reporting Year if the entire System were in place. It is re-calculated once each Reporting Year as of the first Day of the Reporting Year, March 1.

***Calculating Settlement System Revenue Value***

- **As of March 1, 2013:** Settlement System Revenue Value = Aggregate Revenue Value as set forth in Amended Schedule 10 / Monthly System in Service Percentage for March 1, 2013.

- **As of any other March 1 beginning March 1, 2014:** Settlement System Revenue Value = (Actual System Operating Revenue for the preceding Reporting Year / simple average of the Monthly System in Service Percentages during the preceding Reporting Year) plus Required Closure Payments for the preceding Reporting Year.

---

## 2. QUARTERLY SETTLEMENT AMOUNT

---

***Step 1 – Calculating Required Closure Payment (if any)***

Required Closure Payments are calculated for each month for each Concession Metered Parking Space for which the Required Closure Allowance has been exceeded. The City owes a Required Closure Payment for each Day of Required Closure in excess of the Required Closure Allowance.

Required Closure Payments for each Day are aggregated each month to arrive at a monthly amount and the monthly Required Closure Payments for the three months in each Quarter are then totaled and paid as part of the Quarterly Settlement Amount.

*Calculating Monthly Required Closure Payment*

For a given Concession Metered Parking Space ($s$) in month ($m$), the Required Closure Payment ($RCP$) is calculated using the following formula:

**$RCP(s,m) = CPAD(s,m) \ x \ (the \ greater \ of \ 0 \ or \ RCAB_{EOM}(s,m))$**

The formulas for calculating *CPAD* and $RCAB_{EOM}$ are set forth below.

$$CPAD(s,m) = \frac{RV(s,m) * 25\%}{Days(q)}$$

Where:

    *CPAD* is the Closure Payment Amount per Day for a Concession Metered Parking Space *s* in month *m*

    *s* is a Concession Metered Parking Space

    *m* is the month

    *q* is the quarter to which *m* belongs

    *RV* is the Revenue Value of that space *s* on the given month *m*

    *Days* is the number of days within *q*

$RCAB_{EOM}(s,m) = RCAB_{SOM}(s,m)+QRC(s,m)$

Where:

    *s* is the Concession Metered Parking Space

    *m* is the month

    $RCAB_{EOM}$ is the Required Closure Allowance Balance at the end of the month; *provided, however,* that if *s* is added as a Concession Metered Parking Space during *m*, $RCAB_{EOM}$ is zero

    $RCAB_{SOM}$ is the Required Closure Allowance Balance as of the start of the month (<u>calculated using the formula below</u>); *provided, however,* that if *s* was added as a Concession Metered Parking Space during $m_{-1}$, $RCAB_{SOM}$ is the Required Closure Allowance Balance as of the first Day during $m_{-1}$ that *s* became a designated Concession Metered Parking Space

    *QRC* is the number of Days of Required Closure in *m* for *s*; *provided, however,* that if *s* was added as a Concession Metered Parking Space during $m_{-1}$, *QRC* is the number of Days of Required Closure during $m_{-1}$ and *m*

        *-RCA(s,m)*      *if m is the first month in a Reporting Year or if s was not a Concession Metered Parking Space for all of $m_{-1}$*

$RCAB_{SOM}(s,m) =$      *or*

        *min(0, $RCAB_{EOM}(s,m_{-1})$*      *in all other cases*

Where:

    *s* is the Concession Metered Parking Space

    *m* is the month

    $m_{-1}$ is the month before *m*

*RCA* is the Required Closure Allowance

$RCAB_{EOM}$ is the Required Closure Allowance Balance at the end of the month

*RCA(s,m)* = if the Concession Metered Parking Space is in the Central Business District, the number equal to 8% of the number of Days during the Reporting Year that such Concession Metered Parking Space was a designated Concession Metered Parking Space for Metered Parking System Operations (rounded to the nearest number of Days) and based upon the assumption that such Concession Metered Parking Space will continue to be a Concession Metered Parking Space for the remainder of the Reporting Year.

*RCA(s,m)* = if the Concession Metered Parking Space is not in the Central Business District, the number equal to 4% of the number of Days during the Reporting Year that such Concession Metered Parking Space was a designated Concession Metered Parking Space for Metered Parking System Operations (rounded to the nearest number of Days) and based upon the assumption that such Concession Metered Parking Space will continue to be a Concession Metered Parking Space for the remainder of the Reporting Year.

Whenever $RCAB_{EOM}$ is positive, the space has exceeded its Required Closure Allowance and the City is required to make Required Closure Payments with respect to the space.

Whenever $RCAB_{EOM}$ is zero or negative, there are no Required Closure Payments.

*Calculating Quarterly Required Closure Payment*

The Required Closure Payment for a Quarter is equal to the total of the monthly Required Closure Payments calculated in accordance with the above calculations for each of the three months in that Quarter.

### Step 2 – Calculating Quarterly System in Service ("Quarterly SIS")

- Quarterly SIS = Simple average of the Monthly System In Service Percentages for each month in that Quarter.

### Step 3 – Calculating Quarterly Settlement Amount

- **For each Quarter, beginning with the Quarter commencing March 1, 2013:**
  Quarterly Settlement Amount = Required Closure Payments + [25% * Settlement System Revenue Value * (1 + Annual Percentage Adjustment) * (1 – Quarterly SIS)].

---

## 3. MONTHLY SYSTEM IN SERVICE PERCENTAGE

---

### Step 1 – Calculating Existing System Revenue

- Existing System Revenue = Sum of the Existing Revenue of all Concession Metered Parking Spaces.

***Step 2 – Calculating Aggregate Revenue Value***

- Aggregate Revenue Value = Sum of the Revenue Values of all Concession Metered Parking Spaces + Sum of the Revenue Value Adjustments of all Concession Metered Parking Spaces.

***Step 3 – Calculating Reserved Powers System Impact ("RPSI")***

- RPSI = 1 – (Aggregate Revenue Value / Existing System Revenue).

***Step 4 – Calculating Monthly System in Service Percentage ("SISP")***

- **As of March 1, 2013**: Monthly SISP = Aggregate Revenue Value as of March 1, 2013 / (Aggregate Revenue Value as of March 1, 2013 + $4.5 million).

- **As of any March 1, beginning on March 1, 2014**:  Monthly SISP = Preceding month SISP * [1-RPSI] * [1 / (1 + Annual Percentage Adjustment)].

- **As of the first day of any other month**: Monthly SISP = Preceding month SISP * [1-RPSI].

---

## 4. REVENUE VALUE

---

***Step 1 – Determining the Method for Calculation***

- If neither a Regular Rate Adjustment nor an Expected Utilization Rate became effective with respect to a Concession Metered Parking Space during the preceding month, the Revenue Value for that space equals its Existing Revenue.

- Accordingly, only Concession Metered Parking Spaces for which a Regular Rate Adjustment or an Expected Utilization Rate became effective during the preceding month require a separate Revenue Value calculation.

***Step 2 – Calculating Existing Revenue***

- **As of March 1, 2013**: Existing Revenue =  Revenue Value as set forth on Amended Schedule 10.

- **As of March 1, 2014, for all Impacted Concession Metered Parking Spaces if Revenue Value was unchanged during the preceding Reporting Year and an Expected Utilization Rate did not become effective during the preceding Reporting Year:** Existing Revenue = [Actual Operating Revenue for the period starting the first Day of the month after the Implementation Date through January 31, 2014 + Required

Closure Payments for the period starting the first Day of the month after the Implementation Date through January 31, 2014] * [Adjustment for Seasonality set forth on Amended Schedule 10].

- **As of  March 1, 2014, for all Non-Impacted Concession Metered Parking Spaces if Revenue Value was unchanged during the preceding Reporting Year and an Expected Utilization Rate did not become effective during the preceding Reporting Year**: Existing Revenue = Actual Operating Revenue for the preceding Reporting Year + Required Closure Payments for the preceding Reporting Year.

- **As of any March 1 beginning March 1, 2015, if Revenue Value was unchanged during the preceding Reporting Year and  an Expected Utilization Rate did not become effective during the preceding Reporting Year**: Existing Revenue = preceding Reporting Year Actual Operating Revenue + preceding Reporting Year Required Closure Payments.

- **As of any March 1 beginning March 1, 2015, if any Concession Metered Parking Space  qualified as a CLZ Affected Concession Metered Parking Space with respect to a CLZ Change occurring during the preceding Reporting Year, or such Concession Metered Parking Space qualified as a CLZ Affected Concession Metered Parking Space with respect to a CLZ Change which was reversed by the City during the preceding Reporting Year**:  Existing Revenue = the preceding month's Revenue Value

- **Otherwise, on the first day of the month:**  Existing Revenue = preceding month's Revenue Value.

