**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICAH UETRICHT and JOHN KADERBEK, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 1:21-cv-03364 |
| | ) | |
| CHICAGO PARKING METERS, LLC, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | Mag. Judge Gabriel A. Fuentes |
| | ) | |

**MEMORANDUM IN SUPPORT OF CHICAGO PARKING METERS, LLC'S
<u>RULE 12(B)(1) AND RULE 12(B)(6) MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION AND OVERVIEW ........................................................................... 1

BACKGROUND ......................................................................................................... 3

    I.      The Concession ................................................................................... 3

    II.     Plaintiffs' Alleged Injuries, Claims, and Requested Injunctive Relief ................. 6

ARGUMENT ............................................................................................................... 7

    I.      Plaintiffs Lack Article III Standing ................................................... 7

          A.    Plaintiffs do not plead injury in fact. ........................................ 8

          B.    Plaintiffs' claimed injury is not fairly traceable to CPM ........................... 10

          C.    Plaintiffs have not pleaded redressability. ................................ 10

    II.     Plaintiffs Have Not Alleged the Type of Injury Needed to Plead Their Claims ........................................................................................... 12

          A.    Plaintiffs have not pleaded an antitrust injury needed to assert Sherman Act claims. ................................................................ 12

          B.    Plaintiffs cannot plead a pecuniary loss required to assert an ICFA claim. ................................................................................. 13

    III.    Plaintiffs' Sherman Act Claims Are Barred by the State Action Immunity Doctrine ........................................................................... 14

    IV.    Plaintiffs' Claims Suffer from Fundamental Pleading Deficiencies ................. 16

          A.    Plaintiffs fail to plead required elements of their Sherman Act claims. ............................................................................. 16

               1.    Plaintiffs do not sufficiently plead monopoly power. .................. 16

               2.    Plaintiffs do not allege an unreasonable restraint of trade. ........... 17

               3.    Plaintiffs do not allege a plausibly defined market. ..................... 18

          B.    Plaintiffs failed to plead required elements of an ICFA claim. ................. 20

    V.     Plaintiffs' Claims Are Untimely and Should Be Dismissed Based on *Laches* ........................................................................................... 22

i

A.    Plaintiffs' Sherman Act claims are untimely. ................................................. 23

B.    Plaintiffs' ICFA claim is untimely. ............................................................. 24

CONCLUSION ...................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*42nd Parallel N. v. E Street Denim Co.*,
  286 F.3d 401 (7th Cir. 2002) ................................................. 19

*Active Disposal, Inc. v. City of Darien*,
  635 F.3d 883 (7th Cir. 2011) ................................................. 15

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
  683 F.3d 328 (7th Cir. 2012) ................................................. 16

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
  129 F. Supp. 3d 614 (N.D. Ill. 2015) ................................ 13, 23

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*,
  326 F. Supp. 3d 602 (N.D. Ill. 2018) ................................. 15

*Area Transp., Inc. v. Ettinger*,
  219 F.3d 671 (7th Cir. 2000) ............................................ 10, 11

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  131 S. Ct. 1436 (2011) ....................................................... 11

*ASARCO, Inc. v. Kadish*,
  490 U.S. 605 (1989) ............................................................ 11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
  2020 WL 5642941 (N.D. Ill. Sep. 22, 2020) ......................... 19

*Ass'n of Am. Physicians & Surgeons v. Koskinen*,
  2014 WL 1056495 (E.D. Wis. Mar. 18, 2014) ...................... 11

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ............................................................ 13

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
  909 F. Supp. 162 (S.D.N.Y. 1995) ...................................... 19

*Ball Mem'l Hosp. v. Mutual Hosp. Ins., Inc.*,
  784 F.2d 1325 (7th Cir. 1986) ............................................ 16

*Batson v. Live Nation Entm't, Inc.*,
  746 F.3d 827 (7th Cir. 2014) ........................................ 20, 21, 22

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
  182 F.3d 1096 (9th Cir. 1999) ...........................................................18

*Brown Shoe Co. v. U.S.*,
  370 U.S. 294 (1962)...........................................................................18

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*,
  429 U.S. 477 (1977)...........................................................................12

*Brunswick Corp. v. Riegel Textile Corp.*,
  752 F.2d 261 (7th Cir. 1984) .......................................................13, 17

*Cabral v. City of Evansville*,
  759 F.3d 639 (7th Cir. 2014) ............................................................11

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
  445 U.S. 97 (1980)..............................................................................14

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
  761 F.3d 732 (7th Cir. 2014) ............................................................14

*Campbell v. Chicago*,
  823 F.2d 1182 (7th Cir. 1987) .....................................................15, 16

*Cannon v. Univ. of Health Scis./Chi. Med. Sch.*,
  710 F.2d 351 (7th Cir. 1983) ......................................................23, 24

*Chapman v. N.Y. State Div. for Youth*,
  546 F.3d 230 (2d Cir. 2008).............................................................19

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*,
  810 F.2d 869 (9th Cir. 1987) ...........................................................15

*Chattanoga Mfg., Inc. v. Nike, Inc.*,
  301 F.3d 789 (7th Cir. 2002) ............................................................24

*Checker Taxi Co., Inc. v. Nat'l Prod. Workers Union*,
  113 F.R.D. 561 (N.D. Ill. 1986)........................................................24

*Chi. Prof'l Sports Ltd. P'Ship v. Nat'l Basketball Ass'n*,
  961 F.2d 667 (7th Cir. 1992) ............................................................12

*City of Rock Island v. United States*,
  2014 WL 4748326 (C.D. Ill. Sept. 24, 2014) ...................................10

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)...........................................................7, 9, 10, 11

*Common Cause Ind. v. Lawson*,
    937 F.3d 944 (7th Cir. 2019) ...........................................................................9

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)..............................................................................18

*Elliott v. United Ctr.*,
    126 F.3d 1003 (7th Cir. 1997) ..................................................................13, 18

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ...........................................................................9

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..........................................................................................8

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .....................................................................................9

*Goldhamer v. Nagode*,
    621 F.3d 581 (7th Cir. 2010) ...........................................................................8

*Gov't of Puerto Rico v. Carpenter Co.*,
    442 F. Supp. 3d 464 (D.P.R. 2020)................................................................23

*Green Sols. Recycling, LLC v. Reno Disposal Co., Inc.*,
    814 F. App'x 218 (9th Cir. 2020) ...................................................................15

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) .........................................................................23

*Humboldt Bay Mun. Water Dist. v. Louisiana-Pacific Corp.*,
    608 F. Supp. 562 (N.D. Cal. 1985) ...............................................................17

*Ind. Grocery Inc. v. Super Valu Stores, Inc.*,
    864 F.2d 1409 (7th Cir. 1989) .......................................................................16

*Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad*,
    2014 IL App (1st) 123629, 13 N.E.3d 251 (1st Div. 2014)..................6, 22, 24, 25

*JetAway Aviation, LLC v. Bd. of City Comm'rs of City of Montrose, Colo.*,
    754 F.3d 824 (10th Cir. 2014) .......................................................................13

*Justice v. Town of Cicero*,
    577 F.3d 768 (7th Cir. 2008) .........................................................................15

*Kim v. Carter's Inc.*,
    598 F.3d 362 (7th Cir. 2010) ....................................................................13, 14

*L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*,
    769 F.2d 517 (8th Cir. 1985) ........................................................15

*LaSalle Nat'l Bank v. Cty. of DuPage*,
    777 F.2d 377 (7th Cir. 1985) ........................................................15

*Lathrop v. Juneau & Assocs.*,
    220 F.R.D. 330 (S.D. Ill. 2004) ....................................................15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................8, 10

*McCready v. Ill. Sec'y of State, White*,
    382 Ill. App. 3d 789, 888 N.E.2d 702 (1st Dist. 2008)..........................24

*McIntosh v. Walgreens Boots Alliance, Inc.*,
    2019 IL 123626, 135 N.E.3d 73 (2019)...........................................14

