IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

Micah Uetricht, and　　　　　　　　　）
John Kaderbek,　　　　　　　　　　　）
　　　　　　　　Plaintiffs,　　　　　）
　　　　　　　　　　　　　　　　　　）　No. 21-cv-3364
v.　　　　　　　　　　　　　　　　　）　The Honorable Matthew F. Kennelly
　　　　　　　　　　　　　　　　　　）
Chicago Parking Meters, LLC,　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　　　Defendant.　　　　　　）


**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT CPM'S MOTION TO DISMISS**

Thomas H. Geoghegan
Michael P. Persoon
Will Bloom
DESPRES, SCHWARTZ & GEOGHEGAN, LTD.
77 W. Washington St., Ste. 711
Chicago, Illinois 60602
(312) 372-7391
tgeoghegan@dsgchicago.com
mpersoon@dsgchicago.com
wbloom@dsgchicago.com

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669
stuart@chanenolstein.com
ariel@chanenolstein.com

October 25, 2021

**TABLE OF CONTENTS**

PAGE

INTRODUCTION ............................................................ 1

ARGUMENT .............................................................. 4

I.    PLAINTIFFS HAVE ARTICLE III STANDING ................... 4

      A. Plaintiffs Assert A Concrete and Particularized Injury
         to a Legal Cognizable Interest ......................... 5

      B  The Injury Plaintiffs Actually Assert Is Traceable to CPM ................. 8

      C. The Injury Plaintiffs Assert Is Redressable By Terminating or
         Reforming the CPM Agreement to Permit Active Regulation by
         the City over its Meter System, Streets, and Police Practices .......... 9

II.   PLAINTIFFS HAVE PROPERLY ASSERTED AN
      ANTITRUST INJURY ..................................... 9

III.  PART 1 -- THE STATE IMMUNITY DOCTRINE, ALSO REFERRED
      TO AS THE *PARKER* EXEMPTION, IS NOT APPLICABLE TO
      PLAINTIFFS' CLAIMS .................................. 12

III.  PART 2 -- PLAINTIFFS ALLEGE ALL REQUIRED ELEMENTS OF
      A SHERMAN ACT CLAIM ................................ 14

      A. Plaintiffs Sufficiently Allege Monopoly Power .............. 14

      B. Plaintiffs Sufficiently Allege An Unreasonable Restraint of Trade ...... 14

      C. Plaintiffs Allege A Monopoly In A Plausibly Defined
         Product Market, For A Product Plaintiffs Have No
         Alternative To Purchasing on a Regular Basis ............ 15

IV.   PLAINTIFFS STATE A CLAIM UNDER THE ILLINOIS
      CONSUMER FRAUD ACT ("ICFA") ....................... 17

      A. Plaintiffs Plead All Elements of an ICFA Unfair
         Trade Practice Claim .............................. 17

      B. Plaintiffs Have Alleged Pecuniary Loss ................. 19

      C. The "Benefit-of-their-Bargain" Principle From
         *Canasta* and *Kim* is Inapplicable ..................... 20

      D. The Voluntary Payment Doctrine is Inapplicable .............. 21

V.  *LACHES* IS WHOLLY INAPPICABLE, AND, IN ANY EVENT,
    NOT PROPER ON A MOTION TO DISMISS ...............................................21

    A.  The Antitrust Violation Plaintiffs Assert Is A *Continuing* Violation,
        and Therefore *Laches* Runs From The Most Recent Violation    .........23

    B.  *Laches* Is An Affirmative Defense And Therefore Not A
        Ground For 12(b)(6) Dismissal, and Even If It Were, CPM
        Has Not Met Its Burden To Prove Its Affirmative Defense  ................24

    CONCLUSION  .............................................................................................25

## TABLE OF AUTHORITIES

### *CASES*

*Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d
614 (N.D. Ill. 2015).................................................................................24 n.2

*Alvarez v. Pappas*, 229 Ill. 2d 217 (2008) ........................................................21

*Ass'n of Am. Physicians & Surgeons v. Am. Bd. Of Med. Specialties*,
2020 WL 5642941 (N.D. Ill. 2020) ....................................................16

*Atlantic Richfield Co. v. USA Petroleum,* 495 U.S. 328 (1990) ........................12

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..............................9, 15

*Brunswick Corp. v. Pueblo Bowl – O – Mat,* 429 U.S. 477 (1977) ...........9-11, 14

*Cal. Retail Liquor Dealers' Ass'n v. Midcal Aluminum,*
445 U.S. 97 (1980) ...................................................................... passim

*Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732 (7th Cir. 2014) .......... 20

*Centerline Equipment Corporation v. Banner Personnel Service Inc.,*
545 F. Supp. 2d 768 (N.D. Ill. 2008) .......................................................19-20

*G.M. Sign, Inc. v. Stergo*, 681 F. Supp. 2d 929 (N.D. Ill. 2009) ........................19

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) .............22

*Jeffries v. Chi. Transit Auth.*, 770 F.2d 676 (7th Cir. 1985) .............................24

*Kim v. Carter's Inc.*, 598 F.3d 362 (7th Cir. 2010) ..........................................20

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ...............................................22

*Massachusetts v. EPA,* 545 U.S. 497 (2007) ................................................ 6, 7

*McIntosh v. Walgreens Boots Alliance, Inc.*, 2019 IL 123626 ...........................21

*Messina v. Green Tree Servicing*, LLC, 210 F. Supp. 3d 992
(N.D. Ill. 2016) ...................................................................................  19-20

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)  23 n.1

*Nat'l Found. for Special Needs Integrity, Inc. v. Reese*,
No. 115CV00545TWPDKL, 2016 WL 454805 (S.D. Ind. Feb. 5, 2016) ............24

*Parker v. Brown,* 317 U.S. 341 (1943) ....................................................... passim

*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951 (Ill. 2002) ............17-21

*Sherman v. Standard Rate Data Serv., Inc.*, 709 F. Supp. 1433
(N.D. Ill. 1989).............................................................................................24

*Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, No. 15 C 3702,
2015 WL 5934834 (N.D. Ill. Oct. 12, 2015) ........................................ 23n.1

*Spokeo v. Robins,* 578 U.S. 330 (2016) ........................................4, 5, 7