### Step 3 – Calculating Revenue Value

(a) **As of March 1, 2013**: Revenue Value = Revenue Value as set forth on Amended Schedule 10.

(b) **As of the first Day of any month if neither a Regular Rate Adjustment nor an Expected Utilization Rate became effective during the preceding month:** Revenue Value = Existing Revenue.

(c) **As of the first Day of the month immediately following a month during which an Expected Utilization Rate became effective:** Revenue Value = Full Utilization Amount as of the first Day of the month for which Revenue Value is being determined * Expected Utilization Rate + any reduction as required in accordance with the Rate to Fine Multiple pursuant to Section 7.9(e).

(d) **As of the first Day of any month in which a Regular Rate Adjustment became effective in the prior month (unless there was also another Reserved Power action,**

**and an Expected Utilization Rate became effective, during that prior month in which case use the calculation in (c) above)**: Revenue Value = [(the Full Utilization Amount as of the first Day of the month for which Revenue Value is being determined / the Full Utilization Amount as of the first Day of the preceding month) * the Existing Revenue as of the first Day of the month for which Revenue Value is being determined] + any reduction as required in accordance with the Rate to Fine Multiple pursuant to Section 7.9(e).

(e) **As of the first Day of any month immediately following a month during which a Reserved Power action was reversed by the City pursuant to Section 7.9(h) (unless (i) an Expected Utilization Rate was in effect as of the first Day of the month the Reserved Power subject to the reversal became effective, or (ii) following the reversal during the prior month, a Reserved Power action and an Expected Utilization Rate became effective, in each case use the calculation in (c) above):** Revenue Value = the Full Utilization Amount as of the first Day of the month for which Revenue Value is being determined * the Utilization Rate in effect as of the first Day of the month the Reserved Power subject to the reversal became effective + any reduction as required in accordance with the Rate to Fine Multiple pursuant to Section 7.9(e).

(f) **As of February 1 and March 1 if a Regular Rate Adjustment became effective during the preceding January (unless there was also another Reserved Power action, and an Expected Utilization Rate became effective, during the preceding January):** Revenue Value is determined as though the Regular Rate Adjustment had become effective during February.

---

## 5. REVENUE VALUE ADJUSTMENT

*Step 1 – Calculating Expected Utilization Adjustment*

- **On every March 1, beginning March 1, 2015**: Expected Utilization Adjustment = (Measured Utilization Rate - Expected Utilization Rate) / Measured Utilization Rate.

- **On the first day of any other month**: Expected Utilization Adjustment = 0.

*Step 2 –Calculating Revenue Value Adjustment*

- **On every March 1, beginning March 1, 2015**: Revenue Value Adjustment = Revenue Value * Expected Utilization Adjustment.

- **On the first day of any other month**: Revenue Value Adjustment = 0.

The Revenue Value Adjustment is calculated solely for purposes of calculating the Quarterly Settlement Amount. The Revenue Value Adjustment does not increase or decrease the Revenue Value of a Concession Metered Parking Space.

**SCHEDULE 7**

**CONCESSION METERED PARKING SPACES**

Reference is hereby made to SCHEDULE 5 and the column entitled "No. of Concession Metered Parking Spaces."

**SCHEDULE 8**

**INTENTIONALLY DELETED**

## SCHEDULE 9

## INITIAL PARKING FEES

*The Schedule of Initial Parking Fees below is subject to the terms and provisions of the Metered Parking System Ordinance. Reference is hereby made to the Metered Parking System Ordinance for a complete and comprehensive review of the Initial Parking Fees.*

(a) Except as provided in subsection (d), within the area bounded by the south side of Congress Parkway on the south, Lake Michigan on the east, the north side of Wacker Drive on the north, and the west side of Wacker Drive on the west, the fee shall be:

(1)     $3.50 per hour on and from January 1, 2009, through and including December 31, 2009;

(2)     $4.25 per hour on and from January 1, 2010, through and including December 31, 2010;

(3)     $5.00 per hour on and from January 1, 2011, through and including December 31, 2011;

(4)     $5.75 per hour on and from January 1, 2012, through and including December 31, 2012;

(5)     $6.50 per hour on and from January 1, 2013, and thereafter.

(b) Except as provided in subsection (d), within the area bounded by the south side of Roosevelt Road on the south, Lake Michigan on the east, the north side of North Avenue on the north, and the west side of Halsted Street on the west, excluding the area within the boundaries designated in subsection (a) of this section, the fee shall be:

(1)     $2.00 per hour on and from January 1, 2009, through and including December 31, 2009;

(2)     $2.50 per hour on and from January 1, 2010, through and including December 31, 2010;

(3)     $3.00 per hour on and from January 1, 2011, through and including December 31, 2011;

(4)     $3.50 per hour on and from January 1, 2012, through and including December 31, 2012;

(5)     $4.00 per hour on and from January 1, 2013, and thereafter.

(c) Except as provided in subsection (d), within all areas of the City, except for the areas within the boundaries designated in subsections (a) and (b) of this section, the fee shall be:

(1) $.1.00 per hour on and from January 1, 2009, through and including December 31, 2009;

(2) $1.25 per hour on and from January 1, 2010, through and including December 31, 2010;

(3) $1.50 per hour on and from January 1, 2011, through and including December 31, 2011;

(4) $1.75 per hour on and from January 1, 2012, through and including December 31, 2012;

(5) $2.00 per hour on and from January 1, 2013, and thereafter.

(d) Within any area where a parking meter operates 24 hours per day, (1) prior to the Effective Date Of First Amendment, between the hours of 9 p.m. and 8 a.m., the rate shall be fifty percent of the applicable rate set forth in subsections (a), (b) and (c) above, and (2) following the Effective Date Of First Amendment, the rate shall be as set forth in Amended Schedule 10.

(e) Notwithstanding the above, if, in the determination of the director of revenue, a reduction in the parking meter rates for certain locations of the city would result in more efficient traffic flow or reduction of traffic congestion in that location, the director may reduce the parking meter rates for that particular location; provided that the reduction shall not be greater than twenty-five percent of the applicable rate for that location.

**SCHEDULE 10**

**REVENUE VALUE**

To the extent that there is any inconsistency between the terms set forth in Articles 1 through 20 and this Amended Schedule 10, the terms set forth in Articles 1 through 20 shall govern.

## SCHEDULE 11

## FORM OF LEGAL OPINION OF THE CITY

[Letterhead of Counsel to the City]

[Closing Date]

Chicago Parking Meters, LLC
1585 Broadway, 39th Floor
New York, New York 10036

Ladies and Gentlemen:

We have acted as special counsel to the City of Chicago (the "City") in connection with the grant of the right to operate the Metered Parking System, from the City to Chicago Parking Meters, LLC (the "Concessionaire") pursuant to the Chicago Metered Parking System Concession Agreement, dated as of December 4, 2008 (the "Agreement"), by and between the City and Concessionaire. This opinion is being delivered to you pursuant to Section 2.4(a) of the Agreement. Capitalized terms used and not otherwise defined herein shall have the respective meanings set forth in the Agreement.

We have examined originals or copies, certified or otherwise identified to our satisfaction, of (i) the Agreement; (ii) the Metered Parking System Ordinance; (iii) the Lender Consent dated _____, 200__ (the "Lender Consent") given by the City to the Concessionaire and to _____; and (iv) such other records and writings as we have deemed necessary as the basis for the opinions set forth below. In connection with such examination, we have assumed the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to authentic, original documents of all documents submitted to us via facsimile or otherwise as certified, conformed or photostatic copies, and the completeness of all records of corporate proceedings provided to us.

We express no opinion as to the applicability or effect of the laws of any state or jurisdiction other than the laws of the State of Illinois.

Based on and subject to the foregoing and the qualifications referred to below, we are of the opinion that, on the date hereof:

1. The City is a municipality and home rule unit of local government, duly organized and existing under the Constitution and laws of the State of Illinois.

2. The City Council of the City has (i) duly adopted the Metered Parking System Ordinance, which remains in full force and effect, (ii) duly authorized and approved the execution and delivery of the Agreement and other documents related to the transactions contemplated by the Agreement, including the Lender Consent and (iii) duly authorized and approved the performance by the City of its obligations contained in the Agreement. The City has the power and authority to adopt the Metered Parking System Ordinance, to enter into the Agreement and to do all acts and things and execute and deliver all other

documents as are required under the Agreement to be done, observed or performed by the City in accordance with the terms thereof.

3.      The Agreement and the Lender Consent have each been duly authorized, executed and delivered by the City and each constitutes a valid and legally binding obligation of the City, enforceable against the City in accordance with the terms hereof, subject only to applicable bankruptcy, insolvency and similar laws affecting the enforceability of the rights of creditors generally and the general principles of equity.