*Medina v. Public Storage, Inc.*,
    2014 WL 1715517 (N.D. Ill. April 30, 2014) ......................................21

*Messina v. Green Tree Servicing, LLC*,
    210 F. Supp. 3d 992 (N.D. Ill. 2016) ...............................................20

*Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ........................................................23

*Morris v. Harvey Cycle & Camper, Inc.*,
    392 Ill. App. 3d 399, 911 N.E.2d 1049 (1st Dist. 2009)........................14

*N. Ind. Gun & Outdoor Shows v. City of S. Bend*,
    163 F.3d 449 (7th Cir. 1998) ..........................................................4

*New York v. Facebook*,
    2021 WL 2643724 (D.D.C. June 28, 2021)........................................24

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)................................................................17

*Oliveira v. Amoco Oil Co.*,
    201 Ill.2d 134, 776 N.E.2d 151 (2002) ............................................13

*Oliver v. SD-3D LLC*,
    751 F.3d 1081 (9th Cir. 2014) ......................................................23

*Perry v. Village of Arlington Heights*,
    186 F.3d 826 (7th Cir. 1999) ........................................................10

*Price v. Philip Morris, Inc.*,
   219 Ill.2d 182, 848 N.E.2d 1 (2005) ....................................................................13

*Queen City Pizza v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d. Cir. 1997) ...............................................................................18

*Raines v. Byrd*,
   521 U.S. 811 (1997) ..............................................................................................9

*Reapers Hockey Ass'n v. Amateur Hockey Ass'n of Ill., Inc.*,
   412 F. Supp. 3d 941 (N.D. Ill. 2019) ..................................................................18

*Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*,
   381 F.3d 717 (7th Cir. 2004) ...............................................................................18

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) .................................................................23

*Robinson v. Toyota Motor Credit Corp.*,
   201 Ill.2d 403, 775 N.E.2d 951 (2002) ..........................................................20, 21

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ...............................................................................18

*Saunders v. Mich. Ave. Nat'l Bank*,
   278 Ill. App. 3d 307, 662 N.E.2d 602 (1st Dist. 1996) ........................................21

*Schilke v. Wachovia Mortg., FSB*,
   820 F. Supp. 2d 825 (N.D. Ill. 2011) ..................................................................23

*Shakman v. Dunne*,
   829 F.2d 1387 (7th Cir. 1987) .............................................................................10

*Spokeo, Inc. v. Robins*,
   578 U. S. 330 (2016) ..............................................................................................8

*Stamatakis Indus., Inc. v. King*,
   965 F.2d 469 (7th Cir. 1992) ...............................................................................12

*Stanton v. Ash*,
   384 F. Supp. 625 (S.D. Ind. 1974) ........................................................................9

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
   373 F.3d 57 (1st Cir. 2004) ..................................................................................17

*Teamsters & Emplrs Welfare Trust v. Gorman Bros. Ready Mix*,
   283 F.3d 877 (7th Cir. 2002) ...............................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................3

*The Cornucopia Inst. v. U.S. Dep't of Agric.*,
    260 F. Supp. 3d 1061 (W.D. Wis. 2017) ...........................................10

*Thompson v. Ill. Dep't of Prof'l Regulation*,
    300 F.3d 750 (7th Cir. 2002) ...............................................................4

*Tillman v. Pritzker*,
    2021 IL 126387.....................................................................................25

*Town of Hallie v. City of Eau Claire*,
    471 U.S. 34 (1985)...............................................................................14

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ...............................................................7, 8, 9

*Tully v. State*,
    143 Ill.2d 425, 574 N.E.2d 659 (1991) ..............................................25

*U.S. Awami League, Inc. v. City of Chi.*,
    110 F. Supp. 3d 887 (N.D. Ill. 2015) ...................................................9

*United States v. Lewis*,
    411 F.3d 838 (7th Cir. 2005) .............................................................22

*VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*,
    2015 WL 5693735 (N.D. Ill. Sept. 28, 2015) ...................................17

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)............................................................................16

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) .............................................................20

*Wilmes v. U.S. Postal Serv.*,
    810 F.2d 130 (7th Cir. 1987) .............................................................24

*Yu v. Int'l Business Machs. Corp.*,
    314 Ill. App. 3d 892, 732 N.E.2d 1173 (1st Dist. 2000)......................14

*Zelazny v. Lyng*,
    1987 WL 12664 (N.D. Ill. June 16, 1987), *aff'd* 853 F.2d 540 (7th Cir. 1988) ......................24

**Statutes**

65 ILCS 5/1-1-10 ................................................................................................15, 20

65 ILCS 5/11-71-1 .....................................................................................................20

65 ILCS 5/11-71-1(a) .................................................................................................15

65 ILCS 5/11-71-1(c) .................................................................................................15

815 ILCS 505/1 et seq................................................................................................7

815 ILCS 505/10a ......................................................................................................13

815 ILCS 505/10a(e)..................................................................................................24

15 U.S.C. § 15b (2018) ..............................................................................................23

Mun. Code of Chicago § 9-64-190 ...........................................................................5

Mun. Code of Chicago § 9-64-205 .........................................................................5, 23

**Other Authorities**

Chi. City Council, *Journal of Council Proceedings, Dec. 4, 2008* (2008),
   https://chicityclerk.s3.amazonaws.com/s3fs-
   public/document_uploads/journals-proceedings/2008/120408SP.pdf....................4

Chi. City Council, *Journal of Council Proceedings, June 5, 2013* (2013),
   https://chicityclerk.s3.amazonaws.com/s3fs-
   public/document_uploads/journals-proceedings/2013/060513VI.pdf....................4

Chi. Dep't of Transp., 2017 Bikeways – Year in Review (2018),
   https://secureservercdn.net/198.71.233.36/40f.4ba.myftpupload.com/wp-
   content/uploads/2013/06/YearEndReview_2017_2018_0416.pdf...........................5

## INTRODUCTION AND OVERVIEW

Thirteen years after the City of Chicago executed the Chicago Metered Parking System Concession Agreement with Chicago Parking Meters ("CPM"), Plaintiffs filed this lawsuit against CPM challenging the Concession as a violation of antitrust and consumer protection laws. The gist of Plaintiffs' Amended Complaint remains that the Concession, by which CPM paid the City more than $1.15 billion for rights to operate the City's on-street metered parking system, restricts the City's ability to regulate public transportation and entrenches the use of meter parking, thus slowing the development of transportation methods that Plaintiffs prefer, such as biking and busing. Plaintiffs seek an injunction to modify the Concession to permit enhanced regulation and rebidding of the meter system, which Plaintiffs claim will bring about cheaper, environmentally friendly transportation in the City. Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), CPM moves the Court to dismiss the Amended Complaint for the following reasons:

*First, Plaintiffs lack standing*. Plaintiffs fail all three prongs needed to invoke this Court's jurisdiction under Article III. No injury in fact. Plaintiffs do not allege a concrete and particularized injury in fact. Though they claim the Concession increased meter rates, that is a red herring. Plaintiffs must plead injury *in relation to the relief they seek*, and the relief sought has nothing to do with whether meter rates have gone up. Plaintiffs ask for an injunction revising the Concession to enhance the City's ability to regulate the use of meter parking and to rebid it to other vendors, absent which Plaintiffs allege they will be deprived of their preferred transportation options. That allegedly threatened scarcity of Plaintiffs' preferred transportation is what underlies their requested relief, and it is neither a concrete injury nor one particularized to Plaintiffs, only a general public policy grievance. Not fairly traceable. Plaintiffs also do not plausibly plead a causal link between the alleged injury and CPM. The City, not CPM, controls meter rates and other matters impacting the use of meters, and the Concession does not prevent the City from developing

other modes of transportation. Plaintiffs target the Concession as the supposed source of their dissatisfaction that the City has not or might not, for whatever reason, choose their preferred mix of transportation, but that is speculation and not fairly traceable to CPM. <u>Not Redressable</u>. It is also speculative that a decision in Plaintiffs' favor would bring about the change they want. The City already has the full exercise of regulatory power over public transportation. Given the innumerable complexities associated with changing the structure of public transportation in a major city, which are outside the control of CPM and beyond the parameters of the Concession, it is at best hypothetical that Plaintiffs' requested injunction would achieve the changes they desire.