*Topping v. Fry*, 147 F.2d 715 (7th Cir. 1945) ....................................24

*Tunis Brothers Co Inc. v. Ford Motor Co.* 952 F.2d 715 (3d Cir. 1991) ........... 9

*United States v. Anthem Inc.* 855 F.3d 345 (DC Cir. 2017) ......................4, 7, 10

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) .................23 n.1

## **_STATUTES_**

Illinois Municipal Code, 65 ILCS 5/11-71-1 ................................................12, 18

Illinois Municipal Code, 65 ILCS 5/11-71-1(a)............................................. 1, 12

Illinois Municipal Code, 65 ILCS 5/11-71-1(c) .................................................2

Illinois Consumer Fraud Act, 815 ILCS 505/10a(a)..........................................20

## INTRODUCTION

Plaintiffs are resident Chicago motorists who challenge CPM's 75-year monopoly of the public curb space in Chicago's commercial and business areas ("CPM's monopoly"). In violation of Sherman Act Sections 1 and 2, the Concession Agreement between the City and CPM ("CPM Agreement") blocks the City from "active regulation" of CPM's monopoly. The City has no greater regulatory power over the parking meter system than it does over any other privately owned asset—that is, it can act for a public purpose only if it makes a payment to CPM on terms that CPM or a private arbitrator deem acceptable.

In *Parker v. Brown,* 317 U.S. 341 (1943), the Supreme Court created a judicially implied exemption under federal antitrust law for state monopolies or state-regulated utilities. This case involves such a monopoly—which the City conferred on CPM—over the rental of parking at public curb space. The *Parker* exemption, however, does not apply in every state-regulated utility case. In *Cal. Retail Liquor Dealers' Ass'n v. Midcal Aluminum,* 445 U.S. 97 (1980) ("*Midcal*"), the Supreme Court held that where, as here, the monopoly involves a private party, the *Parker* exemption is lost unless two conditions are met. First, "the challenged [private] constraint must be one clearly and affirmatively expressed as state policy; second, the policy must be 'actively supervised' by the State itself." *Id.* at 105. The CPM monopoly meets neither condition.

First, while the State, through the Illinois Municipal Code, authorizes the City to, among other things, acquire, manage, control, maintain, and improve parking meters and other parking facilities and exercise other ownership rights "necessary or incidental to the regulation, control and parking of motor vehicles," 65 ILCS 5/11-71-1(a), that law does not authorize the City or any other municipality to give up its ownership and regulatory

rights to a private party for that party's private gain. The only leasing the Municipal Code permits is for advertising, and even that is severely limited. As set out in 65 ILCS 5/11-71-1(c), "All revenues derived from any such contract [for advertising] shall be used exclusively for traffic regulation and maintenance of streets within the municipality." No lease of the entire system, with all revenue going to a private party, is within the scope or contemplation of the Illinois Municipal Code—much less *affirmatively endorsed* as the Supreme Court unequivocally requires for *Parker* immunity.

Second, the CPM Agreement does meet the Court's second condition, that the City exercise "active supervision" of CPM's monopoly. Complaint ¶¶ 27-34. As even CPM admits, the City cannot regulate CPM's property rights in the monopoly unless the City makes full compensation for any impairment of the fair market value of the CPM Agreement; and the level of that compensation is a determination to be made in private arbitration, making it impossible for the City to know in advance the amounts it will pay for engaging in regulation. *See* Complaint ¶ 34; Motion at 5-6.

In CMP Agreement Section 14.3 and other provisions, the agreement severely restricts the City's "active supervision" by use of its Reserved Powers. Complaint ¶¶ 32-33. The City is significantly inhibited, if not outright prohibited, from active regulation by the stringent requirements for interfering with the profitability of the CPM Agreement—that is, with CPM's property rights over the rental of public curb space.

In its motion to dismiss and accompanying memorandum (collectively, "Motion"), CPM refers to *Midcal* only once, and then only to make the spurious claim that the Illinois Municipal Code authorizes the City to sell, lease, or give up control of the parking meter system when it requires just the opposite. Even CPM effectively admits there is no "active

supervision when it agrees that the CPM Agreement requires reimbursement to CPM for any loss of profitability that results from a regulatory action. Motion at 5-6. The City has no ability to lower the inflated meter rates now collected from Plaintiffs and other class members unless it pays a penalty to CPM for any loss in the profitability of the CPM Agreement. Nor does the City have the ability raise or lower the number of parking spaces—to better manage traffic, improve safety, or just regulate the streets and public ways—unless it pays a penalty to CPM for any corresponding loss in CPM's monopoly.

There is no equivalent to this loss of ownership, control, and regulation of the parking meter system in any other U.S. city. The CPM Agreement establishes an unsupervised private monopoly kept in place for most of a century and far outside the scope intended under *Parker* for a public monopoly under the control of the government.

Moreover, in a century of rapid global warming and rapidly changing technology, the CPM Agreement commits the City to a particular transportation model without the flexibility that all other cities have to limit auto dependency. Even the relatively minor changes of protected bike lanes along a few high traffic blocks become a major endeavor, since the loss of any parking space has to be made up in some manner within the ward to ensure that CPM continues to receive its windfall profit.

In return for providing $1.1 billion in 2008 to fix a short-term budgetary shortfall, CPM has already recovered the full amount of its investment, and an additional $500 million. Complaint ¶ 20. Even as the City tiptoes around regulation in order to avoid any act that may trigger a penalty, the City is already paying CPM "true up" payments or contractual legal damages of up to $27 million a year. Complaint ¶ 33. Meanwhile,

3

Plaintiffs are paying out of pocket the country's highest metered parking rates, which are only nominally set by the City and in fact fixed by the CPM Agreement without any active supervision by the City. Plaintiffs drive on streets congested with meters, which the City may not move or alter without penalty. The City of Chicago and the Plaintiffs are trapped into a form of auto dependency from which other cities are actively moving away.