This opinion is rendered solely for your information in connection with the transaction described above and may not be relied upon by you in any other capacity or for any other purpose and may not be used or relied upon by any other Person for any purpose without our express prior written consent, except that this opinion may be relied upon by [_____], as administrative agent for the lenders providing financing to the Concessionaire in connection with the Transaction.

Very truly yours,

[Counsel to the City]

**SCHEDULE 12**

**FORM OF LEGAL OPINION OF THE CONCESSIONAIRE**

[Letterhead of Counsel to the Concessionaire]

[Closing Date]

City of Chicago
121 North LaSalle Street
Chicago, Illinois 60602

Ladies and Gentlemen:

We have acted as special counsel to Chicago Parking Meters, LLC, a limited liability company organized and existing under the laws of the State of Delaware (the "Concessionaire"), in connection with the grant of the right to operate the Metered Parking System, from the City to the Concessionaire pursuant to the Chicago Metered Parking System Concession Agreement, dated as of December 4, 2008 (the "Agreement"), by and between the City and Concessionaire. This opinion is being delivered to you pursuant to Section 2.4(b) of the Agreement. Capitalized terms used and not otherwise defined herein shall have the respective meanings set forth in the Agreement.

We have examined originals or copies, certified or otherwise identified to our satisfaction, of (i) the Agreement; and (ii) such other records and writings as we have deemed necessary as the basis for the opinions set forth below. In connection with such examination, we have assumed the genuineness of all signatures, the legal capacity of all natural persons, the authenticity of all documents submitted to us as originals, the conformity to authentic, original documents of all documents submitted to us via facsimile or otherwise as certified, conformed or photostatic copies, and the completeness of all records of corporate proceedings provided to us.

We express no opinion as to the applicability or effect of the laws of any state or jurisdiction other than the laws of the State of [•].

Based on and subject to the foregoing and the qualifications referred to below, we are of the opinion that, on the date hereof:

1.      The Concessionaire is duly organized, validly existing and in good standing as a limited liability company under the laws of the State of Delaware.

2.      The Concessionaire has the power and authority to enter into the Agreement and to do all acts and things and execute and deliver all other documents as are required under the Agreement to be done, observed or performed by the Concessionaire in accordance with the terms thereof.

3.      The Concessionaire has duly authorized, executed and delivered the Agreement, and the Agreement constitutes a valid and legally binding obligation of the Concessionaire, enforceable against it in accordance with the terms hereof, subject only to applicable

bankruptcy, insolvency and similar laws affecting the enforceability of the rights of creditors generally and the general principles of equity.

This opinion is rendered solely for your information in connection with the transaction described above and may not be relied upon by you in any other capacity or for any other purpose and may not be used or relied upon by any other Person for any purpose without our express prior written consent.

Very truly yours,

[Counsel to the Concessionaire]

**SCHEDULE 13**

**FINANCIAL INFORMATION**

**SCHEDULE 14**

**EXEMPT PERSONS STATISTICAL SAMPLING METHODOLOGY**

In determining Exempt Persons Annual Loss, the Concessionaire will utilize statistical sampling in accordance with the standards and the methodology set forth below. Certain defined terms used herein shall have the meanings ascribed to such terms in the Concession Agreement and in the last five paragraphs of this Schedule.

- Exempt Person Annual Loss will be calculated separately for each Zone. Any Concession Metered Parking Spaces within a Zone that have different Metered Parking Fee Rate shall be calculated separately.
    - For example, at the start of the Term, Exempt Person Annual Loss = Exempt Person Annual Loss Zone 1 + Exempt Person Annual Loss Zone 2 + Exempt Person Annual Loss Zone 3 + Exempt Person Annual Loss Zone 4 + Exempt Person Annual Loss Zone 5;
    - For any Zone not surveyed by the Concessionaire, Exempt Person Annual Loss shall be zero.

- Exempt Person Annual Loss will be calculated quarterly.
    - CPM may calculate EPAL for the 2010-2011 Reporting Year in accordance with the following schedule:
        - One (1) Calculation during each of the second, third and fourth quarter of the Reporting Year; and
        - One (1) additional Calculation during either of the second or third quarter of the Reporting Year, as elected by CPM, with such additional Calculation to occur at a reasonable interval from the other Calculations.

- Proportion of Exempt Persons to Paying Parkers will be multiplied by actual revenue collected in that Zone to determine the Exempt Person Annual Loss for that Zone.
    - For example, at the start of the Term, Exempt Person Annual Loss Zone 1 = Zone 1 actual revenue * (Exempt Persons / Paying Parkers)

- The Proportion of Exempt Persons to Paving Parkers will be determined through a survey taken on:
    - One weekday during the quarter;
    - One weekend day during the quarter.

- The Proportion of Exempt Persons to Paying Parkers will be the weighted average of the results of the two samples (5 days for the weekday sample and 2 days for the weekend sample). The weighted average will be calculated by multiplying by 5 the number of weekday sampled Exempt Persons plus multiplying by 2 the number of weekend day sampled Exempt Persons and dividing the sum by 5 times the number of weekday sampled Paying Parkers plus 2 times the number of weekend day sampled Paying Parkers.

- Survey procedures:
    - At least 10% of the Concession Metered Parking Spaces within each of the defined Zones are to be randomly selected and surveyed, except that with respect

to Zone 1, those Concession Metered Parking Spaces not selected for survey shall have a value of zero in determining Exempt Person Annual Loss.
- o Each surveyed block within the selected area is to be observed four times during the survey day with at least 2 hours between the observation times
- o Surveyor shall record:
  - The total number of vehicles parked on block;
  - The total number of vehicles parked on block that have validly paid for parking (Paying Parkers);
  - The total number of vehicles parked on block that display an Exempt Person placard (such as a disabled parking placard).

Zone 1 "<u>CBD</u>" *means the area bounded by the north side of North Avenue on the north, Lake Michigan on the east, the south side of Roosevelt Road on the south and the west side of Halsted Street on the west.*

Zone 2 "<u>North Side</u>" *means the area bounded by City Limits on the north, Lake Michigan on the east, North Avenue on the south and City Limits on the west; provided that Zone 2 shall not include any portion of North Avenue itself.*

Zone 3 "<u>West Side</u>" *means the area bounded by the north side of North Avenue on the north, Halsted Street on the east, the south side of Roosevelt Road on the south and City Limits on the west; provided that Zone 3 shall not include any portion of Halsted Street itself.*

Zone 4 "<u>South Side</u>" *means the area bounded by Roosevelt Road on the north, Lake Michigan on the east, City Limits on the south and City Limits on the west; provided that Zone 4 shall not include any portion of Roosevelt Road itself.*

## SCHEDULE 15

## PARKING ZONES

**Zone 1:** an area bounded on the north and west by the City limits, on the south by North Avenue (with no part of North Avenue being included) from the City limits on the west and running east to Interstate 90/94, then northwest along I-90/94 to Cortland Street, then west along Cortland Street (with no part of Cortland Street being included) to Wood Street, then north along Wood Street (with no part of Wood Street being included) to I-90/94, then northwest along I-90/94 to Belmont Avenue, then east on Belmont Avenue (with both sides of Belmont Avenue being included) to Western Avenue, then north along Western Avenue (with both sides of Western Avenue being included) to Addison Street, then east on Addison Street (with no part of Addison Street being included) to Ashland Avenue, then north on Ashland Avenue (with no part of Ashland Avenue being included) to Irving Park Road, then east on Irving Park Road (with both sides of Irving Park Road being included) to Clark Street, then south on Clark Street (with no part of Clark Street being included) to Grace Street, then east on Grace Street (with no part of Grace Street being included) to Sheffield Avenue, then south on Sheffield Avenue (with both sides of Sheffield Avenue being included) to Addison Street, then east on Addison Street (with no part of Addison Street being included) to Broadway, then south on Broadway (with both sides of Broadway being included) to Cornelia Avenue, then northeast on Cornelia Avenue (with no part of Cornelia Avenue being included) to Pine Grove Avenue, then north on Pine Grove Avenue (with both sides of Pine Grove Avenue being included) to Irving Park Road, then east on Irving Park Road (with both sides of Irving Park Road being included) to Lake Michigan, then north along Lake Michigan to the City limits on the north.

**Zone 2:** an area bounded on the east by Lake Michigan, on the south by North Boulevard running west to North Avenue and then running west to I-90/94 (with no part of North Boulevard or North Avenue included), and on the west and north by the boundary with Zone 1.

**Zone 3:** an area bounded on the west by the City limits, on the south by Roosevelt Road (with both sides of Roosevelt Road being included), on the east by Halsted Street (with no part of Halsted Street being included), and on the north by North Avenue (with both sides of North Avenue being included).

**Zone 4:** an area bounded on the south by Roosevelt Road (with both sides of Roosevelt Road being included), on the west by Halsted Street (with both sides of Halsted Street being included), on the north by North Avenue (with both sides of North Avenue being included) and on the east by Lake Michigan; provided, however, that Zone 4 shall not include any area which is part of Zone 5.