For all of these reasons, Plaintiffs do not come close to satisfying Article III.

*Second, Plaintiffs have not pleaded cognizable harm under the federal antitrust and Illinois consumer protection laws*. The Amended Complaint does not allege the type of injury needed to assert claims under the Sherman Act, which requires loss stemming from acts that reduced supply or raised prices in the alleged relevant market—i.e., on-street metered parking. Just the opposite, Plaintiffs' complaint is that there is *too much* on-street parking, not too little. Although Plaintiffs allege increased parking fees under the Concession, as noted, CPM does not determine metered parking rates, which are set by the City. And, Plaintiffs' alleged voluntary payment of parking at rates set by the City also is not sufficient to plead actual pecuniary loss, which is needed to sue for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

*Third, Plaintiffs' Sherman Act claims are barred by the state action immunity doctrine*. State laws authorized the City to regulate competition for on-street metered parking through contracts concerning the City's parking meters. The Concession, as an exercise of the City's state-delegated authority, is immune from challenge under the Sherman Act.

*Fourth, Plaintiffs' claims suffer from additional pleading defects*. For example, Plaintiffs do not plausibly plead a relevant market to support their Sherman Act claims. They artificially

focus strictly on the metered-parking system to the exclusion of the competing alternatives.  Nor do Plaintiffs allege any anticompetitive conduct recognized by the antitrust laws from CPM merely acquiring the right to manage a system that was previously controlled exclusively by the City.  As to Plaintiffs' ICFA claim, the Amended Complaint fails to plead how the Concession—approved by the City Council under state law expressly authorizing such an agreement—could plausibly constitute an unfair trade practice in violation of state policy, as needed to plead such a claim.

_Fifth, Plaintiffs' claims are untimely_.  Plaintiffs' claims accrued in December 2008, when the Concession was executed, or at least by June 2013, when it was amended.  There is no valid reason why Plaintiffs waited until 2021 to sue, long beyond the four-year statute that guides the application of _laches_ for Sherman Act claims and the three-year statute for ICFA claims.

The Amended Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

### I.     The Concession

Plaintiffs are "car owners who live in various Chicago neighborhoods" (Am. Compl. ¶ 3) and who "from time to time . . . pay for parking at the Metered Parking System operated by" CPM (_id._ ¶ 9) pursuant to the Parking Meter Concession Agreement, entered by and between the City of Chicago and CPM, commonly referred to as the Concession.[1]  The Concession grants CPM the right to operate the "Metered Parking System" in Chicago and "to retain the revenues to be derived from the operation of the" system.   Ex. A to Am. Compl., Dkt. No. 22, at 1, § 2.1; _see also_ Am. Compl. ¶ 1.  On December 4, 2008, the Chicago City Council approved the Concession, finding it to be "in the best interests of the residents of the City and desirable for the welfare of its

---

[1] The facts herein are drawn from the well-pleaded factual allegations in the Amended Complaint, which for purposes of this Motion only are accepted as true; documents referred to or incorporated into the Amended Complaint; and matters of which a court may take judicial notice.  _Tellabs, Inc. v. Makor Issues & Rights, Ltd._, 551 U.S. 308, 322 (2007).  For citations herein, unless otherwise noted, emphasis has been added and internal citations omitted.

government and affairs," following a public bidding process in which CPM submitted the highest bid, $1,156,500,000.  Concession at 1-2.[2]  *See also* Am. Compl. ¶ 20.  On June 5, 2013, the Concession was amended (Am. Compl. ¶ 1) and the City Council again gave its approval.[3]

Plaintiffs allege the Concession "confers a private monopoly on CPM to operate . . . the City's entire 'Metered Parking System.'" Am. Compl. ¶ 1.  They claim that under the Concession, CPM "sets the rates charged for [metered parking] spaces," has "significantly increased those rates," has "secured the right to operate those spaces without any meaningful competition by other potential vendors," and operates without the City's "active regulation," which Plaintiffs contend "effectively limits the supply of alternative forms of transportation or alternatives to use of the Metered Parking System, such as bike lanes, express bus lanes, and pedestrian use." *Id.* ¶¶ 14, 24.  Plaintiffs also complain that the City is "restricted from re-bidding" the Concession for its term "to new entrants that may provide the meters on more favorable terms."  *Id*. ¶ 30.

Most of Plaintiffs' characterizations of the Concession are unsupported or contradicted by its terms, and the Court need not accept such allegations.[4]  To begin, the Concession, as adopted in 2008, incorporated an increase in metered parking rates through 2013, but not beyond; and even for those five years, the City retained the right to change rates.[5]  Eight years from the end of those

---

[2] *See also* Chi. City Council, *Journal of Council Proceedings, Dec. 4, 2008*, at 50508-09 (2008), https://chicityclerk.s3.amazonaws.com/s3fs-public/document_uploads/journals-proceedings/2008/120408SP.pdf.

[3] *See* Chi. City Council, *Journal of Council Proceedings, June 5, 2013*, at 54082-83 (2013), https://chicityclerk.s3.amazonaws.com/s3fs-public/document_uploads/journals-proceedings/2013/060513VI.pdf.

[4] Although the Amended Complaint may be dismissed without considering the terms of the Concession (Exhibit A), it is a "well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, *the exhibit trumps the allegations*."  *Thompson v. Ill. Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) (emphasis in original).  "In fact, [a] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment."  *N. Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998).

[5] Specifically, the original Concession confirmed the City's adoption of a rate schedule pursuant to ordinance.  While reserving the City's power to revise that schedule, the City agreed that if it changed rates in a way that reduced the value of the Concession prior to December 31, 2013, it would compensate CPM for that reduced value.  Concession § 7.1.

temporary rates, the Concession does not "fix" rates (Am. Compl. ¶¶ 1, 56) nor give CPM the ability to "set" or "significantly increase those rates." *Id.* ¶ 14. The Concession also does not prohibit the City from reducing rates (*id.* ¶ 27), "restrict[] the City from removal of meters" to "reduce congestion" or "eliminate safety hazards" (*id.*) or "expand the availability" (*id.* ¶ 38) of other "options like bike lanes, bus lanes, [and] pedestrian use." *Id.* ¶ 31.[6] Nothing in the Concession prohibits the City from doing any of those things. And it certainly does not strip the City of its power to regulate transportation in the City. Am. Compl. ¶ 14.

Rather, CPM's right to operate the system is made expressly subject to the City's exercise of its "Reserved Powers" (Concession §§ 2.1, 3.1(a)) including the City's powers to designate the number and location of metered parking spaces, add or remove spaces, set or revise the fees parkers pay to use the spaces, regulate traffic, and generally regulate, exercise its police powers, and control the public way. *Id.* § 1.1 (definition, "Reserved Powers"). Installation and removal of spaces, metered parking rates, and regulation of all other aspects of parking and transportation in the City are matters expressly reserved to and subject to City control (*id.* §§ 2.1, 3.1(a), 3.2(e), 7.1, 7.7(a)) and they are governed by City ordinance, not CPM, and not the Concession.[7]

To be sure, under the Concession, the City obviously cannot freely rebid spaces it already bid out to CPM, and the Concession has mechanisms according to which the City compensates CPM for City actions that reduce the Concession's value.[8] Plaintiffs claim Section 14.3 in

---

[6] Indeed, it is a well-publicized fact subject to judicial notice that the City has expanded bike lanes in recent years while the Concession has been in effect. *E.g.*, CHI. DEP'T OF TRANSP., 2017 BIKEWAYS – YEAR IN REVIEW (2018), https://secureservercdn.net/198.71.233.36/40f.4ba.myftpupload.com/wp-content/uploads/2013/06/YearEndReview_2017_2018_0416.pdf.