Virtually all five sections of CPM's Motion misleadingly describe Plaintiffs' First Amended Complaint, Dkt.22 ("Complaint"), in a condescending tone, as being just a plea for bike lanes. In fact, the Complaint sets out the economic injury from these inflated rates, beyond the financial means of the City to change, and the long-term harm from the loss of the City's active regulation of the public streets for safety and convenience of the public as well as the loss of the City's ability to provide innovative new forms of transportation for the balance of this century. The antitrust laws promote competition not just to ensure lower prices but also to encourage product innovation and new ways of doing things. *See United States v. Anthem Inc.* 855 F.3d. 345, 361 (D.C. Cir. 2017). At the very least, the City should retain the power to do so.

CPM's Motion should be denied.

**ARGUMENT**

## I. PLAINTIFFS HAVE ARTICLE III STANDING.

To establish standing, plaintiffs must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). CPM first argues that Plaintiffs do not have Article III standing to assert their claims, asserting that they have failed to plead all three of the required standing elements. CPM is wrong.

A. **Plaintiffs Assert a Concrete and Particularized Injury to a Cognizable Legal Interest.**

In their Complaint, Plaintiffs allege three different types of injury from CPM's monopoly. First, as the CPM Agreement requires, Plaintiffs pay sharply increased fares— an immediate doubling of the fares that they paid in 2008, and higher than in any other city of comparable size, such as Houston or Los Angeles. Complaint ¶¶ 4, 6, 22, 41. 42, 45, 56.

As a direct result of the CPM Agreement, Plaintiffs and other Chicago motorists are locked into paying the highest metered rates in any city over 100,000 in population (with the sole exception of the much higher density city of New York), without the benefit of any active regulation or control by the City over the rates. Complaint ¶¶ 41, 45   This is an overcharge, designed to ensure a monopoly windfall profit to a private entity for access to a public good. Complaint ¶¶ 50, 51.

Since 2008, plaintiffs have paid out of pocket hundreds if not thousands of dollars more than they paid when the rates for the meters were under the City's control. Furthermore, these rates are determined by what is necessary to ensure the profitability of the CPM Agreement, not the cost or value of any service CPM is providing by collecting (and keeping) all the revenue. Complaint ¶ 51.

The unfair and excessive out of pocket cost imposed on consumers such as plaintiffs is both concrete and "particularized" in that it personally affects each plaintiff—and each Chicago motorist in the proposed Rule 23(b)(2) class. *See Spokeo v. Robins,* 578 U.S. 330, 339-40 (2016). The extra cost paid by plaintiffs to ensure this monopoly profit is required by the CPM Agreement, which CPM has vigorously enforced in litigation with the City. Though the City Council technically raises the rates to ensure this monopoly profit, it is only to comply with a contractual obligation owed to CPM, and enforced by CPM, and not

5

out of its own disinterested judgement or discretion. Complaint ¶¶ 18, 27-34. Otherwise, the City must pay CPM the loss of the profitability in CPM Agreement for the balance of the term. Such payments could easily reach billions more dollars, far beyond the City's means. The City's obligation is undisputed—CPM does not deny that the City has to reimburse CPM if the rate charged to plaintiffs does not continue to ensure the same full profitability of the CPM Agreement. The City is essentially a puppet, and CPM pulls the strings, rather than the other way around, at substantial cost in higher fares to plaintiffs and the proposed class.

The second type of injury is CPM's ability to inhibit regulation of the public streets. The CPM Agreement does not just remove the City's ability to reduce rates, but also its ability to remove meters to reduce congestion, to put in "drop off" zones, and to eliminate safety hazards in high crash areas. Complaint ¶ 27. In every other city, except Chicago— even in New York—motorists have the benefit of a metered parking system that is supervised by the city, and designed to serve the public interest, not a monopoly interest. Plaintiffs suffer injury from the constraints on active supervision of the public streets and ways for their safety and convenience.

Plaintiffs have standing to redress this injury, to restore active supervision over the public streets for the public safety and convenience, a right recognized by the Court in both *Parker* and *Midcal. See supra* at 1. Plaintiffs have standing to seek to restore such regulatory oversight whether or not it relieves every grievance they may have. *See Massachusetts v. EPA,* 549 U.S. 497, 521-525 (2007) (plaintiffs had standing to challenge EPA's refusal to regulate CO-2 emissions). Just as the Court held in *EPA*, plaintiffs have standing to restore

6

the City's authority over the streets and public ways, for safety, traffic management, and other public purposes, free of contractual restrictions by CPM.

The third type of injury is the long-term harm to plaintiffs from locking in auto dependency—especially as other cities move to decrease such dependency. Complaint ¶ 31. First of all, this is an economic injury. Plaintiffs incur large costs for this auto dependency in paying off loans, paying for car insurance, buying gas, repairing the cars, and using the meters. The CPM Agreement effectively requires 36,000 parking spaces to be in place for most of this century. Plaintiffs suffer economic injury to the extent the CPM Agreement inhibits the use of public streets for other options that would require either less use of their cars, or even to give up car ownership. *Id*.

CPM argues that the CPM Agreement does not inhibit bike use, but this is simply not true, and plaintiffs intend to present specific instances—including the City's reluctance to put in bike lanes along Milwaukee Avenue, unless meters being removed could be relocated elsewhere. CPM argues that there is no certainty that the City would provide more bike and bus lanes. Plaintiffs, however, are not required to show that the City will do everything they want; they are only required to show that the City's power to "actively regulate" needs to be restored. *See EPA, supra*. Aside from the tangible cost in the high meter rates, plaintiffs suffer an intangible injury from the loss of the active supervision that *Parker* and *Midcal* require. As the Court has held, Congress can raise an intangible injury to a legally cognizable interest that would not otherwise meet the Article III standard of a case or controversy. *Spokeo*, 578 U.S. at 341-42.

The purpose of antitrust law is to ensure competition, which has now been recognized by federal courts to include innovation. *United States v. Anthem*, 855 F.3d 345,

361 (D.C. Cir. 2017). The CPM Agreement precludes innovation in moving people through the city in new and environmentally sustainable ways. It constrains the City from meeting consumer preferences for alternatives to cars, or car use, not just now, but for another half century. The significant innovation that will happen in other cities will be impossible here so long as the City of Chicago is contractually obligated to ensure CPM's profitability by clogging the streets with parked cars. Plaintiffs are entitled to put on expert testimony that will establish the harm that a 75-year agreement of this kind has to innovation. At the very least, in a time of rapid change in this area, no agreement should bind the City for 75 years, without any opportunity to rebid or adjust it. This is the very type of agreement that caused the Supreme Court to create the two *Midcal* conditions in the first instance.