**Zone 5:** an area bounded on the east by Lake Michigan, on the north and west by the Chicago River and on the south by Congress Parkway (with both sides of Congress Parkway being included) running east to Lake Michigan.

**Zone 6:** an area bounded on the south and the west by the City limits, on the north by Roosevelt Road (with no part of Roosevelt Road being included) running east to Damen Avenue, then south on Damen Avenue (with no part of Damen Avenue being included) to West 19th Street,

then east on West 19th Street (with no part of West 19th Street being included) to Ashland Avenue, then south on Ashland Avenue (with no part of Ashland Avenue being included) to Archer Avenue, then northeast on Archer Avenue (with no part of Archer Avenue being included) to West 31st Street, then southeast on West 31st Street, continuing through Pitney Court, then east on West 31st Street (with no part of West 31st Street being included) to I-90/94, then south on I-90/94 to West 43rd Street, then east on West 43rd Street (with no part of West 43td Street being included) running east to Lake Michigan, then south along Lake Michigan to the City limits on the east, then south along the City limits on the east to the City limits on the south.

**Zone 7:** an area bounded on the east by Lake Michigan, on the north by Roosevelt Road (with no part of Roosevelt Road being included), and on the west and south by the boundary with Zone 6.

**EXHIBIT A**

**METERED PARKING SYSTEM ORDINANCE**

# ORDINANCE

**WHEREAS**, the City of Chicago (the "City") is a body politic and corporate under the laws of the State of Illinois and a home rule unit of local government under Article VII of the 1970 Constitution of the State of Illinois; and

**WHEREAS**, the City owns and controls metered parking spaces, parking meters, pay and display stations, electronic metering devices, and other similar devices (collectively, "Parking Fee Collection Devices") and certain parking lots containing Parking Fee Collection Devices (together with the PBC Parking Lot hereinafter referred to, the "City Lots") including all improvements and supporting structures, computer systems and software used in connection with the administration thereof and the collection of metered parking fees therefrom (collectively, the "Chicago Metered Parking System"); and

**WHEREAS**, the Public Building Commission of Chicago (the "PBC") owns the metered parking lot located at 1752 West 95th Street, Chicago, Illinois, as more particularly described in Exhibit A, which is attached hereto and made a part hereof (the "PBC Parking Lot"); and

**WHEREAS**, the City desires to acquire the PBC Parking Lot and include the PBC Parking Lot in the Chicago Parking Metered System by accepting a conveyance by recordable deed and transfer of title from the PBC to the City of the PBC Parking Lot; and

**WHEREAS**, the PBC approved the conveyance of the PBC Parking Lot to the City on August 12, 2008; and

**WHEREAS**, the City requested qualifications from entities or groups of entities interested in making offers to enter into a concession transaction (the "Concession Transaction") whereby the City will grant certain rights to operate, maintain, improve, install and remove, and collect fees from, Parking Fee Collection Devices in the Chicago Metered Parking System, to the successful respondent pursuant to a concession agreement (the "Concession Agreement") which grants to such respondent, among other things, the right to collect and retain the metered parking fees from the metered parking spaces designated from time to time in the Concession Agreement as "Concession Metered Parking Spaces" and to be compensated for the respondent's services in connection with metered parking spaces designated from time to time in the Concession Agreement as "Reserve Metered Parking Spaces," as otherwise expressly set forth in the Concession Agreement; the City determined that certain of the respondents were qualified to enter into the Concession Transaction (the "Qualified Respondents"); and the City provided to the Qualified Respondents materials and information concerning the Chicago Metered Parking System and the Concession Transaction; and

**WHEREAS**, the City issued a form for submission by the Qualified Respondents of binding offers to enter into the Concession Transaction based upon the final form of the Concession Agreement and Chicago Parking Meters, LLC (the "Concessionaire") is the Qualified Respondent whose offer provides the highest consideration to the City in the amount of $1,156,500,000; and

**WHEREAS**, it is in the best interests of the residents of the City and desirable for the welfare of its government and affairs to authorize the Concession Transaction with the Concessionaire and to accept from the PBC the title to the PBC Parking Lot; and

**WHEREAS**, the operation and maintenance of the Chicago Metered Parking System by the Concessionaire pursuant to the Concession Agreement will require amendments to the Municipal Code of Chicago (the "Municipal Code") to authorize the Concessionaire to operate and maintain the Chicago Metered Parking System; and

**WHEREAS**, it is advisable and necessary to authorize the execution and delivery of such documents and agreements, and the performance of such acts, as shall be necessary in connection with the conveyance of the title to the PBC Parking Lot, and the consummation of the Concession Transaction:

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF CHICAGO:**

**SECTION 1.** Incorporation of Recitals. The above recitals are expressly incorporated in and made a part of this ordinance as though fully set forth herein.

**SECTION 2.** Authorization of the Concession Transaction. The Mayor and the Chief Financial Officer are each authorized to enter into the Concession Agreement with the Concessionaire, providing for initial consideration to the City in the amount of $1,156,500,000 (as adjusted in accordance with the terms of the Concession Agreement), in substantially the same form attached as Exhibit B to this ordinance, or with such changes as are not inconsistent with this ordinance and are approved by the executing officer, such officer's execution of the Concession Agreement to constitute conclusive evidence of the City Council's approval of any and all such changes.

**SECTION 3.** Authorization of Real Estate Acquisition. The Mayor and the Chief Financial Officer are each authorized to accept a proper and recordable conveyance deed from the PBC and to execute and deliver any and all documents, instruments or certificates necessary to effect the proper conveyance of the PBC Parking Lot to the City.

**SECTION 4.** Execution of Documentation: Additional Authorizations.

(a)     The Mayor, the Chief Financial Officer, the City Comptroller, the Director of the Office of Budget and Management, the Director of Revenue, and the Corporation Counsel (the "Authorized Officers"), and any other City officer as shall be designated by the Authorized Officers are each authorized, individually or jointly, to execute and deliver any and all agreements, documents, instruments or certificates as the executing officer shall deem necessary, advisable or appropriate in connection with the acquisition of the PBC Parking Lot, the execution of the Concession Agreement, and the implementation of the Concession Transaction (collectively, the "Metered Parking Transaction Documents").

(b)     In addition to the authorizations and approvals set forth in the preceding paragraphs of this ordinance, any of the Authorized Officers and any other City officer as shall be designated by any of the Authorized Officers are each hereby authorized and directed to do all

2

such other acts and things (including, without limitation, effecting an amendment, modification or supplement to any of the Metered Parking Transaction Documents consistent with the terms of this ordinance; obtaining all permits, authorizations, orders, consents and approvals required to effect the transactions contemplated by the Metered Parking Transaction Documents; assigning the City's interests under those vendor agreements related to the Chicago Metered Parking System attached as Exhibit C to this ordinance; making all necessary filings and paying all proper fees and expenses, entering into such agreements with other governmental units and agencies relating to the PBC Parking Lot or otherwise; accepting conveyance documents to effect the transfer of the PBC Parking Lot; and taking necessary actions to permit the collateral assignment of the Concessionaire's interest in the Chicago Metered Parking System) as may be necessary, advisable or appropriate to carry out the purposes of the Metered Parking Transaction Documents over the term of the Concession Agreement or otherwise to carry out the intent and purposes of this ordinance. All of the acts of each officer which are in conformity with the intent and purposes of this ordinance, whether heretofore or hereafter taken or done (including, without limitation, all subsequent payments made by the City to the Concessionaire or tendered to the City by the Concessionaire as may be required by the Concession Agreement and the retention of, and entering into agreements with, financial advisors) shall be and the same are in all respects ratified, confirmed, authorized, and approved hereby in all respects.

(c)     The City shall appropriate amounts sufficient to pay when due any amounts payable by the City under the Concession Agreement and the City hereby covenants to take timely action as required by law to carry out the provisions of this subsection, but, if in any year during the Term (as defined in the Concession Agreement) of the Concession Agreement it fails to do so, this ordinance shall constitute a continuing appropriation ordinance of such amounts without any further action on the part of the City Council.

**SECTION 5.**  Use of Concession Transaction Proceeds.

(a)     The Authorized Officers and the City Treasurer are each hereby authorized to use a portion of the gross proceeds from the Concession Transaction, and such funds are hereby appropriated, to pay (i) any and all fees and expenses related to the Concession Transaction (including, without limitation, legal and financial advisory fees and expenses); (ii) amounts payable by the City pursuant to Section 16 hereof; and (iii) amounts payable by the City pursuant to Section 17 hereof.