[7] *See, e.g.*, MUN. CODE OF CHICAGO, § 9-64-190 ("Parking meter zones – Regulations"), § 9-64-205 ("Parking meter rates"), § 9-64-205 ("parking meters – Hours of operation"), § 9-64-207 ("Parking meter increments and maximum periods for parking").

[8] *See, e.g.*, Concession § 7.5 & Article 7 generally (provisions setting forth mechanisms for payments relating to meter closures and certain other fluctuations in system usage), § 14.3 (provisions describing potential compensation mechanism relating to the City's exercise of Reserved Powers in a manner adversely affecting Concession market

particular, "prohibit[s], or at the very least, severely inhibit[s], the City's use of its Reserved Powers." Am. Compl. ¶ 32. In fact, that Section says the opposite: "the Parties acknowledge and agree that (i) it is anticipated that the City will exercise its Reserved Powers during the Term," and "the impact of certain of such actions may have a material adverse effect on the fair market value of the Concessionaire Interest," in which case the Concession provides a measure for the City to reimburse CPM. Concession § 14.3. Plaintiffs admit that the City has exercised its Reserved Powers in ways impacting the parking meter system, contrary to their suggestion that the Concession essentially precludes it. Am. Compl. ¶ 34.[9]

## II.    Plaintiffs' Alleged Injuries, Claims, and Requested Injunctive Relief

Plaintiffs attribute negative impacts to the Concession, which generally fall under the contention that they do not "receiv[e] the benefit of active regulation" of the meter parking system (Am. Compl. ¶ 41), and that they are denied their "prefer[ence] to use their cars less or not at all." *Id.* ¶ 44. They claim that the City has failed to "manage traffic, relieve congestion, or provide alternatives to car use," (*id.* ¶ 7); the Concession restricts the City "from removing meters to favor options like bike lanes, bus lanes, pedestrian use and the closing of public streets for commercial and public purposes, which would allow plaintiffs to save on the cost of car use and potentially

---

value), § 15.3 (provisions describing potential payment for "Compensation Events," generally meaning certain specified events or expenses/losses associated with CPM's compliance with directives from the City).

[9] As explained by the Illinois Court of Appeals in denying a prior challenge to the Concession:

> [T]hese compensation payment provisions are based on the premise that the approximately $1.15 billion CPM paid the City for the concession represents the estimated 75-year value of an assumed number of parking meters assets, whose value may change as a result of the City's exercise of its home rule powers over meter inventory or operations. Accordingly, the City agreed to compensate CPM as necessary . . . to maintain the benefit of the bargain.

*Indep. Voters of Ill. Indep. Precinct Org. v. Ahmad*, 2014 IL App (1st) 123629, ¶ 10, 13 N.E.3d 251, 253 (1st Div. 2014). That court rejected the same mischaracterizations of the Concession as those asserted by Plaintiffs. *See, e.g.*, *id.* ¶ 74 (rejecting claim that the Concession fixes meter rates); *id.* ¶ 73 (rejecting claim that City has surrendered its police powers over the metered parking system); *id.* ¶ 81 (describing that "true up" payments "demonstrate that the City has, in fact, exercised its police powers to make changes to the metered-parking system, for the benefit of the public, notwithstanding the concession agreement's compensation provisions").

allow the savings from giving up car ownership altogether," (*id.* ¶ 31); and the Concession allegedly restricts the City's "ability to reduce rates, use peak pricing, remove meters to reduce congestion, put in 'drop off' zones, and eliminate safety hazards in high crash areas." *Id.* ¶ 27.

Plaintiffs assert claims under §§ 1 and 2 of the Sherman Act for alleged exclusive dealing and illegal monopolization. *Id.* ¶¶ 54-63. Plaintiffs narrowly define the relevant product market allegedly monopolized as "the Metered Parking System that offers metered parking at public curb space belonging to the City and that is operated by CPM under the terms of the [Concession]." *Id.* ¶ 40. Plaintiffs also claim that CPM has violated the ICFA, 815 ILCS 505/1 et seq., because CPM has allegedly "engaged—and continues to engage in—an unlawful trade practice." *Id.* ¶¶ 64-66.

Plaintiffs do not seek damages. *See id.* ¶¶ 59, 63, 66, A-E. They seek to certify a class in pursuit of a declaration that the Concession violates the Sherman Act (*id.* ¶¶ 52, 59, 63) and "[e]njoin CPM from enforcing the Agreement unless and until CPM has modified the Agreement to permit active regulation by the City of the Metered Parking System and a reasonable termination date for such Agreement, as modified." *Id.* ¶¶ 66, A-E.

## ARGUMENT

## I.    Plaintiffs Lack Article III Standing

Plaintiffs bear the burden of establishing standing by pleading that they have "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Id.* at 2210. Standing to pursue injunctive relief, as Plaintiffs request, requires showing a prospective concrete injury that is "imminent," meaning "*certainly impending*"; merely "*possible* future injury" is not enough. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). Standing also requires Plaintiffs to plead "a causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged

action of the defendant and not from the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Lastly, standing requires Plaintiffs to plead "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Plaintiffs fail these requirements.

### A. Plaintiffs do not plead injury in fact.

*Plaintiffs' alleged injuries are not concrete.* A "concrete" injury is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U. S. 330, 340 (2016). "Concrete" injuries include "tangible harms, such as physical harms and monetary harms"; intangible harms such as "reputational harms, disclosure of private information, and intrusion upon seclusion"; and harms "specified by the Constitution itself," e.g., abridgment of free speech. *TransUnion*, 141 S. Ct. at 2204.

Plaintiffs have not sufficiently alleged economic harm, physical injury, a recognized intangible injury, or any infringement of their constitutional rights. *Id.* at 2204. They claim that metered parking fees have increased since adoption of the Concession in 2008 and make repeated allusion to the fact that there are fees associated with meter parking, ostensibly to plead economic loss. Am. Compl. ¶¶ 14, 21, 56. But that is irrelevant. Plaintiffs must plead injury *in relation to the relief they seek*, and they do not seek to recover monetary damages for alleged payment of increased metered parking fees (nor could they, as the applicable statutes of limitations have lapsed). *See Goldhamer v. Nagode*, 621 F.3d 581, 585-86 (7th Cir. 2010) (past alleged harm is irrelevant to standing to pursue injunctive relief). They seek an injunction modifying the Concession to enable the City to regulate the meter system more freely, which if not granted, they claim will result in fewer of the transportation alternatives that they prefer to meter parking. *Id.* ¶¶ 4, 6-7, 24, 31, 42-43. That supposed deprivation of their preferred transportation options is not a concrete injury, and "federal courts do not adjudicate" such "hypothetical or abstract disputes."

*TransUnion*, 141 S. Ct. at 2203; *see also U.S. Awami League, Inc. v. City of Chi.*, 110 F. Supp. 3d 887, 891 (N.D. Ill. 2015) ("Offense at government activity . . . is not a sufficiently direct or concrete injury to create standing."); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("Harm to abstract social interests cannot confer Article III standing.").

*Plaintiffs' alleged injuries are not "particularized."* To be "particularized," an injury must be specific to the plaintiff, in a manner that gives the plaintiff a "personal stake" in the alleged dispute that is distinct from the general populace, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), and "distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). "That threshold requirement ensures that [Article III courts] act as judges, and do not engage in policymaking properly left to elected representatives." *Id.*

Plaintiffs have no "personal stake" in how Chicago's transportation options are arranged any more than any of the City's other three million inhabitants. Plaintiffs assert a general grievance that they and all Chicagoans should have a cheaper, greener transportation system (Am. Compl. ¶¶ 24, 31, 43) but their "[i]ndignation . . . is not particularized because it does not affect [them] in an 'individual way.'" *Common Cause Ind. v. Lawson*, 937 F.3d 944, 956 (7th Cir. 2019); *see also Stanton v. Ash*, 384 F. Supp. 625, 629 (S.D. Ind. 1974) (plaintiff lacked standing for "generalized grievance" that defendants withheld funds for transportation programs; "[Plaintiff] asserts . . . they are denied the benefit of highway programs and projects; . . . injur[y] due to the inflation of highway costs; and, that their right to travel has been infringed. . . . [T]he only injury [] plaintiff has asserted is one shared by all citizens and is injury in the abstract.").