**B.    The Injury Plaintiffs Actually Assert Is Traceable to CPM.**

All three types of injury alleged here are traceable directly to the CPM Agreement. It is because of the CPM Agreement that plaintiffs pay double the rates that existed when the City was in control of setting rates. It is the reason plaintiffs pay the higher meter rates than any other city of comparable sized. Plaintiffs have lost the benefit of active regulation of the streets and public ways because of the CPM Agreement. While the City may have retained some limited regulation, the right to such regulation is extraordinarily costly, even in its highly limited form. The City currently pays $27 million a year for just modest regulatory acts.

In cases like *Midcal* where the Court has denied *Parker* immunity, the private parties are not in *total* control but just have a role in the regulatory decision-making process. To be actionable under *Midcal,* the private monopolist need not be in total control, but a partner, as in a joint venture, and stand to profit from its role in the regulatory

process. In this case, however, with respect to rate setting, CPM is effectively in total control, as the City simply cannot afford the cost of paying CPM to raise or lower the rate that Plaintiffs and other class members have to pay. CPM is not acting in the interest of the public in exercising its power over regulatory decisions.

     **C.**     **The Injury Plaintiffs Assert Is Redressable by Terminating or Reforming the CPM Agreement to Permit Active Regulation by the City Over Its Meter System, Streets, and Police Practices.**

For purpose of injunctive relief under Sherman Act Section 16, all three types of injury can be redressed prospectively by terminating or reforming the CPM Agreement to restore the regulatory authority of the City over the parking meter system. Section 16 allows prospective relief—which is the only relief that Plaintiffs seek in this action. The way to redress the existing and prospective forms of injury described here is to end the CPM Agreement—now—and restore the City's active regulation or supervision of the streets. Plaintiffs seek nothing more than the traditional antitrust remedy—removing a 75-year barrier to active regulation and to competition with CPM from rivals that will offer better terms for the City and consumers.

## II.    PLAINTIFFS HAVE PROPERLY ASSERTED AN ANTITRUST INJURY.

From the very early underpinnings of antitrust law, the Supreme Court and lower federal courts have used the words "antitrust injury" to mean not just an injury that one competitor imposes on another, but also injury to competition itself, that is, an injury felt by consumers. *See, e.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977), *citing Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). "An antitrust plaintiff must prove that the challenged conduct affected the prices, quantity or *quality* of goods and services, not just his own welfare." *Tunis Brothers Co. v. Ford Motor Co.* 952

9

F.2d 715, 728 (3d Cir. 1991). Aside from harm to price, quantity, and quality, it also includes conduct that may harm innovation for consumers' benefit. *Anthem,* 855 F.3d at 361.

CPM's cited authorities are simply not on point because it primarily relies on cases that involve injury to competitors, not to consumers. For example, in *Brunswick Corp. v. Pueblo Bowl-O-Mat,* the Court held that Brunswick's attempt to displace Pueblo's contract did not constitute an "antitrust injury" because there would be the same effect on competition no matter which competitor had the contract. 370 U.S. at 489. Here, however, Plaintiffs are seeking to invalidate a contract itself. They are challenging the barriers on re-bidding the contract and the barriers on regulation of a private monopoly. They are seeking more competition with rivals that offer better terms and that allow resumption of active regulation by the City over the public streets and curb space.

CPM asserts that antitrust injury is limited to actions that raise price or reduce output. That is not true—antitrust injury includes actions that harm quality or restrict innovation, as in this case. Even if CPM were correct, however, plaintiffs do, in fact, also challenge the increase in fares and the maintenance of fares at rates set not *by competition* but solely to ensure the profitability—indeed, extraordinary profitability—of the CPM contract. The fares have no relation to cost. Rather they reflect a one-sided deal for $1.1 billion which the City believed it needed in 2008 to close a short-term budget gap.

CPM's only response is to deny it is forcing the City to raise the rates. In Plaintiff's view, CPM's position is not only manifestly untrue, but in any event, it is certainly an issue that has to be discovered, not resolved on a motion to dismiss.

Plaintiffs also challenge the CPM Agreement for reducing the quantity of meters and reasonable substitutes for metered parking. Indeed, CPM says that the relevant

10

product market includes bike lanes, public transit, and garage use, but the CPM Agreement directly or indirectly limits the quantity of such rival substitutes. On the one hand, CPM cites bike lanes, ride sharing, public transit, and garage use as alternatives to use of its meters, but CPM also ignores the fact that the CPM Agreement restricts the availability of these substitutes. Plaintiffs will show, for example, in the case of bike lanes on Milwaukee Avenue, how difficult it is for the City to provide truly safe bike lanes because of restrictions in the CPM Agreement.

The restraints on substitutes are also explicit in the CPM Agreement itself. This is notably true in CPM Agreement Section 3.2. See Complaint ¶ 23. The CPM Agreement prohibits the City parking garages or garages on City land from undercutting the rates that CPM charges in the Loop. Furthermore, no rival can put up a competing vending machine and offer to rent the same curb space on better terms than CPM, or even introduce new meters on blocks without them if it undercuts the profitability of CPM's monopoly.

By analogy to *Brunswick* and other cases, CPM claims there is no "antitrust injury" because "the lawful transfer of the metered parking system through an open bidding process does not constitute anticompetitive conduct." Motion at 13. But this begs the question of whether the transfer of a public monopoly to a private party as set out in the CPM Agreement is legal in the first place. *Parker* immunity is lost when there is a transfer of *public* control to *private* control, for 75 years, with all rival competitors excluded during that 75-year period, *even if* the initial open bidding process was a fair one. In other words, such a transfer of an exclusive government monopoly to a private party violates the Sherman Act when there is: (1) an exclusion of rival competitors for 75 years, and (2) a private contractual restraint on the City's "active regulation" of the public streets.

11

That constraint on the Reserved Powers is set out expressly in CPM Agreement Section 14.3 and other provisions.