(b)     The Authorized Officers and the City Treasurer are each hereby authorized to use the proceeds from the Concession Transaction, in addition to the uses described in subsection (a) above, and such funds are hereby appropriated (except where it is indicated below that any such funds are appropriated in another ordinance), to:

      i.     establish a revenue replacement fund to be held by the City (the "Revenue Replacement Fund") in the amount of $400,000,000, from which the investment earnings thereon (as determined by an Authorized Officer and reduced by such portion thereof as such Authorized Officer shall determine to be necessary to maintain the principal value of the Revenue Replacement Fund), shall be transferred each year, commencing in 2009, to the Corporate Fund, together with, upon the direction of an Authorized

Officer, an amount of proceeds from such Fund as shall be sufficient to cause the total amount of funds transferred for such year from the Revenue Replacement Fund to the Corporate Fund to equal $20,000,0000 (if for such year the investment earnings on the Revenue Replacement Fund shall be less than $20,000,000); and upon such transfer, all such funds shall be subject to appropriation by the City Council;

ii.     establish a human infrastructure fund to be held by the City (the "Human Infrastructure Fund") in the amount of $100,000,000, which shall be transferred to the Corporate Fund, together with any investment earnings thereon; and upon such transfer, all such funds shall be subject to appropriation by the City Council;

iii.    establish a mid-term reserve fund to be held by the City (the "Mid-Term Fund") in the amount of $325,000,000 (together with an estimated amount of investment earnings thereon in the amount of $25,000,000), of which: (1) $100,000,000 shall be transferred to the Corporate Fund for 2009 to cover liabilities carried forward from 2008 and/or to pay notes, commercial paper and other short-term obligations heretofore or hereafter issued or entered into by the City, (2) an additional $50,000,000 shall be transferred to the Corporate Fund for 2009, (3) $50,000,000 shall be transferred to the Corporate Fund for 2010, (4) $50,000,000 shall be transferred to the Corporate Fund for 2011, and (5) $100,000,000 shall be transferred to the Corporate Fund for 2012; and

iv.     establish a budget stabilization fund (the "Stabilization Fund") to be held by the City from the proceeds of the Concession Transaction remaining after the uses described in paragraphs (a) and (b)(i) - (iii) above, in the estimated amount of approximately $324,000,000, the proceeds of which and investment earnings thereon to be used (1) to pay amounts payable by the City pursuant to the Concession Agreement, and (2) for such other purposes and in such other amounts as shall be approved by the City Council.

(c)     Notwithstanding any of the foregoing, no use by the City shall be made of any proceeds of the Concession Transaction for any purpose which would adversely affect existing tax-exempt bonds or other debt obligations of the City.

(d)     The provisions of Section 2-32-520 of the Municipal Code and of the written investment policy adopted by the City Treasurer pursuant to Section 2-32-515 of the Municipal Code shall not apply to the investment of any amounts of proceeds of the Concession Transaction.  Any such amounts of proceeds of the Concession Transaction shall, subject to such investment guidelines, policies and objectives as are determined by the Authorized Officers, be invested by the City Treasurer in any investments that are permitted investments for public pension funds in Illinois under Section 1-113 of the Illinois Pension Code (40 ILCS 5/1-113); *provided*, *however*, notwithstanding the foregoing, no such amounts of proceeds of the Concession Transaction shall be invested in any of the following: common stocks (both public

4

and private), hedge funds, venture capital, real estate, futures, options, currencies, bonds which have a below-investment-grade rating from any of the three major nationally recognized rating agencies; and unrated bank debt. Notwithstanding any provision of the Municipal Code, any such investments acquired with any amount of proceeds of the Concession Transaction or investment income thereon may mature beyond ten years from the date of acquisition.

(e)     Pursuant to the direction of the Authorized Officers, the City Treasurer shall be authorized to engage advisors in connection with the investment of proceeds of the Concession Transaction, subject to the availability of appropriated funds for such purposes.

**SECTION 6.** <u>Amendment of Section 2-80-040 of Municipal Code</u>. Section 2-80-040 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**2-80-040 Powers and duties of the department.**

The department of revenue shall have the following powers and duties:

(Omitted text is unaffected by this ordinance)

(l)     <u>Subset to subsection (p) to</u> ~~To~~ operate off-street parking facilities owned by the city, and to collect all fees and charges for the use of such facilities;

(Omitted text is unaffected by this ordinance)

(o)     To serve ex officio as the traffic compliance administrator provided for in Section 9-100-010 of the code<u>, and in that capacity, to appoint ticketing agents, who may include a person, or the person's designee, acting pursuant to a concession agreement with the city governing the operation, maintenance, improvement, installation and removal of, and collection of fees from, certain designated parking, meters, for purposes of enforcing parking laws and regulations;</u>

(p)     To direct the <u>operation, maintenance, improvement,</u> installation and removal of, and collection of fees from, parking in meters <u>consistent with the provisions of the code</u>, and to determine ~~average~~ <u>comparable</u> meter revenue rates pursuant to Section 9-68-050; <u>provided however that if the city council authorizes a concession agreement for the operation, improvement, installation, removal and maintenance of, and collection of fees from, certain designated parking meters, all powers provided for in subsections (I) and (p) of this section shall be performed consistent with the terms of such concession agreement;</u>

(Omitted text is unaffected by this ordinance)

**SECTION 7.** <u>Amendment of Section 3-32-020 of Municipal Code</u>. Section 3-32-020 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**3-32-020 Definitions.**

When any of the following words or terms are used in this chapter, whether or not capitalized and whether or not used in a conjunctive or connective form, they shall have the meaning or construction ascribed to them in this section:

(Omitted text is unaffected by this ordinance)

(l)        "Lease" or "rental" means any transfer of the possession or use of personal property, but not title or ownership, to a user for consideration, whether or not designated as a lease, rental, license or by some other term, and includes a "nonpossessory lease".

The term "nonpossessory lease" means a lease or rental wherein use but not possession of the personal property is transferred and includes, but is not limited to, leased time on or use of any and all personal property not otherwise itself rented, such as leased time on or for the use of addressing machines, billboards, calculators, computers, computer software, copying equipment or data processing equipment, whether the time is fully or partially utilized, and specifically includes a "nonpossessory computer lease".

The term "nonpossessory computer lease" means a nonpossessory lease in which the customer obtains access to the provider's computer and uses the computer and its software to input, modify or retrieve data or information, in each case without the intervention (other than de minimis intervention) of personnel acting on behalf of the provider.  The term "nonpossessory computer lease" includes, but is not limited to, time sharing or time or other use of a computer with other users.  In the case of a nonpossessory computer lease, the location of the terminal or other device by which a user accesses the computer shall be deemed to be the place of lease or rental and the place of use of the computer for purposes of the tax imposed by this chapter.

The words "lease" or "rental" shall not be construed to include an agreement which constitutes a bona fide conditional sale of personal property.  The primary consideration in determining whether an agreement is a conditional sale rather than a lease or rental is whether the lessee under the agreement both is required to make payments the sum of which is at least equal to the lessor's cost of the personal property and, under the terms of the agreement, has the option of taking title to or ownership of the persona! property for nominal or no consideration after all payments required under the agreement have been made.

The words "lease" or "rental" shall not be construed to include an agreement which grants certain rights to a person, or the person's agent, to install, remove, operate, improve and maintain and collect fees from, certain designated parking meters pursuant to a concession agreement.

The words "lease" or "rental" shall include a transfer of the use of software within the meaning of this chapter only if, for purposes of the Illinois Retailers' Occupation Tax and Illinois Use Tax, the software is not "custom" software and the transfer is an exempt license of software.

(Omitted text is unaffected by this ordinance)

**SECTION 8.**  Amendment of Section 9-4-010 of Municipal Code.  Section 9-4-010 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

6

**9-4-010 Definitions.**

Whenever the following words and phrases are used in Chapter 9-4 through 9-103, they shall have the meanings respectively ascribed to them in this section:

(Omitted text is unaffected this ordinance)

"Parking meter" means a traffic control device which, upon being activated by deposit of currency of the United States, on by electronic or other form of payment, in the amount indicated thereon or otherwise, either: (1) displays a signal showing that parking is allowed from the time of such activation until the expiration of the time fixed for parking in the parking meter zone in which it is located, and upon expiration of such time indicates by sign or signal that the lawful parking period has expired, or (2) issues a ticket or other token, or activates a display device, on which is printed or otherwise indicated the lawful parking period in the parking meter zone in which the parking meter is located, such ticket, or other token, or display device, to be displayed in a publicly visible location on the dashboard or inner windshield of a vehicle parked in the parking meter zone, or such ticket to be affixed on the front lamp of a motorcycle or motor scooter parked in the parking meter zone.