*Plaintiffs' alleged threatened injuries are not imminent.* Far from alleging harm that is "*certainly impending*," *Clapper*, 568 U.S. at 408-09, Plaintiffs waited thirteen years to file this suit, and they have done so because of a vague alleged fear that City transportation will not feature their preferred mix of options. Such an alleged harm, rooted in the long-term development of City

infrastructure, could hardly be less imminent. It is not nearly sufficient for Article III standing. *See, e.g.*, *The Cornucopia Inst. v. U.S. Dep't of Agric.*, 260 F. Supp. 3d 1061, 1069-71 (W.D. Wis. 2017) (speculative theory of future injury is not sufficient).

### B. Plaintiffs' claimed injury is not fairly traceable to CPM.

Article III also requires Plaintiffs to plead a causal relationship between their claimed injury and the challenged conduct, meaning it is "fairly traceable" to CPM, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013), "and not from the independent action of some third party not before the court," *Perry v. Village of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999). They have not done so—and that is so irrespective of whether their relevant claimed harm includes the payment of meter fees, which by a fair reading of the relief sought in the Amended Complaint, it should not. Plaintiffs attempt to pin their dissatisfaction with the City's transportation on CPM, but that rests on mischaracterizations of the Concession, as described above. The City decides how to regulate transportation in Chicago, not CPM. The City has retained full control over the structure of transportation in Chicago, including whether to close streets and whether to remove or designate new meters, and it has exercised that control, as Plaintiffs admit (Am. Compl. ¶ 33) such as by installing extensive bike lanes. *See supra* n.6. It is also the City, not CPM, that controls meter rates. Concession § 7.1. The structure of transportation and relative availability of transportation options in Chicago quite clearly trace to City government, not CPM, and Plaintiffs therefore have not pleaded traceability. *See, e.g.*, *Area Transp., Inc. v. Ettinger*, 219 F.3d 671, 674 (7th Cir. 2000); *Shakman v. Dunne*, 829 F.2d 1387, 1397 (7th Cir. 1987); *City of Rock Island v. United States*, 2014 WL 4748326, at *3-6 (C.D. Ill. Sept. 24, 2014).

### C. Plaintiffs have not pleaded redressability.

"[I]t must be likely, as opposed to merely speculative, that the injury" of which Plaintiffs complain "will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561. Plaintiffs' theory

that the City's transportation infrastructure will change in the manner they want, were the Court to rule in their favor, is guesswork. And it is guesswork that is grounded, moreover, in the false premise that the Concession precludes the City from regulating the metered parking system. *E.g.*, Am. Compl. ¶¶ 2, 4, 6-7. That the City already regulates transportation in Chicago yet has not done so in the manner Plaintiffs want underscores that they have not pleaded redressability. *See ASARCO, Inc. v. Kadish,* 490 U.S. 605, 615 (1989) (no standing where question of redressing claimed injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"); *Cabral v. City of Evansville*, 759 F.3d 639, 642 (7th Cir. 2014) (injury not redressable where favorable outcome would not directly impact plaintiff's rights but rather rights of third parties, and it is speculative whether third parties would take action to plaintiff's benefit).

Plaintiffs speculate that if the City rebid meter spaces to unidentified third parties, or if it were less inhibited by the cost-shifting mechanics of the Concession, it would regulate transportation to include more bike lanes and other options. Am. Compl. ¶¶ 24, 31, 38, 42-45. But the way City transportation will ultimately develop over time is subject to innumerable variables unrelated to the Concession. It implicates the motives and behaviors of City officials and other third-party stakeholders, broader policy questions and voter preferences, macroeconomic and technological developments, and other factors. The Supreme Court has repeatedly cautioned against "endors[ing] standing theories that require" such "guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 414, and courts dismiss such speculative claims for lacking standing. *See, e.g.*, *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1444 (2011); *Area Transp.*, 219 F.3d 671, 673-74 (7th Cir. 2000); *Ass'n of Am. Physicians & Surgeons v. Koskinen*, 2014 WL 1056495, at *7-8 (E.D. Wis. Mar. 18, 2014).

\*     \*     \*

11

Plaintiffs lack Article III standing, and the Amended Complaint should be dismissed with prejudice in its entirety on that basis.

## II. Plaintiffs Have Not Alleged the Type of Injury Needed to Plead Their Claims

### A. Plaintiffs have not pleaded an antitrust injury needed to assert Sherman Act claims.

Plaintiffs' Sherman Act claims require an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). An antitrust injury exists where the challenged conduct causes (a) reduced output or (b) higher prices for consumers in the relevant market—here, according to Plaintiffs, on-street metered parking. *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992).

Plaintiffs do not claim the Concession reduces the amount of available metered parking spaces. They contend the Concession inhibits the City from removing meters and reinforces the longevity of the meter system, which they dislike; they want regulation reducing the supply of parking spaces and fostering the expansion of *other* modes of transportation, "such as bike lanes, express bus lanes, and pedestrian use." Am. Compl. ¶¶ 24, 31, 43. Yet a "restraint that in the end expands output" in the relevant market "serves the interests of consumers" in that market "and should be applauded rather than condemned." *Chi. Prof'l Sports Ltd. P'Ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 673 (7th Cir. 1992). Thus, Plaintiffs do not plead reduced output in the allegedly relevant market. To be sure, despite their hope that the remedy will reduce parking, Plaintiffs allege that the Concession "limits the supply of meters from any source and from any competitor unless the City compensates CPM," (Am. Compl. ¶ 22), ignoring that the City may grant additional concessions at its discretion. Concession § 2.1.

12

Plaintiffs also cannot allege higher prices caused by the Concession. They claim that metered parking fees have increased. Am. Compl. ¶¶ 14, 21. But as noted, the City, not CPM, controls meter pricing and does so independently of the Concession. Thus, the alleged higher prices are not "attributable to an anticompetitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see also Elliott v. United Ctr.*, 126 F.3d 1003, 1005 (7th Cir. 1997) (affirming dismissal where "price and output" of the relevant product in the relevant market "are totally unaffected by the [defendant's conduct]").

Finally, even if the Concession gave CPM control over price (which it does not), the City's lawful transfer of the metered parking system through an open bidding process does not constitute anticompetitive conduct. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 267 (7th Cir. 1984).[10] Without that, Plaintiffs cannot plead an antitrust injury.

### B. Plaintiffs cannot plead a pecuniary loss required to assert an ICFA claim.

To assert a claim under the ICFA, a plaintiff must plead "actual damage." 815 ILCS 505/10a. This means the plaintiff "suffer[ed] 'actual pecuniary loss,'" *Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010), "as a result of the [challenged] practice." *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149, 776 N.E.2d 151, 160 (2002). "[T]he defendant's deception must have affected the plaintiff in a way that made him or her tangibly worse off. Theoretical harm is insufficient." *Price v. Philip Morris, Inc.*, 219 Ill.2d 182, 275-76, 848 N.E.2d 1, 55 (2005) (Karmeir, J., concurring). The Amended Complaint fails this requirement.

---

[10] *See also Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 635-36 (N.D. Ill. 2015) ("Absent an allegation that [the challenged] agreements . . . somehow decreased competition, the mere transfer of a monopoly is not an antitrust injury . . . ."); *JetAway Aviation, LLC v. Bd. of Cty. Com'rs of Cty. of Montrose, Colo.*, 754 F.3d 824, 839 & n.12 (10th Cir. 2014) (Holmes, J., concurring) ("And there can be no anticompetitive conduct—that is, harm to competition—in situations where the sole act in question is the replacement of one monopolist by another.").