Moreover, the restraint on competitive bidding or active supervision for 75 years distinguishes this case from others like *Atlantic Richfield Co. v. USA Petroleum,* 495 U.S. 328 (1990), which involve exclusive dealing contacts between *private parties* for *reasonable periods*. The exclusive contracts in those cases are not transfers of government-created monopolies to private parties that restrict by contract what the government may do. Plaintiffs are not challenging the principle of the City's right to transfer day-to-day management of its parking system through an open bidding process. Rather, they are challenging a contract that locks in a doubled rate and eliminates active supervision.

III.    **PART 1 – THE STATE IMMUNITY DOCTRINE, ALSO REFERRED TO AS *PARKER* EXEMPTION, IS NOT APPLICABLE TO PLAINTIFFS' CLAIMS.**

CPM makes just a cursory attempt to claim that its Agreement fits within the *Parker* exemption, and as already explained in the Introduction above at 1-2, the *Parker* exemption permits State-sanctioned, private-party monopolies only when the two specific *Midcal* conditions are met.

As to the first condition, again as noted in the Introduction, CPM is just wrong that the Illinois Municipal Code, 65 ILCS 5/11-71-1 (codified as "Division 71. Off-Street Parking"), authorizes the CPM Agreement as state policy, let alone "clearly and affirmatively" authorize it. Subparagraph (a) states only that the City may "acquire by purchase" or otherwise own, operate *and* manage "parking meters and other revenue producing facilities" as "necessary or incidental to the regulation, control and parking of motor vehicles," "as the corporate authorities may from time to time find the necessity therefor exists . . . ." 65 ILCS 5/11-71-1(a). The only "purpose" it authorizes is the purchase,

12

ownership, and construction of property. Nothing in this subsection authorizes the sale of the entire meter system for profiteering by a private entity. Subparagraph (a) of the Municipal Code presumes that the City will at all times own and operate the parking meters on public streets. *Id.*

Meanwhile, subparagraph (c) does allow for contracts between the municipality and private parties to carry out the purposes of subparagraph (a), but the only exception to ownership subparagraph (c) permits is the "leasing" of rights "for advertising purposes." Furthermore, the City retains control under subparagraph (c) even of these advertising contracts. 'All revenues derived from any such contract shall be used *exclusively* for traffic regulation and maintenance of streets within the municipality." *Id.* at (c).

In addition to the lack of any clear and affirmative public policy in support of the CPM Agreement, it also fails to maintain the active supervision which is the second condition for *Parker* immunity. Plaintiffs have alleged in detail how the CPM Agreement precludes such "active supervision" of the rates, location, and number of meters. Complaint ¶¶ 26-34. Therefore, even if state law did expressly authorize giving up active supervision of the monopoly, it would still not comply with *Midcal* to obtain *Parker* immunity. That distinguishes this case from those like *Active Disposal Inc. v. City of Darien,* 635 F.3d 328 (7th Cir. 2011), which dealt only with the narrow question of state authorization and not whether the *Midcal* conditions were met.

Moreover, the City simply canceled the CPM Agreement, it would incur a penalty in the tens of billions of dollars, and if attempted to lower rates across the board, it would incur another staggering liability. Even for modest act of meter removal the City is paying up to $27 million a year. Complaint ¶¶ 33. Worse still, the City is deterred from even

attempting to use its reserved powers to remove parking meters because of the complicated and expensive procedures that the CPM Agreement imposes on the City for such removals, which also make it virtually impossible for the City to calculate in advance the true cost of such removal, particularly if CPM presses beyond the current payments agreed to and insists on demanding the maximum amount litigation might generate. Complaint ¶ 34.

The CPM Agreement violates both *Midcal* conditions for *Parker* immunity, and CPM's motion should be denied on the ground of Parker immunity as well.

## III.  PART 2 – PLAINTIFFS ALLEGE ALL REQUIRED ELEMENTS OF A SHERMAN ACT CLAIM.

CPM's Section III actually covers two different issues: (1) Parker Immunity, and (2) the elements of a Sherman Act Claim. This Section III in response is a continuation of the earlier Section III and now addresses the Sherman Act elements.

### A.  Plaintiffs Sufficiently Allege Monopoly Power.

This topic has already been extensively discussed above and will not be repeated here other than to reiterate that CPM's reliance on the Supreme Court's opinion in *Brunswick* is misplaced for the reasons stated *supra*, at 9-11.

### B.  Plaintiffs Sufficiently Allege an Unreasonable Restraint of Trade.

No court has ever upheld an exclusive dealing agreement of 75 years that excludes all competition in the relevant market. CPM claims that exclusive dealing agreements "typically have procompetitive effects, such as reduced costs and stable long-term supply." Motion at 17. While that may be so in some supply contracts, the CPM Agreement is quite different. The CPM Agreement *increases* costs to the City if it regulates the meter system in a way that impairs the profitability of the CPM Agreement. There is no "procompetitive" effect in securing "supply." There is no need for securing the "supply" of meters that

14

function as credit card machines for collecting the bloated parking rates CPM charges Plaintiffs and other class members.

CPM objects that Plaintiffs have not described the share of the market that is "foreclosed." Plaintiffs have previously described what portion of the relevant market is foreclosed—namely, *all of the metered parking*, for which there is only limited substitutability. Complaint ¶¶ 13-16. Indeed, the City itself is foreclosed from competing with CPM, with sixty years to run. As noted above, Section 3.2 of the CPM Agreement restrains price competition with CPM from off street parking owned by the City or on land owned by the City. Complaint ¶ 23. Under a rule of reason there is no "procompetitive" justification for a 75-year indenture that creates parking rates higher than in other comparable cities and limits the ability of the City to control the entire Parking Meter System.

**C.    Plaintiffs Allege a Monopoly in a Plausibly Defined Product Market, for a Product Plaintiffs Have No Alternative to Purchasing on a Regular Basis.**

Plaintiffs describe the relevant product market in detail. Complaint ¶¶ 35-40. Contrary to CPM's claim, this is not a "passing reference," Motion at 19, but rather, the relevant product market is repeatedly reiterated throughout the Complaint. See ¶¶ 1, 2, 4,13, 14, 35-40. It is the Metered Parking System described in the CPM Agreement, the 37,000 meters in place at the time the CPM Agreement was entered. Complaint ¶¶ 35. Both formally and in substance, it is the metered parking system in the commercial and business areas in a certain geographic area, namely, the City of Chicago.