(Omitted text is unaffected by this ordinance)

**SECTION 9.**  Amendment of Section 9-8-010 of Municipal Code.  Section 9-8-010 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**9-8-010 Authorized – Compliance required.**

(a)    (1) Subject to subsection (a)(2) the The commissioner of transportation and the executive director of emergency management and communications are hereby authorized to cause the placement, erection and maintenance of traffic-control devices as provided in the traffic code, as required to make effective the traffic ordinance of the city, and as necessary to guide and warn traffic.  The commissioner of transportation and the executive director of emergency management and communications are also authorized to place and maintain temporary traffic-control devices as needed in connection with construction or special events or experimental devices for the purposes of an engineering study; *provided, however*, such devices shall not be maintained for longer than 180 days without city council approval.  Upon the authorization of the commissioner of transportation or the executive director of emergency management and communications, the actual erection, placement and maintenance of any traffic-control device shall be performed by the appropriate city department or bureau.  All traffic-control devices placed and maintained pursuant to the traffic code shall conform to the manual and specifications approved by the State of Illinois Department of Transportation and shall so far as practicable be uniform as to type and location throughout the city.  All traffic-control devices so erected and not inconsistent with the provisions of state law or this code shall be official traffic-control devices.

(2)    Subject to section 9-64-200, the director of revenue shall have the sole authority to cause or direct the placement, erection and maintenance of parking meters.

(Omitted text is unaffected by this ordinance)

(d)     No provision of any traffic ordinance for which traffic-control devices are required shall be enforced against an alleged violator if at the time and place of the alleged violation an official device is not in proper position and sufficiently legible to be seen by an ordinary observant person.  Whenever a particular section does not state that signs or other devices are required, such section shall be effective even though no signs or other devices are erected or in place.

Any act involving a traffic-control device that would be a violation of this code if the device had been authorized or caused to be erected by the commissioner of transportation shall also be a violation of this code if the act involved: (1) a traffic-control device authorized or caused to be erected by the executive director of emergency management and communications; or (2) a parking meter installed and maintained:  (i) by the director of revenue, or (ii) by a person for such person's designee) acting pursuant to a concession agreement approved by the city council for the operation, maintenance, improvement, installation and removal of, and the collection of fees from, certain designated parking meters.

Any person violating subsections (b) or (c) of this section shall be fined no less than $90.00 and no more than $300.00 and may be required to perform reasonable public service.

**SECTION 10.**     Amendment of Chapter 9-64 of Municipal Code.  Chapter 9-64 of the Municipal Code is hereby amended by adding new sections 9-64-206 and 9-64-207, by adding the language underscored and by deleting the language struck through, as follows:

**9-64-190 Parking Meter zones – Regulations.**

It shall be unlawful to park any vehicle in a designated parking meter zone or space without depositing United States currency of the denomination indicated on the meter or by otherwise making payment by electronic or other forms of payment and putting the meter in operation or otherwise legally activating the meter and, if the meter is the type that issues a ticket or other token, or activates a display device, displaying in a publicly visible location on the dashboard or inner windshield of the vehicle or affixing to the front lamp of a motorcycle or a motor scooter a ticket, token, or display device, issued or activated by the meter, or to park any vehicle in such zone or space for a period longer than is designated on or by the meter for the value of the coin or coins deposited in the meter, or the value otherwise registered by the meter, or to park any vehicle in such zone or space displaying a stolen, altered, defaced or otherwise tampered with or counterfeited ticket, or to park any vehicle in such zone or space displaying a ticket bearing a different plate number from the plate number of the vehicle parked in such zone or space.  It is not a violation of this section to park a vehicle at a zone or space served by a meter that does not function properly, provided that the meter is inoperable or malfunctioning through no fault of the vehicle's operator; and the vehicle's operator reports the meter, in compliance with the posted directions on the meter, as inoperable or malfunctioning within 24 hours of parking the vehicle in the parking meter zone or space served by the inoperable or malfunctioning meter.

8

Upon the expiration of the time thus designated upon or by the meter, the operator of the motor vehicle shall then immediately remove such vehicle from the parking meter zone. No operator of any motor vehicle shall permit such vehicle to remain in the parking meter zone for an additional consecutive time period.

These provisions shall not apply to service vehicles performing professional duties pursuant to a concession agreement approved by the city council for the operation, maintenance, improvement, installation and removal of, and the collection of fees from, certain designated parking meters.

~~These provisions shall not apply during all such times as designated from time to time by order of the city council or on days established as holidays in Section 9-4-010.~~

**9-64-200 Parking meters--Installation and ~~pavement markings~~ signs.**

(a)     The ~~commissioner of transportation~~ director of revenue shall cause parking meters to be installed in parking meter zones in such numbers~~, during such hours of operation,~~ and at ~~such rates, and at~~ such places as established by the city council. ~~and shall have markings painted or placed upon the pavement adjacent to each parking meter, where such markings are appropriate for the type of parking meter installed, for the purpose of designating the parking space for which the meter is to be used.  The commissioner shall consult with the traffic compliance administrator in determining the number of meters necessary in any zone.~~

The director of revenue shall inform the commissioner of transportation about the installation of parking meters, and the commissioner of transportation shall cause signs to be installed and maintained that indicate the area is a parking meter zone or space for those parking meter zones and spaces not subject to a concession agreement approved by the city council for the operation, maintenance, improvement, installation and removal of, and the collection of fees from, certain designated parking meters.

(b)     It shall be unlawful to park any vehicle in any designated parking meter space except entirely within the area for that space.

**9-64-205 Parking meter rates.-~~Central business district.~~**

~~Notwithstanding any prior ordinance establishing a different rate, the rates for parking at a metered space within the area bounded by the south side of Congress Parkway on the south, Lake Michigan on the east, and the north side of Wacker Drive on the north, and the west side of Wacker Drive on the west, shall be $0.25 per five minute period, with a total parking limit time of two hours.~~

Notwithstanding any prior ordinance establishing a different rate, the rates for parking in a parking meter zone or space or a city-owned parking lot comprised of parking meters that are controlled by the Department of Revenue or subject to any concession agreement approved by the city council for operation, maintenance, improvement, installation and removal of, and collection of fees from, certain designated parking meters, shall be as follows:

9

(a)     Except as provided in subsection (d). within the area bounded by the south side of Congress Parkway on the south, Lake Michigan on the east, the north side of Wacker Drive on the north, and the west side of Wacker Drive on the west, the fee shall be:

    (1)     $3.50 per hour on and from January 1, 2009, through and including December 31, 2009;

    (2)     $4.25 per hour on and from January 1, 2010, through and including December 31, 2010;

    (3)     $5.00 per hour on and from January 1, 2011, through and including December 31, 2011;

    (4)     $5.75 per hour on and from January 1, 2012, through and including December 31, 2012;

    (5)     $6.50 per hour on and from January 1, 2013, and thereafter.

(b)     Except as provided in subsection (d). within the area bounded by the south side of Roosevelt Road on the south, Lake Michigan on the east, the north side of North Avenue on the north, and the west side of Halsted Street on the west, excluding the area within the boundaries designated in subsection (a) of this section, the fee shall be:

    (1)     $2.00 per hour on and from January 1, 2009, through and including December 31, 2009;

    (2)     $2.50 per hour on and from January 1, 2010, through and including December 31, 2010;

    (3)     $3.00 per hour on and from January 1, 2011, through and including December 31, 2011;

    (4)     $3-50 per hour on and from January 1, 2012, through and including December 31, 2012;

    (5)     $4.00 per hour on and from January 1, 2013, and thereafter.

(c)     Except as provided in subsection (d), within all areas of the City, except for the areas within the boundaries designated in subsections (a) and (b) of this section, the fee shall be:

    (1)     $1.00 per hour on and from January 1, 2009, through and including December 31, 2009;

    (2)     $1.25 per hour on and from January 1, 2010, through and including December 31, 2010;

    (3)     $1.50 per hour on and from January 1, 2011, through and including December 31, 2011;

    (4)     $1.75 per hour on and from January 1, 2012, through and including December 31, 2012;

    (5)     $2.00 per hour on and from January 1, 2013, and thereafter.

(d)     Within any area where a parking meter operates 24 hours per day, between the hours of 9 p.m. and 8 a.m., the rate shall be fifty percent of the applicable rate set forth in subsections (a), (b) and (c) above.

(e)     Notwithstanding the above, if, in the determination of the director of revenue, a reduction in the parking meter rates for certain locations of the city would result in more efficient traffic flow or reduction of traffic congestion in that location, the director may reduce the parking meter rates for that particular location; provided that the reduction shall not be greater than twenty-five percent of the applicable rate for that location.