*First*, Plaintiffs do not allege a pecuniary loss. Plaintiffs claim their transportation preferences are or will be unsatisfied. *E.g.*, Am. Compl. ¶ 43. That is not an "actual pecuniary loss." *See, e.g.*, *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 402, 911 N.E.2d 1049, 1053 (1st Dist. 2009); *Yu v. Int'l Business Machs. Corp.*, 314 Ill. App. 3d 892, 897, 732 N.E.2d 1173, 1177 (1st Dist. 2000). And Plaintiffs' allegations that they pay higher meter rates are similarly deficient because they fail to show that Plaintiffs were denied the benefit of the bargain—i.e., parking in exchange for paying the meter. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014) (dismissing claim where plaintiff did not sufficiently plead "he paid more than the actual value" of what he received); *Kim*, 598 F.3d at 365 (same).

*Second*, even if Plaintiffs alleged a pecuniary loss from paying meter fees, the voluntary payment doctrine precludes their ICFA claim. "[M]oney voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment, cannot be recovered" unless "there was some necessity that amounted to compulsion and payment was made under the influence of that compulsion." *McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626, ¶¶ 22-23, 135 N.E.3d 73, 80 (2019). Plaintiffs do not plead they lacked knowledge of the facts or were or will be compelled to pay parking meters. They simply voluntarily paid meters, in lieu of the other options they admit are available. Am. Compl. ¶¶ 38-39.

## III.  Plaintiffs' Sherman Act Claims Are Barred by the State Action Immunity Doctrine

Allegedly anticompetitive arrangements between municipalities and private parties are shielded from federal antitrust liability if the challenged conduct is "clearly articulated and affirmatively expressed as state policy." *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). The state policy need not compel the municipality to take the action that is challenged as anticompetitive; it is sufficient that the anticompetitive effects of such action are a "foreseeable result" of the state's grant of authority. *Town of Hallie v. City of Eau Claire*,

471 U.S. 34, 42 (1985).[11]   Thus courts in this circuit have repeatedly applied the state action immunity doctrine to reject Sherman Act challenges similar to this one.[12]

The City and CPM executed the Concession in accordance with state law authorizing the City to regulate and execute contracts in relation to on-street parking meters.   The Illinois Municipal Code provides that "[a]ny municipality" is authorized to "[a]cquire by purchase or otherwise, own, construct, equip, manage, control, erect, improve, extend, maintain and operate . . . parking meters, and any other revenue producing facilities . . . necessary or incidental to the regulation, control and parking of motor vehicles."   65 ILCS 5/11-71-1(a).   Municipalities are further entitled to "[e]nter into contracts dealing in any manner with the objects and purposes" of that authorization.  65 ILCS 5/11-71-1(c).   That the City would execute exclusive contracts for on-street metered parking, like the Concession, is the foreseeable result of these provisions, given that "[i]n the context of municipal powers, it is generally understood that the authority to contract contemplates the power to create exclusive contracts."   *Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 889 (7th Cir. 2011).   Furthermore, the Illinois legislature "has explicitly provided that municipalities may act in anticompetitive ways that do not comply with federal anti-trust laws."   *Lathrop v. Juneau & Assocs.*, 220 F.R.D. 330, 336 (S.D. Ill. 2004) (citing 65 ILCS 5/1-1-10)

---

[11] Immunity under the doctrine is not limited to public entities as defendants; it applies equally to private parties contracting with a state or municipality.   *See, e.g.*, *Green Sols. Recycling, LLC v. Reno Disposal Co., Inc.*, 814 F. App'x 218, 222 (9th Cir. 2020); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc.*, 810 F.2d 869, 878 (9th Cir. 1987); *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 522 (8th Cir. 1985).

[12] *See, e.g.*, *Justice v. Town of Cicero*, 577 F.3d 768, 775 (7th Cir. 2008) (law authorizing local governments to "make all needful rules and regulations concerning the use of water supplied by the waterworks of the city or village" and to fix and collect water rates "as the corporate authorities may deem necessary or expedient" was sufficient to invoke immunity in relation to water department requirements for water meters and fees); *Campbell v. Chicago*, 823 F.2d 1182, 1184 (7th Cir. 1987) (city cap on available taxicab licenses was foreseeable result of statute authorizing city to "license, tax, and regulate" drivers and "[to] prescribe their compensation"); *LaSalle Nat'l Bank v. Cty. of DuPage*, 777 F.2d 377, 382-83 (7th Cir. 1985) (city's actions in the provision of sewer services immune based on state statute authorizing municipalities to "furnish sewerage service to municipal corporations and enter into and perform contracts with any municipality for the furnishing of sewerage service"); *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 326 F. Supp. 3d 602, 620 (N.D. Ill. 2018) (municipal agency's statutory authorization to contract in area of fire-alarm protection rendered immune its exclusive contract with private-company defendant).

(Illinois State legislature "inten[ds] . . . that the 'State action exemption' to the application of federal antitrust statutes be fully available to all municipalities, and the agents . . . of each," and it is "the policy of this State that home-rule municipalities" may exercise their functions "*notwithstanding effects on competition*").

Because the purportedly anticompetitive effects that Plaintiffs complain of relating to the Concession "logically result from the [City's] authority to regulate" and contract for the operation of its parking meters under state law, *Campbell*, 823 F.2d at 1184, the state action immunity doctrine precludes Plaintiffs' Sherman Act claims.

## IV. Plaintiffs' Claims Suffer from Fundamental Pleading Deficiencies

### A. Plaintiffs fail to plead required elements of their Sherman Act claims.

To plead a Sherman Act § 2 monopolization claim, Plaintiffs must allege, among other requirements, that CPM (1) possesses monopoly power (2) in a defined, relevant market and (3) acquired or maintained that monopoly power with anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). A Sherman Act § 1 claim similarly requires, among other elements, an unreasonable restraint of trade in a plausibly pleaded market. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). The Amended Complaint fails to plead those requirements.

### 1. Plaintiffs do not sufficiently plead monopoly power.

The Seventh Circuit has alternatively defined "monopoly power" as "the power to exclude competition or control price," *Ind. Grocery Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir. 1989), or "the ability to raise price significantly higher than the competitive level by restricting output," *Ball Mem'l Hosp. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1331 (7th Cir. 1986). However it is defined, Plaintiffs cannot plead that CPM has monopoly power.

Despite Plaintiffs' claims to the contrary, the Concession makes clear that CPM cannot raise prices or reduce output in the meter parking system. The Concession expressly reserves for the City the power to set metered parking fees (Concession § 7.1), and the power to add or remove parking spaces. *Id.* § 7.2. The City's uncontestable ability to determine prices and output forecloses Plaintiffs from pleading CPM's monopoly power. *Humboldt Bay Mun. Water Dist. v. Louisiana-Pacific Corp.*, 608 F. Supp. 562, 568 (N.D. Cal. 1985) (no monopoly power where the defendants had no power to control prices because the water district set prices).

Even assuming CPM has monopoly power (which it does not), Plaintiffs have not pleaded that it acquired or maintained that power in an anticompetitive matter. CPM simply lodged the highest bid through an open process and then executed the Concession. The Concession, as Plaintiffs concede, did not create any purported monopoly—it only transferred operational control of the metered parking system to CPM after CPM paid over $1.15 billion. Am. Compl. ¶ 20. Merely shifting purported monopoly power from one entity to another has no competitive impact and thus "no antitrust significance." *Riegel*, 752 F.2d at 266 (affirming dismissal of § 2 claim based on the transfer of a monopoly-conferring patent). It is the "same monopoly" as before, with "no increase in the restriction of output" and, therefore, does not state an antitrust claim. *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *13 (N.D. Ill. Sept. 28, 2015).