It is well settled that the key to determining whether a defendant has a monopoly in a product market is the extent there is interchangeability or cross elasticity of demand for

the defendant's product. *Brown Shoe, supra,* at 325. The test is substitutability, as set forth in the 2010 Justice Department and Federal Trade Commission guidelines for Horizontal Mergers. Complaint ¶¶ 36. CPM agrees that substitutability is the relevant test. Motion at 18. Plaintiffs allege as a fact (both self-evident and also provable at trial) that "in the ordinary use of their cars have no meaningful alternative or ability to substitute for (a) regular or repeated use of parking provided by CPM or (b) use of the Metered Parking System for trips to and from the commercial and business areas where the meters in the Metered Parking System are located." Complaint ¶ 37. Of course, as that Complaint paragraph makes clear, the relevant geographic market is the City of Chicago, the market in which CPM has exclusive control of the Metered Parking System.

Parking in Evanston is not an option for an errand in Chicago. "No alternative" means no alternative. In one of the cases cited by CPM, *Ass'n of Am. Physicians & Surgeons v. Am. Bd. Of Med. Specialties*, 2020 WL 5642941 (N.D. Ill. 2020), it may be possible for patients to find good medical care without ever having to use physicians in a particular area. In fact, however—and it is a fact—people who use cars cannot avoid using the parking metered system unless they give up using their cars for the purposes that plaintiffs own them, namely, for getting around the City in which they live. Of course, not every car use will require parking at a meter; in particular cases, often by luck or the location of a business, there may be a garage or off-street parking available. But a monopoly in a relevant product market exists when periodically or on a regular or repeated basis the ordinary use of a car for the purposes that people have cars require parking at a meter. CPM, after all, is now in charge of collecting all the rent from the *public curb space*

set aside for rental. Furthermore, CPM restricts the ability to substitute, as in the case of restricting City-owned garages, from competing with CPM on price. Complaint ¶ 23.

Even more substantially as set forth in the Complaint, CPM restricts alternative forms of transportation that might affect the value of its 75-year agreement. While plaintiffs can take public transportation and use bikes in certain limited circumstances, there is no interchangeability of these options in their current limited forms with use of the parking meter system. Furthermore, the Agreement actually restricts the City from removal of meters to expand the availability, reliability, and safety of such alternative options to use of motor vehicles.

While CPM makes a vague reference to bikes and buses, its Motion does not attempt to describe plausibly how there is a real-world alternative to parking meters for regular and periodic use by local car owners in the City of Chicago. Nor is it plausible that people who already own and pay for cars should engage in the additional expense of ride sharing for short trips within the city of Chicago. Consistent with criteria set out in the 2010 Justice Department and Federal Trade Commission Guidelines for Horizontal Mergers, plaintiffs have alleged at this pleading stage monopoly power in a well-defined product market, and its motion on this ground should be denied.

## IV.  PLAINTIFFS STATE A CLAIM UNDER THE ILLINOIS CONSUMER FRAUD ACT ("ICFA").

In Count III, Plaintiffs state a claim under the ICFA, not for active fraud or deception, but for an "unfair trade practice." In *Robinson v. Toyota*, 775 N.E. 2d 951, 960-61 (Ill. 2002), the Illinois Supreme Court set out three factors for determining whether a practice is unfair. The Court made clear, however, that just one factor alone can suffice to

state a claim, and further, that if all three are established, they may be established to a lesser degree. *See Id*. at 961. Here, Plaintiffs have stated a claim under all three criteria.

**A.     Plaintiffs Meet Each of the Three Unfairness Factors of an "Unfair Trade Practice."**

Plaintiff have sufficiently alleged each of the three unfairness factors that the Illinois Supreme Court set out in *Robinson*.

First, the CPM Agreement "offends public policy." *Robinson*, 775 N.E. 2d at 960. The *de facto* sale or creation of a private property interest in the parking meter system is in conflict with public policy, not just in conflict with Illinois' own antitrust law, but also as expressed in the Municipal Code, 65 ILCS 5/11-71-1. In the latter case, 65 ILCS 5/11-71-1 applicable to parking meters is intended only to give municipalities the authority that is "necessary or incidental" for its own exercise of its ownership rights—not to give those rights away. Moreover, regardless of whether 65 ILCS 5/11-71-1 constitutes an outright prohibition to any sale or lease that gives up the City's right to 75 years of parking meter revenue, the CPM Agreement certainly "offends" the public policy set out there. Worse than being an illegal long-term lease or de facto sale, it was turned over by the City with no possibility of determining the approximate total loss of revenue to the City over the 75 years that the CPM Agreement runs.

Second, the continuation of the CPM Agreement at this point is "immoral, unethical and unscrupulous." *Robinson*, 775 N.E. 2d at 960. CPM has already recovered its entire original investment, plus an additional $500 million, as of last year. By end of the 75-year lease, in return for the original $1.1 billion, CPM will have received billions upon billions of dollars, far beyond any reasonable return on its investment. It is not the City but consumers who will pay nearly all of that money, completely out of line with the cost to

CPM. None of those billions from the meters will go to the City, or for the upkeep of the public streets, or any public purpose but solely for the enrichment of CPM. To continue this kind of one-sided profiteering for 75 years is "unscrupulous," especially when Plaintiffs have no alternative but to keep using CPM's Metered Parking System to keep inflating the windfall to CPM.

Finally, the CPM Agreement "substantially injures consumers." *Id* at 960. Each plaintiff and class member will pay the hundreds or thousands of dollars in the increased fares required for the next 60 years under the CPM Agreement. "Substantial injury" under ICFA is determined not by the harm to any individual consumer but to the aggregate harm that has been or will be inflicted on the entire consumer class. *See Centerline Equipment Corporation v. Banner Personnel Service,* 545 F. Supp. 2d 768, 780 (N.D. Ill 2008) (finding substantial harm was sufficiently alleged where unsolicited faxes to at least forty people imposed costs by wasting paper and toner, wearing down fax machines, and consuming employee time); *Messina v. Green Tree Service, LLC,* 210 F. Supp. 3d 992, 1005 (N.D. Ill. 2016) (applying ICFA to defendant's conduct if it "has the potential to cause injury to a large number of consumers, even if [plaintiff] may only be able to prove nominal economic harm to herself"); *G.M. Sign Inc. v. Stergo,* 681 F. Supp. 2d 929, 936 (N.D. Ill. 2009)("very small individual harms may be considered substantial if they are part of a practice that in the aggregate, causes substantial losses to the public as a whole")(internal citations of quotes omitted). Plaintiffs have sufficiently pled unfairness.