**9-64-206 Parking meters-hours of operation.**

Notwithstanding any prior ordinance establishing different hours of operation, the hours of operation for a parking meter shall be as follows:

(a)     on residential streets, parking meters shall operate from 9:00 a.m. to 6:00 p.m., Monday through Sunday, except that meters shall operate:

(1)     From 8:00 a.m. to 9:00 p.m., Monday through Sunday, at:

1.1     9400 block of South Charles Street;
1.2     4200 block of South Whipple Street;
1.3     4200 block of South Sacramento Avenue;
1.4     4100 block of South Richmond Street;
1.5     4100 block of South Francisco Avenue;
1.6     3900 block of West School Street;
1.7     2400 block of West Homer Street;
1.8     2900 block through and including 3000 block of East 92nd Street;
1.9     500 block of West Melrose Street;
1.10    400 block of West Roslyn Place;
1.11    500 block of West Drummond Place;
1.12    900 block of West Roscoe Street;
1.13    3000 block of North Wilton Avenue;
1.14    4000 block of North Sawyer Avenue;
1.15    4000 block of North Spaulding Avenue;
1.16    4000 block of North Bernard Street;
1.17    4000 block of North Central Park Avenue;
1.18    3500 block of North Lawndale Avenue;
1.19    1000 block through and including 1100 block of West Glenlake Avenue;
1.20    1200 block of West Hood Avenue;
1.21    1200 block of West Norwood Street;
1.22    1200 block of West Rosedale Avenue;
1.23    1500 block of West Catalpa Avenue;
1.24    4800 block of North Winchester Avenue;
1.25    4400 block of North Campbell Avenue;
1.26    700 block of East 80th Street.

(2)     From 7:00 a.m. to 7:00 p.m., Monday through Sunday, at:

1.1     1400 block of West 19th Street;

11

       1.2     2800 block of North Kostner Avenue;
       1.3     4800 block of West Fletcher Street;
       1.4     1900 block through and including 2000 block of North La Crosse Avenue;
       1.5     2000 block of North Leclaire Avenue.

(3)     From 8:00 a.m. to 6:00 p.m., Monday through Sunday, at:
       1.1     6900 block of North Glenwood Avenue.

(4)     From 6:00 a.m. to 6:00 p.m., Monday through Sunday, at:
       1.1     7500 block of North Paulina Avenue.

(b)     On all other streets that are not residential streets (non-residential streets), except those non-residential streets in the area within the boundaries set forth in section 9-64-205(a), parking meters shall operate from 8:00 a.m. to 9:00 p.m., Monday through Sunday, except meters shall operate:

(1)     From 8:00 a.m. to 9:00 p.m., Monday through Saturday, at:
       2.1     600 block through and including 1100 block of South Desplaines Street.

(2)     24 hours per day, Monday through Sunday, at:
       2.1     The area bounded by the Eisenhower Expressway on the north, 15th Place on the south, Ashland Avenue on the east and Damen Avenue on the west;
       2.2     5600 block through and including 5700 block of North Ashland Avenue;
       2.3     400 block of North Kingsbury Street;
       2.4     700 block of East Solidarity Drive.

(3)     From 8:00 a.m. to Midnight, Monday through Sunday, at:
       2.1     0 block through and including 100 block of North Pulaski Road;
       2.2     0 block through and including 100 block of East Oak Street;
       2.3     1300 block through and including 1400 block of North Wells Street;
       2.4     1500 block of North Cleveland Avenue.

(4)     From 6:00 a.m. to 9:00 p.m., Monday through Sunday, at:
       2.1     2600 block through and including 2900 block of West 26th Street;
       2.2     2500 block of South Francisco Avenue;
       2.3     2500 block through and including 2800 block of South California Avenue;
       2.4     2500 block through and including 3000 block of South California Boulevard;
       2.5     2700 block of West 20th Street;
       2.6     2600 block through and including 2700 block of South Washtenaw Avenue.

(5)      From 7:00 a.m. to 9:00 p.m., Monday through Sunday, at:
          2.1     1200 block through and including 1300 block of South Halsted Street.

(c)      On non-residential streets in the area within the boundaries set forth in section 9-64-205(a), parking meters shall operate 24 hours per day, Monday through Sunday, except that meters shall operate:

(1)      From 9:00 a.m. to 9:00 p.m., Monday through Saturday, at:
          3.1     100 South to 100 North blocks of Clark Street; and

(2)      From 8:00 a.m. to 6:00 p.m., Monday through Saturday, at:
          3.1     300 block of East Randolph Street (upper level only)

(d)      In city-owned parking lots comprised of parking meters that are controlled by the Department of Revenue or subject to any concession agreement approved by the city council for the operation, maintenance, improvement, installation and removal of, and collection of fees from, certain designated parking meters, the parking meters shall operate 24 hours per day, Monday through Sunday.

(e)      The time limits set forth above shall not replace any other more restrictive parking or standing restrictions and do not relieve a person from the duty to observe other and more restrictive provisions prohibiting or limiting the standing or parking of vehicles in specified Places or at specified times.

**9-64-207 Parking meter increments and maximum periods for parking.**

(a)      The director of revenue shall determine the minimum time increment that may be purchased at a parking meter; *provided, however*, that the minimum time increment shall not be more than twenty minutes.

(b)      Notwithstanding any prior ordinance establishing maximum periods that a vehicle may park or stand at a meter, the director of revenue shall determine and post, or cause to be posted, on the meter the applicable maximum periods that may be purchased at a parking meter.

**SECTION 11.**      Amendment of Section 9-68-050 of Municipal Code.  Section 9-68-050 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**9-68-050 Temporary disabling or removal of parking meters.**

(a)      In the event that one or more parking meters or metered spaces must be temporarily removed or are otherwise rendered unusable in order to accommodate properly permitted work in or affecting the public way, the permittee shall pay a monthly surcharge per meter or, in the case of meters serving multiple spaces, per metered space based upon the maximum utilization of a comparable meter in a comparable parking meter area multiplied by the applicable rate in effect for such removed or unusable meter or metered space during the

entire time that the meter or metered space is disabled or removed. ~~the average revenue during the preceding year in that parking meter area. In the event that no meter revenue was recorded during the preceding year, the surcharge fee shall be based on upon the average revenue during the preceding year of a similarly situated area.~~ For meters serving multiple spaces, every linear increment of 20 feet shall be considered a metered space.

(b)     The surcharge imposed by this section shall not apply where the permittee is performing construction work pursuant to a contract with the city or other governmental entity or to any person (or such person's designee) acting pursuant to a concession agreement approved by the city council for the operation, maintenance, improvement installation and removal of, and collection of fees from, certain designated parking meters that are the subject of the concession agreement.

(c)     In addition, if removal of one or more meters is necessary for the permitted work to proceed, the ~~commissioner of transportation~~ director of revenue may order temporary removal of the affected parking meters.  The permittee shall pay a fee of $ ~~100.00~~ 150.00 in advance for the removal and reinstallation of each parking meter, *provided, however*, that a fee of $1,000.00 shall be paid for a meter serving multiple spaces.

(d)     In the event that a city department temporarily removes or otherwise renders unusable one or more parking meters or metered spaces for a period of six hours or more, the city department shall notify the director of revenue, in a format prescribed by the director of revenue, of the location of the specific parking meter or metered space which was temporarily removed or otherwise rendered unusable.  The notification shall be sent within 24 hours of temporarily removing or otherwise rendering unusable the parking meter or metered space.

**SECTION 12.**     Amendment of Section 10-8-450 of Municipal Code.  Section 10-8-450 of the Municipal Code is hereby amended by adding the language underscored, as follows:

**10-8-450 Mixing concrete**

It shall be unlawful for any person to mix any dry or wet concrete, cement or plaster of any kind or description upon the surface of any public way.  This provision shall not apply to the department of revenue, or its designated agent, for the operation, maintenance, improvement, installation, or removal of parking meters, or to any person for such person's designee) acting pursuant to any concession agreement with the city governing the operation, installation, improvement, removal and maintenance of, and the collection of fees from, certain designated parking meters.

**SECTION 13.**     Amendment of Chapter 10-20 of Municipal Code.  Chapter 10-20 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**10-20-100 License**

(a)     No person shall make an opening in, or construct or repair any pavement in, any public way or other public place pursuant to this chapter unless that person holds a public way work license as required by this article.  The public way work permit required by this article to

14

make an opening in, or construct or repair any pavement in, any public way or other public place shall only be issued to a person holding such a license. Before the department of transportation issues any such permit, the department of transportation shall first require proof that the permit applicant holds such a license. Such a license shall be effective for one calendar year, and the fee for such a license shall be $125.00. Such a license may be issued at any time during a calendar year, but shall be effective only for the calendar year in which it is issued. The commissioner of transportation is hereby authorized to issue such a license and is authorized to promulgate regulations relating to such a license, including but not limited to terms and conditions for the issuance, maintenance and renewal of the license, the scope of work that may be performed under the license, and terms and conditions applicable to the insurance and letter of credit required by this article.

(b)     The public way work license specified in this section shall not be required for the placement, planting, cultivation, maintenance or removal of any tree, shrub, flower, sod or other plant material in the public way.

(c)     The public way work license specified in this section shall not be required of a government agency or of any person (or such person's designee) for the operation, maintenance, improvement, installation and removal of parking meters acting pursuant to a concession agreement with the city governing the operation, improvement, installation, removal and maintenance of, and the collection of fees from, certain designated parking meters.