### 2. Plaintiffs do not allege an unreasonable restraint of trade.

Exclusive-dealing arrangements typically have procompetitive benefits, such as reduced costs and stable long-term supply. Courts therefore assess them under § 1 using the rule of reason. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 65 (1st Cir. 2004). To establish an unreasonable restraint of trade under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). As

with § 2 claims, merely shifting market power from one entity to another, as Plaintiffs allege here, has no competitive impact and is not an unreasonable restraint of trade. *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29-30 (2d Cir. 2006); *see also supra* n.12.

Plaintiffs do not allege substantial anticompetitive effect. They claim the Concession "limits the supply of meters from any source and from any competitor unless the City compensates CPM for the resulting loss." Am. Compl. ¶ 22. Plaintiffs, however, fail to allege which portion of the market was foreclosed, what competitors were foreclosed, or how any alleged foreclosure raised price or reduced output. *Republic Tobacco Co. v. N. Atl. Trading Co., Inc.*, 381 F.3d 717, 737-38 (7th Cir. 2004) (exclusive dealing arrangements violate § 1 "only when they foreclose competition in a substantial share" of the relevant market). Plaintiffs allege there are too many, not too few, metered spaces. Am. Compl. ¶¶ 24, 31. And their allegations of increased metered parking rates (*id.* ¶¶ 4, 14, 21) also fail because the Concession does not set rates—the City does. Concession § 7.1; *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (exclusive dealing violates § 1 only if it "raise[s] prices above (and therefore reduce[s] output below) the competitive level").

### 3.    Plaintiffs do not allege a plausibly defined market.

Plaintiffs must plausibly define the product and geographic market allegedly monopolized. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999). A market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). The defined market must "correspond to the commercial realities of the industry." *Id.* at 336. Failure to allege a plausible market requires dismissal of both § 1 and § 2 claims. *United Ctr.*, 126 F.3d at 1003; *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d. Cir. 1997); *Reapers Hockey Ass'n v. Amateur Hockey Ass'n of Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019).

18

Plaintiffs allege the relevant product market is "the Metered Parking System that offers metered parking at public curb space belonging to the City and that is operated by CPM under the terms of the Agreement." Am. Compl. ¶ 40. They claim that public transportation, bikes, and retail parking are "limited" substitutes (*id.* ¶¶ 38-39) but nowhere address why their proposed market excludes alternatives such as garages or unmetered spaces, or why other forms of transportation (e.g., ridesharing) are not reasonably interchangeable. Plaintiffs' failure to explain why obvious substitutes are not included in the product market requires dismissal. *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 2020 WL 5642941, at *7 (N.D. Ill. Sep. 22, 2020) (complaint did not allege facts plausibly suggesting that consumers distinguish between physicians allegedly inside and outside the market); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (market did not include contracts outside the alleged market in which plaintiff allegedly competed); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (plaintiffs did not provide "an explanation for why they are defining the relevant product market in such narrow terms").

Additionally, the Amended Complaint does not even attempt to define the relevant geographic market. Plaintiffs make a passing reference to "the commercial and business areas where the meters in the Metered Parking System are located." Am. Compl. ¶ 37. The Amended Complaint provides no explanation for why the market should not be broader—to include, for example, parking in adjacent noncommercial areas. *See, e.g.*, *42nd Parallel N. v. E Street Denim Co.*, 286 F.3d 401, 406 (7th Cir. 2002) (plaintiff's geographic market failed to include nearby areas where consumers could purchase substitutes).

Plaintiffs' failure to allege a plausible product or geographic market requires dismissal of their Sherman Act claims.

19

## B.  Plaintiffs failed to plead required elements of an ICFA claim.

An ICFA claim requires, *inter alia*, pleading of a deceptive or unfair act by the defendant. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012).  Plaintiffs do not allege deception, only that the Concession is "unfair."  Am. Compl. ¶¶ 6, 64-66.  To plead unfairness, Plaintiffs must allege the Concession (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and/or (3) substantially injures consumers.  *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417, 775 N.E.2d 951, 960 (2002).  They have not done so.

*First*, to establish a violation of public policy, Plaintiffs must identify the violation of "a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations."  *Messina v. Green Tree Servicing, LLC*, 210 F. Supp. 3d 992, 1004 (N.D. Ill. 2016).  Plaintiffs allege "a clear consensus of elected officials" believe the Concession is "inimical to the public interest" and the Concession prevents active regulation by the City.  Am. Compl. ¶¶ 47-48, 65.  But the supposed preferences of certain public officials do not determine public policy. *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[The ICFA] is concerned with public policy *as established by statutes and the common law*.").  As the City Council found the Concession to be in the best interests of the City (*see supra* nn.2-3), and state law authorized the City to enter into the Concession, 65 ILCS 5/11-71-1, the Concession is consistent with, rather than in violation of, public policy.  Further, the Illinois Municipal Code makes clear that it is "the policy of this State" to "exercise any power and perform any function pertaining to their government and affairs . . . *notwithstanding effects on competition*."  *Id.* 5/1-1-10.

*Second*, a practice is immoral and oppressive only when it "leave[s] the consumer with little alternative except to submit to it."  *Robinson*, 201 Ill.2d at 418.  Plaintiffs claim that execution of the Concession was immoral and oppressive because "the City was desperate for funding at the time," and the deal is allegedly one-sided in the profit that it confers on CPM.  Am. Compl. ¶¶ 6,

49-50, 65.  But there is no support for the proposition that the ICFA condemns a public transaction merely because it is supposedly economically imbalanced to the detriment of the government—and certainly not one struck through a public bidding process.  Regardless, the ICFA is concerned with impact to consumers, not government finances.  Plaintiffs also allege they "have no alternative to regular or repeated use of the Metered Parking System turned over to CPM." *Id.* ¶ 17.  But these allegations do not plead the Concession foreclosed meaningful choice or unreasonably burdened Plaintiffs.  *Batson*, 746 F.3d at 833; *Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill. App. 3d 307, 313, 662 N.E.2d 602, 608 (1st Dist. 1996).  The Concession did not create the meter system but rather merely transferred its operation to CPM, while the City reserved the powers to set prices, remove meters, and otherwise regulate transportation.  The mere continued availability of meter parking certainly does not "burden" Plaintiffs, let alone is it "so oppressive as to leave [them] with little alternative except to submit to it." *Robinson*, 201 Ill.2d at 418.

Further, it is beyond dispute that Chicagoans are not *forced* to use meter parking.  Indeed, Plaintiffs cannot claim the Concession denies them meaningful choice in transportation while admitting they "can take public transportation," "use bikes," and/or avail themselves of off-street parking at retail outlets.  Am. Compl. ¶¶ 38-39.  When cars are necessary, Plaintiffs do not explain why they cannot use rideshares.  *See Medina v. Public Storage, Inc.*, 2014 WL 1715517, at *7 (N.D. Ill. April 30, 2014) (unfairness not pleaded because "plaintiffs do not suggest that they were coerced into purchasing insurance from Public Storage rather than an independent insurer or that they lacked reasonable alternatives").

*Third*, Plaintiffs have not plausibly alleged any cognizable injury to consumers, let alone a "substantial" one.  They contend that consumers are substantially injured by "higher rates" and the City's alleged lack of regulatory power to implement alternative transportation methods.  Am. Compl. ¶ 6.  As already established, the latter is not a cognizable harm under the IFCA.  But even

a cognizable injury is "substantial" only if it is "not outweighed by any countervailing benefits to consumers" and is "one that consumers themselves could not reasonably have avoided." *Batson*, 746 F.3d at 834. Here, CPM paid the City approximately $1.15 billion, which conferred measurable benefits outweighing Plaintiffs' purely speculated loss of a different mix of transportation options; a fact recognized by City Council when approving the Concession and the Illinois Court of Appeals in rejecting a prior challenge to it:

> [T]he City used that money [received from CPM] to set up: (1) a $400 million revenue replacement fund to generate $20 million a year . . . that could be used for the City's ongoing operations; (2) a $100 million human infrastructure fund to . . . provid[e] resources to . . . residents most in need; (3) a $325 million mid-term reserve fund to supplement revenues in the City's corporate fund through 2012; and (4) a $324 million budget stabilization fund to pay any amounts the City might owe CPM under the concession agreement and for any other purposes authorized by the city council.