### B. Plaintiffs Have Alleged Pecuniary Loss.

As described above, plaintiffs are forced to pay meter rates higher than consumers do in any comparable city in the country. Under the CPM Agreement, they will be required to

do so for 60 years, without regard to change in circumstances, no matter how excessive and inflated these rates may be. As already described, plaintiff have alleged a hard dollar economic loss that is concrete and particular to each of them and every class member. They meet the pecuniary loss requirement of ICFA, 815 ILCS 505/10a. And, as already stated above, even a minute economic injury is sufficient for standing under the ICFA. *See Centerline Equipment, supra,* at 768; *Messina. supra,* at 1005.

### C. The "Benefit-of-the-Bargain" Principle From *Canasta* and *Kim* is Inapplicable

CPM nevertheless denies that Plaintiffs have suffered a true pecuniary loss because they received the "benefit of the bargain," *citing Canasta v. Joseph Bank Clothiers* 761 F.3d 732 (7th Cir. 2014) (dismissing claim that defendant's use of the term "sale price" was deceptive) and *Kim v. Carter's Inc.,* 598 F.3d 362, 365 (7th Cir. 2010) (same).

First of all, both *Canasta* and *Kim* involved claims of deception, not an unfair trade practice under *Robinson*. Indeed, throughout its entire brief, CPM extensively relies on *deceptive* trade practice cases to rebut Plaintiffs' claim of an "unfair trade practice," which of course requires no proof of deception. Plaintiffs are not claiming they were misled by a "sale price" at CPM's parking meters. Rather, Plaintiffs' claim is that continuation of the CPM Agreement "offends public policy," is "unscrupulous" profiteering, and will inflict a "substantial injury" in the aggregate on the class as a whole. *See Robinson,* 960. Plaintiffs do claim that they have paid CPM billions of dollars more than the "actual value" of CPM's investment, and incalculably beyond the cost to maintain the meters. The principal point is that CPM has a monopoly of a public good with a price fixed by CPM's Agreement with the City and having no reference to the value that is provided to consumers. The "benefit-of-

20

the-bargain" principle and the two Seventh Circuit cases on which CPM relies are wholly inapplicable.

### D. The Voluntary Payment Doctrine Is Inapplicable.

CPM's final argument is that plaintiffs paid "voluntarily," and that in order for the ICFA to apply, there must be an element of "compulsion." Motion at 14. CPM's reliance on the "voluntary payment" doctrine, a common law defense that still exists in Illinois, is not applicable here. First, the sole case cited by CPM, *McIntosh v. Walgreens Boots Alliance,* 2019 IL 12326, involved a tax on bottled water and is readily distinguishable. As the Illinois Supreme Court pointed out in *McIntosh,* bottled water at Walgreen's is not a product anyone *must* buy. In contrast, as Plaintiffs allege in their Complaint, they have no alternative but to use CPM's meters—and pay CPM's exorbitant rates— on a regular basis. Complaint ¶ 3. Second, *McIntosh* did not apply to an ICFA claim under *Robinson*, and to the best of our knowledge, no court has ever applied the voluntary payment doctrine to an unfair trade practice claim under *Robinson.* Finally, the voluntary payment doctrine is both
(a) an affirmative defense; and (b) only applicable when plaintiffs are seeking a refund, *see Alvarez v. Pappas*, 229 Ill. 2d 217, 221 (2008), which of course Plaintiffs are not doing here.

CPM's motion to dismiss Plaintiffs' ICFA claim should be denied.

## V. *LACHES* IS WHOLLY INAPPICABLE IN THIS CASE, AND, IN ANY EVENT, NOT PROPER ON A MOTION TO DISMISS.

CPM's *laches* defense is without merit because Plaintiffs' filing for injunctive relief was not unreasonably delayed, and, in any event, CPM has not been unfairly prejudiced by the filing of the action at this time.

First, plaintiffs are not seeking any retroactive monetary relief. There are no damages claimed in this case *at all*. Under Section 16 of the Sherman Act, Plaintiffs are

seeking only prospective injunctive relief to bar the continuation of the CPM Agreement—which has 60 years to run and has already run too long.

Second, this filing for prospective relief is not unreasonably delayed. To the contrary, it is an appropriate time to challenge an exclusive dealing agreement which has already continued long enough and still has 60 years to go. It is precisely the time for the agreement with an unreasonable 75-year term either to be cancelled in its entirety or reformed to comply with the *Midcal* conditions for *Parker* immunity.

Third, contrary to CPM's argument, plaintiffs do not complain of events that "*transpired*" in 2008 or 2013, Motion at 22, and therefore, neither the statute of limitations, nor *laches*, have run. Under the "continuing violation" doctrine, a new antitrust injury arises each time Plaintiffs and other members of the proposed Rule 23(b)(2) class are required to pay into the meters at the unlawful rate the CPM Agreement not only permits, but indeed, requires. Antitrust law's "continuing violation" doctrine has been well settled in federal courts even before the seminal case of *Hanover Shoe v. U.S. Shoe Mfg.,* 392 U.S. 481 (1968) made unambiguous that neither the statute of limitations nor *laches* is to be applied to a continuing violation. *Id. at* 502 n.15. As the Supreme Court stated in *Hanover Shoe*, "[W]e are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on [Plaintiff]. Although [Plaintiff] could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955." *Id*. This exact holding applies equally here. *See also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997) ("Antitrust law provides that, in the case of a 'continuing violation,' . . . 'each overt act that is part of the violation and

that injures the plaintiff . . . starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times").