**10-20-150 Permit – Fees -- Issuance.**

(Omitted text is unaffected by this ordinance)

(g)     The permit specified in this section shall not be required for:

(1)     the placement, planting, cultivation, maintenance or removal or any tree, shrub, flower, sod or other plant material in the public way; or
(2)     the operation, improvement, installation, removal and maintenance of parking meters by a person, or the person's designee, acting pursuant to a concession agreement with the city governing the operation, improvement, installation, removal and maintenance of, and collection of fees from, certain designated parking meters.

**10-20-300 Board of local improvements authorization.**

No person shall build, construct or lay a pavement by private contract on any public way in the city, unless he first shall have made application to the board of local improvements and otherwise complied with the licensing and permitting requirements of this chapter.

Before such permit is issued, the said applicant shall deposit with the board of local improvements a sum sufficient to cover the estimated cost of engineering, inspection, supervision and other services. Against such deposit, charges shall be made by the board of local improvements for such services as may be required from time to time at such rates as will correspond to those established by the city council for similar services. Nothing in this section shall be held to apply to pavements laid by special assessment or special taxation or to the construction, building or laying of pavement in connection with the operation, maintenance,

improvement, installation or removal of parking meters by a person, or the person's designee, acting pursuant to a concession agreement approved by the city council governing the operation, improvement, installation, removal and maintenance of, and collection of fees from, certain designated parking meters.

**SECTION 14.** Amendment of Section 10-28-010 of Municipal Code. Section 10-28-010 of the Municipal Code is hereby amended by adding the language underscored and by deleting the language struck through, as follows:

**10-28-010 Permission required.**

No person shall construct or maintain any bay window, bridge, wire, pipe, kiosk, or other structure or device over any public way or other public place; or any clock or post at the curb, or any clock attached outside the face of any building; or any loading platform, switch track or pushcart track upon any public way or other public place; or any tunnel or vault underneath the surface of any public way or other public place; or install or maintain any wire, pipe or conduit underneath the surface of any public way or other public place without first having obtained specific authority by ordinance passed by the city council authorizing such special privilege. Nothing in this section shall authorize any person to make an opening in, or construct or repair any pavement in the public way or other public place unless such person holds a public way work license if such a license is required by Chapter 10-20 of this Code. _Provided, however,_ no ordinance authorizing such special privilege shall be required to construct or maintain parking meters and signs by a person, or the person's designee, acting pursuant to a concession agreement approved by the city council governing the operation, maintenance, improvement, installation and removal of, and the collection of fees from, certain designated parking meters.

Any person violating any of the provisions of this section shall be fined not less than $25.00 nor more than $200.00 for each offense. A separate and distinct offense shall be held to have been committed each day any person continues to violate this section or fails or refuses to cause the removal of such unauthorized structure within such time as may be fixed by the commissioner of business affairs and consumer protection, not exceeding 30 days, after notice in writing for such removal has been served upon the owner or person maintaining any such privilege.

For purposes of this section, "kiosk" means a freestanding, permanent structure erected as an accessory to a building, and used to provide information concerning the building and its occupants.

**SECTION 15.** Approval of Transfer and Change of Control. Notwithstanding any other provision of the Concession Agreement, any Transfer (as defined in the Concession Agreement), including any Change of Control (as defined in the Concession Agreement), occurring during the Term of the Concession Agreement, that is subject to approval by the City must be approved by the City Council.

**SECTION 16.** Cook County Parking Taxes. During a period commencing on the Closing Date (as defined in the Concession Agreement) and ending on the earlier of (1) the first anniversary of the Closing Date, or (2) the date the Concessionaire informs the Director of

16

Revenue that compliance with the requirements of that certain Cook County Parking Lot and Garage Operations Tax Ordinance (the "County Ordinance") for each of the City Lots is practicable, each Authorized Officer is authorized to pay to the Concessionaire, from proceeds of the Concession Transaction or other legally available funds, the difference, if any, between amounts imposed by Cook County, Illinois, pursuant to the County Ordinance, with respect to any City Lot and the amount that the Concessionaire is able to collect from persons parking at such City Lot.

SECTION 17. <u>Termination of Certain Monthly Parking Rates and Permits</u>. Notwithstanding any prior ordinance establishing a different rate or a monthly parking permit for City-owned parking lots, the rates for parking in a City-owned parking lot comprised of parking meters that are controlled by the Department of Revenue or subject to any concession agreement approved by the City Council for the operation, maintenance, installation, removal and maintenance of, and in certain cases, collection of fees from such parking meters shall be subject to Section 9-64-205 of the Municipal Code and every monthly parking permit or pass issued for such City-owned parking lots shall terminate upon the effective date of this ordinance. The Director of Revenue shall refund to the permittee any overpayment of parking charges as a result of any early termination of a monthly parking permit pursuant to this section.

SECTION 18. <u>Conflict; Severability; Exercise of Home Rule Power</u>. To the extent that any ordinance, resolution, rule, order, or provision of the Municipal Code, or part thereof, is in conflict with the provisions of this ordinance, the provisions of this ordinance shall be controlling. If any section, paragraph, clause or provision of this ordinance shall be held invalid, the invalidity of such section, paragraph, clause or provision shall not affect any of the other provisions of this ordinance. No provision of the Municipal Code or violation of any provision of the Municipal Code shall be deemed to impair the validity of this ordinance or the documents or instruments authorized by this ordinance or render any such documents or instruments voidable at the option of the City; *provided further,* that the foregoing shall not be deemed to affect the availability of any other remedy or penalty for any violation of any provision of the Municipal Code. This ordinance is an exercise of the City's power as a home rule unit of local government under Article VII of the 1970 Constitution of the State of Illinois and is intended to override any conflicting provision of any Illinois statute that does not specifically preempt the exercise of home rule power by the City.

SECTION 19. <u>Publication of Ordinance</u>. This ordinance shall be published by the City Clerk by causing to be printed in special pamphlet form at least 25 copies hereof, which copies are to be made available in his office for public inspection and distribution to members of the public who may wish to avail themselves of a copy of this ordinance.

SECTION 20. <u>Effectiveness</u>. This ordinance shall be in full force and effect from and after the date of its passage and approval, except that Section 9-64-206 of the Municipal Code shall be in full force and effect from and after January 1, 2009.

**EXHIBIT A**

**PBC PARKING LOT**

**1752 W. 95TH STREET, CHICAGO, ILLINOIS**

LEGAL DESCRIPTION: LOT 22 EXCEPT THE EAST 105 FEET AND (EXCEPT THAT PART OF LOT 22 LYING SOUTH OF A LINE 54 FEET NORTH OF AND PARALLEL TO SOUTH LINE OF SECTION 6) IN SUBDIVISION BY E.S. PIKE ENTITLED LONGWOOD IN THE SOUTHEAST 1/4 OF THE SAID SECTION 6, TOWNSHIP 37 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.PIN: 25-06-424-021.

Annex 1

# REVISED SCHEDULE 10A

| Terminal ID | Block Description | Expected Utilization Rate |
|---|---|---|
| 107801 | 1130 W. Lawrence | 8.3255% |
| 107802 | 1130 W. Lawrence | 2.6166% |
| 127801 | 3120 N. Greenview | 12.4471% |
| 127802 | 3120 N. Greenview | 10.9227% |
| 128801 | 1530 W. Barry | 1.9298% |
| 128802 | 1530 W. Barry | 4.0955% |
| 129801 | 1635 W. Melrose | 9.9912% |
| 148801 | 4519 N. Lincoln | 26.7568% |
| 148802 | 4519 N. Lincoln | 23.8711% |
| 149801 | 4050 N. Laporte | 3.6104% |
| 149802 | 4050 N. Laporte | 4.2315% |
| 165801 | 2630 N. Emmett | 8.7188% |
| 165802 | 2630 N. Emmett | 9.7115% |
| 165803 | 2630 N. Emmett | 2.9459% |
| 169801 | 1752 W. 95th St. | 0.5866% |
| 170801 | 4715 N. Western | 28.8180% |
| 170802 | 4715 N. Western | 19.1102% |
| 171801 | 2301 W. Leland | 30.8936% |
| 171802 | 2301 W. Leland | 46.1675% |
| 175801 | 417 E. 75th St. | 0.3030% |
| 186801 | 2315 W. Lawrence | 20.4268% |
| 187801 | 3840 N. Lincoln | 7.2302% |
| 195801 | 1938 W. Monterey | 0.4057% |
| 195802 | 1938 W. Monterey | 0.1404% |
| 195803 | 1938 W. Monterey | 0.0635% |
| 199801 | 1835 W. 95th St. | 0.8974% |
| 199802 | 1835 W. 95th St. | 0.7095% |