*Ahmad*, 2014 IL App (1st) 123629, ¶ 7. It cannot be disputed, moreover, that Plaintiffs can avoid the meter parking system by using alternatives like public transit, ridesharing, garages, and bikes. *See, e.g.*, *Batson*, 746 F.3d at 834 (plaintiffs failed to state a claim because parking fees at issue "could reasonably have been avoided . . . [by] opting for alternative entertainment").

For these reasons, Plaintiffs have not pleaded that CPM has plausibly engaged in any unfair practice in violation of the IFCA.

**V.      Plaintiffs' Claims Are Untimely and Should Be Dismissed Based on *Laches***

A plaintiff pleads herself out of court "where, as here, the allegations of the complaint itself . . . plainly reveals that an action is untimely." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). Plaintiffs complain of events that transpired in December 2008, when the Concession was executed, or at the latest June 2013, when it was amended. Am. Compl. ¶¶ 1, 13-14, 21. Their delay in filing until July 2021 makes their claims are untimely.

### A.     Plaintiffs' Sherman Act claims are untimely.

Sherman Act claims for damages are subject to a four-year statute of limitations.  15 U.S.C. § 15b (2018).  Plaintiffs seek equitable relief, not damages.  Am. Compl. ¶¶ A-E.  Yet "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy."  *Cannon v. Univ. of Health Scis./Chi. Med. Sch.*, 710 F.2d 351, 358 (7th Cir. 1983).  Thus, the four-year damages statute serves "as a baseline for determining whether a presumption of laches applies."  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999).[13]  *Laches* bars untimely claims for equitable relief where the plaintiff's undue delay prejudices the party against whom relief is sought.  *Id.* at 820.  "*Laches* is a question of degree"; "[i]f the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice will be required."  *Id.* at 824.

It is apparent from the Amended Complaint that Plaintiffs needlessly delayed.  They complain of a Concession entered in December 2008, which was amended—not in any way that Plaintiffs claim is relevant—in June 2013,[14] and yet waited until 2021 to file this suit.  In *Alarm Detection Systems*, the Court dismissed antitrust claims in comparable circumstances where the plaintiff challenged municipal ordinances and agreements between nine and twelve years later. 129 F. Supp. 3d at 632-34.  The court held that the plaintiff's equitable claims were time-barred, notwithstanding continued performance under the challenged restraints.  *Id.*  Courts in the Seventh

---

[13] Multiple circuits have referred to the four-year period to determine whether a claim for injunctive relief is timely. *See, e.g.*, *Oliver v. SD-3D LLC*, 751 F.3d 1081, 1085-86 (9th Cir. 2014); *Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc.*, 392 F.3d 265, 277 (8th Cir. 2004); *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 474-75 (D.P.R. 2020); *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 991-92 (N.D. Cal. 2020).

[14] *See, e.g.*, MUN. CODE OF CHICAGO § 9-64-205 (2021), https://www.chicityclerk.com/legislation-records/municipal-code; *supra* nn. 2-3 (published proceedings of Concession and amendment's passage).  Since the ordinance and the Concession agreements are matters of public record, Plaintiffs can be charged with constructive notice dating back to at least 2013.  *See Schilke v. Wachovia Mortg., FSB*, 820 F. Supp. 2d 825, 838 (N.D. Ill. 2011) (citing cases).

Circuit have similarly found an eight-year delay "unreasonable" as a matter of law[15] and a six-year delay untimely under *laches*. *See, e.g.*, *Checker Taxi Co., Inc. v. Nat'l Prod. Workers Union*, 113 F.R.D. 561, 569-70 (N.D. Ill. 1986); *see also New York v. Facebook*, 2021 WL 2643724, at *22 (D.D.C. June 28, 2021) (applying *laches* guided by four-year statute of limitations to dismiss claims "challeng[ing] two highly publicized acquisitions" because of six- and eight-year delays).

Plaintiffs' "unreasonable, inexcusable delay raises a presumption that [CPM] suffers damage and prejudice." *Wilmes v. U.S. Postal Serv.*, 810 F.2d 130, 134 (7th Cir. 1987); *see also Cannon*, 710 F.2d at 359 n.9 (presumption of *laches* places burden on plaintiff to show that the delay was excusable or that defendant was not prejudiced). Plaintiffs do not allege any facts to justify their prolonged delay. Even if a presumption of prejudice did not apply, a defendant's significant expenditure of time and money during the period that the plaintiff "sat idly by and chose not to challenge" the alleged conduct "constitute[s] sufficient prejudice as a matter of law." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002). CPM paid the City over $1.15 billion for the Concession. Concession § 2.1. And for the last thirteen years, CPM has been responsible for maintaining, improving, and upgrading the system. *See, e.g.*, *id.* §§ 3.16, 4.1, 4.7. That included "installing 'Pay and Display' pay boxes that permit payment by credit or debit card, allow more cars to park on the street, and allow customers to purchase 'portable time' (i.e., the right to park in multiple meter locations without paying duplicative meter fees)." *Ahmad*, 2014 IL App (1st) 123629, ¶ 10. Without question, Plaintiffs' extreme delay in filing this suit is prejudicial.

### B. Plaintiffs' ICFA claim is untimely.

By the same reasoning, Plaintiffs' IFCA claim is also untimely. The ICFA provides a three-year limitations period. 815 ILCS 505/10a(e); *McCready v. Ill. Sec'y of State, White*, 382 Ill. App.

---

[15] *Zelazny v. Lyng*, 1987 WL 12664, at *2 (N.D. Ill. June 16, 1987), *aff'd* 853 F.2d 540 (7th Cir. 1988).

24

3d 789, 798, 888 N.E.2d 702, 710 (1st Dist. 2008). Although the IFCA limitations period applies to damages claims, Illinois courts "ordinarily follow statutes of limitation as convenient measures for determining the length of time that ought to operate as a bar to an equitable cause of action" under *laches*. *Id.* at 270.[16] *Laches* "is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party." *Tully v. State*, 143 Ill.2d 425, 432, 574 N.E.2d 659, 662 (1991). "There are two fundamental elements of *laches*: (1) lack of due diligence by the party asserting the claim and (2) prejudice to the opposing party." *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25.

Plaintiffs' delay in filing this action until thirteen years after the well-publicized Concession and eight years after its public amendment readily establishes lack of diligence. *See id.* ¶¶ 26-27 (plaintiff had constructive notice of challenged bond authorization statutes based on their publication yet waited years to file challenge). And that CPM has expended more than $1.15 billion to win the Concession and additional resources to upgrade the system as the Concession required establishes prejudice for purposes of *laches* under Illinois law, the same as under federal law. *Id.* ¶ 28 (prejudice satisfied by fact that defendant had expended large sums of money).

Plaintiffs' lengthy delay in bringing their IFCA claim warrants dismissal.

## CONCLUSION

For the foregoing reasons, CPM respectfully requests the Court to dismiss the Amended Complaint with prejudice.

Dated: September 27, 2021                    Respectfully submitted,

                                             By: /s/ Joseph L. Motto
                                             Dan K. Webb

---

[16] Because the referenced limitations period is a state law, rather than a federal law, state-law principles on *laches* apply. *See Teamsters & Emplrs Welfare Trust v. Gorman Bros. Ready Mix*, 283 F.3d 877, 885-86 (7th Cir. 2002) (Easterbrook, J., concurring) ("If state law supplies the period of limitations, then it also supplies all related doctrines of tolling and laches."). In any event, application of federal principles leads to the same outcome.

Robert Y. Sperling
Joseph L. Motto
Conor Reidy
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
DWebb@winston.com
RSperling@winston.com
JMotto@winston.com
CReidy@winston.com

*Attorneys for Chicago Parking Meters, LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 27, 2021, I caused a true and correct copy of the foregoing to be filed via the CM/ECF system and served upon all counsel of record.


/s/ Joseph L. Motto