Fourth, CPM compounds its error in ignoring the continuing violation doctrine by repeatedly citing to cases that address claims under Section 7 of the Clayton Act and not claims under Sections 1 and 2 of the Sherman Act. Throughout its *laches* argument, CPM points to several inapplicable Clayton Act cases that involve a national or international business that sleeps on its rights in the face of a monopolistic merger or other action *by a competitor*. The case law makes clear why the Clayton Act cases are not analogous.[1]

Finally, *laches* is an affirmative, fact-based defense, which CPM has the burden to prove and which our courts have repeatedly held should not be resolved on a motion to dismiss. Even if it could be considered on a motion to dismiss—before any discovery on CPM's purported equitable damages—CPM has not met, and cannot meet, its burden of proving either *laches* element in its Motion.

### A. The Antitrust Violation Plaintiffs Assert Is a *Continuing* Violation, and Therefore *Laches* Runs From the Most Recent Violation.

Plaintiffs have properly pled that Defendants' violation of the antitrust laws is a continuing violation. Complaint ¶ 56 ("In violation of Sherman Act Section 2 . . . defendant

---

[1] For an explanation of why dismissals of Clayton Act merger and acquisition claims based on the statute of limitations are generally inapplicable to Sherman Act claims that implicate continuing violations, the Court should return to one of its own relatively recent opinions, *Shuffle Tech Int'l, LLC v. Sci. Games Corp.*, No. 15 C 3702, 2015 WL 5934834, at *13–14 (N.D. Ill. Oct. 12, 2015), in which the Court especially noted that unlike Sherman Act claims, in Clayton Act merger claims, "[e]ven if the merger itself was unlawful, the continued existence of the merged entity is not a continuing violation." *Id*. at 13-14, quoting *Midwestern Machine Co. v. Northwest Airlines, Inc.,* 392 F.3d 265, 271 (8th Cir. 2004) and citing *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598–99, 605 (6th Cir. 2014). While Plaintiffs concede that *Shuffle Tech* is distinguishable from this case in several ways, nevertheless, the Court's discussion of the Clayton Act / Sherman Act distinction in *Shuffle Tech* is all that is needed to understand why CPM's repeated reliance on Clayton Act merger cases is inapposite to this case and generally not supportive of its *laches* argument.

CPM has . . . caused continuing economic injury to plaintiffs and other members of the proposed class."). Plaintiffs suffer a new economic injury each time they are required by circumstance to pay into one CPM's parking meters, and the four-year statute of limitations runs anew. As noted above, the "continuing violation" doctrine is well settled in the federal courts and unquestionably applies here.[2]

### B. *Laches* Is an Affirmative Defense and Therefore Not a Ground for 12(b)(6) Dismissal, and Even if It Were, CPM Has Not Met Its Burden to Prove Its Affirmative Defense.

*Laches* is an affirmative defense, which *must be proven by the Defendant. Jeffries v. Chi. Transit Auth.*, 770 F.2d 676, 679 (7th Cir. 1985); *Nat'l Found. for Special Needs Integrity, Inc. v. Reese*, No. 115CV00545TWPDKL, 2016 WL 454805, at *3 (S.D. Ind. Feb. 5, 2016) (and cases cited). The Seventh Circuit has specifically and repeatedly held that a district court should not address a defendant's affirmative defense on a motion to dismiss. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (and cases cited). Indeed, the Seventh Circuit has held more specifically that *laches* is not a proper basis to dismiss a plaintiff's Complaint. *See Topping v. Fry*, 147 F.2d 715, 718 (7th Cir. 1945); *Jeffries*, 770 F.2d at 679 ("[the *laches* elements of] delay and prejudice are factual issues"). See also

---

[2]     The district court's opinion in *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614 (N.D. Ill. 2015), incorrectly characterized by CPM at page 23 of its Motion, is not to the contrary. Although CPM asserts that the court held that "plaintiff's equitable claims were time-barred, notwithstanding continued performance under the challenged restraints," Motion at 23, citing *Alarm* at 632-34, that is not what the court held *at all*. The Court actually held at pages 632-34 that plaintiff's Sherman Act *damages* claims were barred *by the statute of limitations*. The words "equitable claim(s)" do not appear anywhere in the opinion. The word "laches" also does not appear anywhere in the body of the opinion, although in footnote 7 Judge Durkin actually *rejects* one of defendant's laches argument (interestingly, on the ground that plaintiff did *not* plead itself out of the complaint) and then in footnote 10, Judge Durkin states he need not and will not reach Defendants' *laches* arguments on the declaratory judgment counts (all of which were legal claims) because he had already dismissed those counts on statute of limitations grounds. *Id*. at 631 n.7, 634 n.10.

*Sherman v. Standard Rate Data Serv., Inc.*, 709 F. Supp. 1433, 1441 & n. 9 (N.D. Ill. 1989) ("laches is a factual question which generally is not subject to resolution at the summary judgment stage let alone the pleadings stage").

CPM appears to argue that there is an exception to this clear bar when plaintiffs "plead themselves out of court" by admitting facts that support its claim of *laches*. But CPM does not point to any admission which establishes either of the two conditions for *laches,* namely, "unreasonable delay" and "material prejudice." For prospective injunctive relief to stop the full running of a 75-year term, there has been neither "unreasonable delay" or "material prejudice." Plaintiffs have filed an action alleging that that the continuation of the CPM Agreement is "unreasonable" at least from this point forward. That being so, this is just the time for the action to be filed. Second, as noted above plaintiffs seek only prospective relief, not damages. It is unclear how CPM is damaged by an action not seeking damages but only prospective relief.

There is simply no factual basis for a *laches* claim, and even if there were, there is no basis to consider it on a motion to dismiss at the pleading stage before any discovery of facts. The *laches* portion of CPM's motion should also be denied.

## CONCLUSION

Plaintiffs respectfully request this Court to deny CPM's motion to dismiss.

Respectfully submitted,

*Plaintiffs Micah Uetricht and John Kaderbek*

Thomas H. Geoghegan
Michael P. Persoon
Will Bloom
DESPRES, SCHWARTZ & GEOGHEGAN, LTD.
77 W. Washington St., Ste. 711
Chicago, Illinois 60602
(312) 372-7391
tgeoghegan@dsgchicago.com

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN
7373 N. Lincoln Ave.
Suite 100
Lincolnwood, IL 60712
(847) 469-4669
stuart@chanenolstein.com